# 24-1465

# United States Court of Appeals
### *for the*
# Fourth Circuit

SUSAN SCHARPF and ANTHONY D'ARMIENTO,
on behalf of themselves and all others similarly situated,

*Plaintiffs/Appellants*,

— v. —

GENERAL DYNAMICS CORP.; BATH IRON WORKS CORP.; ELECTRIC
BOAT CORP.; GENERAL DYNAMICS INFORMATION TECHNOLOGY,
INC.; HUNTINGTON INGALLS INDUSTRIES, INC.; NEWPORT NEWS
SHIPBUILDING AND DRY DOCK CO.; INGALLS SHIPBULIDING, INC.;
HII MISSION TECHNOLOGIES CORP.; HII FLEET SUPPORT GROUP LLC;
MARINETTE MARINE CORPORATION; BOLLINGER SHIPYARDS, LLC;
GIBBS & COX, INC.; SERCO, INC.; CACI INTERNATIONAL, INC.;
THE COLUMBIA GROUP, INC.; THOR SOLUTIONS, LLC;
TRIDENTIS, LLC; FASTSTREAM RECRUITMENT LTD,

*Defendants/Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

## BRIEF OF APPELLANTS

*Counsel for Plaintiffs-Appellants listed on the Following Page*

CP COUNSEL PRESS   (800) 4-APPEAL • (116961)

Brent W. Johnson
Steven J. Toll
Robert W. Cobbs
Alison S. Deich
Zachary R. Glubiak
Sabrina S. Merold
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
(202) 408-4600

Shana E. Scarlett
Rio S. Pierce
Sarah Dupree
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292

Kevin K. Green
HAGENS BERMAN SOBOL SHAPIRO LLP
533 F Street, Suite 207
San Diego, CA 92101
(619) 929-3340

Elaine T. Byszewski
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150

George F. Farah
Nicholas Jackson
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
(212) 477-8090

Simon Wiener
HANDLEY FARAH & ANDERSON PLLC
68 Harrison Avenue, Suite 604
Boston, MA 02111
(202) 921-4567

*Counsel for Plaintiffs-Appellants*

Candice J. Enders
Julia R. McGrath
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000

Brian D. Clark
Stephen J. Teti
Arielle S. Wagner
Eura Chang
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South,
    Suite 2200
Minneapolis, MN 55401
(612) 339-6900

*Additional Counsel for Plaintiffs-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>24-1465</u>      Caption: <u>Susan Scharpf et al. v. General Dynamics Corporation et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Susan Scharpf</u>
(name of party/amicus)

_____

who is _____<u>Appellant</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                          ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert W. Cobbs                    Date:    6/5/2024

Counsel for: Susan Scharpf

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1465__          Caption: __Susan Scharpf et al. v. General Dynamics Corporation et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Anthony D'Armiento__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:



3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert W. Cobbs        Date: 6/5/2024

Counsel for: Anthony D'Armiento

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................. 1

JURISDICTIONAL STATEMENT .................................................................... 5

STATEMENT OF ISSUES ............................................................................... 5

STATEMENT OF THE CASE........................................................................... 6

    I.    Defendants Unlawfully Conspired Not to "Poach" Each
           Other's Naval Engineers and Acted to Prevent Discovery of
           the Conspiracy ........................................................................... 6

    II.   Misreading Fourth Circuit Precedent, the District Court
           Dismissed Plaintiffs' Case for Purported Failure to Allege
           "Affirmative Acts" of Concealment........................................ 8

SUMMARY OF ARGUMENT ......................................................................... 10

STANDARD OF REVIEW ............................................................................. 14

ARGUMENT ................................................................................................... 14

    I.    The District Court Erred in Holding Plaintiffs Had Not
           Sufficiently Alleged Affirmative Acts of Concealment ................ 14

           A.    Plaintiffs' Allegations Satisfy the Affirmative Acts
                   Standard ....................................................................... 15

           B.    The District Court Effectively Applied the Rejected
                   "Separate and Apart" Standard .................................... 19

           C.    The District Court Erred In Holding Plaintiffs'
                   Allegations Were Mere "Fail[ures] To Own Up To
                   Illegal Conduct" ........................................................ 28

                1.    *Pocahontas* ..................................................... 30

                2.    *Boland/Robertson* ......................................... 34

    II.   The District Court Erred in Its Consideration of Sham
           Provisions in Teaming Agreements .................................... 40

A.    The District Court Improperly Rejected Plaintiffs' Allegations and Drew Inferences Against Them ...................... 41

B.    The District Court Improperly Imposed a Reliance Requirement on the Affirmative Acts Test ............................... 45

III.    The Complaint Otherwise States a Claim on Which Relief Can Be Granted ..................................................................... 48

A.    Plaintiffs Adequately Alleged Each Element of Fraudulent Concealment ........................................... 48

B.    Plaintiffs State a Claim for Relief for Defendants' Antitrust Violations .................................................. 51

IV.    The District Court Erred in Not Permitting Leave to Amend ............. 52

CONCLUSION .......................................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
  483 U.S. 143 (1987) ............................................................. 28

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) ............................................. 52

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................. 14

*Bailey v. Glover*,
  88 U.S. 342 (1874) ............................................................... 5

*Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*,
  522 U.S. 192 (1997) ............................................................. 28

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................. 52

*Boland v. Consol. Multiple Listing Serv., Inc*,
  868 F. Supp. 2d 506 (D. S.C. 2011) ............................. passim

*Brecht v. Abrahamson*,
  507 U.S. 619 (1993) ............................................................. 33

*Colo. ex rel. Woodard v. Western Paving Constr. Co.*,
  630 F. Supp. 206 (D. Colo. 1986) ..................................... 21

*Corder v. Antero Res. Corp.*,
  57 F.4th 384 (4th Cir. 2023) ............................................. 54

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
  144 S. Ct. 2440 (2024) ................................................. 27, 28

*Donaldson v. Primary Residential Mortg., Inc.*,
  2020 WL 3184089 (D. Md. 2020) ..................................... 51

*Edmonson v. Eagle Nat'l Bank*,
  922 F.3d 535 (4th Cir. 2019) ....................................... passim

*GO Computer, Inc. v. Microsoft Corp.*,
  508 F.3d 170 (4th Cir. 2007) ........................... 2, 33, 47, 50

*Hecht Co. v. Bowles*,
 321 U.S. 321 (1944) ......................................................................39

*Holmberg v. Ambrecht*,
 327 U.S. 392 (1946) ........................................................................2

*In re Animation Workers Antitrust Litig.*,
 123 F. Supp. 3d 1175 (N.D. Cal. 2015) ............................................17

*In re Copper Antitrust Litig.*,
 436 F.3d 782 (7th Cir. 2006) ...........................................................27

*In re High-Tech Emp. Antitrust Litig.*,
 2014 WL 3917126 (N.D. Cal. 2014) .................................................16

*Jien v. Perdue Farms, Inc.*,
 2020 WL 5544183 (D. Md. 2020) .....................................................15

*Matrix Cap. Mgmt. Fund, LP v. Bearingpoint, Inc.*,
 576 F.3d 172 (4th Cir. 2009) ...........................................................53

*Nasim v. Warden, Md. House of Corr.*,
 64 F.3d 951 (4th Cir. 1995) .............................................................27

*New York v. Hendrickson Bros.*,
 840 F.2d 1065 (2d Cir. 1988).........................................................20

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
 828 F.2d 211 (4th Cir. 1987) ................................................ *passim*

*Reid v. James Madison Univ.*,
 90 F.4th 311 (4th Cir. 2024) ...........................................................27

*Robertson v. Sea Pines Real Estate Cos.*,
 679 F.3d 278 (4th Cir. 2012) ............................... 3, 10, 35, 36, 52

*Rotkiske v. Klemm*,
 589 U.S. 8 (2019)............................................................................28

*SD3 LLC v. Black & Decker (U.S.) Inc.*,
 801 F.3d 412 (4th Cir. 2015) ...........................................................52

*SD3 II LLC v. Black & Decker (U.S.) Inc.*,
 888 F.3d 98 (4th Cir. 2018) ....................................................49, 50

*Seymour v. Freer*,
 8 Wall. 202 (1869) .........................................................................39

*Smith v. Reddy*,
    101 F.3d 351 (4th Cir. 1996) ............................................................52

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
    71 F.3d 119 (4th Cir. 1995) ........................................ *passim*

*TCF Nat'l Bank v. Market Intelligence, Inc.*,
    812 F.3d 701 (8th Cir. 2016) ............................................................26

*Texas v. Allan Constr. Co.*,
    851 F.2d 1526 (5th Cir. 1988) ................................................. 21, 23

*U.S. v. Gilbertson*,
    970 F.3d 939 (8th Cir. 2020) ............................................................16

*U.S. v. Pepe*,
    895 F.3d 679 (9th Cir. 2018) ............................................................33

*U.S. v. Philip Morris Inc.*,
    116 F. Supp. 2d 131 (D.D.C. 2000) ..............................................16

*Whiteside v. U.S.*,
    775 F.3d 180 (4th Cir. 2014) ............................................................25

*Zenith Radio Corp. v. Hazeltine Research*,
    401 U.S. 321 (1971) ............................................................................27

**Statutes & Other Authorities:**

15 U.S.C. § 15 ..............................................................................................28

15 U.S.C. § 15(a) ................................................................................. 5, 53

15 U.S.C. § 15b ...........................................................................................28

15 U.S.C. § 26 ..............................................................................................5

28 U.S.C. § 1291 .........................................................................................5

28 U.S.C. § 1331 .........................................................................................5

28 U.S.C. § 1337 .........................................................................................5

FED. R. CIV. P. 9 ........................................................................................35

FED. R. CIV. P. 12(b)(6) ..............................................................8, 14, 48

FED. R. CIV. P. 15(a)(2) ...........................................................................53

Lɪᴇ, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/lie (accessed June 18, 2024)..........................................32

Local Rule 34(a)............................................................................................54

**INTRODUCTION**

This case concerns a conspiracy to suppress wages and reduce mobility in the labor market for naval engineers—highly skilled technical professionals who design ships for the Navy and Coast Guard. For more than twenty years, while Plaintiffs and putative class members worked to ensure the safety and capability of U.S. ships, their employers maintained a secret anticompetitive agreement not to "poach" each other's engineers. The purpose and effect of this agreement was to suppress workers' compensation by restraining the open competition for talent that is the hallmark of healthy labor markets. No-poach agreements can suppress workers' compensation by thousands of dollars per year, compounded over the course of their careers. Such agreements are *per se* illegal under the antitrust laws.

An extensive pre-suit investigation identified *multiple independent witnesses* who directly confirmed the existence of Defendants' no-poach conspiracy. These witnesses also made clear that Defendants kept their conspiracy *secret* to avoid discovery by Plaintiffs, the putative class, and other potential antitrust enforcers. Former managers of Defendants' businesses described the no-poach pact as a "gentleman's agreement" that was explicitly "non-ink-to-paper" to avoid creation of documentary evidence. "They don't put that in writing," one witness explained. "You'd be hard pressed to find that in writing."

1

Antitrust suits have a four-year statute of limitations, but the statute may be tolled under the doctrine of fraudulent concealment that is "read into every federal statute of limitation." *Holmberg v. Ambrecht*, 327 U.S. 392, 397 (1946). When an antitrust violation "has been concealed . . . the statute does not begin to run until the fraud has been discovered." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007). The doctrine "ensure[s] that wrongdoers are not permitted, or encouraged, to take advantage of the limitations period to commit secret illegal conduct without penalty." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 549 (4th Cir. 2019) (quoting *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 125 (4th Cir. 1995)). To plead tolling of the statute for fraudulent concealment, a plaintiff must plausibly allege that "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Id.* at 548 (quoting *Marlinton*, 71 F.3d at 122).

The district court below dismissed Plaintiffs' suit on the sole ground that Plaintiffs had failed to adequately plead the first element of this test. Most importantly, it held that Plaintiffs *categorically* "may not succeed on their claim that, by the creation of and participation in a secret conspiracy, the Defendants committed an act of concealment that tolls the statute of limitations" because those acts do not

meet the "affirmative acts of concealment" standard adopted by this court in *Marlinton*. JA362-363. This is reversible error.

*Marlinton*'s "affirmative acts" standard was adopted *explicitly to reach* "acts of concealment involved in the antitrust violation itself," which "need not be separate and apart from the acts of concealment involved in the antitrust violation." 71 F.3d at 126. Indeed, *Marlinton* made clear that conspirators who are "careful not to write down evidence of their antitrust violations" satisfy this standard. *Id.* at 125. This Court explicitly considered and rejected the position taken by the district court—that concealment "involved" with the creation of and participation in an anticompetitive conspiracy does not count.

The district court rooted its conclusion in two Fourth Circuit cases, neither of which supports or even considers the categorical exclusion adopted by the district court. The first, *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir. 1987) predates *Marlinton*'s affirmative acts standard. This Court has cautioned against reading it as establishing a general rule for fraudulent concealment cases rather than "simply a comment on the deficient allegations" in that case. *Marlinton*, 71 F.3d at 124. The second, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012), affirmed in one sentence of a footnote a district court's explicitly fact-bound conclusion. The district court erroneously read both as placing some acts of concealment, including attempts to avoid creating written evidence and

even direct lies about key facts, beyond *Marlinton*'s standard. Neither case supports the district court's reading or conclusion.

The district court dismissed other acts of concealment as well. For example, Plaintiffs alleged that pairs of Defendants adopted duplicative, artificially narrowed no-poach provisions in "teaming agreements" governing their work together on a contract. These provisions had no effect because of Defendants' industry-wide no-poach conspiracy, but gave the misleading impression that industry recruitment constraints were limited and lawful. The district court refused to credit these allegations, substituting its own conclusions as to the legitimacy of these provisions. The district court also dismissed Defendants' public misrepresentations about their competitive hiring processes as mere "fail[ures] to own up to illegal conduct." JA361.

Plaintiffs more than plausibly allege Defendants' concealment. Their extensive pre-suit investigation allowed Plaintiffs to plead at a level of detail that is virtually unheard of in major antitrust conspiracy cases, alleging direct quotes from *multiple witnesses* who confirmed the existence of Defendants' conspiracy and their efforts to keep it secret. By placing Defendants' conspiracy beyond the reach of the law, the district court erroneously disregarded the age-old policy concern of fraudulent concealment:

> To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing

the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure.

*Bailey v. Glover*, 88 U.S. 342, 349 (1874). That reasoning remains correct 150 years later. The Court should reverse the judgment below and remand with instructions to deny Defendants' motion to dismiss.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 over Plaintiffs' timely appeal on May 20, 2024 from the April 19, 2024 final decision and judgment of the United States District Court for the Eastern District of Virginia. *See* JA350-365 (Opinion); JA366-367 (Judgment); JA368-371 (Notice of Appeal). Plaintiffs originally filed this suit in the district court under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. JA047.

## STATEMENT OF ISSUES

1) Did the district court err in holding Plaintiffs had not alleged sufficient "affirmative acts of concealment" to toll the statute of limitations?

2) Did Plaintiffs' Complaint otherwise adequately allege tolling of the statute of limitations and a plausible claim to relief under the antitrust laws?

3) In the alternative, did the district court err in denying Plaintiffs leave to amend?

## STATEMENT OF THE CASE

### I. Defendants Unlawfully Conspired Not to "Poach" Each Other's Naval Engineers and Acted to Prevent Discovery of the Conspiracy.

Naval engineers are highly skilled professionals who design ships for the Navy, Coast Guard, and other "public fleet" customers. JA041. Defendants, defense contractors who employ naval engineers (and one independent recruiter), have since at least 2000 maintained an unlawful, anticompetitive agreement among themselves not to "poach" each other's naval engineers. JA041. According to multiple witnesses with personal knowledge interviewed during Plaintiffs' counsel's pre-suit investigation, this industry-wide unwritten "gentleman's agreement" prohibits each Defendant contractor from actively recruiting each other's naval engineers. JA074; *see also* JA074-079 (detailing the rules of the conspiracy, its history, witness statements concerning the conspiracy's existence and individual Defendants' participation therein). By the beginning of the class period on January 1, 2000, each of the Defendant corporate families then existing had joined the conspiracy, JA076; other Defendants joined as they entered the market, JA079. Each Defendant is tied to the conspiracy by statements from at least one witness.[1] *See* JA078-079.

---

[1] Some Defendants' participation in or liability for the alleged antitrust violations is established by allegations at a slight remove from these eyewitness statements, e.g., through acquisition or retention of liabilities of a participating business unit. *See generally* JA048-JA065; JA079.

Defendants acted to prevent discovery of their conspiracy. First and foremost, they deliberately maintained the unwritten nature of the agreement, which was negotiated, passed on and enforced through verbal communication only. *See* JA041; JA045-046; JA074; JA075-076; JA078; JA096; JA101. Witnesses made clear Defendants' *specific intent* to avoid the creation of written evidence: one described a "non-ink-to-paper" no-poach agreement involving their firm, JA078, and another noted "[t]hey don't put that in writing. You'd be hard pressed to find that in writing," JA045-046. Defendants also used euphemistic code words to minimize suspicion, including by describing their conspiracy as a "gentleman's agreement," and describing other firms as "friends" with whom they "had a relationship." JA045-046; JA097-098.

Defendants also covered their tracks with misdirection. Like a child who secretly eats a dozen cookies but tells her parents she ate *one* when questioned about the crumbs on her face, Defendants adopted narrow, bilateral no-poach clauses in "teaming agreements" that often governed two Defendants' work on a particular project. JA046; JA085-086; JA096. Because all Defendants participated in an *industry-wide*, multilateral no-poach agreement that was *not* limited to particular projects, these sham provisions in teaming agreements had no practical business effect. JA046; JA085-086; JA096. But by memorializing an agreement that was narrower in scope than Defendants' *unwritten* agreement, these provisions covered

up the unlawful scheme. JA046; JA085-086; JA096. The Complaint also collects many public misrepresentations from the Defendants concerning their competitive hiring and antitrust compliance, including misrepresentations on recruiting webpages targeted at naval engineers. JA096-101.

Plaintiffs neither knew nor had reason to know of Defendants' conspiracy, and in spite of their reasonable diligence could not have discovered it. JA102-103. Additional facts relevant to arguments advanced by Defendants below but not ruled upon by the district court are cited below in Section III and in Plaintiffs' opposition to Defendants' Joint Motion to Dismiss, JA176-238.

## II. Misreading Fourth Circuit Precedent, the District Court Dismissed Plaintiffs' Case for Purported Failure to Allege "Affirmative Acts" of Concealment.

All Defendants except Faststream Recruitment Ltd. jointly moved to dismiss the Complaint under Rule 12(b)(6).[2] Defendants argued, first, that Plaintiffs, who had last been employed as naval engineers in 2011 (Scharpf) and 2004 (D'Armiento), had not adequately alleged that Defendants had fraudulently concealed the facts underlying Plaintiffs' claims, and that their claims were thus barred by the statute of limitations. *See generally* JA138-139; JA141-147.

---

[2] Some Defendants also moved for dismissal individually; the district court did not decide these motions. *See* JA350 n.1. Faststream, a British company, has not appeared in the district court. *See* JA019-036. References to "Defendants" as a group in this brief generally exclude Faststream.

Defendants also argued that the Complaint failed to state a plausible violation of the antitrust laws. *See generally* JA147-166.

On April 19, 2024, after hearing oral argument,[3] the district court issued an opinion and order dismissing the case as untimely. JA350-365. It issued final judgment the same day, despite Plaintiffs' requests, in briefing and at oral argument, that they be allowed leave to amend if necessary. JA366-367; *see* JA324; JA211 n.16; JA238 & n.48. The district court held that "Plaintiffs have not pleaded facts sufficient to satisfy the affirmative acts element of the Fourth Circuit's fraudulent concealment doctrine, and the Complaint therefore fails to allege facts sufficient to toll the expiration of the applicable statute of limitations." JA364. It did not reach other questions presented in Defendants' motion. JA357 nn.6-7; JA364 n.13.

Despite *Marlinton*'s holding that "affirmative acts of concealment . . . . may include acts of concealment involved in the alleged antitrust violation itself," 71 F.3d at 126, the district court reasoned that Defendants' "creation of and participation in a secret conspiracy" could only qualify as affirmative acts of concealment under a "self-concealing" standard that *Marlinton* had rejected. *See* JA362-363. It reasoned

---

[3] Notably, both the parties' presentations and the Court's questions at oral argument focused on the question whether the affirmative acts standard distinguished between acts of *commission* and acts of *omission*—a question the district court later did not address in its opinion. *See* JA287-303; JA318-319; JA322-323.

that Defendants' alleged actions to avoid creating written evidence were therefore insufficient. JA362-363. The district court also suggested these allegations, along with allegations of Defendants' public misrepresentations, were "failures to admit wrongdoing" that do not count as affirmative acts of concealment. JA361-363 (citing *Pocahontas*, 828 F.2d at 218 and *Boland v. Consol. Multiple Listing Serv., Inc*, 868 F. Supp. 2d 506 (D. S.C. 2011), *aff'd sub nom. Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 n.2 (4th Cir. 2011)).

Turning to Plaintiffs' allegations of sham no-poach provisions in teaming agreements, the district court refused to credit the allegations that the provisions were pretextual shams, holding that these provisions "plainly serve the presumably valid purpose of prohibiting solicitation for the duration of a teaming agreement." JA363-364. It reasoned they were therefore insufficient "affirmative acts of concealment" to toll the statute of limitations. JA364.

The district court's rationale is discussed further below as relevant. Plaintiffs timely appealed the district court's opinion and final judgment. JA368-371.

## SUMMARY OF ARGUMENT

The district court erred in holding Plaintiffs failed to allege "affirmative acts of concealment" to toll the statute of limitations.

Under settled Fourth Circuit law, the statute is tolled if "(1) the [defendant] fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the

plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Edmonson*, 922 F.3d at 548 (quoting *Marlinton*, 71 F.3d at 122). The purpose of the doctrine is to "ensure that wrongdoers are not permitted, or encouraged, to take advantage of the limitation period to commit secret illegal conduct without penalty." *Id.* at 549.

In *Marlinton*, this Court adopted the "affirmative acts of concealment" standard to elucidate the first element of this test. 71 F.3d at 126. It contrasted two other formulations of the first element: First, it rejected a "self-concealing" standard in which a plaintiff need not prove "acts of concealment" *at all* as long as she "prov[es] that a self-concealing antitrust violation has occurred." *Id.* at 122. Next, it rejected a standard in which "a plaintiff is required to provide evidence, separate and apart from the acts of concealment involved in defendants' antitrust violation, that the defendants affirmatively acted to conceal the plaintiff's claim." *Id.* Instead, it adopted an "intermediate" standard under which "a plaintiff must prove that the defendants affirmatively acted to conceal their antitrust violations, but the plaintiff's proof may include acts of concealment involved in the antitrust violation itself." *Id.* at 122.

*Marlinton*'s affirmative acts standard was specifically intended to reach the kind of concealing conduct alleged here—in which Defendants create and execute their conspiracy *secretly*, to avoid detection. At the heart of its reversible error, the

district court misread *Marlinton* when it excluded Plaintiffs' allegations, supported by witnesses, that Defendants' "creation of and participation in a secret conspiracy," including deliberate efforts to avoid creation of documentary evidence, cannot be affirmative acts. *See Marlinton*, 71 F.3d at 125 (rejecting separate and apart standard because it might not reach conspiracies "in which the conspirators are careful not to write down evidence of their antitrust violations in the first place.").

The district court also erred in holding such acts may be sufficient *only* if the "self-concealing" standard applies. Where the self-concealing standard applies, no acts of concealment need be pled at all; the sufficiency of alleged concealment involved in the antitrust violation itself is the hallmark of the *affirmative acts* standard, not the self-concealing standard. In excluding such acts, the district court effectively applied the rejected "separate and apart" standard instead. *See generally* §§ I.A-B.

The cases on which the district court relied, *Pocahontas* and *Boland*, do not suggest otherwise. Both cases are explicitly bound to facts radically different than those at the bar, in which the defendants' alleged "concealment" lacked indicia of *wrongfulness*—the culpability that undermines defendants' equitable interest in the statute of limitations. The district court, however, drew the sweeping conclusion from these cases that Defendants may not only act to keep a conspiracy secret but also *lie* about their unlawful behavior without tolling. JA358; JA361. This was error.

*Pocahontas* also does not bear on the affirmative acts standard at all; as this Court has warned, it predates the standard and its holding that the plaintiff failed to satisfy its due diligence obligation is inextricable from its discussion of the defendant's alleged concealment. *See generally* § I.C.

The district court also erred analyzing Defendants' adoption of sham provisions in teaming agreements. It improperly drew inferences against the Plaintiffs, rejecting Plaintiffs' allegations that the provisions served to cover up the broader unlawful agreement to which all Defendants adhered. Instead, the district court held the provisions "plainly serve the presumably valid purpose of prohibiting solicitation for the duration of a teaming agreement," a factfinding that was improper at this stage. The district court also imposed a reliance requirement on affirmative acts that is not the law. *See generally* § II.

Analyzed under the correct standards, Plaintiffs adequately allege each element of fraudulent concealment, and their allegations state a plausible claim for relief. This Court should reverse the district court's errors, reject the arguments it did not reach and reverse the judgment with instructions to deny Defendants' motion. *See generally* § III.

Finally, the district court should not have dismissed the suit and issued final judgment without granting Plaintiffs leave to amend, as they requested below. *See generally* § IV.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's decision to grant a motion to dismiss pursuant to Rule 12(b)(6), including claims for fraudulent concealment," *Edmonson*, 922 F.3d at 545, "tak[ing] the non-conclusory factual allegations in Plaintiffs' complaint[] as true and draw[ing] all reasonable inferences therefrom in Plaintiffs' favor," *id.* at 541. "To survive a motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" *Id.* at 552 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

### I. The District Court Erred in Holding Plaintiffs Had Not Sufficiently Alleged Affirmative Acts of Concealment.

To plead fraudulent concealment, a plaintiff must plausibly allege that "(1) the [defendant] fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Edmonson*, 922 F.3d at 549 (quoting *Marlinton,* 71 F.3d at 122). The district court held that Plaintiffs failed to adequately allege the first of these three prongs. *See* JA360-364.

On its sole ground for decision, the district court misread the standard this Circuit applies when considering whether a defendant's fraudulent concealment tolls

the statute of limitations. When this Court's binding precedents are read correctly, Plaintiffs more than meet the pleading standard.

A. <u>Plaintiffs' Allegations Satisfy the Affirmative Acts Standard.</u>

"To satisfy the first element of the fraudulent concealment test, a plaintiff must 'provide evidence of affirmative acts of concealment' by the defendants." *Edmonson*, 922 F.3d at 549 (quoting *Marlinton*, 71 F.3d at 126). "Those acts, however, need not be separate and apart from the acts of concealment involved in the antitrust violation; rather, [a plaintiff's] proof may include acts of concealment involved in the alleged antitrust violation itself." *Marlinton*, 71 F.3d at 126. The "affirmative acts of concealment" test makes no distinction between acts of commission and omission: "We can see no valid reason to differentiate between those conspiracies in which the conspirators document their antitrust violations and subsequently shred those documents, from those in which the conspirators are careful not to write down evidence of their antitrust violations in the first place." *Id.* at 125; *see also Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *13 (D. Md. 2020) (noting affirmative acts of concealment including "keeping [] meetings 'off the books' and 'requir[ing] in-person attendance at the secret meetings to avoid leaving a paper trail.'"). A plaintiff sufficiently alleges affirmative acts of concealment "if, for example, it alleges that the defendant employed some trick or contrivance

intended to exclude suspicion and prevent inquiry." *Edmonson*, 922 F.3d at 553 (cleaned up).

Here, Plaintiffs allege Defendants concealed their no-poach agreement by, *inter alia*, deliberately creating and executing their conspiracy in secret. Multiple industry witnesses attested that participants sought to prevent the creation of a documentary record of the conspiracy by "carefully avoiding putting anything in writing." JA096. They described their no-poach pact as a "gentleman's agreement," a phrase often used to put a genteel face on unwritten illegal agreements. *See, e.g.*, *U.S. v. Gilbertson*, 970 F.3d 939, 948 (8th Cir. 2020) ("gentleman's agreement" not to trade used to facilitate market manipulation); *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 3917126, at *13 (N.D. Cal. 2014) (similar no-poach "gentleman's agreement"); *U.S. v. Philip Morris Inc.*, 116 F.Supp.2d 131, 137 (D.D.C. 2000) ("gentleman's agreement" not to research the health effects of smoking or develop "safer" cigarettes). One witness even described the agreement as "non-ink-to-paper," emphasizing that the conspiracy wasn't unwritten by coincidence, but that the intent of the conspirators was to avoid creating a written record of their misdeeds.

Defendants also "passed on" their agreement "only as verbal instructions from executives to managers," JA076, and "enforced the conspiracy through private phone calls between high-level executives and unofficial retribution through the companies' many working relationships," JA101. Defendants' executives used

euphemistic code words to avoid discussing the conspiracy and its import plainly, relying on the "gentleman's agreement" euphemism to describe their anticompetitive cabal and directing recruiters not to target "friends" with whom Defendants "had a relationship." JA045-046; JA078.

These allegations are even more damning when reasonable inferences are drawn in Plaintiffs' favor. *See Edmonson*, 922 F.3d at 545. Common sense suggests that a conspiracy of this scale and duration could not possibly have remained undiscovered for more than twenty years without Defendants' affirmative efforts. For example, over twenty years, the officers and executives who agreed to the no-poach must also have instructed subordinates or successors involved in the conspiracy not to discuss it or write it down, or quashed on pretextual grounds uninvolved colleagues' suggestions to recruit. *See, e.g.*, *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1201 (N.D. Cal. 2015) (allegations that Defendants' "intentionally cho[se] to meet in-person or over the telephone, rather than risk memorializing details about the alleged conspiracy" raised "the reasonable inference that Defendants took affirmative steps to conceal the details of their conspiracy").

Plaintiffs also alleged further "contrivance[s] intended to exclude suspicion and prevent inquiry." *Edmonson*, 922 F.3d at 553 (citation omitted). Plaintiffs alleged that Defendants adopted sham provisions in bilateral contracts designed to

mislead potential plaintiffs and antitrust enforcers about the scope of no-poach agreements in the industry. JA046; JA085-086; JA096. They also offered public misrepresentations designed to mislead potential plaintiffs as to the competitiveness of their hiring process and prevent inquiry, including on recruitment websites targeted at naval engineers. *See* JA096-101.

These allegations evince the Defendants' wrongful intent to "shield themselves from liability for unlawful conduct by keeping that conduct secret,"[4] and squarely trigger the policy driving *Marlinton* that such Defendants may not take shelter in the statute of limitations. 71 F.3d at 125. Indeed, *Marlinton* specifically rejected the "separate and apart" standard on precisely the ground that it might exclude from the fraudulent concealment doctrine the kind of behavior alleged here, "in which the conspirators are careful not to write down evidence of their antitrust violations in the first place." *Id.* It would be "indefensible" for such conduct not to suffice. *Id.*

The district court did not discount these allegations as conclusory or insufficiently particular. Nor could it; they are supported by a virtually unheard-of

---

[4] Indeed, Defendants appear to concede the allegations establish their intent to conceal the conspiracy, as they argued below: "Keeping an agreement secret or unwritten may be *some* form of concealment, but it is not an '*affirmative*' act of concealment that justifies tolling." JA254. But *concealment*, or at least concealing behavior, is the ball game. *Marlinton* squarely rejects Defendants' argument, and the district court rightly did not accept it. 71 F.3d at 125.

body of direct witness statements. They amply "ma[ke] [Defendants] aware of the particular circumstances for which it will have to prepare a defense at trial," and evince "that plaintiff has substantial prediscovery evidence of those facts." *Edmonson*, 922 F.3d at 553. From a policy standpoint, fraudulent concealment doctrine is dead letter if such allegations are insufficient.

B. <u>The District Court Effectively Applied the Rejected "Separate and Apart" Standard.</u>

The district court rejected Plaintiffs' core allegations of concealment based on a flawed understanding of this Court's decision in *Marlinton*. According to the district court, *Marlinton* "explained that antitrust violations that are not 'inherently deceptive' are subject to the 'intermediate, affirmative acts' standard, not the 'self-concealing' standard." JA362. Because, it reasoned, "the 'self-concealing' standard does not apply here," Plaintiffs "may not succeed on their claim that, by the creation of and participation in a secret conspiracy, the Defendants committed an act of concealment that tolls the statute of limitations." JA362-363. In other words, "the creation of and participation in a secret conspiracy" can *only* be "act[s] of concealment that toll[] the statute of limitations" under a self-concealing standard. JA362-363.

But this is wrong. Where a conspiracy is "inherently deceptive," the self-concealing standard excuses plaintiffs from pleading *any* acts of concealment *at all* because concealment may be inferred from the nature of the violation itself.

*Marlinton*, 71 F.2d at 123 & n.1. Rather, it is the affirmative acts standard adopted by this Court in *Marlinton* that permits plaintiffs to establish the first element of concealment by alleging concealment intrinsic to "the creation of and participation in a secret conspiracy," in contrast to the separate and apart standard, which does not. JA362-363; *compare Marlinton*, 71 F.3d at 122-26.

The district court's reasoning fundamentally misconstrues *Marlinton*, in which this Court weighed three competing tests for the first step of the fraudulent concealment inquiry. First, under the Second Circuit "self-concealing" standard, a plaintiff "may prove the concealment element by showing *either* that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury *or* that the wrong itself was of such a nature as to be self-concealing." *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (emphasis added). In other words, instead of pleading particular *acts* of concealment, a plaintiff could simply allege a *violation* that *requires* concealment to be successful—the violation self-evinces concealment.

Second, under the "separate and apart" standard then affirmed by an evenly divided Tenth Circuit, "acts taken in carrying out the conspiracy itself" are not considered concealing at all; "[f]raudulent concealment occurs when a defendant takes affirmative steps *in addition to the original wrongdoing* to prevent the plaintiff

from discovering the wrong."[5] *Colo. ex rel. Woodard v. Western Paving Constr. Co.*, 630 F. Supp. 206 (D. Colo. 1986) (emphasis added), *aff'd by evenly divided en banc panel*, 841 F.2d 1025 (10th Cir. 1988). Under an intermediate "affirmative acts of concealment" standard adopted by most other circuits, a plaintiff could not rely *exclusively* on alleging an antitrust violation to establish concealment, and must therefore allege the kinds of affirmative acts the Second Circuit demanded in the alternative; but those acts were not required to be distinct from concealing acts undertaken as part of the antitrust violation itself, as they would be under the "separate and apart" standard. *See Marlinton*, 71 F.3d at 122 (citing *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1532 (5th Cir. 1988)).

This Court first considered the self-concealing standard, concluding that an alleged antitrust violation alone could establish concealment only "when deception or concealment is a necessary element of the antitrust violation." *Id.* at 123. It then reasoned that deception was "not an essential element of the unlawful price-fixing conspiracy alleged in this case." Rather, the "deceptive aspect" of the conspiracy

---

[5] The district court also appears to have mistaken the import of the separate and apart standard, which it characterized as requiring acts "subsequent in time to the wrong," while the affirmative acts standard (in the district court's view) "allows for consideration of conduct both before and after the completion of the conduct constituting the offense." JA359. But the important distinction between the two standards is not *timing* of concealing acts, but whether acts "involved in" the antitrust violation satisfy the standard. *Marlinton*, 71 F.3d at 122.

was distinct from the violation itself, because "price-fixing is not inevitably deceptive or concealing." *Id.* Thus, it did not follow from proof that the defendants fixed prices that they also concealed their price-fixing (consider, e.g., OPEC's open output fixing), and additional facts were required to show the defendants' wrongful concealment.[6]

The *Marlinton* court next turned to the "separate and apart" standard. The Court rejected its central policy rationale—that a different rule would "gut" the statute of limitations—because the antitrust laws prohibit many kinds of anticompetitive conduct, such as mergers to monopoly, that are not concealed at all.[7] *Id.* at 124. The Court then reasoned that the separate and apart standard was both unclear and inconsistent with the purpose of the fraudulent concealment doctrine.

---

[6] This analysis is obviously correct at the high level of abstraction adopted in *Marlinton*. The district court, however, conflated Defendants' conspiracy to allocate markets with their efforts to *keep secret* that unlawful allocation. JA362-363 (excluding Defendants' "creation of and participation in a *secret* conspiracy") (emphasis added). *Marlinton*, however, rejected the self-concealing standard on the ground that those two aspects of the conspiracy were distinct and should *not* be conflated. 71 F.3d at 123. If *secrecy* is inseparable from the conspiracy, then the self-concealing standard would, by *Marlinton*'s logic, apply. If it is not, then Defendants' acts to keep the conspiracy *secret* would meet even the separate and apart standard, and certainly satisfy the affirmative acts standard.

[7] Though many kinds of antitrust violations are typically unconcealed, the Court repeatedly communicated its expectation that "almost all price-fixing conspiracies involve some affirmative acts of secrecy," and that tolling would be the norm in such cases. *Marlinton*, 71 F.3d at 124; *see also id.* at 123 n.1 (antitrust conspiracies "generally secret[]"); *id.* at 124 ("typically involve acts of secrecy or concealment," "usually secret").

*Id.* at 124-26. Not only would it be conceptually "difficult, if not impossible" to "decid[e] which acts are in furtherance of conspiracies and which acts are separate and apart from conspiracies," *id.* at 125, but also there was no reason to do so: "Adoption of the separate and apart standard would undercut the purpose of the fraudulent concealment doctrine merely to benefit those defendants who were cunning enough to commit their crimes initially in such a manner that there was no need for further concealment." *Id.* The statute of limitations "'should not be available to a wrongdoer who takes undue advantage of the statute by attempting to conceal his conduct." *Id.* (quoting *Allan Constr.*, 851 F.2d at 1532).

The Court thus adopted the intermediate standard. *Id.* at 125-26. Under that standard, the plaintiff "must provide evidence of affirmative acts of concealment by [the defendants]. Those acts, however, need not be separate and apart from the acts of concealment involved in the antitrust violation; rather, [the plaintiff's] proof may include acts of concealment involved in the alleged antitrust violation itself." *Id.* at 126.

The district court, however, understood *Marlinton* to exclude allegations that Defendants "create[ed] and participate[d] in a secret conspiracy," on the theory that to credit such allegations would be to apply the "'self-concealing' standard." JA362-363. But as explained above, that is not what the self-concealing standard *is* and *Marlinton* was explicit that such "acts of concealment involved in the antitrust

violation itself" *do* qualify. 71 F.3d at 126. The district court's categorical refusal to consider "the creation of and participation in a secret conspiracy" on the grounds that to do so would be to adopt the self-concealing standard cannot be squared with *Marlinton* and its progeny.

In short, the district court mistakenly assumed that the self-concealing standard *permitted* Plaintiffs to establish concealment through acts involved in the conspiracy itself, when in fact the self-concealing standard absolves them of the obligation to do so. *See Marlinton*, 71 F.3d at 122. It is instead the affirmative acts standard—the one that applies to this case—that permits Plaintiffs to satisfy the test with acts intertwined with the violation itself. *See id.* at 126. It is the rejected separate and apart standard—the one the district court effectively applied instead—that does not, *see id.* at 123-26.

There are thus no grounds in the Fourth Circuit for excluding from the fraudulent concealment test Plaintiffs' well-pled allegations that Defendants consciously concealed their conspiracy with a variety of efforts to avoid the creation of written evidence. The district court effectively applied the wrong standard, erring as a matter of law.

\*\*\*

Lest there be any doubt, the district court's holding also sits poorly with the Fourth Circuit's most recent and comprehensive overview of fraudulent

concealment doctrine in *Edmonson*. That case reiterated and affirmed *Marlinton*'s affirmative acts standard, but also undertook an extensive consideration of fraudulent concealment doctrine as one of a trio of interlocking equitable doctrines that may excuse a plaintiff's out-of-limitations filing. 922 F.3d at 548-53. Fraudulent concealment, equitable tolling, and equitable estoppel each address late filing by weighing the relative equities of exposing a defendant to a post-limitations suit against those of preventing a plaintiff from pursuing a valid cause of action. In weighing those equities, the Court considers both the plaintiff's and the defendant's role in the suit's untimeliness—especially each party's *culpability* for the delay.

If a defendant directly interferes with a plaintiff's ability to file suit, it will have to face the suit even despite the plaintiff's full knowledge of the facts of her claim (equitable estoppel). *See id.* at 549. In such a circumstance, it is neither unjust nor inconsistent with the policy rationales of the statute of limitations to tax the defendant with the burden of suit; the defendant has no equitable interest in the repose offered by the statute. At the other end of the scale, if the defendant had *no* role in preventing the plaintiff from timely filing suit, the statute may be tolled only "in those rare [cases] where—due to circumstances external to the [plaintiff's] own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Id.* (quoting *Whiteside v. U.S.*, 775 F.3d 180, 184 (4th Cir. 2014)). The plaintiff may not be culpable, *and* the injustice to the

plaintiff must be so great as to trump the defendants' legitimate interest in the statute of limitations' purpose "to protect defendants from stale or fraudulent claims."[8] *Marlinton*, 71 F.3d at 125.

Fraudulent concealment doctrine addresses the middle ground in which the plaintiff does not know of the cause of action at least in part because of the defendant's attempts to conceal it. To weigh the equities in such a circumstance requires some assurance that the plaintiff has not slept on her rights; if she *could*, with the exercise of ordinary diligence, have discovered her claim in spite of defendants' concealment, then the statute of limitations justly prevents the plaintiff from pursuing a claim she could have timely pressed. If, however, the plaintiff could *not* have discovered the claim, then it is no injustice for a defendant who has *wrongfully* concealed it to be required to face the suit. *See Edmonson*, 922 F.2d at 549. The defendants' *culpability* reduces the weight of the plaintiff's equitable burden from showing "extraordinary circumstances" to mere diligence.[9]

---

[8] As the *Edmonson* court points out, even if their claims did not fit within fraudulent concealment doctrine, Plaintiffs' inability to bring timely claims because of Defendants' wrongful concealment surely constitutes "extraordinary circumstances" making it "unconscionable to enforce the limitation period" under equitable tolling doctrine. *See* 922 F.3d at 552 n.5.

[9] At the motion to dismiss stage, of course, reasonable inferences of culpability must be drawn in Plaintiffs' favor, with any factual disputes to be resolved later, usually by the jury. *See TCF Nat'l Bank v. Market Intelligence, Inc.*, 812 F.3d 701, 711 (8th Cir. 2016) ("Generally, fraudulent concealment and a

Under the separate and apart standard applied *de facto* by the district court, however, a defendant may *culpably* conceal a cause of action from a plaintiff who *has no other means of discovering her claim*, as long as the concealment is limited to "the creation of and participation in a secret conspiracy." JA362-363. This flies in the face of the consistent weighing of equities so carefully laid out by the Court in *Edmonson*, and subverts the consistent, equity-focused affirmative acts standard laid out in *Marlinton*.[10]

---

plaintiff's due diligence are questions of fact unsuited for summary judgment.") (cited with approval in *Edmonson*, 922 F.3d at 554).

[10] Alternatively, the Court could modify its treatment of the Clayton Act's statute of limitations to use a "discovery rule" rather than an "injury rule." *See* JA230-231. Most cases in this Circuit and others assume that an antitrust claim accrues when a plaintiff is injured, regardless of whether the plaintiff knows or could know of her injury. *See, e.g.*, *Pocahontas*, 828 F.2d at 217-18. In the Seventh Circuit, however, antitrust claims follow the default rule for federal statutes and do not accrue until the plaintiff has discovered or should have discovered the claim through the exercise of due diligence. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 789-90 (7th Cir. 2006); *see also Reid v. James Madison Univ.*, 90 F. 4th 311, 319 (4th Cir. 2024) ("Under federal law's 'standard rule' of accrual,' . . . 'a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to [her] that reasonable inquiry will reveal [her] cause of action.'") (quoting *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995)).

The injury rule is drawn from language in *Zenith Radio Corp. v. Hazeltine Research* considering a separate question of whether a claim has accrued when the plaintiff's damages are speculative; its language was not intended to address whether an antitrust claim that could not have been discovered by the plaintiff has accrued. *See* 401 U.S. 321, 338-39 (1971). Recently, the Supreme Court has clarified that absent specific Congressional instruction to the contrary, "a cause of action 'does not become complete and present for limitations purposes'—it does not *accrue*— "until the plaintiff can file suit and obtain relief." *Corner Post, Inc. v. Bd. of*

C. The District Court Erred In Holding Plaintiffs' Allegations
Were Mere "Fail[ures] To Own Up To Illegal Conduct."

The district court adopted its conclusion based on two Fourth Circuit cases

considering defendants' "fail[ures] to own up to illegal conduct." *See* JA361-363

(discussing *Boland v. Consol. Multiple Listing Serv., Inc*, 868 F. Supp. 2d 506 (D.

S.C. 2011) and *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d

211 (4th Cir. 1987)). The district court misread these cases. Neither holds that

Defendants' "creation of and participation in a secret conspiracy" may not constitute

affirmative acts of concealment. Neither holds that misrepresentations to potential

plaintiffs, especially those not on inquiry notice, may not be affirmative acts of

concealment. Neither case holds that the kinds of concealment alleged in Plaintiffs'

---

*Governors of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2451 (2024) (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). Nothing in the Clayton Act's statute of limitations suggests a Congressional intent to start the limitations clock before a plaintiff could even know of their claim. *Compare Rotkiske v. Klemm*, 589 U.S. 8, 10, 13-15 (2019) (statutory language begins limitations period when a "violation occurs") *with* 15 U.S.C. § 15b (limitations period begins "after the cause of action accrued.").

If the Court's fraudulent concealment doctrine cannot reach this case, the Court should follow the Seventh Circuit and re-examine when an antitrust claim accrues. This would harmonize antitrust accrual doctrine with other federal statutes, including RICO, which is typically interpreted in parallel with antitrust laws. *See Pocahontas*, 828 F.2d at 220 ("the [RICO] statutory period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action."); *see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150 ("The Clayton Act, 38 Stat. 731, as amended, 15 U.S.C. § 15, offers a far closer analogy to RICO than any state law alternative. Even a cursory comparison of the two statutes reveals that the civil action provision of RICO was patterned after the Clayton Act.").

Complaint are "failures to disclose" that are categorically excluded, and neither presents comparable facts that would support the district court's conclusion. And if either of these cases *did* exclude Defendants' behavior from the "affirmative acts of concealment" test, their authority would be dubious considering the thorough, well-reasoned decisions in *Marlinton* and *Edmonson* (the latter of which postdates both cases).

Indeed, the district court appears to have read these cases as giving defendants *carte blanche* to "lie" about the facts underlying a cause of action. JA361 ("[T]hese allegations are, in substance, claims that Defendants *lied* and 'failed to own up to illegal conduct.'") (emphasis added) (citing *Pocahontas*, 828 F.2d at 218); *see also* JA358 (summarizing *Pocahontas*'s fraudulent concealment claims as "rather than admit the conspiracy, the defendants lied."). It used this characterization to dismiss Plaintiffs' allegations that Defendants gave "'pretextual reasons'" for their anticompetitive conduct and made "public misrepresentations" regarding the same. JA361; *see* JA046; JA085-086; JA096 (describing sham contractual provisions designed to mislead potential plaintiffs and antitrust enforcers); JA096-101 (quoting public misrepresentations designed to mislead potential plaintiffs as to the competitiveness of their hiring). This reading is unsupportable. As common sense demands, in this Circuit when a defendant lies, uses a sham pretext, or acts to avoid

creating evidence to conceal a market allocation conspiracy, that defendant has "affirmatively acted to conceal their antitrust violations," *Marlinton*, 71 F.3d at 122.

## 1. *Pocahontas*

The district court's reading of *Pocahontas* is inconsistent with the facts and reasoning of that case and its subsequent treatment by this Court, which has cautioned against reading it as more than "simply a comment on the deficient allegations" presented. *Marlinton*, 71 F.3d at 124. The allegations in *Pocahontas* bear no resemblance to those at the bar—and certainly do not compel the Court to upset *Marlinton*'s later binding precedent.

In that case Pocahontas*,* a coal mine operator, alleged that other coal miners and customers had "illegally exploited a web of subsidiary, affiliate, and contractual relationships to control the production and pricing of coal." 828 F.2d at 214-15. Defendants allegedly did this by, *inter alia*, effecting the out-of-limitations "unilateral[] terminat[ion]" of an agreement between Pocahontas and one of the defendants.[11] *Id.*

Pocahontas alleged the defendants fraudulently concealed their conspiracy when the plaintiff inquired of one of the defendant companies "why [that company]

---

[11] Many other facts of the case bear on the Court's skepticism of Pocahontas's allegations, including that the core allegations—that defendants coordinated a monopolized market through interlocking directorates—were not borne out in discovery. *See Pocahontas*, 828 F.2d at 215-217. But a full recitation of the case's convoluted facts is not necessary to understand the error below.

refused to accept certain deliveries of coal and why the price paid for delivered coal was so low."[12] *Id.* at 218. The company "responded that the delivery quotas were due to a railroad strike that affected [its] ability to store the coal and that the pricing simply was the maximum allowable." *Id.* The Court found that "[t]o permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct *upon this sort of timid inquiry* would effectively nullify the statute of limitations in these cases."[13] *Id.* at 218-19 (emphasis added). It went on, "'[f]raudulent concealment' implies conduct more affirmatively directed at deflecting litigation than that alleged here; and 'due diligence' contemplates more than the unpursued inquiry allegedly made by Pocahontas." *Id.* at 219.

The district court's characterization of the facts, that "rather than admit the conspiracy, the defendants lied," ignores the distinction *Pocahontas* was trying to draw. JA358. The defendants in *Pocahontas* were *not* alleged to have *lied*—that is, to have "ma[de] an untrue statement with intent to deceive" or even knowingly

---

[12] Pocahontas also alleged the defendants had concealed the interlocking directorates that were the real gravamen of the complaint, but the Court rejected that argument because the directorates were matters of public record. *Pocahontas*, 828 F.2d at 218.

[13] *Marlinton* specifically rejected this rationale when it considered the "separate and apart" standard, correctly noting that the statute of limitations remains vitally important to many kinds of antitrust cases in which the defendants do *not* routinely conceal their violations. *See* 71 F.3d at 124. Extending *Pocahontas* to reach this case would require the Court's renewed acceptance of this flawed reasoning.

"create[d] a false or misleading impression." LIE, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/lie (accessed June 18, 2024). Rather, the point of *Pocahontas*, to the extent it rests on the character of the defendant's alleged actions at all, is that the defendant's responses *did not support an inference of wrongful concealment*—an attempt to "deflect[] litigation." *Pocahontas*, 828 F.2d at 219. Rather, the plaintiff's questions were so oblique to the alleged conspiracy—so "timid"—that the defendant's answers could not reasonably be read as an attempt to mislead. *See id.* at 218-219.

But *Pocahontas* should not really be read as touching the "affirmative acts" standard at all. The case predated *Marlinton* and conflated the plaintiff's lack of diligence with the defendant's actions. *See id.* (qualifying "failure to own up to illegal conduct" with "upon this sort of timid inquiry"; holding that "due diligence contemplates more than the unpursued inquiry allegedly made by Pocahontas."). Even if the defendant in *Pocahontas* had *wrongfully lied* to the plaintiff, the Court clearly thought Pocahontas could not have satisfied its diligence obligation by relying on the defendant's answers, because a reasonable plaintiff would expect the defendant to deny wrongdoing under the particular circumstances alleged (and because the alleged answers were not square denials). The case cannot be read as creating a categorical exemption from an "affirmative acts" standard, unconditioned on a plaintiff's lack of diligence.

This Court has noted the ambiguous holding in *Pocahontas* and cautioned against reading its language beyond its facts.[14] *See Marlinton*, 71 F.3d at 122 ("[In *Pocahontas*] we did not expressly adopt any of the above standards or state to what extent our decision was based on the fact that the plaintiff had constructive notice of the antitrust violations or had failed to provide evidence of due diligence. Instead, we simply examined the allegations of the complaint and concluded that the plaintiff had failed to allege facts sufficient to invoke the doctrine of fraudulent concealment."); *id.* at 124 ("Our observation, that to make out a claim of fraudulent concealment required evidence more 'affirmatively directed at deflecting litigation' than the failure to admit illegal activity in response to a general inquiry, was simply a comment on the deficient allegations in *Pocahontas*."). Cases are not authority for propositions not considered. *See Brecht v. Abrahamson*, 507 U.S. 619, 630-631 (1993); *U.S. v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018). And the facts to which *Pocahontas* is limited are completely inapposite.

---

[14] Notably, the Court has continued to apply *Pocahontas* where plaintiffs *are* on inquiry notice of their claims: In *GO Computer*, for example, this Court relied on *Pocahontas* to find that the "profusion of information" regarding the allegedly anticompetitive scheme "was sufficient, as a matter of law, to spur a reasonably diligent person to investigate an antitrust claim," and that the plaintiff could not end its inquiry in reliance on a letter from the defendant denying legal wrongdoing. 508 F.3d at 178; *see id.* at 179 (pointing to evidence that plaintiffs viewed the defendant "as a bunch of thieves" (quotation marks omitted)).

The district court suggested that, because *Pocahontas* did not find fraudulent concealment on the plaintiff's "timid inquiry" to the defendant, and because Plaintiffs here are not alleged to have made "*any* inquiry of [the Defendants] at all," therefore the Defendants' efforts to prevent discovery of their conspiracy must also not suffice. JA361. This does not follow. The facts of this case are not *analogous* and *weaker* than those in *Pocahontas*; rather, they are completely different in dispositive respects. First, Defendants' actions here unquestionably support an inference of *intentional*, *wrongful* concealment, whereas in *Pocahontas* the allegedly concealing answers did not, as pled, support such an inference. And second, in *Pocahontas* the plaintiff was on inquiry notice of the conspiracy, and could not reasonably rely on the particular alleged representations made by a suspected conspirator; in this case, *because of Defendants' wrongful concealment*, Plaintiffs had no reason to suspect that their employers had struck a secret, unlawful industry-wide no-poach agreement behind Plaintiffs' backs, and had no duty to investigate potential claims or mistrust Defendants' representations. That they did not inquire about Defendants' conspiracy bears neither on their diligence nor Defendants' acts of concealment.

## 2. *Boland/Robertson*

In *Boland*, the plaintiffs challenged agreements made by two groups of real estate brokers in their roles as board members of two regional Multiple Listing

Services—websites on which local brokers list properties for sale. 868 F. Supp. 2d at 509-10. The plaintiffs alleged the brokers had violated the antitrust laws "by enacting and enforcing unlawful MLS rules," memorialized in "by-laws and regulations" of the MLSs. *Id.* at 509-10, 514. Importantly, the district court noted that whether plaintiffs' allegations amounted to an antitrust violation *at all* presented "extremely difficult and particularly close questions of law," suggesting that it was not obvious to the conspirators that their agreements were unlawful. *Id.* at 516.

In spite of their allegations that the defendants had memorialized their anticompetitive agreements in official by-laws, the plaintiffs also alleged fraudulent concealment. *Id.* at 517. Their allegations were minimal:

> Plaintiffs have alleged that the Defendants never told them that they were fixing the prices of real estate . . . . [and] that the Defendants used means and methods designed to avoid detection such as (1) meeting secretly, (2) giving pretextual reasons for costs of real estate, and (3) agreeing not to discuss publicly the nature of their communications in furtherance of their illegal scheme.

*Id.* at 518. The filed complaints pled no further details. *See* Am. Compl. at ¶¶ 62-64, *Boland v. Consol. Multiple Listing Serv., Inc.*, No. 3:09-1335-SB (D.S.C. Feb. 26, 2010), ECF No. 22; Compl. at ¶¶ 86-88, *Robertson v. Sea Pines Real Est. Cos.*, No. 9:10-95-SB (D.S.C. Jan. 14, 2010), ECF No. 1.

Considering these threadbare allegations, the district court held:

> [T]he Court agrees with Defendants that the Plaintiffs' allegations *lack the particularity required by Rule 9* and, therefore, are legally insufficient to state a claim of fraudulent concealment. The cases are

clear that a plaintiff must allege affirmative acts of concealment or affirmative steps to mislead; here the Court believes that the Plaintiffs' allegations amount to no more than a failure to admit to wrongdoing, which does not suffice.

*Boland*, 868 F. Supp. 2d at 518 (emphasis added). The district court did not elucidate further, and it is unclear whether its "failure to admit wrongdoing" language was even intended to encompass the plaintiff's allegations of secret meetings, etc., as opposed to the allegations that defendants did not inform plaintiffs of their conspiracy.

The Fourth Circuit affirmed this ruling in a single footnote: "On this [fraudulent concealment] issue, we also affirm. The district court properly concluded that plaintiffs failed to 'allege affirmative acts of concealment or affirmative steps to mislead' and that 'plaintiffs' allegations amount to no more than a failure to admit wrongdoing, which does not suffice.'" *Robertson*, 679 F.3d at 291 n.2 (quoting *Pocahontas*, 828 F.2d at 218-19).

This is an awfully sparse discussion from which to draw any broad principle, and even a cursory reading makes clear that *Boland*'s holding, and thus *Robertson*'s summary affirmance, are *explicitly bound to the particular facts of the case*. The holding of *Boland* is not that all facts that *could be characterized* as "failure[s] to admit wrongdoing" are as a matter of law not "affirmative acts of concealment." Rather, the holding is that the *Boland* plaintiffs' allegations were *insufficiently particularized* to raise an inference that the defendants had concealed their

conspiracy. *Boland*, 868 F. Supp. 2d at 518. In other words, the *Boland* plaintiffs' allegations of "(1) meeting secretly, (2) giving pretextual reasons for costs of real estate, and (3) agreeing not to discuss publicly the nature of their communications in furtherance of their illegal scheme" were wholly conclusory, and insufficiently detailed to raise a plausible inference that the plaintiff's characterization of the alleged acts as "secret" and "pretextual" was accurate. If the plaintiffs had offered additional details substantiating their conclusory concealment allegations, the case would have come out the other way. The actual details of the complaint, however, strongly implied they could not so plead—if the *Boland* defendants had sought to *conceal* their agreement, memorializing it in written bylaws was a bad start.

The nonconclusory details in *Boland* suggest the defendants acted *privately*, but did not *culpably* seek to *conceal* their agreement. There is no expectation, for instance, that the public will be admitted to board meetings of privately held companies. Indeed, attendees may, in the ordinary course of business, be expected *not* to discuss such matters publicly. That does not make such meetings *secret* or evince an intent to mislead plaintiffs.[15]

---

[15] The district court misread Plaintiffs' argument on this point below, characterizing it as an argument that, because the *Boland* defendants did not hide their conduct, it must have been discoverable, and that the case thus turned on the plaintiffs' lack of diligence. JA362. This is incorrect; Plaintiffs argued below as here. *See* JA219-220.

The district court appears to have believed the *Boland* court accepted the plaintiffs' fraudulent concealment allegations as well pled, and that *taken as well pled*, allegations that a defendant met secretly, offered misleading "pretextual" statements, and kept communications secret were *categorically* insufficient "fail[ures] to own up to illegal conduct" that could *never* satisfy the affirmative acts test. JA361. But this puts the cart before the horse; rather, it is *because the plaintiffs' allegations failed to show secrecy and pretext* that the *Boland* court found they were not acts of concealment. At least as applied here, "failure to own up to illegal conduct" is a label that *follows* the conclusion that a defendant's behavior was not concealing, not one that exempts some kinds of wrongfully concealing behavior from the affirmative acts standard.[16]

In this case, by contrast, the allegations are more than adequate to support the inference that Defendants *wrongfully* prevented the Plaintiffs from discovering the conspiracy, by deliberately avoiding the creation of written evidence; by covering their tracks with sham contractual provisions; and with misrepresentations directed at naval engineers who had no reason to suspect the existence of a conspiracy. These allegations, in contrast to *Boland*'s conclusory and self-contradictory claims of

---

[16] In many other cases, including *Pocahontas*, it is inextricable from the diligence inquiry.

secrecy, amply support the conclusion that Defendants' actions were not just *private*, but *concealing*.

***

The district court's readings of *Pocahontas* and *Boland* put a tremendous variety of obviously concealing conduct—including outright lies—outside the ambit of fraudulent concealment doctrine. But neither case was designed to erect formal categorical boundaries on what may count as "affirmative acts of concealment." Rigid rules merely license those "who were cunning enough" to conceal their crimes cleverly to shield their unlawful conduct. *Marlinton*, 71 F.3d at 125. This is the opposite of the policy animating fraudulent concealment, which, like other equitable doctrines, must be flexible enough to do justice even in the face of wrongdoers' most creative efforts to evade it. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("Flexibility rather than rigidity has distinguished [equity jurisdiction]"); *Seymour v. Freer*, 8 Wall. 202, 218 (1869) ("[A] court of equity ha[s] unquestionable authority to apply its flexible and comprehensive jurisdiction in such manner as might be necessary to the right administration of justice between the parties.").

Rather than creating a "failure to own up to illegal conduct" loophole in which Defendants can find safe harbor, *Boland* and even *Pocahontas* illustrate the distinction between acts of *concealment*, which are wrongful, and acts that are not. The cases reinforce that the affirmative acts standard is focused on justice rather than

formalism. Artful pleading may not transmute ordinary privacy into wrongful concealment, and straightforward answers to oblique questions cannot be easily characterized as lies. Neither, says *Marlinton*, may wrongful concealment hide behind arbitrary distinctions not relevant to the doctrine's equitable purpose.

In this case, the allegations unequivocally and plausibly support the inference that Defendants *wrongfully concealed* their unlawful agreement. They undertook the conspiracy with an intention of preventing its discovery by Plaintiffs and the putative class, and they executed on that intent by carefully avoiding the creation of written evidence, misrepresenting their competitiveness to putative class members during recruitment, and adopting sham contract provisions designed to hide their conspiracy. These actions are core concealment of the kind *Marlinton* and *Edmonson* explicitly reach.

## II. The District Court Erred in Its Consideration of Sham Provisions in Teaming Agreements.

Having held wrongly that "the creation of and participation in a secret conspiracy" and Defendants' public misrepresentations could not meet the affirmative acts standard, the district court could still dismiss the case only if it disposed of allegations that plainly *would* satisfy even the rejected "separate and apart" standard: that Defendants had entered into sham provisions in limited, bilateral "teaming agreements" designed to mask the industry-wide, unlimited scope of no-poach agreements in the industry, *see* JA046; JA085-086; JA096. The district

court erred in its analysis of these allegations in two ways: First, it improperly failed to accept Plaintiffs' allegations as true and drew inferences against the Plaintiffs, imputing a valid purpose onto the alleged sham provisions instead of crediting Plaintiffs' allegations that they concealed the conspiracy. Second, the court superimposed a reliance test on the affirmative acts analysis that is unsupported by this Court's case law and inconsistent with the purposes of the fraudulent concealment doctrine.

A. The District Court Improperly Rejected Plaintiffs' Allegations and Drew Inferences Against Them.

Plaintiffs alleged that Defendants entered into an industry-wide, unwritten no-poach agreement that prohibited *each* Defendant from actively recruiting *each other* Defendant's employees, *full stop*. JA041. Throughout the conspiracy, Plaintiffs allege, pairs of Defendants also entered into "written agreements not to recruit each other's naval engineers *when working on the same project*." JA085; JA096 (emphasis added). "These explicit, unconcealed agreements misled Plaintiffs and Class Members into thinking they could be recruited whenever they were not working on the same project as a rival." JA096. "[T]he written, unconcealed agreements hid the true nature of Defendant's conspiracy: that each had entered into a secret and much more expansive 'gentlemen's agreement' not to affirmatively recruit others' naval engineers, regardless of whether the two companies were engaged on the same project and regardless of whether the engineers in question

were working on that project." JA096. These provisions were, in other words, shams: they memorialized narrow, plausibly legal agreements to disguise an unwritten, obviously unlawful one. In *Edmonson*, this Circuit made it clear that using this kind of legal artifice to disguise one's illegal behavior is core fraudulent concealment. *See Edmonson*, 922 F.3d at 553-54.

To reach the opposite conclusion, the district court relied on improper inferences against Plaintiffs. Specifically, the district court found that "these no-hire clauses—whose lawfulness Plaintiffs do not challenge[17]—plainly serve the presumably valid purpose of prohibiting solicitation for the duration of a teaming agreement." JA363-364. But Plaintiffs' allegation is precisely that the provisions do *not* serve such a purpose, *because solicitation among the Defendants is already prohibited by their unlawful agreement, to which multiple witnesses attested. See* JA096. Rather, Plaintiffs allege, these provisions served to mislead Plaintiffs and class members about the scope and legality of no-poach agreements in the industry. JA096. The district court may not, at the pleading stage, find facts to the contrary. *See Edmonson*, 922 F.3d at 541.

---

[17] This is misleading. Plaintiffs obviously *do* challenge the provisions as instruments Defendants used to conceal their unlawful conspiracy. Plaintiffs do not seek to establish that any one teaming agreement violates the antitrust law in the abstract, stripped of context, because the case concerns an industry-wide no-poach agreement. *See* JA085 n.8. It does not follow that they are "presumably valid." JA363.

The district court also reasoned that "the no-hire clauses alleged here have none of the features of the 'sham' entities and instruments in *Edmonson.*" JA363. It would, of course, be bizarre if the Defendants' concealment of the no-poach conspiracy alleged here took on the precise shape of the unlawful kickback scheme at issue in *Edmonson. See Edmonson*, 922 F.3d at 540-43. The district court's narrow focus on the precise form of the sham business entities in *Edmonson* led the court to ignore the broader question underlying the affirmative acts element: whether Defendants engaged in acts *to conceal* their unlawful scheme. *See Edmonson*, 922 F.2d at 553 (asking whether "the defendant employed some trick or contrivance intended to exclude suspicion and prevent inquiry.") (cleaned up). What matters for the affirmative acts analysis is that defendants *used* the sham to *conceal* the conspiracy, not the precise form of the sham. *See id.* ("The use of the sham entities to conceal the source and flow of the kickback payments constitutes an affirmative act of concealment."). The district court toyed with this principle when it cited the definition of a "sham": "A false pretense or fraudulent show; an imposture. 2. Something that is not what it seems; a counterfeit." JA363 (quoting BLACK'S LAW DICTIONARY (11th ed. 2019)). But the district court never applied this definition to Plaintiffs' allegations; rather, it first presumed that the provisions were *not* shams and then reached that same premise as a conclusion. *See* JA046; JA085; JA096.

Notably, the district court's only data point for these allegations was *Edmonson*. That Plaintiffs' facts are different from *Edmonson*'s only matters if the facts are different *in a relevant way*. But the district court's reasoning does not illustrate any *relevant* differences between Plaintiffs' facts and *Edmonson*'s. The closest the district court comes is in referencing *Edmonson*'s allegation that the "sham" entities in that case were used "for the *sole* purpose of receiving the [kickback] payments." JA363 (quoting *Edmonson*, 922 F.3d at 542). But that *Edmonson* characterized *its particular scheme* as "sole[ly]" a sham does not mean a sham cannot serve multiple purposes, including legitimate ones. Indeed, it is hard to know what "solely" a sham means, in much the same way it is hard to say when concealing behavior is "separate and apart" from a conspiracy (*see Marlinton*, 71 F.3d at 125); even in *Edmonson*, the kickbacks were delivered in part through "in-kind payments" in the form of "free or discounted leads, postage, and/or marketing materials and services," strongly suggesting that the sham entity delivering kickbacks had a legitimate purpose alongside its unlawful one (else its in-kind services would be worthless). 922 F.3d at 541. This is a common arrangement in, e.g., money laundering schemes, which *only* work if the sham entity has a credible legitimate purpose to use as cover. Here, within the cover of *apparently* legitimate contracts, Defendants hid provisions they used to misdirect anyone who might uncover their broader industry-wide conspiracy.

B. <u>The District Court Improperly Imposed a Reliance Requirement on the Affirmative Acts Test.</u>

The district court also suggested that even if the teaming agreements' no-poach provisions were affirmative acts of concealment, the element was nonetheless unsatisfied absent some allegation that Plaintiffs were "diverted away" from litigation by the sham provisions. JA364. The district court purported to take this reliance requirement from introductory language in *Edmonson*, which described the fraudulent concealment doctrine generally as applying "where the defendant has wrongfully deceived or misled the plaintiff." JA364 n.12 (quoting *Edmonson*, 922 F.3 at 549). But neither *Edmonson* nor any other of this Court's cases supports such a reliance requirement.

The Fourth Circuit's consistent formulation of the fraudulent concealment test places the focus of the affirmative acts element squarely on the alleged actions of the defendants. "[A] plaintiff must demonstrate: (1) *the party pleading the statute of limitations* fraudulently concealed facts that are the basis of the plaintiff's claim…" *Edmonson*, 922 F.3d at 548 (quoting *Marlinton*, 71 F.3d at 122) (emphasis added); *see id.* at 553 ("a plaintiff must provide evidence of affirmative acts of concealment *by the defendants*.") (emphasis added). This focus makes sense considering the principal rationale for the fraudulent concealment doctrine: defendants are not entitled to the benefits of the statute of limitations period if they engage in actions

designed to conceal the illegal conduct. *See supra* § I.A-B; *Edmonson*, 922 F.3d at 549; *Marlinton*, 71 F.3d at 125.

This Court has been wise to not require plaintiffs to parse with specificity their reliance on any single affirmative act. In the context of a secret conspiracy, any revelation could hypothetically lead to the conspiracy being exposed, making it a fool's errand to pick out which of a defendants' many concealing efforts, if not undertaken, would have led to plaintiffs' filing within the limitations period in a counterfactual world. Moreover, often *plaintiffs* would not have been the ones to uncover such a conspiracy in the first instance, so *their* reliance or non-reliance on an act of concealment has no causal link to their late filing. An arbitrary reliance requirement would allow defendants who have wrongfully concealed their conspiracy to escape liability without any failure of diligence on a plaintiff's part.

Indeed, the allegations in *Edmonson* would not stand up to the reliance standard imposed by the district court here. There, the plaintiff mortgagors' "affirmative acts" allegations were that defendants (1) created and used sham business entities to channel unlawful cash kickbacks, (2) backdated certain sham business agreements, and (3) did not report the unlawful payments on plaintiffs' HUD-1 Settlement Statement forms. *Edmonson*, 922 F. 3d at 553-54. This Court did not consider, in finding each of these acts to be an affirmative act of concealment, whether plaintiffs relied on or were even aware of the specific concealing act. *See*

*id.* For example, there is no mention in *Edmonson* of whether the plaintiffs were aware of the later-determined-to-be-sham entities, and no allegation that plaintiffs would have sued within the statute of limitations period if not for the disguising of the entities receiving the payments. *See id.* at 553.

The fraudulent concealment test does contain a separate due diligence element, not addressed by the district court here. *See* JA364 n.13. In cases where plaintiffs are on inquiry notice of potential claims, part of the due diligence analysis *may* resemble a reliance inquiry. For example, the court may ask if a plaintiff reasonably ended their inquiry in reliance on a defendant's misrepresentation, or whether the circumstances called for further investigation. *Cf. Pocahontas*, 828 F.2d at 218-19; *GO Computer*, 508 F.3d 178-79. In other cases, especially where the plaintiff was not on inquiry notice, the due diligence analysis does not resemble a reliance requirement at all. If the plaintiff "was not (and should not have been) aware of facts that should have excited further inquiry," then it may satisfy the due diligence requirement "without demonstrating that it engaged in any specific inquiry." *Edmonson*, 922 F.3d at 554 (quoting *Marlinton*, 71 F.3d at 128). Regardless, a plaintiff's reliance bears only on *their diligence*, rather than the *defendant's concealment*.

### III. The Complaint Otherwise States a Claim on Which Relief Can Be Granted.

As discussed above, the district court erred in holding that Defendants' alleged conduct did not satisfy the affirmative acts test. The district court therefore did not reach other arguments advanced by Defendants below, including whether Plaintiffs satisfied the due diligence elements of the fraudulent concealment test and whether the Complaint plausibly alleged an agreement among the Defendants. *See* JA357 n.6 (declining to rule on plausibility arguments); JA364 n.13 (declining to rule on diligence). Because this Court reviews dismissals under Rule 12(b)(6) *de novo*, the Court can and should dispose of these other arguments and reverse the judgment with instructions to deny Defendants' motion. *See Edmonson*, 922 F.3d at 552-58 (having concluded that the district court applied the wrong equitable tolling standard, proceeding to analyze the complaint under the correct standard and holding that Plaintiffs' allegations were sufficient).

### A. Plaintiffs Adequately Alleged Each Element of Fraudulent Concealment.

As discussed above in Section I.A, Plaintiffs alleged with particularity a variety of efforts Defendants undertook to prevent discovery of their unlawful conspiracy. Indeed, those allegations are as plausible and as specific as could reasonably be expected: they allege that Defendants concealed the conspiracy from at least 2000 onward; that Defendants' executives and senior managers kept the

conspiracy secret and avoided the creation of written evidence; that they used code words to avoid explicit discussion of their conspiracy; adopted sham provisions in teaming agreements; and publicly misrepresented their competitiveness to the public, including specifically in recruiting advertisements seeking naval engineers; and they allege locations where at least part of the allegedly concealing conduct likely occurred. *See* JA044-046; JA056; JA076; JA085-086; JA096-101.

Plaintiffs also alleged that they exercised due diligence at all times. JA102. Plaintiffs alleged that they did not and could not have learned of the facts alleged until April 2023, shortly before the Complaint was filed, and that before they discovered the conspiracy, they had believed themselves to be compensated at competitive levels. JA102. Plaintiffs even alleged that reasonable plaintiffs in their circumstances would have assumed that their employers were complying with relevant laws, and that they lacked skills and information to discern what competitive wages should have been. JA102.

The Fourth Circuit recognizes "the exercise of due diligence" requires *no* investigative steps from plaintiffs until they are on inquiry notice of their claims. *See Marlinton*, 71 F.3d at 122; *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 108 (4th Cir. 2018) (plaintiff "must show (1) fraud by the [defendants], (2) a lack of actual notice by [plaintiff] of its claim, and (3) *either a lack of inquiry notice or, in the event it was on inquiry notice*, that it exercised reasonable diligence in

investigating the claim.") (emphasis added). Indeed, in *Edmonson*, the Fourth Circuit reiterated that "this Court long has held that 'it is possible for a plaintiff to satisfy the due diligence requirement without demonstrating that it engaged in any specific inquiry'" where "the plaintiff establishes that it was not (and should not have been) aware of facts that should have excited further inquiry." 922 F.3d at 554 (quoting *Marlinton*, 71 F.3d at 128). "Generally, whether a plaintiff exercised due diligence is a jury issue." *Id.*

A plaintiff is on inquiry notice of a claim "[w]here a plaintiff knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain." *GO Computer*, 508 F.3d at 179. The analysis focuses on the actions a reasonable plaintiff would have taken given the information she had. *See id*. at 178; *SD3 II*, 888 F.3d at 113 ("[I]f the plaintiff (1) believes he might have been harmed and (2) knows who is responsible for that harm, then he is on inquiry notice to act.").

Applying this test, the Fourth Circuit has found plaintiffs were *not* on inquiry notice of an illegal kickback scheme even when separate private litigation had been initiated against two of the same defendants, both federal and state enforcement actions were publicly underway, and local media included coverage of the alleged scheme and the various enforcement actions. *See Edmonson*, 922 F.3d at 555. The Court explained that, even with these "several pieces of public information,"

plaintiffs had sufficiently alleged that "they did not and could not have known about the Kickback Scheme, due to [defendants'] efforts to conceal the kickbacks." *Id.*; *see also Donaldson v. Primary Residential Mortg., Inc.,* 2020 WL 3184089, at *21 (D. Md. 2020) (rejecting defendants' argument that "plaintiffs allege no diligence at all," because the plaintiffs "had no reason to investigate a potentially fraudulent relationship" between the defendant and another entity). In this case, as in *Edmonson* and others, Plaintiffs had no reason to investigate the factual basis of their claims until shortly before they filed suit. This is more than sufficient to establish the diligence elements of fraudulent concealment, as comparison with the much more public facts of *Edmonson* illustrates.

B. <u>Plaintiffs State a Claim for Relief for Defendants' Antitrust Violations.</u>

The district court also did not reach Defendants' argument that Plaintiffs "fail to allege any actual agreement among Defendants." JA130. This argument is meritless. In fact, Plaintiffs plainly allege that "[e]xecutives in charge of hiring in the naval engineering industry have long adhered to a 'gentlemen's agreement' that prohibits any Defendant from actively recruiting naval engineers from other Defendants." JA074. "[A]ll defendant corporate families that existed in 2000 had joined it by that time." JA076. Each Engineering Defendant was tied to the conspiracy by at least one witness, and details of the allegations supporting the inference that each Defendant was party to the unlawful agreement are provided for

each Defendant. *See, e.g.*, JA076; JA078-079; *see generally* JA074-079 (detailing witness testimony); JA048-065 (detailing Defendant relationships). Taken as a whole, the allegations establish an unusually clear picture of the conspiracy for a pre-discovery complaint.

The allegations are replete with *direct evidence* of the conspiracy, which is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). Paradigmatically, direct evidence includes "eyewitness account[s]." *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996). Nothing further is required to plausibly "suggest that an agreement was made" under *Twombly. Robertson*, 679 F.3d at 289 ("Circumstantial evidence . . . is thus superfluous in light of the direct evidence in the by-laws of the agreement itself."). Lest there be any doubt, however, Plaintiffs *also* alleged Defendants' parallel conduct and "plus factors" more than sufficient to raise a right to relieve above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see* JA080-089; *see also SD3 LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424-32 (4th Cir. 2015) (analyzing parallel conduct and plus factors).

## IV. The District Court Erred in Not Permitting Leave to Amend.

Finally, the district court erred in issuing a final judgment rather than granting Plaintiffs' requests in the alternative for leave to amend, offered in both their

opposition brief and at oral argument. JA211 n. 16; JA238 & n.48; JA324. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Fourth Circuit "reads Rule 15(a) to mean that leave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile." *Matrix Cap. Mgmt. Fund, LP v. Bearingpoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009). A district court's decision to deny leave to amend is reviewed for abuse of discretion. *Id.* at 192. "A district court's failure to articulate its reasons for denying leave to amend does not amount to an abuse of discretion so long as its reasons are apparent." *Id.* However, in similar circumstances, *Matrix* reversed the district court for denying leave to amend *without* articulating a reason beyond its motion to dismiss opinion or determining prejudice, bad faith, or futility. *See id.* at 192-96.

The district court's reasons for denying leave to amend in this case are not apparent. Neither prejudice nor bad faith is present here, and none has been found by the district court. Nor is there any suggestion of futility because the district court entered judgment without giving plaintiffs an opportunity to offer an amendment. Should this Court affirm the district court's ruling in other respects, Plaintiffs could easily supplement their allegations to perfect their claims, given guidance as to where they are deficient.

For example, Plaintiffs can represent that in an amended complaint they could allege that several witnesses who had been Defendants' high-level managers denied the existence of the unwritten "gentleman's agreement" when asked, *and further sought to deflect potential litigation* by suggesting that witnesses had instead been referencing the written, sham no-poach provisions in Defendants' teaming agreements. These allegations illustrate the way former participants in the conspiracy sought to avoid accountability by adverting to Defendants' sham agreements. Plaintiffs can also allege that Defendants' executives used personal cell phones instead of work-issued devices to prevent sensitive communications from being discovered. Any perceived lack of particularity can be supplemented by detailed allegations drawn from witness statements or even pled on information and belief. *See Corder v. Antero Res. Corp.*, 57 F.4th 384, 401-02 (4th Cir. 2023).

## CONCLUSION

For the reasons set forth above, the Court should reverse the judgment of the district court and remand with instructions to deny Defendants' motion. In the alternative, the Court should reverse the judgment with instructions to permit Plaintiffs to amend the Complaint.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument pursuant to Local Rule 34(a).

Dated: July 23, 2024

*/s/ Brent W. Johnson*
    Brent W. Johnson

Steven J. Toll
Robert W. Cobbs
Alison S. Deich
Zachary R. Glubiak
Sabrina S. Merold
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
bjohnson@cohenmilstein.com
stoll@cohenmilstein.com
rcobbs@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com
smerold@cohenmilstein.com

Shana E. Scarlett
Rio S. Pierce
Sarah Dupree
HAGENS BERMAN
SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com
sarahd@hbsslaw.com

Steve W. Berman
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com

Kevin K. Green
HAGENS BERMAN
SOBOL SHAPIRO LLP
533 F Street, Suite 207
San Diego, CA 92101
Tel: (619) 929-3340
keving@hbsslaw.com

Elaine T. Byszewski
HAGENS BERMAN
SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

George F. Farah
Nicholas Jackson
HANDLEY FARAH & ANDERSON
PLLC
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
njackson@hfajustice.com

Simon Wiener
HANDLEY FARAH & ANDERSON
PLLC
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567
swiener@hfajustice.com

***Counsel for Plaintiffs-Appellants***

Candice J. Enders
Julia R. McGrath
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark
Stephen J. Teti
Arielle S. Wagner
Eura Chang
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
bdclark@locklaw.com
sjteti@locklaw.com
aswagner@locklaw.com
echang@locklaw.com

*Additional Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with applicable type-volume and length limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,890 words, excluding the items exempted by FED. R. APP. P. 32(f).

The brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size in Times New Roman.

Dated: July 23, 2024

*/s/ Brent W. Johnson*
Brent W. Johnson

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of Plaintiffs-Appellants with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on July 23, 2024.

I also certify that the foregoing document is being served this day to all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Dated: July 23, 2024

*/s/ Brent W. Johnson*
Brent W. Johnson
