NO. 24-1465

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SUSAN SCHARPF and ANTHONY D'ARMIENTO,
on behalf of themselves and all others similarly
situated

*Plaintiffs-Appellants*

v.

GENERAL DYNAMICS CORPORATION, et al.

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)

---

# JOINT APPENDIX

---

Brent W. Johnson
Steven J. Toll
Robert W. Cobbs
Alison S. Deich
Zachary R. Glubiak
Sabrina S. Merold
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave. NW, Suite
500
Washington, DC 20005
Tel: (202) 408-4600

David G. Barger
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Tel: (703) 749-1307

Douglas E. Litvack
Mathew S. Hellman
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite
900  Washington, DC 20001
Tel: (202) 637-6357

Shana E. Scarlett
Rio S. Pierce
Sarah Dupree
HAGENS BERMAN
SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000

Steve W. Berman
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292

Elaine T. Byszewski
HAGENS BERMAN
SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150

George F. Farah
Nicholas Jackson
HANDLEY FARAH &
ANDERSON PLLC
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090

Simon Wiener
HANDLEY FARAH &
ANDERSON PLLC
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567

*Counsel for Plaintiffs-Appellants*

Michael A. Doornweerd
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 923-2631

*Counsel for Defendants-Appellees
Bath Iron Works Corp., Electric Boat
Corp., General Dynamics Corp., and
General Dynamics Information
Technology, Inc.*

Adam Block Schwartz
Todd Stenerson
David Higbee
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Tel: (202) 508-8000

Sima Namiri-Kalantari
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Tel: (213) 622-4750

Chahira Solh
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Tel: (949) 263-8400

*Counsel for Defendants-Appellees
Huntington Ingalls Industries, Inc.,
HII Fleet Support Group LLC, HII
Mission Technologies Corp., Ingalls
Shipbuilding, Inc., and Newport
News Shipbuilding and Dry Dock
Company*

Candice J. Enders
Julia R. McGrath
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000

Brian D. Clark
Stephen J. Teti
Arielle S. Wagner
Eura Chang
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900

*Additional Counsel for Plaintiffs-Appellants*

John F. Terzaken, III
SIMPSON THACHER & BARTLETT
LLP
900 G Street, NW
Washington, DC 20001
Tel: (202) 636-5500

*Counsel for Defendant-Appellee
Marinette Marine Corp.*

Attison L. Barnes, III
Krystal B. Swendsboe
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000

*Counsel for Defendant-Appellee Bollinger
Shipyards, LLC*

Perry Lange
Jennifer Milici
John W. O'Toole
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 663-6000

*Counsel for Defendant-Appellee Gibbs &
Cox, Inc.*

Benjamin L. Hatch
Casey Erin Lucier
MCGUIREWOODS LLP
888 16th Street, NW
Washington, DC 20006
Tel: (202) 857-1700

J. Brent Justus
Nicholas J. Giles
Joshua D. Wade
W. Cole Geddy
MCGUIREWOODS LLP

Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1018

*Counsel for Defendant-Appellee Serco, Inc.*

Michael F. Murray
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Tel: (202) 551-1700

*Counsel for Defendant-Appellee CACI International, Inc.*

William T. DeVinney
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
Tel: (703) 942-8076

*Counsel for Defendant-Appellee The Columbia Group, Inc.*

Matthew J. MacLean
Alvin Dunn
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Tel: (202) 663-8183

*Counsel for Defendant-Appellee Thor Solutions, LLC*

William E. Lawler, III
Amanda C. DeLaPerriere
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006
Tel: (202) 420-2249

*Counsel for Defendant-Appellee*
*Tridentis, LLC*

Nathan P. Eimer
EIMER STAHL LLP
24 South Michigan Ave., Suite 1100
Chicago, Illinois 60604
Tel: (312)-660-7601

*Counsel for Defendant-Appellee*
*Faststream Recruitment Ltd.*

# TABLE OF CONTENTS

**DOCUMENT**                                                                    **PAGE**

District Court Docket Sheet as of July 17, 2024 .................................................JA001

Dkt. No. 1, Complaint .......................................................................................JA037

Dkt. No. 178, Defendants' Joint Motion to Dismiss.........................................JA112

Dkt. No. 178-1, Memorandum of Law in Support of Defendants'

     Joint Motion to Dismiss ............................................................................JA122

Dkt. No. 202, Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss...JA176

Dkt. No. 211, Defendants' Reply in Support of Joint Motion to Dismiss ........JA243

Dkt. No. 223, Transcript of March 20, 2024, Hearing on Defendants'

     Motion to Dismiss .....................................................................................JA283

Dkt. No. 224, Memorandum Opinion and Order .............................................JA350

Dkt. No. 225, Final Judgment .........................................................................JA366

Dkt. No. 226, Notice of Appeal.......................................................................JA368

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:23-cv-01372-AJT-WEF

Scharpf et al v. General Dynamics Corp. et al
Assigned to: District Judge Anthony J Trenga
Referred to: Magistrate Judge William E. Fitzpatrick
Case in other court: 4CCA, case manager Emily Borneisen,, 24-01465
Cause: 15:1 Antitrust Litigation

Date Filed: 10/06/2023
Date Terminated: 04/19/2024
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Susan Scharpf**
*on behalf of herself and all others similarly situated*

represented by **Rio Pierce**
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue
Suite 300
Berkeley, CA 94710
510-725-3042
Email: riop@hbsslaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alison Sarah Deich**
Cohen Milstein Sellers & Toll PLLC (DC)
1100 New York Ave NW
Suite 500, West Tower
Washington, DC 20005-3965
202-408-4600
Fax: 202-408-4699
Email: adeich@cohenmilstein.com
*ATTORNEY TO BE NOTICED*

**Arielle S. Wagner**
Lockridge Grindal Nauen PLLP (MN-NA)
100 Washington Ave S.
Suite 2200
Minneapolis, MN 55401
**NA**
612-339-6900
Fax: 612-339-0981
Email: aswagner@locklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent William Johnson**
Cohen Milstein Sellers & Toll PLLC (DC-

JA001

NA)
1100 New York Ave NW
Suite 500
Washington, DC 20005-3964
**NA**
202-408-4600
Fax: 202-408-4699
Email: bjohnson@cohenmilstein.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian D. Clark**
Lockridge Grindal Nauen Pllp
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
612-339-6900
Fax: 612-339-0981
Email: bdclark@locklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Candice Enders**
Berger Montague, PC (PA-NA)
1818 Market Street
Suite 3600
Philadelphia, PA 19103
**NA**
215-875-3000
Fax: 215-875-4604
Email: cenders@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elaine T Byszewski**
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue
Ste 920
Pasadena, CA 91101
213-330-7150
Email: elaine@hbsslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eura Chang**
Lockridge Grindal Nauen PLLP (MN-NA)
100 Washington Ave S.
Suite 2200
Minneapolis, MN 55401
**NA**
612-339-6900
Fax: 612-339-0981
Email: echang@locklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George Fuad Farah**
Handley Farah & Anderson PLLC (NY-NA)
33 Irvinig Place
New York, NY 10003
**NA**
212-477-8090
Fax: 844-300-1952
Email: gfarah@hfajustice.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia McGrath**
Berger Montague, PC (PA-NA)
1818 Market Street
Suite 3600
Philadelphia, PA 19103
**NA**
215-875-3000
Fax: 215-875-4604
Email: jmcgrath@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas James Jackson**
Handley Farah & Anderson PLLC (NY-NA)
33 Irvinig Place
New York, NY 10003
**NA**
347-826-1308
Fax: 844-300-1952
Email: njackson@hfajustice.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert White Cobbs**
Cohen Milstein Sellers & Toll PLLC (DC-NA)
1100 New York Ave NW
Suite 500
Washington, DC 20005-3964
**NA**
202-408-4600
Fax: 202-408-4699
Email: rcobbs@cohenmilstein.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shana Scarlett**
Hagens Berman Sobol Shapiro LLP
Hagens Berman Sobol Shapiro LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
510-725-3000

Email: shanas@hbsslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Simon Albert Wiener**
Handley Farah & Anderson PLLC
33 Irving Place
New York, NY 10003
202-921-4567
Email: swiener@hfajustice.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen J Teti**
Lockridge Grindal Nauen P.L.L.P.
100 Washington Ave. S
Ste 2200
Minneapolis, MN 55401
612-339-6900
Fax: 612-339-0981
Email: sjteti@locklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steve W. Berman**
Hagens Berman Sobol Shapiro LLP (WA-NA)
1301 Second Avenue
Suite 2000
Seattle, WA 98101
**NA**
206-623-7292
Fax: 206-623-0594
Email: steve@hbsslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Glubiak**
Cohen Milstein Sellers & Toll
District of Columbia
1100 New York Ave NW
Fifth Floor
Washington
Washington, DC 20005
202-408-4638
Email: zglubiak@cohenmilstein.com
*ATTORNEY TO BE NOTICED*

**Steven Jeffrey Toll**
Cohen Milstein Sellers & Toll PLLC (DC)
1100 New York Ave NW
Suite 500, West Tower
Washington, DC 20005-3965
(202) 408-4600

Email: stoll@cohenmilstein.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Anthony D'Armiento**<br>*on behalf of himself and all others similarly situated* | represented by | **Rio Pierce**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Alison Sarah Deich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Arielle S. Wagner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent William Johnson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brian D. Clark**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Candice Enders**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elaine T Byszewski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eura Chang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George Fuad Farah**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia McGrath**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas James Jackson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert White Cobbs**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shana Scarlett**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Simon Albert Wiener**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen J Teti**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steve W. Berman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Glubiak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Jeffrey Toll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**General Dynamics Corp.**                    represented by **David Glenn Barger**
Greenberg Traurig LLP (McLean)
1750 Tysons Blvd
Suite 1000
McLean, VA 22102
703-749-1307
Fax: 703-749-8307
Email: bargerd@gtlaw.com
*ATTORNEY TO BE NOTICED*

**Douglas Eugene Litvack**
Jenner & Block LLP (DC-NA)
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412

**NA**
202-639-6000
Fax: 202-639-6066
Email: dlitvack@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew S. Hellman**
Jenner & Block LLP (DC-NA)
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
**NA**
202-639-6000
Fax: 202-639-6066
Email: mhellman@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Doornweerd**
Jenner & Block LLP (IL-NA)
353 N Clark Street
Chicago, IL 60654
**NA**
312-222-9350
Fax: 312-527-0484
Email: mdoornweerd@jenner.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

| | | |
|---|---|---|
| **Bath Iron Works Corp.** | represented by | **David Glenn Barger**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Douglas Eugene Litvack**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew S. Hellman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Doornweerd**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

| | | |
|---|---|---|
| **Electric Boat Corp.** | represented by | **David Glenn Barger**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Douglas Eugene Litvack**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew S. Hellman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Doornweerd**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**General Dynamics Information**
**Technology, Inc.**

represented by **David Glenn Barger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas Eugene Litvack**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew S. Hellman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Doornweerd**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Huntington Ingalls Industries, Inc.**

represented by **Adam Block Schwartz**
Shearman & Sterling
401 9th Street, N. W.
Suite 800
Washington, DC 20004
202-508-8000
Email: adam.schwartz@aoshearman.com
*ATTORNEY TO BE NOTICED*

**Chahira Solh**
Crowell & Moring LLP (CA-NA)
3 Park Plaza
20th Floor
Irvine, CA 92614
**NA**
949-263-8400
Fax: 949-263-8414

Email: csolh@crowell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Higbee**
Shearman & Sterling LLP (DC-NA)
401 9th Street, NW
Washington, DC 2004-2128
**NA**
202-508-8000
Fax: 202-508-2100
Email: david.higbee@shearman.com
*ATTORNEY TO BE NOTICED*

**Djordje Petkoski**
Shearman & Sterling LLP (DC-NA)
401 9th Street, NW
Washington, DC 2004-2128
**NA**
202-508-8000
Fax: 202-508-8100
Email: djordje.petkoski@shearman.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Samuels**
401 9th St. NW
Suite 800
Washington, DC 20004
804-852-2060
Email: joseph.samuels@aoshearman.com
*ATTORNEY TO BE NOTICED*

**Robbie Rogart Jost**
Crowell & Moring
1001 Pennsylvania Avenue, NW
Washington, DC 20004
202-624-2556
Email: rrogart@crowell.com
*ATTORNEY TO BE NOTICED*

**Sima Namiri-Kalantari**
Crowell & Morning LLP (CA-NA)
515 South Flower St
41st Floor
Los Angeles, CA 90071
**NA**
213-622-4750
Fax: 213-622-2690
Email: snamiri@crowell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd Michael Stenerson**

Shearman & Sterling LLP (DC-NA)
401 9th Street, NW
Washington, DC 2004-2128
**NA**
202-508-8000
Fax: 202-661-7484
Email: todd.stenerson@shearman.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Newport News Shipbuilding and Dry Dock Co.**    represented by    **Adam Block Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chahira Solh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Higbee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Djordje Petkoski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Samuels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robbie Rogart Jost**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sima Namiri-Kalantari**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd Michael Stenerson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ingalls Shipbuilding, Inc.**    represented by    **Adam Block Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chahira Solh**
(See above for address)

JA010

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Higbee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Djordje Petkoski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Samuels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robbie Rogart Jost**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sima Namiri-Kalantari**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd Michael Stenerson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**HII Mission Technologies Corp.**              represented by **Adam Block Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chahira Solh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Higbee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Djordje Petkoski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Samuels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robbie Rogart Jost**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Sima Namiri-Kalantari**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd Michael Stenerson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**HII Fleet Support Group LLC**          represented by  **Adam Block Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chahira Solh**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Higbee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Djordje Petkoski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Samuels**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robbie Rogart Jost**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sima Namiri-Kalantari**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd Michael Stenerson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marinette Marine Corporation**          represented by  **John Francis Terzaken , III**
Simpson Thacher & Bartlett LLP
900 G Street, NW

Washington, DC 20001
202-636-5858
Fax: 202-636-5502
Email: john.terzaken@stblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abram Ellis**
Simpson Thacher & Bartlett LLP
900 G Street, NW
Washington, DC 20001
202-636-5579
Email: aellis@stblaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allison W. Reimann**
Godfrey & Kahn
One East Main Street
P.O. Box 2719
Suite 500
Madison, WI 53701-2719
608-284-2625
Email: areimann@gklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christie B Carrino**
Godfrey & Kahn
833 East Michigan Street
Suite 1800
Milwaukee, WI 53202
414-273-3500
Fax: 414-273-5198
Email: ccarrino@gklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean O'Donnell Bosack**
Godfrey & Kahn, S.C.
833 E. Michigan Street
Suite 1800
Milwaukee, WI 53202
414-287-9431
Fax: 414-273-5198
Email: sbosack@gklaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bollinger Shipyards, LLC**            represented by **Attison Leonard Barnes , III**
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036

202-719-7000
Fax: 202-719-7049
Email: abarnes@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Park**
Wiley Rein LLP (DC-NA)
2050 M. Street NW
Washington, DC 20036
**NA**
202-719-7000
Fax: 202-719-7049
Email: dpark@wiley.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon Burd**
Wiley Rein LLP (DC-NA)
2050 M. Street NW
Washington, DC 20036
**NA**
202-719-7000
Fax: 202-719-7049
Email: jburd@wiley.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Krystal Brunner Swendsboe**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202-719-4197
Email: kswendsboe@wiley.law
*ATTORNEY TO BE NOTICED*

**Scott McCaleb**
Wiley Rein LLP (DC-NA)
2050 M. Street NW
Washington, DC 20036
**NA**
202-719-7000
Fax: 202-719-7049
Email: smccaleb@wiley.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gibbs & Cox, Inc.**                     represented by **Jennifer Milici**
Wilmer Cutler Pickering Hale & Dorr LLP
(DC-NA)
2100 Pennsylvania Ave NW
Washington, DC 20037
*** NA ***

202-663-6000
Fax: 202-663-6363
Email: jennifer.milici@wilmerhale.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Winfred O'Toole**
Wilmer Cutler Pickering Hale & Dorr LLP
(DC-NA)
2100 Pennsylvania Ave NW
Washington, DC 20037
*** NA ***
202-663-6000
Email: john.otoole@wilmerhale.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Perry Andrew Lange**
Wilmer Cutler Pickering Hale & Dorr LLP
2100 Pennsylvania Ave, NW
Washington, DC 20037
202-663-6493
Email: perry.lange@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Serco, Inc.**                    represented by **Benjamin Lucas Hatch**
McGuireWoods LLP (Norfolk)
101 W Main St
Suite 9000
Norfolk, VA 23510-1655
757-640-3947
Email: bhatch@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Casey Erin Lucier**
McGuireWoods LLP
888 16TH STREET N.W.
Suite 500
BLACK LIVES MATTER PLAZA
Washington, DC 20006
202-857-2482
Fax: 202-828-3322
Email: clucier@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Johnny Brent Justus**
McGuireWoods LLP
800 East Canal St.
Richmond, VA 23219
804-775-1018
Fax: 804-698-2026
Email: bjustus@mcguirewoods.com

*ATTORNEY TO BE NOTICED*

**Joshua Wade**
McGuireWoods LLP
800 E. Canal St.
Richmond, VA 23219
804-775-4388
Email: jwade@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Nicholas James Giles**
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
804-775-4760
Email: ngiles@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**William Cole Geddy**
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
804-775-1128
Email: cgeddy@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**BMT International, Inc.**
*TERMINATED: 02/20/2024*

represented by **Patrick John Curran , Jr.**
Davis Wright Tremaine LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
202-973-4200
Email: patcurran@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Sieff**
Davis Wright Tremaine LLP (Los Angeles-NA)
865 South Figueroa Street
24th Floor
Los Angeles, CA 90017
**NA**
213-633-6800
Email: adamsieff@dwt.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harvey S. Schochet**
Davis Wright Tremaine LLP (San Francisco-NA)
50 California Street

Suite 2300
San Francisco, CA 94111
**NA**
415-276-6500
Email: harveyschochet@dwt.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Technology Financing, Inc.**
*TERMINATED: 02/20/2024*

represented by **Patrick John Curran , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Sieff**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harvey S. Schochet**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Yonaton Rosenzweig**
Davis Wright Tremaine LLP (Los Angeles-NA)
865 South Figueroa Street
24th Floor
Los Angeles, CA 90017
**NA**
213-633-6800
Email: yonirosenzweig@dwt.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CACI International Inc.**

represented by **Christopher C. Brewer**
Paul Hastings LLP
2050 M Street NW
Washington, DC 20036
202-551-1759
Email: chrisbrewer@paulhastings.com
*ATTORNEY TO BE NOTICED*

**Craig Young Lee**
Paul Hasting LLP (DC-NA)
2050 M Street NW
Washington, DC 20036
**NA**
202-551-1700
Fax: 202-551-0252
Email: craiglee@paulhastings.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Michael Murray**
Paul Hasting LLP (DC-NA)
2050 M Street NW
Washington, DC 20036
**NA**
202-551-1700
Fax: 202-551-0230
Email: michaelmurray@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Molly Teague**
Paul Hastings LLP (DC-NA)
2050 M Street NW
Washington, DC 20036
**NA**
202-551-1700
Fax: 202-551-0472
Email: mollyteague@paulhastings.om
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan Patrick Phair**
Paul Hasting LLP (DC-NA)
2050 M Street NW
Washington, DC 20036
**NA**
202-551-1700
Fax: 202-551-0251
Email: ryanphair@paulhastings.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Columbia Group, Inc.**                    represented by **William Devinney**
BrigliaHundley
1921 Gallows Road
Tysons, VA 22182
703-942-8076
Email: wdevinney@brigliahundley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thor Solutions, LLC**                    represented by **Matthew Jeffrey Maclean**
Pillsbury Winthrop Shaw Pittman LLP (DC)
1200 17th Street, NW
Washington, DC 20036
202-663-8000
Fax: 202-663-8007
Email: matthew.maclean@pillsburylaw.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Alvin Dunn**
Pillsbury Winthrop Shaw Pittman LLP (DC
- NA)
1200 Seventeenth Street, NW
Washington, DC 20036
**NA**
202-663-8000
Fax: 202-663-8007
Email: alvin.dunn@pillsburylaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tridentis, LLC**                    represented by    **Amanda DeLaPerriere**
Blank Rome LLP
1825 Eye Street NW
Washington, DC 20006
478-278-2969
Email:
amanda.delaperriere@blankrome.com
*ATTORNEY TO BE NOTICED*

**Carolyn Rachel Cody-Jones**
Blank Rome LLP (DC)
1825 Eye Street NW
Washington, DC 20006
202-420-2589
Fax: 202-572-1420
Email: carolyn.r.cody@gmail.com
*TERMINATED: 01/22/2024*

**William Lawler , III**
Blank Rome LLP (DC-NA)
1825 Eye Street NW
Washington, DC 20006
**NA**
202-420-2200
Fax: 202-330-5460
Email: wlawler@blankrome.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Faststream Recruitment Ltd.**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/06/2023 | 1 | Complaint *Class Action Complaint* ( Filing fee $ 402, receipt number AVAEDC-9162407.), filed by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Civil Cover Sheet)(Toll, Steven) (Attachment 1 replaced to correct pdf fillable form on 10/10/2023)(Dest). (Entered: 10/06/2023) |

JA019

| 10/06/2023 | [2](#) | Proposed Summons *General Dynamics Corp.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
|---|---|---|
| 10/06/2023 | [3](#) | Proposed Summons *Bath Iron Works Corp.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [4](#) | Proposed Summons *Electric Boat Corp.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [5](#) | Proposed Summons *General Dynamics Information Technology, Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [6](#) | Proposed Summons *Huntington Ingalls Industries, Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [7](#) | Proposed Summons *Newport News Shipbuilding and Dry Dock Co.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [8](#) | Proposed Summons *Ingalls Shipbuilding, Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [9](#) | Proposed Summons *HII Mission Technologies Corp.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [10](#) | Proposed Summons *HII Fleet Support Group LLC* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [11](#) | Proposed Summons *Marinette Marine Corporation* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [12](#) | Proposed Summons *Bollinger Shipyards, LLC* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [13](#) | Proposed Summons *Gibbs & Cox, Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [14](#) | Proposed Summons *Serco, Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [15](#) | Proposed Summons *BMT International, Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [16](#) | Proposed Summons *Technology Financing, Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [17](#) | Proposed Summons *CACI International Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [18](#) | Proposed Summons *The Columbia Group, Inc.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [19](#) | Proposed Summons *Thor Solutions, LLC* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [20](#) | Proposed Summons *Tridentis, LLC* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |
| 10/06/2023 | [21](#) | Proposed Summons *Faststream Recruitment Ltd.* by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 10/06/2023) |

| 10/06/2023 | | Initial Case Assignment to District Judge Anthony J Trenga and Magistrate Judge William E. Fitzpatrick. (Dest) (Entered: 10/10/2023) |
|---|---|---|
| 10/10/2023 | 22 | Summons Issued as to BMT International, Inc., Bath Iron Works Corp., Bollinger Shipyards, LLC, CACI International Inc., Electric Boat Corp., Faststream Recruitment Ltd., General Dynamics Corp., General Dynamics Information Technology, Inc., Gibbs & Cox, Inc., HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Marinette Marine Corporation, Newport News Shipbuilding and Dry Dock Co., Serco, Inc., Technology Financing, Inc., The Columbia Group, Inc., Thor Solutions, LLC, Tridentis, LLC, NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Notice to Attorney) (Dest) (Entered: 10/10/2023) |
| 10/13/2023 | 23 | NOTICE of Appearance by Alison Sarah Deich on behalf of Anthony D'Armiento, Susan Scharpf (Deich, Alison) (Entered: 10/13/2023) |
| 10/16/2023 | 24 | Motion to appear Pro Hac Vice by Brent W. Johnson and Certification of Local Counsel Alison Deich Filing fee $ 75, receipt number AVAEDC-9172570. by Anthony D'Armiento, Susan Scharpf. (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 25 | Motion to appear Pro Hac Vice by Robert W. Cobbs and Certification of Local Counsel Alison Deich Filing fee $ 75, receipt number AVAEDC-9172606. by Anthony D'Armiento, Susan Scharpf. (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 26 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf CACI International Inc. served on 10/12/2023, answer due 11/2/2023 (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 27 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Electric Boat Corp. served on 10/12/2023, answer due 11/2/2023 (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 28 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf HII Fleet Support Group LLC served on 10/12/2023, answer due 11/2/2023 (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 29 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Huntington Ingalls Industries, Inc. served on 10/12/2023, answer due 11/2/2023 (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 30 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Ingalls Shipbuilding, Inc. served on 10/12/2023, answer due 11/2/2023 (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 31 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Marinette Marine Corporation served on 10/12/2023, answer due 11/2/2023 (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 32 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Newport News Shipbuilding and Dry Dock Co. served on 10/12/2023, answer due 11/2/2023 (Deich, Alison) (Entered: 10/16/2023) |
| 10/16/2023 | 33 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Technology Financing, Inc. served on 10/12/2023, answer due 11/2/2023 (Deich, Alison) (Entered: |

| | | 10/16/2023) |
|---|---|---|
| 10/16/2023 | [34](#) | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Bollinger Shipyards, LLC served on 10/13/2023, answer due 11/3/2023 (Deich, Alison) Modified text to correct service date on 10/17/2023 (Dest). (Entered: 10/16/2023) |
| 10/17/2023 | [35](#) | ORDER granting [24](#) Motion for Pro hac vice Appointed Brent William Johnson for Anthony D'Armiento,Brent William Johnson for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/17/2023. (swil) (Entered: 10/17/2023) |
| 10/17/2023 | [36](#) | ORDER granting [25](#) Motion for Pro hac vice Appointed Robert White Cobbs for Anthony D'Armiento,Robert White Cobbs for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/17/2023. (swil) (Entered: 10/17/2023) |
| 10/17/2023 | [37](#) | NOTICE of Appearance by Zachary Glubiak on behalf of Anthony D'Armiento, Susan Scharpf (Glubiak, Zachary) (Entered: 10/17/2023) |
| 10/17/2023 | [38](#) | Motion to appear Pro Hac Vice by Elaine T. Byszewski and Certification of Local Counsel Alison Deich Filing fee $ 75, receipt number AVAEDC-9175389. by Anthony D'Armiento, Susan Scharpf. (Deich, Alison) (Entered: 10/17/2023) |
| 10/17/2023 | [39](#) | Motion to appear Pro Hac Vice by Rio S. Pierce and Certification of Local Counsel Alison Deich Filing fee $ 75, receipt number AVAEDC-9175397. by Anthony D'Armiento, Susan Scharpf. (Deich, Alison) (Entered: 10/17/2023) |
| 10/17/2023 | [40](#) | Motion to appear Pro Hac Vice by Shana E. Scarlett and Certification of Local Counsel Alison Deich Filing fee $ 75, receipt number AVAEDC-9175399. by Anthony D'Armiento, Susan Scharpf. (Deich, Alison) (Entered: 10/17/2023) |
| 10/17/2023 | [41](#) | Motion to appear Pro Hac Vice by Steve W. Berman and Certification of Local Counsel Alison Deich Filing fee $ 75, receipt number AVAEDC-9175401. by Anthony D'Armiento, Susan Scharpf. (Deich, Alison) (Entered: 10/17/2023) |
| 10/18/2023 | [42](#) | ORDER granting [38](#) Motion for Pro hac vice Appointed Elaine T Byszewski for Anthony D'Armiento,Elaine T Byszewski for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/18/2023. (swil) (Entered: 10/18/2023) |
| 10/18/2023 | [43](#) | ORDER granting [39](#) Motion for Pro hac vice Appointed Rio Pierce for Anthony D'Armiento,Rio Pierce for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/18/2023. (swil) (Entered: 10/18/2023) |
| 10/18/2023 | [44](#) | ORDER granting [40](#) Motion for Pro hac vice Appointed Shana Scarlett for Anthony D'Armiento,Shana Scarlett for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/18/2023. (swil) (Entered: 10/18/2023) |
| 10/18/2023 | [45](#) | ORDER granting [41](#) Motion for Pro hac vice Appointed Steve W. Berman for Anthony D'Armiento,Steve W. Berman for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/18/2023. (swil) (Entered: 10/18/2023) |
| 10/18/2023 | [46](#) | WAIVER OF SERVICE Returned Executed by Anthony D'Armiento, Susan Scharpf. Bath Iron Works Corp. waiver sent on 10/17/2023, answer due 12/18/2023. (Glubiak, Zachary) (Entered: 10/18/2023) |
| 10/18/2023 | [47](#) | WAIVER OF SERVICE Returned Executed by Anthony D'Armiento, Susan Scharpf. General Dynamics Corp. waiver sent on 10/17/2023, answer due 12/18/2023. (Glubiak, Zachary) (Entered: 10/18/2023) |
| 10/18/2023 | [48](#) | WAIVER OF SERVICE Returned Executed by Anthony D'Armiento, Susan Scharpf. General Dynamics Information Technology, Inc. waiver sent on 10/17/2023, answer due 12/18/2023. (Glubiak, Zachary) (Entered: 10/18/2023) |

| 10/19/2023 | 49 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Tridentis, LLC served on 10/13/2023, answer due 11/3/2023 (Glubiak, Zachary) (Entered: 10/19/2023) |
|---|---|---|
| 10/19/2023 | 50 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf HII Mission Technologies Corp. served on 10/12/2023, answer due 11/2/2023 (Glubiak, Zachary) (Entered: 10/19/2023) |
| 10/19/2023 | 51 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Gibbs & Cox, Inc. served on 10/13/2023, answer due 11/3/2023 (Glubiak, Zachary) (Entered: 10/19/2023) |
| 10/19/2023 | 52 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf Serco, Inc. served on 10/13/2023, answer due 11/3/2023 (Glubiak, Zachary) (Entered: 10/19/2023) |
| 10/19/2023 | 53 | NOTICE of Appearance by Adam Block Schwartz on behalf of HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Newport News Shipbuilding and Dry Dock Co. (Schwartz, Adam) (Entered: 10/19/2023) |
| 10/19/2023 | 54 | Motion to appear Pro Hac Vice by David Higbee and Certification of Local Counsel Adam Schwartz Filing fee $ 75, receipt number AVAEDC-9180151. by HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Newport News Shipbuilding and Dry Dock Co.. (Schwartz, Adam) (Entered: 10/19/2023) |
| 10/19/2023 | 55 | Motion to appear Pro Hac Vice by Todd Michael Stenerson and Certification of Local Counsel Adam Schwartz Filing fee $ 75, receipt number AVAEDC-9180168. by HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Newport News Shipbuilding and Dry Dock Co.. (Schwartz, Adam) (Entered: 10/19/2023) |
| 10/19/2023 | 56 | Motion to appear Pro Hac Vice by Djordje Petkoski and Certification of Local Counsel Adam Schwartz Filing fee $ 75, receipt number AVAEDC-9180173. by HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Newport News Shipbuilding and Dry Dock Co.. (Schwartz, Adam) (Entered: 10/19/2023) |
| 10/20/2023 | 57 | ORDER granting 54 Motion for Pro hac vice Appointed David Higbee for HII Fleet Support Group LLC,David Higbee for HII Mission Technologies Corp.,David Higbee for Huntington Ingalls Industries, Inc.,David Higbee for Ingalls Shipbuilding, Inc.,David Higbee for Newport News Shipbuilding and Dry Dock Co. Signed by District Judge Anthony J Trenga on 10/20/2023. (swil) (Entered: 10/20/2023) |
| 10/20/2023 | 58 | ORDER granting 55 Motion for Pro hac vice Appointed Todd Michael Stenerson for HII Fleet Support Group LLC,Todd Michael Stenerson for HII Mission Technologies Corp.,Todd Michael Stenerson for Huntington Ingalls Industries, Inc.,Todd Michael Stenerson for Ingalls Shipbuilding, Inc.,Todd Michael Stenerson for Newport News Shipbuilding and Dry Dock Co. Signed by District Judge Anthony J Trenga on 10/20/2023. (swil) (Entered: 10/20/2023) |
| 10/20/2023 | 59 | ORDER granting 56 Motion for Pro hac vice Appointed Djordje Petkoski for HII Fleet Support Group LLC,Djordje Petkoski for HII Mission Technologies Corp.,Djordje Petkoski for Huntington Ingalls Industries, Inc.,Djordje Petkoski for Ingalls Shipbuilding, Inc.,Djordje Petkoski for Newport News Shipbuilding and Dry Dock Co. Signed by District Judge Anthony J Trenga on 10/20/2023. (swil) (Entered: 10/20/2023) |
| 10/20/2023 | 60 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf; Thor Solutions, LLC served on 10/16/2023, answer due 11/6/2023 (Glubiak, Zachary) (Entered: |

| | | |
|---|---|---|
| | | 10/20/2023) |
| 10/20/2023 | 61 | NOTICE of Appearance by Perry Andrew Lange on behalf of Gibbs & Cox, Inc. (Lange, Perry) (Entered: 10/20/2023) |
| 10/20/2023 | 62 | Motion to appear Pro Hac Vice by Jennifer Milici and Certification of Local Counsel Perry Lange Filing fee $ 75, receipt number AVAEDC-9182221. by Gibbs & Cox, Inc.. (Lange, Perry) (Entered: 10/20/2023) |
| 10/20/2023 | 63 | Financial Interest Disclosure Statement (Local Rule 7.1) by Gibbs & Cox, Inc.. (Lange, Perry) (Entered: 10/20/2023) |
| 10/23/2023 | 64 | ORDER granting 62 Motion for Pro hac vice Appointed Jennifer Milici for Gibbs & Cox, Inc. Signed by District Judge Anthony J Trenga on 10/23/2023. (swil) (Entered: 10/23/2023) |
| 10/23/2023 | 65 | NOTICE of Appearance by David Glenn Barger on behalf of Bath Iron Works Corp., Electric Boat Corp., General Dynamics Corp., General Dynamics Information Technology, Inc. (Barger, David) (Entered: 10/23/2023) |
| 10/24/2023 | 66 | Corporate Disclosure Statement by General Dynamics Corp.. (Barger, David) (Entered: 10/24/2023) |
| 10/24/2023 | 67 | Corporate Disclosure Statement by Bath Iron Works Corp.. (Barger, David) (Entered: 10/24/2023) |
| 10/24/2023 | 68 | Corporate Disclosure Statement by Electric Boat Corp.. (Barger, David) (Entered: 10/24/2023) |
| 10/24/2023 | 69 | Corporate Disclosure Statement by General Dynamics Information Technology, Inc.. (Barger, David) (Entered: 10/24/2023) |
| 10/24/2023 | 70 | Financial Interest Disclosure Statement (Local Rule 7.1) by Huntington Ingalls Industries, Inc.. (Schwartz, Adam) (Entered: 10/24/2023) |
| 10/24/2023 | 71 | Financial Interest Disclosure Statement (Local Rule 7.1) by HII Fleet Support Group LLC. (Schwartz, Adam) (Entered: 10/24/2023) |
| 10/24/2023 | 72 | Financial Interest Disclosure Statement (Local Rule 7.1) by HII Mission Technologies Corp.. (Schwartz, Adam) (Entered: 10/24/2023) |
| 10/24/2023 | 73 | SUMMONS Returned Executed by Anthony D'Armiento, Susan Scharpf BMT International, Inc. served on 10/16/2023, answer due 11/6/2023 (Glubiak, Zachary) (Entered: 10/24/2023) |
| 10/24/2023 | 74 | Financial Interest Disclosure Statement (Local Rule 7.1) by Ingalls Shipbuilding, Inc.. (Schwartz, Adam) (Entered: 10/24/2023) |
| 10/24/2023 | 75 | Financial Interest Disclosure Statement (Local Rule 7.1) by Newport News Shipbuilding and Dry Dock Co.. (Schwartz, Adam) (Entered: 10/24/2023) |
| 10/24/2023 | 76 | Motion to appear Pro Hac Vice by George F. Farah and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9186148. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 10/24/2023) |
| 10/24/2023 | 77 | Motion to appear Pro Hac Vice by Nicholas J. Jackson and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9186196. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 10/24/2023) |
| 10/24/2023 | 78 | Motion to appear Pro Hac Vice by Simon A. Wiener and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9186202. by Anthony |

| | | |
|---|---|---|
| | | D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 10/24/2023) |
| 10/25/2023 | 79 | ORDER granting 76 Motion for Pro hac vice Appointed George Fuad Farah for Anthony D'Armiento,George Fuad Farah for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/25/2023. (swil) (Entered: 10/25/2023) |
| 10/25/2023 | 80 | ORDER granting 77 Motion for Pro hac vice Appointed Nicholas James Jackson for Anthony D'Armiento,Nicholas James Jackson for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/25/2023. (swil) (Entered: 10/25/2023) |
| 10/25/2023 | 81 | ORDER granting 78 Motion for Pro hac vice Appointed Simon A. Wiener for Anthony D'Armiento,George Fuad Farah for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/25/2023. (swil) Modified to update attorney on 12/22/2023 (swil). (Entered: 10/25/2023) |
| 10/25/2023 | 82 | Joint MOTION for Extension of Time to File Answer *to Complaint* by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Exhibit A (Proposed Order))(Toll, Steven) (Entered: 10/25/2023) |
| 10/25/2023 | 83 | Waiver of *Notice of Hearing* by Anthony D'Armiento, Susan Scharpf (Toll, Steven) (Entered: 10/25/2023) |
| 10/25/2023 | 84 | Motion to appear Pro Hac Vice by Douglas E. Litvack and Certification of Local Counsel David G. Barger Filing fee $ 75, receipt number BVAEDC-9188223. by Bath Iron Works Corp., Electric Boat Corp., General Dynamics Corp., General Dynamics Information Technology, Inc.. (Barger, David) (Entered: 10/25/2023) |
| 10/25/2023 | 85 | Motion to appear Pro Hac Vice by Michael Doornweerd and Certification of Local Counsel David G. Barger Filing fee $ 75, receipt number AVAEDC-9188255. by Bath Iron Works Corp., Electric Boat Corp., General Dynamics Corp., General Dynamics Information Technology, Inc.. (Barger, David) (Entered: 10/25/2023) |
| 10/25/2023 | 86 | ORDERED the Court GRANTS the Motion and extends Electric Boat's deadline to respond to the complaint in this matter to December 18, 2023 in re 82 Joint MOTION for Extension of Time to File Answer *to Complaint*. Signed by Magistrate Judge William E. Fitzpatrick on 10/25/2023. (swil) (Entered: 10/26/2023) |
| 10/26/2023 | 87 | ORDER granting 84 Motion for Pro hac vice Appointed Douglas Eugene Litvack for Bath Iron Works Corp.,Douglas Eugene Litvack for Electric Boat Corp.,Douglas Eugene Litvack for General Dynamics Corp.,Douglas Eugene Litvack for General Dynamics Information Technology, Inc. Signed by District Judge Anthony J Trenga on 10/26/2023. (swil) (Entered: 10/26/2023) |
| 10/26/2023 | 88 | ORDER granting 85 Motion for Pro hac vice Appointed Michael Doornweerd for Bath Iron Works Corp.,Michael Doornweerd for Electric Boat Corp.,Michael Doornweerd for General Dynamics Corp.,Michael Doornweerd for General Dynamics Information Technology, Inc. Signed by District Judge Anthony J Trenga on 10/26/2023. (swil) (Entered: 10/26/2023) |
| 10/27/2023 | 89 | MOTION for Extension of Time to File Response/Reply as to 1 Complaint, by Bollinger Shipyards, LLC. (Attachments: # 1 Proposed Order Proposed Order)(Barnes, Attison) (Entered: 10/27/2023) |
| 10/27/2023 | 90 | Waiver of *Notice of Hearing* by Bollinger Shipyards, LLC (Barnes, Attison) (Entered: 10/27/2023) |
| 10/27/2023 | 91 | Corporate Disclosure Statement by Bollinger Shipyards, LLC. (Barnes, Attison) (Entered: 10/27/2023) |

| 10/27/2023 | 92 | NOTICE of Appearance by Krystal Brunner Swendsboe on behalf of Bollinger Shipyards, LLC (Swendsboe, Krystal) (Entered: 10/27/2023) |
|---|---|---|
| 10/30/2023 | 93 | ORDERED that Defendant Bollinger Shipyards, LLC's deadline to answer or otherwise respond to Plaintiffs' Complaint is extended by thirty (30) days, with such responsive pleadings to be served no later than December 3, 2023 in re 89 MOTION for Extension of Time to File Response/Reply as to 1 Complaint. Signed by Magistrate Judge William E. Fitzpatrick on 10/30/2023. (swil) (Entered: 10/31/2023) |
| 10/31/2023 | 94 | NOTICE of Appearance by Carolyn Rachel Cody-Jones on behalf of Tridentis, LLC (Cody-Jones, Carolyn) (Entered: 10/31/2023) |
| 10/31/2023 | 95 | Financial Interest Disclosure Statement (Local Rule 7.1) by Tridentis, LLC. (Cody-Jones, Carolyn) Modified text to correct filing event on 11/1/2023 (Dest). (Entered: 10/31/2023) |
| 10/31/2023 | 96 | Motion to appear Pro Hac Vice by William Lawler and Certification of Local Counsel Carolyn Cody-Jones Filing fee $ 75, receipt number AVAEDC-9196285. by Tridentis, LLC. (Cody-Jones, Carolyn) (Entered: 10/31/2023) |
| 10/31/2023 | 97 | Motion to appear Pro Hac Vice by Stephen J. Teti and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9196716. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 10/31/2023) |
| 10/31/2023 | 98 | ORDER granting 96 Motion for Pro hac vice Appointed William Lawler, III for Tridentis, LLC. Signed by District Judge Anthony J Trenga on 10/31/2023. (swil) (Entered: 10/31/2023) |
| 10/31/2023 | 99 | Motion to appear Pro Hac Vice by Arielle S. Wagner and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9196751. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 10/31/2023) |
| 10/31/2023 | 100 | Motion to appear Pro Hac Vice by Eura Chang and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9196767. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 10/31/2023) |
| 10/31/2023 | 101 | Motion to appear Pro Hac Vice by Brian D. Clark and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9196782. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 10/31/2023) |
| 10/31/2023 | 102 | ORDER granting 100 Motion for Pro hac vice Appointed Eura Chang for Anthony D'Armiento,Eura Chang for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/31/2023. (swil) (Entered: 10/31/2023) |
| 10/31/2023 | 103 | ORDER granting 101 Motion for Pro hac vice Appointed Brian Clark for Anthony D'Armiento,Brian Clark for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/31/2023. (swil) (Entered: 10/31/2023) |
| 10/31/2023 | 104 | ORDER granting 99 Motion for Pro hac vice Appointed Arielle S. Wagner for Anthony D'Armiento,Arielle S. Wagner for Susan Scharpf. Signed by District Judge Anthony J Trenga on 10/31/2023. (swil) (Entered: 10/31/2023) |
| 10/31/2023 | 105 | NOTICE of Appearance by Nicholas James Giles on behalf of Serco, Inc. (Giles, Nicholas) (Entered: 10/31/2023) |
| 10/31/2023 | 106 | NOTICE of Appearance by Johnny Brent Justus on behalf of Serco, Inc. (Justus, Johnny) (Entered: 10/31/2023) |
| 10/31/2023 | 107 | NOTICE of Appearance by Casey Erin Lucier on behalf of Serco, Inc. (Lucier, Casey) (Entered: 10/31/2023) |

| 10/31/2023 | 108 | NOTICE of Appearance by Benjamin Lucas Hatch on behalf of Serco, Inc. (Hatch, Benjamin) (Entered: 10/31/2023) |
|---|---|---|
| 10/31/2023 | 109 | NOTICE of Appearance by William Cole Geddy on behalf of Serco, Inc. (Geddy, William) (Entered: 10/31/2023) |
| 11/01/2023 | 110 | NOTICE of Appearance by Matthew Jeffrey Maclean on behalf of Thor Solutions, LLC (Maclean, Matthew) (Entered: 11/01/2023) |
| 11/01/2023 | | Notice of Correction re 95 Corporate Disclosure Statement. Unfortunately, the document was filed using the wrong docket event. The "Financial Interest Disclosure Statement (Local Rule 7.1)" event was incorrectly filed as "Corporate Disclosure Statement." The clerk's office staff corrected this error. No further action is required at this time. (Dest) (Entered: 11/01/2023) |
| 11/01/2023 | 111 | Financial Interest Disclosure Statement (Local Rule 7.1) by Thor Solutions, LLC. (Maclean, Matthew) (Entered: 11/01/2023) |
| 11/01/2023 | 112 | NOTICE of Appearance by Christopher C. Brewer on behalf of CACI International Inc. (Brewer, Christopher) (Entered: 11/01/2023) |
| 11/01/2023 | 113 | Motion to appear Pro Hac Vice by Ryan P. Phair and Certification of Local Counsel Christopher C. Brewer Filing fee $ 75, receipt number AVAEDC-9199844. by CACI International Inc.. (Brewer, Christopher) (Entered: 11/01/2023) |
| 11/01/2023 | 114 | Motion to appear Pro Hac Vice by Michael F. Murray and Certification of Local Counsel Christopher C. Brewer Filing fee $ 75, receipt number AVAEDC-9199868. by CACI International Inc.. (Brewer, Christopher) (Entered: 11/01/2023) |
| 11/01/2023 | 115 | Motion to appear Pro Hac Vice by Craig Y. Lee and Certification of Local Counsel Christopher C. Brewer Filing fee $ 75, receipt number AVAEDC-9199871. by CACI International Inc.. (Brewer, Christopher) (Entered: 11/01/2023) |
| 11/01/2023 | 116 | Financial Interest Disclosure Statement (Local Rule 7.1) by CACI International Inc.. (Brewer, Christopher) (Entered: 11/01/2023) |
| 11/02/2023 | 117 | Joint MOTION for Extension of Time to File Answer *and for Extended Page Limits* by Gibbs & Cox, Inc.. (Attachments: # 1 Proposed Order)(Lange, Perry) (Entered: 11/02/2023) |
| 11/02/2023 | 118 | Motion to appear Pro Hac Vice by Alvin Dunn and Certification of Local Counsel Matthew J. MacLean Filing fee $ 75, receipt number AVAEDC-9200528. by Thor Solutions, LLC. (Maclean, Matthew) (Entered: 11/02/2023) |
| 11/02/2023 | 119 | NOTICE of Appearance by Joshua Wade on behalf of Serco, Inc. (Wade, Joshua) (Entered: 11/02/2023) |
| 11/02/2023 | 120 | Waiver of *Notice of Hearing for 117 Joint MOTION for Extension of Time to File Answer and for Extended Page Limits* by Gibbs & Cox, Inc. (Lange, Perry) (Entered: 11/02/2023) |
| 11/02/2023 | 121 | ORDER granting 118 Motion for Pro hac vice Appointed Alvin Dunn for Thor Solutions, LLC. Signed by District Judge Anthony J Trenga on 11/2/2023. (swil) (Entered: 11/02/2023) |
| 11/03/2023 | 122 | ORDER granting 117 Joint MOTION for Extension of Time to File Answer *and for Extended Page Limits*, and extend deadline for the above Defendants to respond to the complaint in this matter to December 18, 2023. The Plaintiffs' opposition brief(s) will be due February 20, 2024, and the above Defendants' reply brief(s) will be due on March 5, |

| | | |
|---|---|---|
| | | 2024 (see Order for further details). Signed by Magistrate Judge William E. Fitzpatrick on 11/3/2023. (Dest) (Entered: 11/03/2023) |
| 11/03/2023 | 123 | Financial Interest Disclosure Statement (Local Rule 7.1) by Serco, Inc.. (Wade, Joshua) (Entered: 11/03/2023) |
| 11/06/2023 | 124 | Motion to appear Pro Hac Vice by Sabrina S. Merold and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9206470. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 11/06/2023) |
| 11/06/2023 | 125 | Motion to appear Pro Hac Vice by Candice J. Enders and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9206499. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 11/06/2023) |
| 11/06/2023 | 126 | Motion to appear Pro Hac Vice by Julia R. McGrath and Certification of Local Counsel Zachary R. Glubiak Filing fee $ 75, receipt number AVAEDC-9206516. by Anthony D'Armiento, Susan Scharpf. (Glubiak, Zachary) (Entered: 11/06/2023) |
| 11/06/2023 | 127 | ORDER granting 97 Motion for Pro hac vice Appointed Stephen John Teti for Anthony D'Armiento,Stephen John Teti for Susan Scharpf. Signed by District Judge Anthony J Trenga on 11/6/2023. (swil) (Entered: 11/07/2023) |
| 11/06/2023 | 128 | ORDER granting 113 Motion for Pro hac vice Appointed Ryan Patrick Phair for CACI International Inc. Signed by District Judge Anthony J Trenga on 11/6/2023. (swil) (Entered: 11/07/2023) |
| 11/06/2023 | 129 | ORDER granting 114 Motion for Pro hac vice Appointed Michael Murray for CACI International Inc. Signed by District Judge Anthony J Trenga on 11/6/2023. (swil) (Entered: 11/07/2023) |
| 11/06/2023 | 130 | ORDER granting 115 Motion for Pro hac vice Appointed Craig Young Lee for CACI International Inc. Signed by District Judge Anthony J Trenga on 11/6/2023. (swil) (Entered: 11/07/2023) |
| 11/07/2023 | 131 | Motion to appear Pro Hac Vice by Jon Burd and Certification of Local Counsel Krystal B. Swendsboe Filing fee $ 75, receipt number AVAEDC-9207956. by Bollinger Shipyards, LLC. (Swendsboe, Krystal) (Entered: 11/07/2023) |
| 11/07/2023 | 132 | Motion to appear Pro Hac Vice by Scott McCaleb and Certification of Local Counsel Krystal B. Swendsboe Filing fee $ 75, receipt number AVAEDC-9207989. by Bollinger Shipyards, LLC. (Swendsboe, Krystal) (Entered: 11/07/2023) |
| 11/07/2023 | 133 | Motion to appear Pro Hac Vice by Daniel Park and Certification of Local Counsel Krystal B. Swendsboe Filing fee $ 75, receipt number AVAEDC-9207998. by Bollinger Shipyards, LLC. (Swendsboe, Krystal) (Entered: 11/07/2023) |
| 11/07/2023 | 134 | ORDER granting 131 Motion for Pro hac vice Appointed Jon Burd for Bollinger Shipyards, LLC. Signed by District Judge Anthony J Trenga on 11/7/2023. (swil) (Entered: 11/07/2023) |
| 11/07/2023 | 135 | ORDER granting 132 Motion for Pro hac vice Appointed Scott McCaleb for Bollinger Shipyards, LLC. Signed by District Judge Anthony J Trenga on 11/7/2023. (swil) (Entered: 11/07/2023) |
| 11/07/2023 | | Notice of Correction: The application to qualify as a foreign attorney does not include the name(s) of any federal district court(s) in which the applicant has been admitted to practice. The motion will not be ruled upon until this information is provided to the Court in re 133 Motion to appear Pro Hac Vice by Daniel Park and Certification of Local Counsel Krystal B. Swendsboe. (wgar, ) (Entered: 11/07/2023) |

| | | |
|---|---|---|
| 11/07/2023 | | Notice of Correction: The application to qualify as a foreign attorney does not include the name(s) of any federal district court(s) in which the applicant has been admitted to practice. The motion will not be ruled upon until this information is provided to the Court in re 124 Motion to appear Pro Hac Vice by Sabrina S. Merold and Certification of Local Counsel Zachary R. Glubiak. (wgar, ) (Entered: 11/07/2023) |
| 11/07/2023 | 136 | ORDER granting 125 Motion for Pro hac vice Appointed Candice Enders for Anthony D'Armiento,Candice Enders for Susan Scharpf. Signed by District Judge Anthony J Trenga on 11/7/2023. (swil) (Entered: 11/08/2023) |
| 11/07/2023 | 137 | ORDER granting 126 Motion for Pro hac vice Appointed Julia McGrath for Anthony D'Armiento,Julia McGrath for Susan Scharpf. Signed by District Judge Anthony J Trenga on 11/7/2023. (swil) (Entered: 11/08/2023) |
| 11/09/2023 | 138 | NOTICE of Appearance by Patrick John Curran, Jr on behalf of BMT International, Inc., Technology Financing, Inc. (Curran, Patrick) (Entered: 11/09/2023) |
| 11/09/2023 | 139 | Corporate Disclosure Statement by BMT International, Inc.. (Curran, Patrick) (Entered: 11/09/2023) |
| 11/09/2023 | 140 | Corporate Disclosure Statement by Technology Financing, Inc.. (Curran, Patrick) (Entered: 11/09/2023) |
| 11/13/2023 | 141 | NOTICE of Appearance by John Francis Terzaken, III on behalf of Marinette Marine Corporation (Terzaken, John) (Entered: 11/13/2023) |
| 11/13/2023 | 142 | Motion to appear Pro Hac Vice by Sean O'D. Bosack and Certification of Local Counsel John Francis Terzaken, III Filing fee $ 75, receipt number AVAEDC-9215610. by Marinette Marine Corporation. (Terzaken, John) (Entered: 11/13/2023) |
| 11/13/2023 | 143 | Motion to appear Pro Hac Vice by Allison W. Reimann and Certification of Local Counsel John Francis Terzaken, III Filing fee $ 75, receipt number AVAEDC-9215648. by Marinette Marine Corporation. (Terzaken, John) (Entered: 11/13/2023) |
| 11/13/2023 | 144 | ORDER granting 142 Motion for Pro hac vice Appointed Sean O'D Bosack for Marinette Marine Corporation. Signed by District Judge Anthony J Trenga on 11/13/2023. (swil) (Entered: 11/13/2023) |
| 11/13/2023 | 145 | Motion to appear Pro Hac Vice by Christie B. Carrino and Certification of Local Counsel John Francis Terzaken, III Filing fee $ 75, receipt number AVAEDC-9215664. by Marinette Marine Corporation. (Terzaken, John) (Entered: 11/13/2023) |
| 11/13/2023 | 146 | Motion to appear Pro Hac Vice by Adam Sieff and Certification of Local Counsel Patrick Curran Filing fee $ 75, receipt number BVAEDC-9215583. by BMT International, Inc., Technology Financing, Inc.. (Curran, Patrick) (Entered: 11/13/2023) |
| 11/13/2023 | 147 | ORDER granting 143 Motion for Pro hac vice Appointed Allison W. Reimann for Marinette Marine Corporation. Signed by District Judge Anthony J Trenga on 11/13/2023. (swil) (Entered: 11/13/2023) |
| 11/13/2023 | 148 | Motion to appear Pro Hac Vice by Yonaton Rosenzweig and Certification of Local Counsel Patrick Curran Filing fee $ 75, receipt number AVAEDC-9215723. by BMT International, Inc., Technology Financing, Inc.. (Curran, Patrick) (Entered: 11/13/2023) |
| 11/13/2023 | 149 | Motion to appear Pro Hac Vice by Harvey S. Schochet and Certification of Local Counsel Patrick Curran Filing fee $ 75, receipt number AVAEDC-9215778. by BMT International, Inc., Technology Financing, Inc.. (Curran, Patrick) (Entered: 11/13/2023) |
| 11/13/2023 | 150 | Motion to appear Pro Hac Vice by Abram Jeremy Ellis and Certification of Local Counsel John Francis Terzaken, III Filing fee $ 75, receipt number AVAEDC-9216041. by |

| | | Marinette Marine Corporation. (Terzaken, John) (Entered: 11/13/2023) |
|---|---|---|
| 11/13/2023 | 151 | ORDER granting 145 Motion for Pro hac vice Appointed Christie B. Carrino for Marinette Marine Corporation. Signed by District Judge Anthony J Trenga on 11/13/2023. (swil) (Entered: 11/14/2023) |
| 11/13/2023 | 152 | ORDER granting 146 Motion for Pro hac vice Appointed Adam Sieff for BMT International, Inc.,Adam Sieff for Technology Financing, Inc. Signed by District Judge Anthony J Trenga on 11/13/2023. (swil) (Entered: 11/14/2023) |
| 11/13/2023 | 153 | ORDER granting 148 Motion for Pro hac vice Appointed Yonaton Rosenzweig for Technology Financing, Inc. Signed by District Judge Anthony J Trenga on 11/13/2023. (swil) (Entered: 11/14/2023) |
| 11/13/2023 | 154 | ORDER granting 149 Motion for Pro hac vice Appointed Harvey S. Schochet for BMT International, Inc.,Harvey S. Schochet for Technology Financing, Inc. Signed by District Judge Anthony J Trenga on 11/13/2023. (swil) (Entered: 11/14/2023) |
| 11/14/2023 | 155 | ORDER granting 150 Motion for Pro hac vice Appointed Abram Jeremy Ellis for Marinette Marine Corporation. Signed by District Judge Anthony J Trenga on 11/14/2023. (swil) (Entered: 11/14/2023) |
| 11/14/2023 | 156 | Plaintiffs' Unopposed Motion for Appointment of Interim Co-Lead Class Counsel, filed by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Proposed Order) (Toll, Steven) (Entered: 11/14/2023) |
| 11/14/2023 | 157 | Memorandum in Support re 156 MOTION to Appoint Counsel *Plaintiffs' Unopposed Motion for Appointment of Interim Co-Lead Class Counsel* filed by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Exhibit Declaration of Brent W. Johnson, # 2 Exhibit CMST Firm Resume, # 3 Exhibit Declaration of George F. Farah, # 4 Exhibit HFA Firm Resume, # 5 Exhibit Declaration of Shana E. Scarlett, # 6 Exhibit HBSS Firm Resume) (Toll, Steven) (Entered: 11/14/2023) |
| 11/14/2023 | 158 | Waiver of *Notice of Hearing* by Anthony D'Armiento, Susan Scharpf (Toll, Steven) (Entered: 11/14/2023) |
| 11/15/2023 | | Notice of Correction re 157 Memorandum in Support. Unfortunately the memorandum in support is the incorrect document filed. Please refile the memorandum in support with its exhibits. (Dest) (Entered: 11/15/2023) |
| 11/15/2023 | 159 | Memorandum in Support re 156 MOTION to Appoint Counsel *Plaintiffs' Unopposed Motion for Appointment of Interim Co-Lead Class Counsel CORRECTED MEMORANDUM* filed by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Exhibit Declaration of Brent W. Johnson, # 2 Exhibit CMST Firm Resume, # 3 Exhibit Declaration of George F. Farah, # 4 Exhibit HFA Firm Resume, # 5 Exhibit Declaration of Shana E. Scarlett, # 6 Exhibit HBSS Firm Resume)(Toll, Steven) (Entered: 11/15/2023) |
| 11/15/2023 | 160 | Financial Interest Disclosure Statement (Local Rule 7.1) by Marinette Marine Corporation. (Terzaken, John) (Entered: 11/15/2023) |
| 11/16/2023 | 161 | ORDER granting 156 Plaintiffs' Unopposed Motion for Appointment of Interim Co-Lead Class Counsel (see Order for further details). Signed by District Judge Anthony J Trenga on 11/16/2023. (Dest) (Entered: 11/16/2023) |
| 11/21/2023 | 162 | MOTION for Order Declaring Defendant The Columbia Group, Inc. Served by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Proposed Order)(Glubiak, Zachary) (Entered: 11/21/2023) |

| | | |
|---|---|---|
| 11/21/2023 | [163](#) | Memorandum in Support re [162](#) MOTION for Order Declaring Defendant The Columbia Group, Inc. Served filed by Anthony D'Armiento, Susan Scharpf. (Attachments: # [1](#) Exhibit Declaration of Zachary R. Glubiak, # [2](#) Exhibit 1, # [3](#) Exhibit 2, # [4](#) Exhibit 3, # [5](#) Exhibit 4, # [6](#) Exhibit 5, # [7](#) Exhibit 6, # [8](#) Exhibit 7, # [9](#) Exhibit 8, # [10](#) Exhibit 9, # [11](#) Exhibit 10, # [12](#) Exhibit 11, # [13](#) Exhibit 12, # [14](#) Exhibit 13, # [15](#) Exhibit 14, # [16](#) Exhibit 15, # [17](#) Exhibit 16, # [18](#) Exhibit 17, # [19](#) Exhibit 18, # [20](#) Exhibit 19, # [21](#) Exhibit 20, # [22](#) Exhibit 21, # [23](#) Exhibit 22, # [24](#) Exhibit 23, # [25](#) Exhibit 24, # [26](#) Exhibit 25, # [27](#) Exhibit 26, # [28](#) Exhibit 27, # [29](#) Exhibit 28, # [30](#) Exhibit 29)(Glubiak, Zachary) (Entered: 11/21/2023) |
| 11/21/2023 | [164](#) | Waiver of *Notice of Hearing* by Anthony D'Armiento, Susan Scharpf (Glubiak, Zachary) (Entered: 11/21/2023) |
| 11/27/2023 | [165](#) | NOTICE of Appearance by William Devinney on behalf of The Columbia Group, Inc. (Devinney, William) (Entered: 11/27/2023) |
| 11/28/2023 | [166](#) | Motion to appear Pro Hac Vice by Chahira Solh and Certification of Local Counsel Robbie Jost Filing fee $ 75, receipt number AVAEDC-9238074. by HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Newport News Shipbuilding and Dry Dock Co.. (Jost, Robbie) (Entered: 11/28/2023) |
| 11/28/2023 | [167](#) | Motion to appear Pro Hac Vice by Sima Namiri-Kalantari and Certification of Local Counsel Robbie Jost Filing fee $ 75, receipt number AVAEDC-9238166. by HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Newport News Shipbuilding and Dry Dock Co.. (Jost, Robbie) (Entered: 11/28/2023) |
| 11/29/2023 | [168](#) | ORDER granting [166](#) Motion for Pro hac vice Appointed Chahira Solh for HII Fleet Support Group LLC,Chahira Solh for HII Mission Technologies Corp.,Chahira Solh for Huntington Ingalls Industries, Inc.,Chahira Solh for Ingalls Shipbuilding, Inc.,Chahira Solh for Newport News Shipbuilding and Dry Dock Co. Signed by District Judge Anthony J Trenga on 11/29/2023. (swil) (Entered: 11/29/2023) |
| 11/29/2023 | [169](#) | ORDER granting [167](#) Motion for Pro hac vice Appointed Sima Namiri-Kalantari for HII Fleet Support Group LLC,Sima Namiri-Kalantari for HII Mission Technologies Corp.,Sima Namiri-Kalantari for Huntington Ingalls Industries, Inc.,Sima Namiri-Kalantari for Ingalls Shipbuilding, Inc.,Sima Namiri-Kalantari for Newport News Shipbuilding and Dry Dock Co. Signed by District Judge Anthony J Trenga on 11/29/2023. (swil) (Entered: 11/29/2023) |
| 12/01/2023 | [170](#) | Joint MOTION To Include the Columbia Group in the Courts November 3, 2023, Order re [122](#) Order on Motion for Extension of Time to Answer, by The Columbia Group, Inc.. (Attachments: # [1](#) Proposed Order Proposed Order)(Devinney, William) (Entered: 12/01/2023) |
| 12/04/2023 | [171](#) | Motion to appear Pro Hac Vice by Daniel Park and Certification of Local Counsel Krystal B. Swendsboe Filing fee $ 75, receipt number AVAEDC-9247201. *Corrected Version of Docket 133, Pro Hac Vice Application* by Bollinger Shipyards, LLC. (Swendsboe, Krystal) (Entered: 12/04/2023) |
| 12/05/2023 | [172](#) | ORDER granting [171](#) Motion for Pro hac vice Appointed Daniel Park for Bollinger Shipyards, LLC. Signed by District Judge Anthony J Trenga on 12/5/2023. (swil) (Entered: 12/05/2023) |
| 12/06/2023 | [173](#) | ORDERED that Plaintiffs' Motion for Order Declaring The Columbia Group, Inc. Served (Dkt. 162) is DENIED AS MOOT; it is further ORDERED that the Joint Motion (Dkt. 170) is GRANTED; it is further ORDERED that The Columbia Group must respond to |

| | | |
|---|---|---|
| | | the complaint in this matter on or before December 18, 2023. Defendant The Columbia Group may join the consolidated brief to be filed by other Defendants under the same schedule and conditions as set forth in the Court's November 3, 2023 Order (see Order for further details). Signed by Magistrate Judge William E. Fitzpatrick on 12/6/2023. (Dest) (Entered: 12/06/2023) |
| 12/11/2023 | 174 | NOTICE of Appearance by Joseph Samuels on behalf of HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Newport News Shipbuilding and Dry Dock Co. (Samuels, Joseph) (Entered: 12/11/2023) |
| 12/15/2023 | 175 | Motion to appear Pro Hac Vice by John W. O'Toole and Certification of Local Counsel Perry Lange Filing fee $ 75, receipt number AVAEDC-9269603. by Gibbs & Cox, Inc.. (Lange, Perry) (Entered: 12/15/2023) |
| 12/18/2023 | 176 | ORDER granting 175 Motion for Pro hac vice Appointed John Winfred O'Toole for Gibbs & Cox, Inc. Signed by District Judge Anthony J Trenga on 12/18/2023. (swil) (Entered: 12/18/2023) |
| 12/18/2023 | 177 | Motion to appear Pro Hac Vice by Matthew S. Hellman and Certification of Local Counsel David G. Barger by General Dynamics Corp.. (Barger, David) (Entered: 12/18/2023) |
| 12/18/2023 | 178 | Joint MOTION to Dismiss for Failure to State a Claim by BMT International, Inc., Bath Iron Works Corp., Bollinger Shipyards, LLC, CACI International Inc., Electric Boat Corp., General Dynamics Corp., General Dynamics Information Technology, Inc., Gibbs & Cox, Inc., HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Marinette Marine Corporation, Newport News Shipbuilding and Dry Dock Co., Serco, Inc., Technology Financing, Inc., The Columbia Group, Inc., Thor Solutions, LLC, Tridentis, LLC. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Barger, David) (Entered: 12/18/2023) |
| 12/18/2023 | 179 | Notice of Hearing Date set for March 20, 2024 re 178 Joint MOTION to Dismiss for Failure to State a Claim (Barger, David) (Entered: 12/18/2023) |
| 12/18/2023 | 180 | MOTION to Dismiss for Failure to State a Claim by General Dynamics Corp.. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Barger, David) (Entered: 12/18/2023) |
| 12/18/2023 | 181 | MOTION to Dismiss for Failure to State a Claim by Thor Solutions, LLC. (Maclean, Matthew) (Entered: 12/18/2023) |
| 12/18/2023 | 182 | Memorandum in Support re 181 MOTION to Dismiss for Failure to State a Claim filed by Thor Solutions, LLC. (Attachments: # 1 Proposed Order)(Maclean, Matthew) (Entered: 12/18/2023) |
| 12/18/2023 | 183 | Notice of Hearing Date re 180 MOTION to Dismiss for Failure to State a Claim (Barger, David) (Entered: 12/18/2023) |
| 12/18/2023 | 184 | MOTION to Dismiss for Failure to State a Claim by Serco, Inc.. (Attachments: # 1 Memorandum in Support of Defendant Serco Inc.'s Individual Motion to Dismiss, # 2 Proposed Order)(Justus, Johnny) (Entered: 12/18/2023) |
| 12/18/2023 | 185 | Notice of Hearing Date *March 20, 2024* re 181 MOTION to Dismiss for Failure to State a Claim (Maclean, Matthew) (Entered: 12/18/2023) |
| 12/18/2023 | 186 | Notice of Hearing Date re 184 MOTION to Dismiss for Failure to State a Claim (Justus, Johnny) (Entered: 12/18/2023) |

| | | |
|---|---|---|
| 12/18/2023 | 187 | MOTION to Dismiss for Failure to State a Claim by Bollinger Shipyards, LLC, Marinette Marine Corporation. (Attachments: # 1 Memorandum of Law in Support, # 2 Proposed Order)(Terzaken, John) (Entered: 12/18/2023) |
| 12/18/2023 | 188 | Notice of Hearing Date set for March 20, 2024 re 187 MOTION to Dismiss for Failure to State a Claim (Terzaken, John) (Entered: 12/18/2023) |
| 12/18/2023 | 189 | MOTION to Dismiss for Failure to State a Claim by Tridentis, LLC. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Cody-Jones, Carolyn) (Entered: 12/18/2023) |
| 12/18/2023 | 190 | Notice of Hearing Date set for March 20, 2024 re 189 MOTION to Dismiss for Failure to State a Claim (Cody-Jones, Carolyn) (Entered: 12/18/2023) |
| 12/18/2023 | 191 | MOTION to Dismiss for Failure to State a Claim by CACI International Inc.. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Gregg Nivala, # 3 Proposed Order)(Brewer, Christopher) (Entered: 12/18/2023) |
| 12/18/2023 | 192 | Notice of Hearing Date set for March 20, 2024 re 191 MOTION to Dismiss for Failure to State a Claim (Brewer, Christopher) (Entered: 12/18/2023) |
| 12/18/2023 | 193 | Supplemental MOTION to Dismiss for Failure to State a Claim by BMT International, Inc., Technology Financing, Inc.. (Attachments: # 1 Memorandum in Support of Motion to Dismiss)(Curran, Patrick) (Entered: 12/18/2023) |
| 12/18/2023 | 194 | Notice of Hearing Date set for March 20, 2024 re 193 Supplemental MOTION to Dismiss for Failure to State a Claim (Curran, Patrick) (Entered: 12/18/2023) |
| 12/19/2023 | | Set Deadlines as to 191 MOTION to Dismiss for Failure to State a Claim, 193 Supplemental MOTION to Dismiss for Failure to State a Claim, 178 Joint MOTION to Dismiss for Failure to State a Claim, 187 MOTION to Dismiss for Failure to State a Claim, 189 MOTION to Dismiss for Failure to State a Claim, 181 MOTION to Dismiss for Failure to State a Claim, 180 MOTION to Dismiss for Failure to State a Claim, 184 MOTION to Dismiss for Failure to State a Claim. Motion Hearing set for 3/20/2024 at 10:00 AM in Alexandria Courtroom 701 before District Judge Anthony J Trenga. (wgar, ) (Entered: 12/19/2023) |
| 12/19/2023 | | Electronic Fee Payment - Pro Hac Vice as to 177 Motion to appear Pro Hac Vice by Matthew S. Hellman and Certification of Local Counsel David G. Barger by General Dynamics Corp.. Filing fee $ 75, receipt number BVAEDC-9273375.. (Barger, David) (Entered: 12/19/2023) |
| 12/19/2023 | 195 | ORDER granting 177 Motion for Pro hac vice Appointed Matthew S. Hellman for Bath Iron Works Corp.,Matthew S. Hellman for Electric Boat Corp.,Matthew S. Hellman for General Dynamics Corp.,Matthew S. Hellman for General Dynamics Information Technology, Inc. Signed by District Judge Anthony J Trenga on 12/19/2023. (swil) (Entered: 12/20/2023) |
| 01/19/2024 | 196 | NOTICE of Appearance by Amanda DeLaPerriere on behalf of Tridentis, LLC (DeLaPerriere, Amanda) (Entered: 01/19/2024) |
| 01/19/2024 | 197 | MOTION to Withdraw as Attorney *Carolyn Cody-Jones* by Tridentis, LLC. (Cody-Jones, Carolyn) (Entered: 01/19/2024) |
| 01/22/2024 | 198 | ORDER granting 197 Motion to Withdraw as Attorney. Attorney Carolyn Rachel Cody-Jones terminated. Signed by Magistrate Judge William E. Fitzpatrick on 1/22/2024. (Dcrow, ) (Entered: 01/22/2024) |

| 02/16/2024 | 199 | NOTICE of Voluntary Dismissal *Without Prejudice as to Defendants BMT International, Inc. and Technology Financing, Inc.* by Anthony D'Armiento, Susan Scharpf (Toll, Steven) (Entered: 02/16/2024) |
|---|---|---|
| 02/20/2024 | 200 | So Ordered re 199 Notice of Voluntary Dismissal Without Prejudice filed by Anthony D'Armiento, Susan Scharpf. Signed by District Judge Anthony J Trenga on 2/20/2024. (swil) (Entered: 02/20/2024) |
| 02/20/2024 | 201 | NOTICE of Settlement *with Defendant Faststream Recruitment, Ltd. and Stipulation for Suspension of Proceedings* by Anthony D'Armiento, Susan Scharpf (Toll, Steven) (Entered: 02/20/2024) |
| 02/20/2024 | 202 | Memorandum in Opposition re 178 Joint MOTION to Dismiss for Failure to State a Claim filed by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 02/20/2024) |
| 02/20/2024 | 203 | Memorandum in Opposition re 187 MOTION to Dismiss for Failure to State a Claim , 184 MOTION to Dismiss for Failure to State a Claim , 180 MOTION to Dismiss for Failure to State a Claim , 191 MOTION to Dismiss for Failure to State a Claim , 181 MOTION to Dismiss for Failure to State a Claim , 189 MOTION to Dismiss for Failure to State a Claim filed by Anthony D'Armiento, Susan Scharpf. (Toll, Steven) (Entered: 02/20/2024) |
| 02/21/2024 | 204 | Exhibits for Case, filed by Dineen Cherylann Etienne. (Dest) (Entered: 02/22/2024) |
| 02/26/2024 | 205 | ORDERED that the Claim is DISMISSED WITHOUT PREJUDICE as to any claim that non-party Etienne may subsequently bring (see Order for further details). Signed by District Judge Anthony J Trenga on 2/26/2024. (Dest) (Entered: 02/26/2024) |
| 03/05/2024 | 206 | Reply to Motion re 184 MOTION to Dismiss for Failure to State a Claim filed by Serco, Inc.. (Justus, Johnny) (Entered: 03/05/2024) |
| 03/05/2024 | 207 | Motion to appear Pro Hac Vice by Molly Teague and Certification of Local Counsel Christopher C. Brewer Filing fee $ 75, receipt number AVAEDC-9398989. by CACI International Inc.. (Brewer, Christopher) (Entered: 03/05/2024) |
| 03/05/2024 | 208 | REPLY to Response to Motion re 189 MOTION to Dismiss for Failure to State a Claim filed by Tridentis, LLC. (DeLaPerriere, Amanda) (Entered: 03/05/2024) |
| 03/05/2024 | 209 | Reply to Motion re 187 MOTION to Dismiss for Failure to State a Claim filed by Bollinger Shipyards, LLC, Marinette Marine Corporation. (Terzaken, John) (Entered: 03/05/2024) |
| 03/05/2024 | 210 | REPLY to Response to Motion re 181 MOTION to Dismiss for Failure to State a Claim filed by Thor Solutions, LLC. (Maclean, Matthew) (Entered: 03/05/2024) |
| 03/05/2024 | 211 | REPLY to Response to Motion re 178 Joint MOTION to Dismiss for Failure to State a Claim filed by Bath Iron Works Corp., Bollinger Shipyards, LLC, CACI International Inc., Electric Boat Corp., General Dynamics Corp., General Dynamics Information Technology, Inc., Gibbs & Cox, Inc., HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Marinette Marine Corporation, Newport News Shipbuilding and Dry Dock Co., Serco, Inc., The Columbia Group, Inc., Thor Solutions, LLC, Tridentis, LLC. (Barger, David) (Entered: 03/05/2024) |
| 03/05/2024 | 212 | REPLY to Response to Motion re 180 MOTION to Dismiss for Failure to State a Claim filed by General Dynamics Corp.. (Barger, David) (Entered: 03/05/2024) |
| 03/05/2024 | 213 | REPLY to Response to Motion re 191 MOTION to Dismiss for Failure to State a Claim filed by CACI International Inc.. (Brewer, Christopher) (Entered: 03/05/2024) |

| | | |
|---|---|---|
| 03/06/2024 | 214 | ORDER granting 207 Motion for Pro hac vice Appointed Molly Teague for CACI International Inc. Signed by District Judge Anthony J Trenga on 3/6/2024. (swil) (Entered: 03/06/2024) |
| 03/08/2024 | 215 | Mail sent to Dineen Cherylann Etienne returned as undeliverable. (Dest) (Entered: 03/12/2024) |
| 03/18/2024 | 216 | Emergency MOTION for Electronic Device Application by General Dynamics Corp.. (Attachments: # 1 Exhibit Mr. Litvack's Electronic Device Application)(Barger, David) (Entered: 03/18/2024) |
| 03/19/2024 | 217 | ORDER granting 216 Emergency MOTION for Electronic Device Application. Signed by District Judge Anthony J Trenga on 3/19/2024. (Dest) (Entered: 03/19/2024) |
| 03/20/2024 | 218 | Minute Entry for proceedings held before District Judge Anthony J Trenga:Motion Hearing held on 3/20/2024. Appearance of counsel. Defendants' 187 MOTION to Dismiss for Failure to State a Claim, 193 Supplemental MOTION to Dismiss for Failure to State a Claim, 184 MOTION to Dismiss for Failure to State a Claim, 178 Joint MOTION to Dismiss for Failure to State a Claim, 180 MOTION to Dismiss for Failure to State a Claim, 191 MOTION to Dismiss for Failure to State a Claim, 181 MOTION to Dismiss for Failure to State a Claim, 189 MOTION to Dismiss for Failure to State a Claim are argued and TAKEN UNDER ADVISEMENT. (Court Reporter R. Stonestreet.)(yguy) (Entered: 03/20/2024) |
| 03/26/2024 | 219 | MOTION for Preliminary Approval of Settlement With Faststream Recruitment, Ltd., Certification of Settlement Class, and Appointment of Settlement Class Counsel by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Proposed Order)(Glubiak, Zachary) (Entered: 03/26/2024) |
| 03/26/2024 | 220 | Memorandum in Support re 219 MOTION for Preliminary Approval of Settlement With Faststream Recruitment, Ltd., Certification of Settlement Class, and Appointment of Settlement Class Counsel filed by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Declaration of Shana E. Scarlett)(Glubiak, Zachary) (Entered: 03/26/2024) |
| 03/26/2024 | 221 | Waiver of *Notice of Hearing* by Anthony D'Armiento, Susan Scharpf (Glubiak, Zachary) (Entered: 03/26/2024) |
| 03/26/2024 | 222 | Memorandum in Support re 219 MOTION for Preliminary Approval of Settlement With Faststream Recruitment, Ltd., Certification of Settlement Class, and Appointment of Settlement Class Counsel *CORRECTED MEMORANDUM* filed by Anthony D'Armiento, Susan Scharpf. (Attachments: # 1 Declaration of Shana E. Scarlett, # 2 Exhibit A) (Glubiak, Zachary) (Entered: 03/26/2024) |
| 04/10/2024 | 223 | TRANSCRIPT of proceedings held on March 20, 2024, before Judge Anthony J. Trenga, Court Reporter/Transcriber Rebecca Stonestreet, Telephone number 240-426-7767. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/10/2024. Redacted Transcript Deadline set for 6/10/2024. Release of Transcript Restriction set for 7/9/2024. (stonestreet, rachel) (Entered: 04/10/2024)** |
| 04/19/2024 | 224 | MEMORANDUM OPINION AND ORDER that the Joint Motion to Dismiss, [Doc. No. 178], be, and the same hereby is, GRANTED; and this action is dismissed as time-barred |

| | | under the applicable statute of limitations; and it is further ORDERED that the Individual Motions, [Doc. Nos. 180, 181, 184, 187, 189, 191, 193], be, and the same hereby are, DENIED as moot; and it is further ORDERED that the Motion for Preliminary Approval of Settlement, [Doc. No. 219], be, and the same hereby is, DENIED as moot (see Order for further details). Signed by District Judge Anthony J Trenga on 4/19/2024. (Dest) (Entered: 04/19/2024) |
|---|---|---|
| 04/19/2024 | 225 | CLERK'S JUDGMENT is hereby entered in accordance with Rule 58 of the Federal Rules of Civil Procedure in favor of the defendantsBath Iron Works Corp., Bollinger Shipyards, LLC, CACI International Inc., Electric Boat Corp., General Dynamics Corp., General Dynamics Information Technology, Inc., Gibbs & Cox, Inc., HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries, Inc., Ingalls Shipbuilding, Inc., Marinette Marine Corporation, Newport News Shipbuilding and Dry Dock Co., Serco, Inc., The Columbia Group, Inc., Thor Solutions, LLC, Tridentis, LLC, BMT International, Inc. and Technology Financing, Inc., and against the plaintiffs Susan Scharpf, *on behalf of herself and all others similarly situated*, and Anthony D'Armiento, *on behalf of himself and all others similarly situated*. Entered by District Judge Anthony J Trenga on 4/19/2024. (Dest) (Entered: 04/19/2024) |
| 05/20/2024 | 226 | NOTICE OF APPEAL as to 225 Clerk's Judgment,,, by Anthony D'Armiento, Susan Scharpf. Filing fee $ 605, receipt number AVAEDC-9536786. (Toll, Steven) (Entered: 05/20/2024) |
| 05/20/2024 | 227 | Transmission of Notice of Appeal to US Court of Appeals re 226 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov). (dvanm) (Entered: 05/20/2024) |
| 05/22/2024 | 228 | USCA Case Number 24-1465 4CCA, case manager Emily Borneisen, for 226 Notice of Appeal filed by Anthony D'Armiento, Susan Scharpf. (dvanm) (Entered: 05/22/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/12/2024 08:54:12 | | |
| **PACER Login:** | bjohnsonCMST | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-01372-AJT-WEF |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

SUSAN SCHARPF and

ANTHONY D'ARMIENTO,

on behalf of themselves and all others
similarly situated,

                       Plaintiffs,

       v.

GENERAL DYNAMICS CORP.,

BATH IRON WORKS CORP.,

ELECTRIC BOAT CORP.,

GENERAL DYNAMICS
INFORMATION
TECHNOLOGY, INC.,

HUNTINGTON INGALLS INDUSTRIES,
INC.,

NEWPORT NEWS SHIPBUILDING AND
DRY DOCK CO.,

INGALLS SHIPBUILDING, INC.,

HII MISSION TECHNOLOGIES CORP.,

HII FLEET SUPPORT GROUP LLC,

MARINETTE MARINE CORPORATION,

BOLLINGER SHIPYARDS, LLC,

GIBBS & COX, INC.,

SERCO, INC.

No. _____

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

BMT INTERNATIONAL, INC.

TECHNOLOGY FINANCING, INC.

CACI INTERNATIONAL INC.,

THE COLUMBIA GROUP, INC.

THOR SOLUTIONS, LLC

TRIDENTIS, LLC, and

FASTSTREAM RECRUITMENT LTD.,

                              Defendants.

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE..........................................................................7

III.    PARTIES ...............................................................................................................8

        A.      Plaintiffs ....................................................................................................8

        B.      Defendants ................................................................................................8

                1.      Shipbuilder Defendants ................................................................9

                2.      Engineering Consultancy Defendants ....................................17

                3.      Faststream Recruitment Ltd. ....................................................24

IV.     AGENTS AND CO-CONSPIRATORS ..........................................................25

V.      INTERSTATE COMMERCE ..........................................................................26

VI.     FACTUAL ALLEGATIONS.............................................................................26

        A.      Background...............................................................................................26

                1.      The U.S. Naval Design and Shipbuilding Industries................26

                2.      Naval Architects, Marine Engineers, and Associated
                        Professionals ................................................................................28

                3.      Naval Engineering Employers ....................................................30

                4.      "Incestuous" Nature of the Naval Engineering Industry ..........32

        B.      Defendants' No-Poach Conspiracy .......................................................34

                1.      Participants in the No-Poach Conspiracy Directly Confirm
                        Its Existence, Operation and Scope..........................................35

                2.      Additional Evidence Affirms the No-Poach Conspiracy's
                        Reach and Effects Throughout the Class Period.....................40

        C.      Defendants Monitored and Enforced the No-Poach Agreement and
                its Goal of Compensation Suppression by Sharing Information
                Directly and through Third Parties .......................................................47

        D.      Anticompetitive Effects and Injury Suffered by Class Members .........50

1.  Economic Theory Teaches That Defendants' No-Poach Conspiracy Had Anticompetitive Effects ................................................. 50

2.  Witnesses Confirm That the Conspiracy Had Anticompetitive Effects ............................................................................... 51

VII.  THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS ................................................................................. 55

A.  Continuing Violation ................................................................... 55

B.  Fraudulent Concealment .............................................................. 55

1.  Defendants Concealed the Scope and Nature of Their Conspiracy ............................................................................ 56

2.  Plaintiffs Failed to Discover the Conspiracy Despite Due Diligence ........................................................................ 62

VIII.  CLASS ACTION ALLEGATIONS ........................................................... 63

IX.  CAUSE OF ACTION ......................................................................... 66

X.  PRAYER FOR RELIEF ....................................................................... 67

XI.  JURY TRIAL DEMAND ..................................................................... 68

Plaintiffs Susan Scharpf and Anthony D'Armiento bring this action on behalf of themselves individually and on behalf of a class (the "Class," or "Class Members") consisting of all persons employed as naval architects and/or marine engineers in the United States by Defendants (excluding Defendant Faststream Recruitment Ltd.), their subsidiaries, or related entities from January 1, 2000, to such date as Defendants' unlawful conduct ceases (the "Class Period").

## I.   INTRODUCTION

1.    Naval architects and marine engineers (collectively, "naval engineers") design and build the nation's warships and other "public fleet" vessels. While some naval engineers work directly for the federal government, most are employed by a group of private contractors and consulting firms who are hired by the Navy, the Coast Guard, and other federal and state entities. Confidential witnesses have confirmed that, for *decades*, these companies and a close-knit, "incestuous" community of their executives and managers have maintained an illegal agreement not to actively recruit, or "poach," each other's employees. This unwritten "gentlemen's agreement" suppressed wages for naval engineers below competitive levels, depriving Plaintiffs and the Class of hundreds of millions of dollars in compensation.

2.    Naked "no-poach" agreements such as the one alleged in this complaint are unlawful *per se* under the nation's antitrust laws. The purpose and effect of such agreements is to cheat the highly skilled workers who design the most powerful military fleet in the world out of the competitive wages they deserve.

3.    Defendants include shipbuilders that produce military vessels large and small, specialized consulting firms, and a recruiting firm that sometimes serves these companies. The large ship builders—General Dynamics and Huntington Ingalls Industries—operate the only five shipyards in the country used to build large military vessels. The mid-size ship builders—Bollinger

- 1 -

Shipyards and Marinette Marine—operate shipyards focused on smaller military ships. The specialized engineering "consultancies"—Gibbs & Cox, JJMA/Serco, BMT Group, CSC/CACI, The Columbia Group, Thor Solutions, Tridentis, and a subsidiary business unit of Huntington Ingalls—help design, refit, and maintain nearly every ship in the U.S. fleet.[1] Behind closed doors, these consultants refer to themselves as the "Beltway Bandits." Most have offices along a single one-mile stretch of M Street Southeast in Washington, DC, next to the Washington Navy Yard; all have headquarters in northern Virginia, convenient to each other and the Pentagon. The final Defendant is Fasstream Recruitment—a recruitment agency that occasionally helped Defendants recruit naval engineers from outside the conspiracy. According to a former employee, Fasstream abided by the no-poach rules agreed to by the Defendants and facilitated unlawful information exchanges among the Defendants that helped them enforce their no-poach conspiracy.

4.      Many of Defendants' former executives and managers provided direct evidence of the conspiracy. Several former managers directly confirmed that they had a standing "gentlemen's agreement" not to poach naval engineers from other conspirators (using exactly those words). One industry veteran bluntly admitted that his firm did not "go after people at other companies." And a former insider from Huntington Ingalls said that the company maintained a "do not hire list"—a

---

[1] Over the course of the Class Period, five consultancy firms who participated in the unlawful conspiracy were purchased by larger businesses. Gibbs & Cox is owned by parent company Leidos, a diversified science and engineering contractor. Formerly independent consultancy John J. McMullen Associates changed hands several times before being acquired by Defendant Serco, also a large science and engineering contractor. The naval engineering unit of CSC is now owned by Defendant CACI, a diversified defense technology contractor. AMSEC LLC, formerly an independent consultancy, is now owned by Defendant Huntington Ingalls Industries, one of the two large U.S. shipbuilding contractors. And formerly independent consultancy M. Rosenblatt & Son was purchased by AMSEC early in the class period and later spun off in substantial part to Defendant The Columbia Group.

list of companies from which Huntington Ingalls would not poach naval engineers. Every Defendant has been tied to the no-poach agreement by at least one confidential witness.

\*\*\*

5.      Plaintiffs and the Class Members are highly skilled professionals who work or worked for the Defendants as naval architects and marine engineers. Naval architects are responsible for naval vessels' design, including the form, structure, and stability of hulls. These responsibilities require specialized knowledge of hydrostatics, hydrodynamics, vessel motion physics, mechanics, strength of materials, and design of structures. Marine engineers design onboard ship systems, including those related to propulsion, power generation, air conditioning, ventilation, water distillation, cargo handling, steering, and fuel. Marine engineers include workers with some variation of the job title "marine engineer" as well as specialized electrical, HVAC, structural, and other engineers whose work focuses on marine applications.

6.      In addition to developing the technical skills and experience necessary to perform this highly specialized work, naval engineers generally must also possess at least a bachelor's degree in engineering (for many positions, from one of a handful of schools with specialized naval engineering programs), a security clearance, and U.S. citizenship. These requirements dramatically limit the pool of eligible candidates and should have given naval engineers significant bargaining power with Defendants. In other industries, similarly specialized requirements generate cottage industries of recruiters whose full-time job is to convince skilled workers to leave their employers to accept substantially higher salaries with competitors.

7.      In this industry, however, no naval engineering consultancy or major defense shipbuilder routinely recruits naval engineers from other firms. Instead, each firm primarily recruits recent college graduates with no work experience and, to some extent, recently discharged

military personnel. One executive, who first entered the industry in 1969 and worked his way into management over the next five decades, put it bluntly: "You didn't recruit people from [other] firms." That same executive reported that, in the event someone floated the possibility of recruiting from a competitor, the answer was predictable: "He works for [a competitor]; we can't do that." As a result, naval engineers generally spend their entire careers without being solicited by a rival firm, earning modest annual raises and salaries well below those of engineers with similar degrees of training and expertise in other industries.

8.      In a competitive labor market, this state of affairs would make no economic sense. Experience is valuable in naval engineering. Inexperienced recruits must be trained and supervised closely, and they lack the skill needed to anticipate and prevent problems. Military contracts are enormous prizes and experienced teams with good track records can help win this business. Military contracts also come with specialized performance requirements and specialized oversight bureaucracy, and experience with these requirements and processes is invaluable. Mistakes can be extremely expensive, leading to massive remedial work with little additional compensation or even jeopardizing present and future contracts. In a competitive market, these facts would give Defendants powerful incentives actively recruit experienced naval engineers and lure them with high compensation. In reality, however, that does not happen.

9.      The reason experienced naval engineers are not constantly courted by their employers' competitors is that the market for these workers has been plagued by a decades-long conspiracy among Defendants that has successfully stifled competition for talented engineers and suppressed compensation. Starting in at least 2000, and likely dating back to the 1980s, Defendants have adhered to an informal "gentlemen's agreement" among themselves not to recruit each other's naval engineers. This no-poach conspiracy imposed clear rules on its participants:

Defendants were prohibited from affirmatively recruiting from one another—with some going so far as maintaining "do not hire" lists—but were permitted to hire naval engineers who initiated contact. Consistent with these rules, one executive explained that, if a competitor "offered my guy a position, they'd call me and say, 'We didn't poach him.'"

10.     Defendants' no-poach arrangement caused a persistent shortage of qualified naval engineers. As one industry insider put it: "[T]here was so much more demand [for employees] than there was talent." In a competitive labor market, strong demand for a small pool of qualified workers invariably drives up compensation. The persistent shortage of qualified naval engineers, and Defendants' failure to respond to that shortage with substantial increases in compensation, is strong economic evidence of a conspiracy.

11.     The close knit, interdependent nature of the naval engineering industry facilitated Defendants' conspiracy. Defendants collectively employ fewer than 10,000 naval engineers nationwide, frequently work together on the same projects, and are geographically concentrated— primarily in the Washington, D.C./Northern Virginia metro area and the Norfolk/Newport News area, with additional pockets of concentrated employment around other major shipyards. Many Defendants maintain offices for senior managers practically side-by-side on the same street abutting the Washington Navy Yard. The "incestuous" relationships among industry managers enabled Defendants to monitor each other's hiring practices, reinforce the agreement in direct communications, and punish firms who violated the agreement. As one former project manager admitted, firms who recruit another firm's employees "don't stay around that long because companies don't want to work with them."

12.     Defendants concealed their agreement throughout the conspiracy period by never committing it to writing and instead maintaining it as an unwritten "gentlemen's agreement"

among themselves and their executives. As one industry insider explained, "They don't put that in writing. You'd be hard pressed to find that in writing." A witness who worked as in-house recruiting staff for a Defendant confirmed the existence of a "non-ink-to-paper" agreement between Defendants that "we would not poach from each other." One of the few third-party recruiters who worked in the industry added that when Defendants' hiring managers reached out to solicit his help in recruiting new naval engineers, they would often use coded language to discuss the set of competitors whose employees the hiring manager did not want to recruit, referring to those companies as "friends" or explaining that the company "had a relationship" with these competitors.

13.     Defendants *did* enter explicit written agreements not to recruit from rivals when working on the same project—usually as a provision of "teaming agreements" delineating Defendants' work on a particular contract. The no-poach provisions in these teaming agreements were much more limited than the deliberately concealed "gentlemen's agreement" that forbade active recruitment among all Defendants. The language of these agreements typically prohibited recruitment of personnel *who worked on the project to which a teaming agreement pertained*, for the duration of the project. In fact, however, all active recruitment of *any* competitor Defendant's employees was off-limits. These written teaming agreements were used to cover up the Defendants' unlawful "gentlemen's agreement" with more credibly defensible project-based limitations. The teaming agreements created the false impression that workers could be solicited and recruited by rivals who were *not* working on their projects, even though Defendants' agreement not to recruit one another's naval engineers applied to *any* naval engineer working for *any* Defendant. These affirmative actions to fraudulently conceal the conspiracy enabled Defendants' unlawful behavior to go undetected by members of the Class.

14.     Defendants' no-poach agreement is a classic *per se* unlawful restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1. Together, Defendants' unlawful and anticompetitive conduct has cost thousands of highly skilled naval engineers hundreds of millions of dollars in compensation. Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs bring this lawsuit to vindicate their rights to have their compensation determined by a competitive market.

## II.     JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.     This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum state because each resides in or has its principal place of business in the Commonwealth of Virginia, employed individuals in this state during the Class Period, and/or has had substantial contacts within the Commonwealth of Virginia in furtherance of the conspiracy.

17.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

18.     Venue is proper in this Division under Local Rule 3(C) because one or more of the Defendants transacted business, was found, and/or resided in this Division; a substantial part of

the events giving rise to Plaintiffs' claims arose in this Division; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this Division.

## III.    PARTIES

### A.    Plaintiffs

19.     Susan Scharpf was employed as a naval architect at Alion Science & Technology Corporation from 2007 to 2009, as a naval marine engineer with Computer Sciences Corporation from 2009 to 2011, and as a marine engineer with Gibbs & Cox, Inc., from 2011 to 2013.

20.     Anthony D'Armiento was employed as a naval architect by Northrop Grumman Ship Systems ("NGSS") at Ingalls Shipyard from 2002 to 2004. NGSS is a former division of Northrop Grumman Corporation. As discussed more fully in Section III.B.1.b(1) below, in 2011, Northrop Grumman spun off its shipbuilding operations, including NGSS, into a new entity, Huntington Ingalls Industries, Inc.

### B.    Defendants

21.     The naval engineering industry has undergone many changes since the beginning of Defendants' conspiracy, including a number of major corporate transactions that merged or spun off various Defendants, their subsidiaries, and/or their naval engineering business units. Each of the naval engineering businesses that changed hands during the Class Period maintained a high degree of continuity in personnel, relevant policies and practices, customers, business culture, and standing within the industry. Indeed, naval engineers often continue to use the legacy name of a naval engineering business unit long after it has been officially renamed and merged into another corporate entity—sometimes two or three times.

22.     This Complaint uses the term "Engineering Defendants" to refer to the group of business units operated by Defendants other than Faststream Recruitment Ltd.—i.e., the units that employ or employed naval engineers during the Class Period. Where the Complaint refers to "each

Engineering Defendant," it means each such functional business unit that exists or existed with an independent identity at the relevant time(s). "All Engineering Defendants" similarly refers to all such business units that exist or existed with an independent identity at the relevant time(s).

    **1.**    **Shipbuilder Defendants**

        **a.**    **General Dynamics Defendants**

            (1)    <u>General Dynamics Corporation</u>

    23.    Defendant General Dynamics Corporation ("General Dynamics" or "GDC") is a global aerospace and defense company and was the fourth-largest U.S. defense contractor by dollar value of awards in 2022. It is incorporated in Delaware with its principal place of business in Reston, Virginia.

    24.    During the Class Period, General Dynamics Corporation, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

    25.    On information and belief, General Dynamics Corporation operates centralized human resources and recruiting functions that assist GDC subsidiaries, including Bath Iron Works, Electric Boat, and NASSCO in filling positions for naval engineers. On information and belief, GDC employees helped GDC subsidiaries participate in the alleged conspiracy, including by refraining from actively recruiting competitors' naval engineers.

            (2)    <u>Bath Iron Works Corporation</u>

    26.    Defendant Bath Iron Works Corporation ("Bath Iron Works") is a wholly owned subsidiary of General Dynamics Corp., incorporated in Maine with its principal place of business in Bath, Maine. Bath Iron Works is a full-service shipyard that specializes in the design, building, and support of complex surface combatants for the U.S. Navy. General Dynamics Corp. acquired Bath Iron Works Corporation in August 1995.

27.     During the Class Period, Bath Iron Works, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

(3)     Electric Boat Corporation

28.     Defendant Electric Boat Corporation ("Electric Boat") is a wholly owned subsidiary of General Dynamics Corp., incorporated in Delaware with its principal place of business in Groton, Connecticut. Electric Boat operates a major shipyard in Groton, Connecticut, that focuses on the U.S. submarine fleet.

29.     During the Class Period, Electric Boat, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

(4)     General Dynamics Information Technology, Inc.

30.     General Dynamics Information Technology, Inc. ("GDIT") is a wholly owned subsidiary of General Dynamics Corp., incorporated in Delaware with its principal place of business in Falls Church, VA.

31.     As discussed more fully below, on information and belief, GDIT is the successor to the liabilities for the Sherman Act violations alleged here committed by a naval engineering consultancy business unit that did business during the Class Period at various times as Computer Sciences Corporation ("CSC"), CSRA, Inc., and CSC Advanced Marine Center, from the start of the Class Period to approximately August 2018. In approximately August 2018, this business unit was sold to CACI International, Inc., which assumed liability for the unit's antitrust violations from that point forward. Details of the transactions resulting in this arrangement of liability are described in Section III.B.2.d below. On information and belief, the sale did not transfer liabilities prior to August 2018, which remained with GDIT.

b.      **Huntington Ingalls Defendants**

(1)      Huntington Ingalls Industries, Inc.

32.      Defendant Huntington Ingalls Industries, Inc. ("Huntington Ingalls" or "HII") is incorporated in Delaware with its principal place of business in Newport News, Virginia. Huntington Ingalls Industries is the largest military shipbuilding company in the United States.

33.      During the Class Period, Huntington Ingalls Industries, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

34.      Huntington Ingalls Industries, Inc. operates two divisions, Newport News Shipbuilding and Ingalls Shipbuilding, which operate major shipyards in Newport News, VA, and Pascagoula, MS, respectively.

35.      Huntington Ingalls Industries, Inc. was incorporated in 2010 as a subsidiary of Northrup Grumman Corp. and spun off by Northrup Grumman into its own public company in 2011. As part of the spinoff, Northrup Grumman Corp. transferred its wholly owned subsidiary Northrup Grumman Shipbuilding, Inc., then the operating subsidiary of Northrup Grumman that held Northrup's shipbuilding business, including Northrup Grumman Ship Systems, Inc., which employed Plaintiff Anthony D'Armiento. Northrup Grumman Ship Systems, Inc. and Northrup Grumman Shipbuilding, Inc. were renamed and dissolved after the spinoff of Huntington Ingalls (as no subsidiary of either name is listed by Huntington Ingalls Industries, Inc. on its most recent SEC filings).

36.      The shipbuilding businesses spun off by Northrup Grumman included the two major shipyards it had acquired, which are today the main divisions of Huntington Ingalls. Northrup acquired Litton Industries Inc., the ultimate owner of Ingalls Shipbuilding, in 2000, and acquired Newport News Shipbuilding Inc. in 2001.

- 11 -

37.     Ingalls and Newport News shipyards were acquired in whole-company transactions by Northrup Grumman, and the operating subsidiaries containing Northrup Grumman's shipbuilding business were transferred *in toto* to Huntington Ingalls Industries, Inc. Through these transactions Huntington Ingalls, Inc. assumed liability for the violations of the Sherman Act alleged here attributable to the former Northrup Grumman shipbuilding division during the Class Period.

(2)     Newport News Shipbuilding and Dry Dock Company

38.     Defendant Newport News Shipbuilding and Dry Dock Company ("Newport News Shipbuilding") is a wholly owned subsidiary of Huntington Ingalls Industries, Inc., incorporated in Delaware, with its principal place of business in Newport News, Virginia. On information and belief, it operates the Newport News Shipbuilding division of Huntington Ingalls.

39.     On information and belief, during the Class Period, Newport News Shipbuilding and Dry Dock Company, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

(3)     Ingalls Shipbuilding, Inc.

40.     Defendant Ingalls Shipbuilding, Inc. ("Ingalls Shipbuilding" or "Ingalls") is a wholly owned subsidiary of Huntington Ingalls Industries, Inc., incorporated in Delaware, with its principal place of business in Pascagoula, Mississippi. On information and belief, it operates the Ingalls Shipbuilding division of Huntington Ingalls.

41.     On information and belief, during the Class Period, Ingalls Shipbuilding, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

(4)    Huntington Ingalls Consultancies

42.    Over the course of the Class Period, three former engineering consultancies were purchased by Huntington Ingalls Industries, Inc. or absorbed into the Huntington Ingalls corporate family as part of another transaction. Two of these consultancies remain part of the Huntington Ingalls corporate family and the third was sold, but on information and belief a portion of its liabilities remain with a Huntington Ingalls subsidiary.

(a)    *HII Fleet Support Group LLC*

43.    Defendant HII Fleet Support Group LLC ("HII Fleet Support"), formerly known as AMSEC LLC, is a naval engineering consultancy. HII Fleet Support is a Delaware limited liability company with its principal place of business in Virginia Beach, Virginia. It is a wholly owned subsidiary of Huntington Ingalls Industries, Inc.

44.    During the Class Period, HII Fleet Support, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

45.    HII Fleet Support is the successor to former Huntington Ingalls Industries, Inc. subsidiary AMSEC LLC, a legacy engineering consultancy. Huntington Ingalls changed the name of the company from AMSEC LLC to its current name in approximately September 2018. Though it has been gradually phasing out its use of the AMSEC LLC name, Huntington Ingalls continues to use it to market its naval engineering services, including on job-focused social media platform LinkedIn.

46.    AMSEC LLC was acquired by Huntington Ingalls Industries, Inc. in March 2011. During the Class Period, AMSEC LLC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

47.     M. Rosenblatt & Son, Inc.,[2] a legacy naval engineering consultancy, was acquired by AMSEC LLC in April 2000. During the Class Period, M. Rosenblatt & Son, Inc. and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States. In 2008, AMSEC sold the M. Rosenblatt & Son business unit to Defendant The Columbia Group.

48.     As used in this complaint, "AMSEC" refers to legacy consultancy AMSEC LLC and to its successor HII Fleet Support Group LLC, which operates in continuity with AMSEC LLC and continues to use that name. Where the complaint refers to "M. Rosenblatt," it means M. Rosenblatt & Son Inc. and/or the business unit of AMSEC and later The Columbia Group that traces its lineage back to M. Rosenblatt & Son, Inc., as these business units operated with a high degree of continuity even as its corporate ownership changed hands. Many industry participants continued to identify the unit with the M. Rosenblatt name long after its acquisition by AMSEC and later The Columbia Group.

(b)     *HII Mission Technologies Corp.*

49.     Defendant HII Mission Technologies Corp. ("HII Mission Technologies") is a wholly owned subsidiary of Huntington Ingalls Industries, Inc. Through approximately August 2019 HII Mission Technologies operated, *inter alia*, a naval engineering consultancy business unit. HII Mission Technologies is a Delaware corporation with its principal place of business in McLean, Virginia.

---

[2] Not to be confused with Bruce S. Rosenblatt & Associates, another naval engineering consultancy that Plaintiffs do not name as a defendant or co-conspirator.

50.     During the Class Period, HII Mission Technologies Corp., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

51.     On information and belief, as part of the corporate structuring associated with Huntington Ingalls' purchase of Alion Science and Technology Corporation ("Alion") in approximately August 2021, HII Mission Technologies assumed liabilities stemming from this action through approximately August 2019 of both John J. McMullen & Associates ("JJMA") and Alion.

52.     JJMA provided naval architecture and marine engineering services from 1957 until its acquisition in 2005 by Alion, which marketed the former JJMA business unit as "JJMA Maritime Sector" or "JMS." However, the JJMA business unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture through its purchase by Alion, and remains to this day broadly referred to in the industry as "JJMA."

53.     During the Class Period, JJMA, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

54.     During the Class Period, Alion Science & Technology Corporation, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

55.     Alion sold the legacy JJMA business unit as part of its Naval Systems Business Unit to Defendant Serco Inc. in approximately August 2019. On information and belief, under the terms of this asset sale liabilities for antitrust violations predating the sale remained with Alion.

56.     From approximately August 2019 forward, the business unit tracing its lineage back to JJMA was absorbed into Defendant Serco, Inc., which rebranded it as Serco's Maritime, Engineering, Technology and Sustainment division. Nonetheless, the business unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture, and continues to be widely referred to with the name "JJMA."

57.     The remainder of Alion, including its liabilities, was purchased by Huntington Ingalls Industries, Inc. in approximately August 2021. On information and belief, HII caused Alion to be merged into its wholly-owned subsidiary Huntington Ingalls Mission Technologies Corp. soon after this sale, including Alion's assets and liabilities.

58.     In this complaint, "John J. McMullen & Associates" and "JJMA" refer to that engineering consultancy business prior to its sale to Alion. "Alion" refers to Alion Science and Technology Corporation prior to its sale of the legacy JJMA unit to Serco.

   **c.**  **Marinette Marine Corporation**

59.     Defendant Marinette Marine Corporation ("Marinette Marine" or "MMC") is a ship manufacturer that produces ships for the U.S. Navy and Coast Guard. It is incorporated in Wisconsin with a principal place of business in Marinette, Wisconsin. Since 2009, Marinette Marine has been majority-owned by Italian shipbuilder Fincantieri Marine Group (FMG), when the latter acquired the company from The Manitowoc Group. As of 2022, FMG owned an 87% share of the company.

60.     During the Class Period, Marinette Marine Corporation, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

### d.    Bollinger Shipyards, LLC

61.    Defendant Bollinger Shipyards, LLC ("Bollinger" or "Bollinger Shipyards") is a privately owned shipyard that produces ships, workboats, and patrol vessels. It is a Louisiana limited liability company with its principal place of business in Lockport, Louisiana.

62.    During the Class Period, Bollinger Shipyards, LLC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

### 2.    Engineering Consultancy Defendants

### a.    Gibbs & Cox, Inc.

63.    Gibbs & Cox, Inc. ("Gibbs" or "Gibbs & Cox")  is an engineering consultancy that primarily provides naval architecture and marine engineering services. As of approximately May 2021, it is a wholly owned subsidiary of Leidos Holdings, Inc. (formerly Science Applications International Corporation, SAIC). It is a New York corporation with its principal place of business in Arlington, Virginia.

64.    During the Class Period, Gibbs & Cox, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

### b.    Serco, Inc.

65.    Defendant Serco, Inc. ("Serco") is a New Jersey corporation with its principal place of business in Herndon, Virginia. It provides a diversified range of government contracting services, including naval architecture and marine engineering. It is a wholly owned subsidiary of British multinational Serco Group plc., which provides similar services worldwide.

66.     During the Class Period, Serco, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

67.     Serco, Inc.'s naval architecture and marine engineering business unit traces its lineage through a series of transactions to legacy engineering consultancy JJMA.

68.     As discussed in Section III.B.1.b(4), Alion acquired JJMA in 2005 and sold the business to Serco in approximately August 2019 as part of its Naval Systems Business Unit. On information and belief, the terms of this asset sale left liabilities attributable to the unit prior to the sale with Alion.

69.     From approximately August 2019 forward, the business unit tracing its lineage back to JJMA was absorbed into Serco, Inc., which rebranded it as Serco's Maritime, Engineering, Technology and Sustainment division. Despite this rebranding, the business unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture with its predecessors.

    **c.     BMT Defendants**

70.     Defendant Technology Financing Inc. is a Delaware corporation with its principal place of business in Houston, Texas. It directly owns 100% of named co-conspirator BMT Designers & Planners Inc., a New York corporation currently in Chapter 7 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York.[3] BMT Designers & Planners, Inc. was an engineering consultancy that provided naval architecture and marine engineering services to the federal government. It abruptly folded in early 2022 after a contract dispute with the United States Navy and subsequently entered liquidation.

---

[3] *In re BMT Designers & Planners, Inc.*, No. 1:22-bk-10123 (Bankr. S.D.N.Y.).

71.     During the Class Period, BMT Designers & Planners Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

72.     Defendant BMT International, Inc. is a Maryland corporation with its principal place of business in Houston, Texas. It directly owns 100% of Defendant Technology Financing, Inc.

73.     Named co-conspirator BMT Group Ltd. is a British limited company with its principal place of business in London, United Kingdom. BMT Group is an international design, engineering, science, program, and risk-management consultancy.

74.     Defendants Technology Financing, Inc. and BMT International, Inc. are intermediate holding companies interposed between BMT Designers & Planners, Inc. and ultimate parent BMT Group Ltd. On information and belief, neither has any employees, operations, or business it transacts under its own name.

75.     On information and belief, Defendants Technology Financing, Inc. and BMT International, Inc. are alter egos of each other and of BMT Designers & Planners, Inc. They exist solely to structure the potential liabilities of BMT Group Ltd. for its American subsidiary operations while enabling the parent company to extract millions of dollars in revenue from those same subsidiaries.

76.     Complex corporate forms might be lawful and socially beneficial for structuring corporate debt liability—in which context lenders and debtors carefully allocate risks and depend on reliable application of corporate law. In quasi-tort cases like this one, however, honoring the corporate form of BMT Designers & Planners, Inc. would unjustly impair Plaintiffs and Class Members, who received low, noncompetitive wages throughout the Class Period but could not

have been expected to know of the conspiracy alleged here in time to file suit before BMT Designers & Planners, Inc.'s bankruptcy.

77.     Technology Financing, Inc. and BMT International, Inc., meanwhile, received millions of dollars in profits during the Class Period flowing from, at least in part, the savings BMT Designers & Planners Inc. obtained from paying noncompetitive wages.

78.     This complaint uses the terms "BMT" and "BMT Designers & Planners" to refer to BMT Designers & Planners, Inc.

### d.      CACI International Inc.

79.     Defendant CACI International Inc. is a Delaware corporation with its principal place of business in Reston, Virginia. CACI International Inc. is primarily in the business of providing technology-related services to the United States Government, among them naval architecture and marine engineering services.

80.     During the Class Period, CACI International Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

81.     CACI International Inc.'s naval architecture and marine engineering business unit traces its lineage back through a series of transactions to Computer Sciences Corporation ("CSC"), a company primarily in the business of providing technology-related services to the United States Government. During the Class Period, among the services CSC provided were naval architecture and engineering services.

82.     During the Class Period, CSC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

83.     Some or all of the naval architecture and marine engineering services provided by CSC and its subsidiaries during the Class Period were provided through a business unit or subsidiary of CSC under the name "CSC Advanced Marine Center."

84.     During the Class Period, CSC Advanced Marine Center, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

85.     From late 2015 to approximately April 2018, CSRA, Inc. was a Nevada corporation with its principal place of business in Falls Church, Virginia. CSRA was formed in late 2015 in a transaction that merged the North American public sector business line of CSC with SRA International, another government technology services contractor. After the transaction, the business unit(s) of the CSC corporate family that provided naval architecture and engineering services were absorbed into CSRA, Inc., including, on information and belief, the pre-transaction liabilities of CSC and CSC Advanced Marine for the conspiracy alleged in this action.

86.     During the Class Period, CSRA, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

87.     General Dynamics Corporation acquired CSRA, Inc. in April 2018. On information and belief, General Dynamics Corporation later caused CSRA, Inc. to be merged into its wholly owned subsidiary Defendant General Dynamics Information Technology, Inc., discussed above.

88.     In approximately August 2018, General Dynamics Corporation, GDIT, or another GDC subsidiary sold CSRA, Inc.'s former systems engineering and acquisition services business unit to CACI International Inc. This sale included business lines that provided naval architecture and marine engineering services to the United States Government.

89.     On information and belief, the sale of CSRA's former systems engineering and acquisition services business unit to CACI International transferred assets, but not existing liabilities, to CACI International. Accordingly, Defendant General Dynamics Information Technology, Inc. is the successor to liabilities related to this action incurred before the sale of CSRA's former systems engineering and acquisition services business unit to CACI International Inc.

90.     Throughout these transactions, the legacy CSC/CSC Advanced Marine business unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture.

91.     In this complaint, "CSC" refers to the CSC/CSC Advanced Marine business prior to the spinoff of its naval engineering business to CSRA. "CSRA" refers to CSRA, Inc. from the time of its formation to the time when General Dynamics sold CSRA's naval engineering business unit to CACI International Inc. "CACI" and "CACI International" refer to CACI International Inc.

            e.      **The Columbia Group, Inc.**

92.     Defendant The Columbia Group, Inc. is a District of Columbia corporation with its principal place of business in Fairfax, Virginia. It provides technology and engineering services to the federal government, including naval architecture and marine engineering services.

93.     During the Class Period, The Columbia Group, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

94.     The Columbia Group, Inc. acquired Columbia Research Corporation in 2005. Columbia Research Corporation provided engineering, logistics and acquisition services. During the Class Period, Columbia Research Corporation, its predecessors, and/or its wholly owned or

controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

95.     In June 2008, The Columbia Group, Inc. assumed the operations of the Washington, DC office of AMSEC LLC, which itself had acquired M. Rosenblatt & Son, Inc. in April 2000. The operations that The Columbia Group, Inc. assumed traced their lineage to the legacy M. Rosenblatt engineering consultancy. After the acquisition, The Columbia Group began referring to this business unit as the Rosenblatt Ship Design Division. This unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture with the legacy M. Rosenblatt business unit.

96.     As used in this complaint, "Columbia Group" refers to The Columbia Group, Inc. or its predecessor Columbia Research Corporation. As noted above, "M. Rosenblatt" refers to M. Rosenblatt & Son, Inc. prior to its 2000 acquisition by AMSEC LLC and to the legacy M. Rosenblatt business unit as part of AMSEC LLC from its 2000 acquisition to 2008 and as a division of The Columbia Group from 2008 onward.

                    **f.     Thor Solutions LLC**

97.     Defendant Thor Solutions LLC is a Virginia limited liability company with its principal place of business in Arlington, Virginia. It is an engineering consultancy firm that provides technical and engineering services to the federal government, including naval architecture and marine engineering services. It was founded in 2009.

98.     During the Class Period, Thor Solutions, LLC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

99.     In this complaint, "Thor Solutions" refers to Thor Solutions LLC.

### g.   Tridentis, LLC

100.   Defendant Tridentis, LLC is a Virginia limited liability company with its principal place of business in Alexandria, Virginia. Tridentis, LLC is an engineering consultancy that provides naval architecture and marine engineering services to the federal government. It was founded in 2006.

101.    During the Class Period, Tridentis, LLC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

102.   In this complaint, "Tridentis" refers to Tridentis, LLC.

### 3.   Faststream Recruitment Ltd.

103.   Defendant Faststream Recruitment Ltd is a British limited company with its principal place of business in Southampton, United Kingdom. Faststream Recruitment Ltd. is an international recruitment agency that specializes in the maritime, shipping, and energy sectors. Until approximately 2020, Faststream Recruitment Ltd. was the sole owner and corporate parent of Faststream Recruitment Inc., a now-dissolved Delaware company with its principal place of business in Houston, Texas.

104.   During the Class Period, Faststream Recruitment Inc., its predecessors, and/or its wholly owned or controlled subsidiaries knowingly joined and acted in furtherance of the conspiracy alleged herein by, *inter alia*, refraining from recruiting candidates for naval architecture and engineering positions on the basis of an illicit agreement between competitors; divulging up-to-date and confidential salary information about competitors' wage levels for naval architects and marine engineers to Engineering Defendants; and preparing "salary surveys" for Engineering Defendants with current, firm-identifiable salary information for naval architects and marine engineers.

105.    Faststream Recruitment Inc. no longer has any corporate presence in the United States. As corporate parent of Faststream Recruitment, Inc., Defendant Faststream Recruitment Ltd. is the successor to its liabilities for the Sherman Act violations alleged in this complaint.

106.    In this complaint, Faststream Recruitment Ltd. and its predecessor Faststream Recruitment Inc. are referred to as "Faststream."

### IV.    AGENTS AND CO-CONSPIRATORS

107.    The Defendants were joined in their anticompetitive conspiracy by co-conspirators both known and unknown who joined the conspiracy and acted in furtherance of it.

108.    BMT Designers & Planners, Inc. is a New York corporation with, on information and belief, no current business operations. It is presently being liquidated in Chapter 7 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. As detailed in Section VII.B.1 below, witness statements confirm that BMT Designers & Planners was a member of the alleged conspiracy.

109.    NASSCO Holdings Incorporated ("NASSCO") is a Delaware corporation with its principal place of business in San Diego, California. It is a wholly owned subsidiary of Defendant General Dynamics Corp. It operates the NASSCO shipyard in San Diego, California, which builds many of the largest ships in the U.S. fleet. On information and belief, NASSCO is a party to the conspiracy alleged herein.

110.    Austal USA LLC ("Austal") is an Alabama limited liability company with its principal place of business in Mobile, Alabama. It is a wholly owned subsidiary of Australian limited company Austal Limited. It specializes in ship manufacturing for the U.S. Navy and the Coast Guard. On information and belief, Austal is a party to the conspiracy alleged herein.

111.    BAE Systems Ship Repair Inc. ("BAE") is a Delaware corporation with its principal place of business believed to be in Norfolk, VA. It is a wholly owned indirect subsidiary of global

defense contractor BAE Systems plc. Through subsidiaries including BAE Systems Norfolk Ship Repair Inc., BAE Systems Jacksonville Ship Repair LLC, BAE Systems San Diego Ship Repair Inc., and BAE Systems Hawaii Shipyards Inc., BAE provides marine engineering services in U.S. Navy shipyards, where BAE is responsible for a variety of maintenance, repair, and modernization work on U.S. vessels. It is a major employer of marine engineers in the United States. On information and belief, BAE and its ship repair subsidiaries are parties to the conspiracy alleged herein.

112.    Various other persons and entities not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

113.    Throughout the Class Period, Defendants acted by and through agents to plan and execute their anticompetitive conspiracy.

## V.    INTERSTATE COMMERCE

114.    During the Class Period, Defendants employed Plaintiffs and other Class Members in various states across the United States, including Virginia, the District of Columbia, Maine, Mississippi, and Connecticut.

115.    Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## VI.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    The U.S. Naval Design and Shipbuilding Industries

116.    The shipbuilding industry in the United States is heavily concentrated on the design and manufacture of the U.S. "public fleet"—vessels owned or operated by federal and state governments or government agencies, particularly the U.S. Navy and Coast Guard. Commercial

shipping vessels, in contrast, are generally built overseas. The country's five major shipbuilding yards—Bath Iron Works in Bath, Maine; Electric Boat in Groton, Connecticut; Newport News Shipbuilding in Newport News, Virginia; Ingalls Shipbuilding in Pascagoula, Mississippi; and NASSCO in San Diego, California—all rely predominantly, if not exclusively, on contracts with the U.S. military. Several midsize shipyards, including those owned by Defendant Marinette Marine in Marinette, Wisconsin, and Defendant Bollinger Shipyards in the Gulf Coast region, are also reliant on military contracts, with the relatively small remainder of the U.S. industry devoted to civilian vessels. A handful of public shipyards owned by the U.S. Navy and Coast Guard are devoted to maintenance and repair of public vessels rather than new construction.

117.    The U.S. shipbuilding industry generates just shy of $30 billion in annual revenue. Nearly 80% is derived from military shipbuilding, maintenance, and repairs. The U.S. Navy alone spent roughly $23 billion per year on shipbuilding between 2017 and 2021. The industry employs approximately 108,000 workers—64% of whom are concentrated in just five coastal states, with Virginia accounting for 28%.

118.    The "Big 5" shipyards are owned by only two companies—General Dynamics Corp. and Huntington Ingalls Industries, Inc. General Dynamics owns Bath Iron Works, Electric Boat, and NASSCO, while Huntington Ingalls owns Newport News Shipbuilding and Ingalls Shipbuilding. These yards build all of the largest vessels in the U.S. Navy and Coast Guard fleets, along with vessels operated by the U.S. Army's Transportation Corps and the National Oceanic and Atmospheric Administration. The U.S. Navy primarily awards shipbuilding contracts to just three other shipbuilding companies—Marinette Marine in Wisconsin, Bollinger Shipyards in Louisiana, and Austal USA in Alabama. These shipbuilders generally build smaller ships including patrol boats, littoral combat ships, naval tugboats, and naval transports.

119.    For large ships, years of engineering and design work go into a vessel before a single piece of steel is fabricated. This is due in part to the fact that shipbuilders do not work from prototypes. As the president of Huntington Ingalls put it when testifying before Congress, "[t]he first ship in a class *is* the prototype." The U.S. Navy's latest frigate—the *Constellation*-class—illustrates this heavy investment and long lead time, with the Navy anticipating two years of design and four years of construction before the first ship is delivered.

120.    The working lives of U.S. military ships span decades. The typical ship serves 30 to 50 years depending on the class. Over the course of a vessel's life, it may go through several nearly complete refittings with the latest advancements in communications, propulsion, and weapons systems. These refittings require major engineering and design support.

**2.    Naval Architects, Marine Engineers, and Associated Professionals**

121.    As of 2020, nearly 10,000 individuals work in the United States as naval architects or marine engineers. Other professionals including designers, project managers, and associated staff work closely with naval architects and marine engineers to serve the design and engineering needs of the U.S. public fleet.

122.    Naval architects design vessel hulls and are responsible for a vessel's overall stability and performance. Marine engineers design a wide array of onboard systems, from propulsion mechanics to electrical systems to water purification, heating, and air conditioning. Marine engineers are employed under a variety of titles, including "marine engineer" as well as other specialty titles like structural or electrical engineer. This Complaint refers to all these workers collectively as "naval engineers."

123.    Naval engineering is a highly skilled profession with degree, citizenship, and security clearance requirements that serve as barriers to entry. The median salary for naval engineers is nearly $100,000. Naval engineers generally must have earned at least a bachelor's

degree in engineering, with certain roles requiring a master's degree or PhD. Certain positions are also restricted to candidates with degrees from schools with specialized naval engineering programs such as the Merchant Marine College. Once on the job, naval engineers receive additional specialized training.

124.    In addition to having significant education and specialized training, naval engineers generally must hold a security clearance because of the sensitive nature of their work. Depending on the clearance level, obtaining such a clearance can take over a year. Workers who have previously obtained a security clearance can often be cleared faster and present less risk to employers of being denied clearance.

125.    Given the security clearance requirement, naval engineers must also generally be U.S. citizens, which further restricts the pool of available talent. In industries that do not have citizenship requirements, companies can fill engineering talent needs by recruiting globally. For example, a 2019 study found that nearly 40% of U.S. computer hardware engineers are immigrants to the United States. Naval engineering firms, however, *cannot* fill their talent needs in a worldwide marketplace.

126.    Finally, naval engineering jobs have characteristics that ordinarily promote job mobility. Despite being highly skilled and subject to security clearance and citizenship requirements, naval engineers are generally employed on an at-will basis without contracts, meaning they can quit at any time to accept work with a new employer. Jobs in the industry are geographically concentrated in the Washington, DC, metropolitan area and around major shipyards in Virginia, Connecticut, and other coastal states, making it possible for naval engineers to switch jobs without moving households and to interview with potential employers without extensive travel. These characteristics should have made it easy for naval engineers to readily switch between

competing firms, and for Defendants to profitably "headhunt" for experienced candidates, had Defendants' conspiracy not forbidden active recruitment.

### 3.    Naval Engineering Employers

127.    Almost all naval engineers working on the U.S. public fleet work for one of three types of employers: (1) shipbuilders, including major general defense contractors like General Dynamics and Huntington Ingalls; (2) dedicated engineering consultancies, such as Gibbs & Cox and The Columbia Group; and (3) the federal government. Data collected by the Bureau of Labor Statistics suggests that roughly 40% of naval engineers work for shipbuilders; 40% work for engineering consultancies; and the remaining 20% work directly for the federal government.[4]

128.    Shipbuilders design and build the U.S. public fleet. The largest shipbuilders are the two general defense contractors—General Dynamics and Huntington Ingalls—who own the five major private U.S. shipyards that build and service major warships. These companies are generally the lead contractors on major shipbuilding programs such as *Virginia*-class submarines or *Arleigh Burke*-class destroyers. These companies employ naval engineers to help design, build, support, and refit U.S. public vessels.

129.    Major shipbuilders do not design and build each piece of a ship in-house. Instead, shipbuilding projects typically involve a host of subcontractors covering nearly every aspect of a project. Subcontractors may be other major general defense contractors, like Raytheon or Lockheed Martin; diversified manufacturing powerhouses, like General Electric; or specialized firms, including the engineering consultancy Defendants.

---

[4] These estimates also exclude from the total pool naval engineers counted by BLS as working in other industries and self-employed engineers.

130.    Engineering consultancies are specialized firms (or specialized units of larger firms) focused on naval design and engineering. They usually employ naval architects and marine engineers of all stripes, as well as associated professionals. Consultancies may contract directly with the federal government, either to design projects in the first instance or to help evaluate and liaise with shipbuilders on the government's behalf; consultancies are also frequently hired as subcontractors by major shipbuilders. Consultancies may also subcontract between themselves, and competing consultancies frequently work together on major projects.

131.    The federal government employs naval engineers to help oversee the design, construction, and maintenance of the public fleet and to perform some in-house engineering work at the nation's five public shipyards: Navy facilities at Norfolk, Virginia; Portsmouth, Maine; Puget Sound, Washington; and Pearl Harbor, Hawaii; and the Coast Guard Yard at Baltimore, Maryland. These public naval yards are dedicated exclusively to maintenance of the Navy's and Coast Guard's existing fleets. Naval engineers employed directly by the federal government mostly work in the Navy and Coast Guard, and the special circumstances of military employment limit the flow of naval engineers between the public and private sectors.

132.    Shipbuilders and engineering consultancies are horizontal competitors for the same pool of naval engineering talent. Naval architecture and marine engineering skills are highly transferable and applicable across a variety of contexts. This is especially true of engineers with experience managing projects, personnel, and government relationships.

133.    Therefore, while shipbuilders may hire engineering consultancies as subcontractors (or consultancies may subcontract among themselves), all of the Defendants are horizontal competitors to each other in the labor market for naval engineers regardless of the structure of inter-Defendant relationships (which themselves change from project to project).

134.    In practice, however, as described below, there is almost no competition to hire experienced naval engineers.

**4.    "Incestuous" Nature of the Naval Engineering Industry**

135.    Public fleet naval engineers are an extremely close-knit community; indeed, multiple witnesses described the industry as "incestuous." Fewer than 10,000 naval engineers work in the United States today. For comparison, there are 804,000 private-sector attorneys in the United States; there are 15,500 administrative law judges, adjudicators, and hearing officers. Other occupations with higher total employment than naval engineers include cartographers and photogrammetrists; gambling cage workers; and postsecondary physics professors.

136.    Only a small handful of colleges and universities in the United States—fewer than twenty—offer accredited training in naval engineering. In fact, the pool of newly trained naval engineers is so concentrated that *40%* have some tie with the University of Michigan. Of the remaining schools, four are either military service academies or operated by the U.S. Navy.[5] Naval engineers are bound together across firms by alumni networks and relationships forged at these colleges and universities.

137.    Naval engineers routinely work together across firms. As described above, naval engineering consultancies work together with each other and with shipbuilders in relationships ranging from co-equals to supervisors to subcontractors. Two firms in a contractor/subcontractor relationship on one contract may find their roles reversed on the next contract. This repeat-player dynamic encourages close and cooperative inter-firm relationships that extend to the individual level—so much so that one industry veteran described the various firms as "allied places." It also

---

[5] They are: the Naval Postgraduate School, United States Coast Guard Academy, United States Merchant Marine Academy, and the United States Naval Academy.

ensures that competing firms' fates are bound to each other by networks of obligation and favoritism that provide each firm with many opportunities to help friends and punish rivals who are perceived as competing "out of bounds."

138.    Industry groups and conferences provide many opportunities to reinforce close relationships, especially among industry leaders. The Society of Naval Architects and Marine Engineers (SNAME) serves a variety of industry functions including publishing research, coordinating educational opportunities, and organizing conferences and events. SNAME organizes some 32 standing committees affording naval engineering managers and executives from competing firms the opportunity to interact. It organizes regular events at which competitors have the opportunity to interact socially, including lunches, happy hours, and conventions. These events offer competitors the freedom to interact privately without any digital record—a combination that has facilitated anticompetitive activity and communications in numerous industries. The American Society of Naval Engineers puts on similar events.

139.    Industry executives are heavily concentrated in the Washington, DC, area. Engineering consultancies including Serco, CACI, Gibbs & Cox, AMSEC, and The Columbia Group all have offices along M Street SE between First Street and Twelfth Street in Washington, just a stone's throw from the Washington Navy Yard, as does shipbuilder Huntington Ingalls. Competitors bump into each other on the street frequently. All Defendant corporate families, except recruiting agency Faststream and BMT Designers and Planners, which has closed its U.S. offices, have U.S. headquarters in the Eastern District of Virginia; all but Huntington Ingalls are headquartered in close-in D.C. suburbs of Northern Virginia, convenient to each other and the Pentagon.

140.    The close-knit nature of the naval engineering industry and the specialized nature of naval engineers facilitated Defendants' no-poach conspiracy.

**B.    Defendants' No-Poach Conspiracy**

141.    Executives in charge of hiring in the naval engineering industry have long adhered to a "gentlemen's agreement" that prohibits any Defendant from actively recruiting naval engineers from other Defendants, in spite of the obvious incentives for companies in need of scarce naval engineering talent to do so. This long-standing agreement reduces Class Members' mobility and depresses salaries industry-wide.

142.    Managers with hiring authority repeatedly and independently confirmed the existence of an industry-wide "gentlemen's agreement," using that term, not to actively poach from competitors. Another senior employee conveyed that a company that had broken the rules was "not supposed to do that." Each Engineering Defendant in this action is tied to the conspiracy through the testimony of at least one witness who verified the party's adherence to the industry's no-poach regime.

143.    Other witnesses, though unaware of no-poach agreements, confirmed close relationships with supposed competitors, that they had never been actively recruited by competitors, and that salaries in the industry are inexplicably low relative to salaries in comparable fields. Indeed, several witnesses—including naval engineers who were not themselves aware of the no-poach—described the industry as "incestuous," referring to the industry's small, close-knit, geographically concentrated nature.

144.    The conspiracy, which began at least by the early 1980s, expanded to industry-wide proportions by at least 2000. The conspiracy alleged herein has persisted among the major industry participants, and coordination among participants has only become easier as smaller players have

consolidated into larger ones. Each firm's commitment to the unlawful conspiracy is reaffirmed every time a hiring manager decides not to call a competitor's employee they know to be qualified.

145.    Former managers of the Defendants confirmed broad agreements among all industry participants. Moreover, the circumstances that prevail in the industry—in which there is *almost no recruitment among competitors*, despite a very limited and specialized pool of potential employees and low salaries—reinforces the conclusion that all Defendants engaged in a single no-poach conspiracy. The conspiracy is facilitated by the close business ties among competitors, which provide a range of levers for punishing defection from the conspiracy. It is also facilitated by close personal relationships among the small community of naval engineers, and a wealth of opportunities to conspire at conferences, social events, and private in-person meetings.

146.    The conspiracy is still in effect to this day. One naval engineer—who was last employed in 2020—was unaware of the no-poach agreement, but did report that when he attempted to interview with other naval engineering firms, he was required to specify that he had independently pursued the opportunity and not been solicited. And a recruiter from Huntington Ingalls indicated that the company's applicant tracking system contained a "do not hire list" of companies whose employees Huntington Ingalls' recruiters were not permitted to affirmatively recruit.

1.    **Participants in the No-Poach Conspiracy Directly Confirm Its Existence, Operation and Scope**

147.    Plaintiffs' investigation has uncovered direct evidence of the conspiracy, gathered from eyewitness industry participants.

148.    At least as far back as the early 1980s, a no-poach conspiracy existed among Gibbs & Cox, JJMA (now Serco), and other engineering consultancies. A management-level employee with hiring authority who was subject to the conspiracy's rules confirmed the existence of a

"gentlemen's agreement" among these firms that "you didn't recruit people" from competitors. Firms could hire a competitor's employee if and only if the employee affirmatively reached out—a rule that continues in substantially the same form to this day. By the late 1980s, the conspiracy extended at least to include Bath Iron Works—a major shipyard acquired by General Dynamics in 1995.

149.   The conspiracy continued throughout the late 1990s and all defendant corporate families that existed in 2000 had joined it by that time. Gibbs & Cox, JJMA (now Serco, with pre-sale liabilities owned by HII Mission Technologies), M. Rosenblatt & Co. (now the Columbia Group, with pre-sale liabilities owned by HII Fleet Support), Advanced Marine Enterprises[6] (now CACI, with pre-sale liabilities owned by General Dynamics Information Technology), and Designers and Planners (now BMT) participated in a no-poach agreement with each other. It was still limited to active recruitment of competitors' employees and enforced when necessary by phone calls among high-level employees. The agreement was never reduced to writing and passed on only as verbal instructions from executives to managers.

150.   Senior managers who worked at Gibbs & Cox, Alion Science & Technology (successor to JJMA, now Serco), and BMT Designers and Planners confirmed that they would not actively recruit from competitor firms. One witness, asked about the scope of no-poach agreements in the industry, stated: "I never recruited anyone actively from a competitor."

151.   Defendants' former employees mad statements that the following Defendants or business units participated in the gentlemen's agreement not to recruit naval engineers from competitors: Gibbs & Cox, Alion (now Serco), CSC Advanced Marine Enterprises (now General

---

[6] Advanced Marine Enterprises was acquired in or around 2001 by CSC.

Dynamics and/or CACI), BMT Designers & Planners, The Columbia Group, AMSEC (now HII Fleet Support), Bath Iron Works, and Marinette Marine.

152.    Several of the engineering consultancy Defendants, including at least Gibbs & Cox, JJMA/Alion (now Serco), CSRA (now CACI), AMSEC, Tridentis, and the Columbia Group, referred to each other collectively as the "Beltway Bandits." According to an executive employed by one of these Defendants who was involved in recruiting naval engineers, these companies shared an agreement among themselves not to actively recruit each other's employees. Indeed, one executive for Gibbs & Cox reported that he overheard a colleague say to another colleague in regard to recruiting a potential candidate, "He works for JJMA, we can't do that." Another executive explained that, "If Gibbs & Cox offered my guy a position, they'd call me and say, 'We didn't poach him.'"

153.    Exceptions to the no-poach rule were tightly controlled. The primary exception was that Defendants could hire employees who applied for a position on their own. In some circumstances, a Defendant who lost a major contract would allow its employees to be recruited by the winner of the contract. One witness, who attempted to recruit an engineer to one of the engineering consultancy Defendants during this period from a competitor, noted that some Defendants disapproved of the recruitment. That recruitment nevertheless fell within the narrow exception to Defendants' no-poach agreement because the contract on which the recruit was working for the competitor was being transferred to the Defendant. Other witnesses described the exception in virtually identical terms.

154.    The conspiracy is still going strong today.

155.    At least as recently as 2018, Huntington Ingalls maintained a "do not hire list" of companies from whom HII's recruiters could not actively recruit, including at least General Dynamics.

156.    A manager involved in recruitment for Thor Solutions in the mid-to-late 2010s confirmed the existence of a "non-ink-to-paper" agreement among Thor Solutions and companies with which it worked, including Alion, that "we would not poach from each other."

157.    One of the handful of independent recruiters who placed naval engineers in the industry in the late 2010s noted that they were instructed to avoid recruiting from other companies in the industry. Hiring managers sometimes explained these restrictions by describing competitors as "friends," or by saying "we have a relationship," which the recruiter understood to mean that the relationship in question was non-contractual. The recruiter recalled in particular that in one instance, Bollinger Shipyards indicated that it could not hire a candidate from Alion, despite the candidate's being an otherwise perfect fit. The recruiter recalled another attempt to place a Gibbs & Cox employee that was stymied by an apparent agreement not to recruit from Gibbs.

158.    A manager who left a Defendant for the government in 2019 confirmed the existence of a widespread no-poach "gentlemen's agreement" in the industry. Another manager who worked in the industry during the last five years confirmed the existence of a no-poach agreement among naval engineering competitors, including at least Gibbs & Cox and Alion (now Serco).  Other witnesses employed in managerial positions as recently as 2022 described ongoing agreements among competitors in the industry not to actively recruit employees from each other.

***

159.    For each of the following Defendant entities or business units, at least one industry witness either named it as part of the industry-wide no-poach conspiracy, discussed an application

involving that entity of the no-poach agreement to a particular individual seeking to change employment in the industry, or acknowledged that it had a policy or practice of not recruiting competitors' employees: Bath Iron Works, Electric Boat, Huntington Ingalls Industries, Inc., Newport News Shipbuilding, Ingalls Shipbuilding, Marinette Marine, Bollinger Shipyards, Gibbs & Cox, John J. McMullen & Associates, Alion, Serco, BMT Designers & Planners, AMSEC (both during the period of independence as AMSEC LLC and as a subsidiary of Huntington Ingalls Industries, Inc.), Computer Sciences Corporation, CSRA, CACI International, the Columbia Group, M. Rosenblatt, Thor Solutions, and Tridentis.

160.    The conspiracy was continuous and industry-wide throughout the Class Period. Though its origins are obscure, by at least 2000 all major players in the industry had reached a mutual understanding that they would not poach each other's employees. While naval engineering business units and their parent companies went through an astonishing number of sales, spin-offs, reorganizations, and other corporate events during the Class Period, the business units themselves maintained continuity from place to place. Indeed, veteran naval engineers often refer to certain consultancies, like the ones tracing their lineage back to John J McMullen & Associates and M. Rosenblatt & Son, by their legacy names three or more transactions old. Through these transactions, key personnel and corporate cultures remained the same, and as a result these business units continued to adhere to the unlawful no-poach agreement. Newcomers to the conspiracy like Thor Solutions and Tridentis, who started their firms in the middle of the Class Period, quickly joined the fold. The conspiracy continues to this day.

2.      **Additional Evidence Affirms the No-Poach Conspiracy's Reach and Effects Throughout the Class Period**

a.      **Uniform, Anticompetitive Hiring Practices**

161.    During the Class Period, each Engineering Defendant followed two distinctive hiring practices that, taken together, make no economic sense except in the context of a conspiracy to reduce competition and depress wages in the naval engineering labor market. Each Engineering Defendant (1) maintained a practice or policy of *not* actively recruiting competing Defendants' naval engineers; and (2) maintained a practice or policy that the Defendant *could* (and often *did*) *hire* competing Defendants' naval engineers, provided the engineer made the initial approach to the Defendant.

162.    No Engineering Defendant, much less *all Engineering Defendants*, would arrive at such a combination of practices independently without a mutual understanding that the other Engineering Defendants would restrict themselves to the same policies. In the absence of an unlawful agreement among the Engineering Defendants, each would have every incentive to recruit each other's employees, competing in the labor market on salaries, benefits, working conditions, and other dimensions of normal labor markets. Economic theory suggests that naval engineers should have been able to exert significant bargaining power over Defendants during the conspiracy period because the education, specialized training, security clearance, and citizenship requirements described above made the pool of naval engineers small and the cost of replacement significant. As a long-time industry insider put it, naval engineers are "so rare" and "very special." Moreover, during the Class Period, there was a shortage of naval engineers. As this witness explained: "[T]here was so much more demand [for employees] than there was talent."

163.    These market characteristics should have resulted in a war for talent in which Defendants offered regular promotions and pay increases, attempted to lure talent away from

rivals, and matched offers from competitors trying to do the same. Indeed, in other industries with small labor pools and high-stakes competition, whole specialized mini-industries exist solely to recruit talent. For example, in data science, software engineering, and other engineering segments of the defense industry (not to mention law), dedicated, highly paid professionals have full-time jobs working industry contacts and connections in order to tempt engineers from one competitor to another. By contrast, in the naval engineering industry, Plaintiffs could only identify one recruiting firm (Faststream) that, as a small fragment of its business, helped Engineering Defendants recruit naval engineers. When asked if the Engineering Defendants placed limitations on his ability to recruit naval engineers from other companies, a former Faststream employee replied: "100 percent," adding "that happened with everyone."

164.    In a labor market with these characteristics (especially with a shortage of supply), the only explanation for firms' parallel failure to actively recruit from competitors is an unlawful agreement.

165.    Lest there be any doubt, however, the second prong of Defendants' policies—that competitors' employees who *themselves apply* for jobs may be hired—belies any innocent or procompetitive explanation for Defendants' policies. If market-wide factors like an oversupply of workers or overspecialization of experienced engineers were driving independent decisions not to recruit by all Defendants, *they would also lead these companies not to hire employees who applied*.[7] It is not that experienced naval engineers are not *valuable* to competitor Defendants; it is that the Defendants mutually recognize that they benefit *more* from a regime of mutual non-recruitment than they would from any individual hire.

---

[7] A market-wide labor oversupply, of course, is the opposite of what is alleged here, and in any case would be very unlikely to last from the 1980s to the present day.

b.        **The Industry Is Susceptible to Collusion**

166.     Several features of the naval engineering industry render the industry particularly susceptible to collusion and illustrate that Defendants had the motive, means, and opportunity to execute their conspiracy, and that innocent explanations for Defendants' behavior are unlikely. These "plus factors" include: (1) high barriers to entry; (2) shared financial incentives to maintain low salaries industry-wide; (3) shared pressure from government customers to keep costs low; (4) extensive repeat-player working relationships among competitors, with opportunities for a range of informal punishments that can be used to enforce the unlawful no-poach agreement; (5) social ties between key personnel, encouraging trust and cooperation among competitors; (6) opportunities to collude at industry events, social events, and frequent informal meetings among key personnel; and (7) a culture of secrecy that insulates the industry from rigorous oversight and enables collusion.

167.     *High Barriers to Entry*. The naval engineering employment market is susceptible to collusion given the high barriers to creating a naval engineering firm. Naval engineering firms face high barriers to entry given the contract-based, relationship-driven, and specialized nature of the work. Naval engineering firms work on extremely sensitive projects and spend years developing trust and reputation among government customers and peer firms. Both naval engineering and government contracting are highly specialized fields requiring considerable skill and experience from a substantial number of personnel. These barriers enabled Defendants to sustain their conspiracy because new entrants could not easily enter the market, draw naval engineers away with promises of higher compensation, and expect their investment to be quickly rewarded with lucrative government contracts. Indeed, because all Engineering Defendants paid Class Members artificially low wages, they were able to bid for government contracts at lower

- 42 -

prices than potential new entrants could bid, further entrenching the Engineering Defendants against potential threats from non-conspirators.

168.     *Shared Financial Incentives to Maintain Low Salaries and Ban Recruitment.* The Engineering Defendants have and had throughout the Class Period obvious financial incentives to keep salaries for naval engineers low. As noted above, the demand for naval engineering talent far outstrips the pool of available personnel. Under ordinary circumstances, this imbalance between supply and demand would put tremendous upward pressure on salaries, eating into Defendants' profits. Collectively, however, the Engineering Defendants can maintain stable, low wages in the industry by limiting the avenues through which they compete with each other for talent.

169.     Perhaps less obviously, each Engineering Defendant has financial and other incentives to restrain active recruitment in particular (relative to other forms of competition). First, the naval engineering industry's orientation around large, unique government contracts makes it difficult to coordinate some forms of anticompetitive agreement, like price fixing, output reduction, or division of territory; Defendants' no-poach agreement was by contrast a relatively easy way to realize benefits from Defendants' unlawful conspiracy. Second, competitive recruitment is particularly costly for firms whose employees are "poached" because not only do they lose an employee but they must suffer a disruption to the work the employee was doing. Moreover, and perhaps as importantly, it takes a personal toll on managers at that firm, who must not only find a replacement for the poached employee but also handle the administrative consequences of the departure and manage the employees who remain, whose workload has likely increased. This kind of disruption gives managers a personal incentive to form, maintain, and enforce unlawful agreements restraining competition.

170.   *Shared Pressure from Government Customers.* Government specialists exercise substantial oversight over contractors, including expenditures on personnel. Several witnesses remarked that the government put unrealistic pressure on firms that employed naval engineers to keep salaries low. This external pressure from customers incentivized each Engineering Defendant to find ways to keep wages low for naval engineers—including securing understandings from competitor firms to maintain low wages by not recruiting each other's employees.

171.   *Repeat-Player Working Relationships.* Defendants were able to form, monitor, and enforce their conspiracy given the close-knit nature of the industry. Naval engineering consultancy Defendants frequently worked on "gigantic" contracts where rival firms were very likely to be involved. They could be contracted by the U.S. government for the same project or subcontracted by the same general defense contractor. Given these close and repeated working relationships, one naval engineer with experience working at three different Defendants noted that "[c]ompanies that [recruit rivals' employees] don't stay around that long because companies don't want to work with them."

172.   *Forums for Collusion.* Defendants' executives also met annually at various industry-wide conferences, including at events put on by WorkBoat and Shipbuilders Council of America. These events offered opportunities for the industry's most senior executives to confer regarding naval engineers and their compensation. In addition to the salary discussions found in both informal and formal settings at WorkBoat conferences, the Shipbuilders Council of America features a board of directors that includes senior executives—such as the president or CEO—from nearly every industry player. General Dynamics, Bath Iron Works, Huntington Ingalls, Newport News Shipbuilding, Ingalls Shipbuilding, and Marinette Marine (among others) all occupy positions on that board. As a result, board meetings and the more informal, private social events

that followed offered executives from each of these companies the opportunity to discuss, implement, and reinforce their unlawful gentlemen's agreement.

173.    Trade associations like the Society of Naval Architects and Marine Engineers (SNAME) and the American Society of Naval Engineers (ASNE) offered Defendants a further opportunity to conspire. As alleged above, both SNAME and ASNE regularly put on events, ranging from large annual conferences to more regular regional meetings, at which competitors have the opportunity to confer privately and off the record, including during lunches, happy hours, and other social functions.

174.    *Teaming Agreements.* In addition to the extensive gentlemen's agreement described above, Defendants entered written agreements to not recruit each other's naval engineers when working on the same project. These agreements were generally part of broader "teaming agreements"—contracts consummated between naval engineering firms working alongside each other on projects. Defendants entered these agreements when subcontracting with one another or when submitting joint bids to the U.S. government (or another contractor) after which the firms would complete the work together if awarded the contract.

175.    These agreements had the effect of facilitating the unlawful no-poach conspiracy at issue in this action[8] because: (1) no-poach practices were normalized and discussed on a regular basis between competing firms; (2) the incentive to cheat on the broader conspiracy was reduced because teaming agreements reduced the potential upside of cheating; and (3) Defendants' employees were led to mistakenly believe that the teaming agreements were the *only* recruiting

---

[8] The no-poach restrictions in individual teaming agreements may by their own terms violate the Sherman Act, but Plaintiffs do not seek to resolve those questions in this action.

restrictions in place. This last effect enabled Defendants to fraudulently conceal their conspiracy, as discussed in Section VIII.B below.

### c.   Defendants Took Actions Against Their Unilateral Self-Interest

176.   Defendants acted against their unilateral self-interest by not competing for talent. Naval engineering is a highly specialized industry in which human capital constitutes Defendants' greatest asset. Moreover, industry insiders acknowledged that there was an industry-wide shortage of naval engineers. Given the inadequate supply of naval engineers, a Defendant pursuing its own unilateral interests would have offered promotions and raises to retain top talent. Defendants also would have competed aggressively to lure away each other's employees by offering better salaries and benefits. This competition would have resulted in a high degree of labor mobility and the ratcheting up of pay as high performers switched between firms. Instead, Defendants maintained relatively uniform compensation structures, rarely gave bonuses or promotions, and did not actively recruit each other's employees.

177.   As explained further below, Defendants also acted against their self-interest by exchanging competitively sensitive compensation information. In a competitive market—particularly one with a shortage of qualified workers—a firm acting in its unilateral self-interest would not share its compensation information with rivals because it would tell rivals how much they needed to offer to poach employees. For example, if a firm told rivals that it was paying its naval engineers $90,000, the rivals would know that they could lure those naval engineers away by offering them only slightly more compensation. Yet Defendants routinely shared their compensation information with one another, showing a level of trust among Defendants that only makes sense if they had an agreement not to poach one another's employees.

C.   **Defendants Monitored and Enforced the No-Poach Agreement and its Goal of Compensation Suppression by Sharing Information Directly and through Third Parties**

178.   The goal of Defendants' conspiracy not to recruit one another's naval engineers was to suppress their compensation. To ensure that the no-poach conspiracy's goal of compensation suppression was achieved, Defendants monitored Class Members' compensation by sharing sensitive compensation and wage information. This unlawful and anticompetitive conduct helped ensure that naval engineers were unable to leverage the otherwise-favorable market dynamics—including a scarce supply of specialized employees and an outsized demand for that talent—to seek better wages and higher compensation.

179.   Defendants' sharing and monitoring of the compensation of naval engineers took numerous forms. They included in-person and direct communications between competitors. Defendants' executives met annually at various industry-wide conferences, including events hosted by WorkBoat and the Shipbuilders Council of America, and engaged in direct communications about Class Members' compensation with their competitors. These events offered executives the opportunity to compare sensitive hiring information like wages paid to naval engineers during cocktail hours or other informal gatherings—something a third-party recruiter who attended such events confirmed was a regular occurrence. These informal settings often featured a kind of "scuttlebutt," according to that recruiter, with hiring managers saying things like "I'm paying $90,000 for my naval architects. What are you doing?"

180.   At cocktail hours hosted by Defendant Faststream in the mid-2010s, Defendants' personnel frequently asked Faststream employees to divulge sensitive wage information for naval engineers from Faststream's other clients. Faststream is a marine recruiting agency and was at the time one of only a few firms that Defendants would occasionally engage to find naval engineers

from non-conspirators.[9] A typical question that Faststream employees heard from attendees at such events was, "What is so-and-so [competitor firm] paying?"

181.   Defendants' sharing and monitoring of Class Members' compensation also included formal presentations concerning that compensation. They included presentations by Faststream that offered detailed insights into salaries offered to naval engineers throughout the industry. Following these presentations, industry executives had the opportunity to question Faststream's team about salary information. These sessions offered Defendants detailed insights into the compensation offered to naval engineers throughout the industry and did so with their competitors for labor in the same room. For example, a Faststream employee gave a presentation entitled "Human Capital Management: Recruitment, Hiring and Retention in Today's Marine and Offshore Environment" at the WorkBoat Maintenance & Repair Conference and Expo in New Orleans on April 14, 2015. Attendees at that conference included at least Alion, Bollinger Shipyards, and Gibbs & Cox.

182.   In yet another mechanism of the conspiracy, Defendants requested and received formal surveys of Class Members' compensation from third parties. Separate from their presentations at trade conferences, Faststream allowed Defendants to confirm the success of their no-poach conspiracy by conducting by-request salary surveys. When a Defendant asked Faststream for a salary survey—typically when recruiting or hiring for a naval engineer opening— Faststream would create a spreadsheet identifying the different salaries offered to employees it had placed with other companies. A recruiter for Faststream confirmed that to produce such a spreadsheet, he would be asked for detailed, firm-specific information, such as the following: "I placed two people at Gibbs & Cox at $X in X position. I placed two people at Austal at $X in X

---

[9] Faststream has since closed its U.S. offices.

position." The survey Faststream sent to the client would involve both current salary averages for industry positions and specific examples of current salaries at specific companies. For example, the survey received by the client might have identified Gibbs & Cox as paying $90,000 for a specific level of naval architect, and generally included several such examples, showing multiple specific salaries for specific openings, down to the position level. Salary information within these surveys was transparent to the Defendant recipients. Crucially, this information was provided to Defendants but *not* to their employees.

183.   All of these mechanisms of sharing and monitoring Class Members' compensation—informal, in-person, direct communications with competitors, presentations by third parties hired by Defendants (and delivered to Defendants while they were in in the same room), and formal compensation surveys requested and paid for by Defendants—all enabled Defendants to confirm that their no-poach agreement  was continuing to have its desired effect of suppressing compensation and that their competitors' compensation was not indicative of true competition for labor. Those mechanisms allowed Defendants to know their own suppressed compensation was sufficient to continue to retain their own employees and that candidates for their open positions would not be offered better compensation by their competitors. The no-poach agreement in conjunction with these mechanisms of monitoring and enforcement meant that not only was the compensation of "passive talent"—those naval engineers who did not actively seek employment at a competitor—suppressed, but the compensation of those who did seek employment at competitors was as well. In other words, even if a naval engineer employed by a Defendant took the initiative to apply for an opening with another Defendant—thereby evading the "gentlemen's agreement" not to poach one another's employees—that naval engineer would be unlikely to secure better compensation.

D.      **Anticompetitive Effects and Injury Suffered by Class Members**

184.    Defendants' conspiracy significantly suppressed the earnings of thousands of naval engineers for decades.

1.      **Economic Theory Teaches That Defendants' No-Poach Conspiracy Had Anticompetitive Effects**

185.    Economic theory teaches that the multitude of barriers to becoming a naval engineer, the excess demand for naval engineers relative to supply, the dependence of Defendants on naval engineers who built up project-specific expertise, the at-will nature of employment contracts, and the geographic concentration of the work should have combined to form a competitive and high-paying labor market. Instead, Plaintiffs and Class Members were compensated significantly below the level they would have received absent a conspiracy.

186.    As explained above, Defendants conspired to suppress Plaintiffs' and Class Members' earnings by agreeing not to recruit each other's naval engineers. By putting the onus on Class Members to seek new employment opportunities, Defendants reduced the likelihood that Class Members would leave for rivals and avoided paying the higher compensation that would have been necessary to mitigate this risk.

187.    The no-poach made Class Members less likely to leave their current jobs for several mutually reinforcing reasons. First, Class Members simply were not contacted by rival firms. Absent conspiracy, Defendants would have contacted one another's naval engineers who were not actively looking for new jobs (a pool of workers that economists call "passive talent") and tried to lure them away with higher compensation; their current employers would then face pressure to match their rivals' salary offers to keep their workers. Second, the lack of proactive recruiting meant there was less information available regarding opportunities at rival firms. Class Members who took it upon themselves to seek better opportunities therefore found it more difficult than they

would have absent a conspiracy. Third, the lack of labor market dynamism enabled Defendants to maintain relatively similar—and stagnant—compensation scales such that the opportunity for a motivated class member to find a better opportunity elsewhere was diminished. This is because the conspiracy avoided what otherwise would have been the ratchet effect present in competitive labor markets, where competing firms continually raise the bar to attract talent. The conspiracy therefore suppressed the compensation of those Class Members who were actively recruited, but did not seek out work at other companies, as well as those Class Members who did seek other opportunities.

188.    Recent economic literature confirms that no-poach agreements such as the one alleged here suppress compensation through the mechanisms described above.[10]

### 2.    Witnesses Confirm That the Conspiracy Had Anticompetitive Effects

189.    Consistent with the economic theory described above, salaries for naval engineers at Defendant firms are low and stagnant. Engineers in peer fields can expect to make substantially more than their counterparts in naval engineering and to see their salaries rise faster.

190.    Several witnesses remarked on the industry's reputation for underpaying for talent. Not only are starting salaries low, but wages do not grow substantially with experience and sometimes fail to keep pace with inflation. One naval engineer observed that promotions were hard to come by and that no raises were available beyond a 2% annual cost-of-living adjustment.

---

[10] *See, e.g.*, Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings* (July 20, 2023), http://dx.doi.org/10.2139/ssrn.4155577; Francine Lafontaine et al., *No-Poaching Clauses in Franchise Contracts, Anticompetitive or Efficiency Enhancing?* (March 24, 2023), http://dx.doi.org/10.2139/ssrn.4404155; Matthew Gibson, *Employer Market Power in Silicon Valley*, IZA DP No. 14843 (Nov. 2021), https://www.iza.org/publications/dp/14843/employer-market-power-in-silicon-valley; Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, 57 J. HUM. RES. S324 (2022), https://doi.org/10.3368/jhr.monopsony.1019-10483.

Another witness remarked that competing naval engineering firms all seemed to offer similar compensation, making it difficult to find higher salaries by switching jobs. Yet another echoed that sentiment, noting that "nobody really jumped ahead" in compensation by moving from one Defendant to another.

191. The anecdotal experience of witnesses confirms that Defendants offer salaries far below what would be available in a competitive market. For example, in most industries, government salaries are substantially lower than private-sector salaries, because government jobs make up for lower pay with a combination of benefits, improved work-life balance, job security, and the satisfactions of public service. One naval engineer, however, noted that they had been offered a job with a government agency that paid $40,000 per year *more* than their job with a Defendant doing equivalent work.

      a.      **Defendants' Market Power Bolsters an Inference of Anticompetitive Effects**

192. As explained further below, the market for naval engineers in the United States is a distinct labor market, and Defendants collectively wielded power within that market. This market power provides further evidence that Defendants' conspiracy could—and did—harm Class Members.

      (1)      <u>Relevant Labor Market</u>

193. The relevant labor market is the market for naval engineers.

194. From the perspective of naval engineers, there are no close economic and/or functional substitutes for employment in other industries. As explained above, naval engineers have industry-specific credentials, skills, and experiences—including specialized bachelors' degrees and a specialized understanding of military ships—that are not transferable to other

industries. Employers of naval architects are willing to pay a premium (i.e., a higher salary) for workers with these credentials, skills, and experiences.

195.    If naval engineers were to take a job in another industry that required *fewer* skills or credentials, they would likely have to take a pay cut because their industry-specific skills would not provide a benefit for which the new employer is willing to pay. And if naval engineers sought employment in a field with more or different job requirements, they would likely have to either (a) pay to receive training in that field or (b) accept a pay cut to work at a lower level in a different field while they built new expertise.

196.    Naval engineers, like most laborers, cannot withhold their services until a later date as a means of negotiating for higher compensation. They depend on a regular income. This weakens their negotiating position with potential employers and enhances the Defendants' market power.

(2)    <u>Relevant Geographic Market</u>

197.    The relevant geographic market is the United States. If all employers collectively imposed a slight decrease in compensation for naval engineers from the competitive level, the vast majority of naval engineers would remain in the United States and within the industry, making the slight decrease in compensation profitable. This is in part because naval engineers have United States citizenship, a United States security clearance that is not transferable to other countries, and specialized knowledge that serves the United States military.

(3)    <u>Market Power</u>

198.    Defendants controlled the relevant market during the conspiracy period. Defendants collectively employ approximately three out of four of the naval engineers in the United States. This market power, combined with the barriers to entry discussed previously, limited the opportunity for Class Members to obtain higher earnings by working for an entity other

than Defendants. Thus, Defendants' no-poach agreement had the effect predicted by economic theory: depressed compensation for Class Members.

### b.    Scope of the Harm to Class Members

199.    Defendants' conspiracy harmed tens of thousands of Class Members. In 2020, there were just under 10,000 marine engineers and naval architects employed in the United States. This figure may undercount the true number of naval engineers affected by Defendants' conspiracy because Defendants employed naval engineers under other titles as well, such as structural engineers. After accounting for the fact that a portion of naval engineers are employed by the government, along with the growth rate of the industry since Defendants' conspiracy began, Class Members easily number in the tens of thousands.

200.    Defendants' conspiracy deprived Class Members of hundreds of millions of dollars in earnings. As of May 2022, the median compensation of naval engineers in the United States was $96,910 per year. The overall compensation for all Class Members across the Class Period is measured in the billions of dollars. But for Defendants' conspiracy, that compensation would have been materially higher for Class Members throughout the Class Period.

### c.    Lack of Procompetitive Justification

201.    Defendants' conspiracy constituted a "naked" no-poach agreement with no procompetitive justification. The purpose and effect were to avoid paying Class Members higher salaries in what otherwise would have been a very dynamic labor market. The decades-long duration and large number of firms involved in Defendants' conspiracy underscores the fact that it lacked a legitimate rationale and was not ancillary to any project-specific agreements (or any other agreements).

## VII.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS

### A.   Continuing Violation

202.   Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein. Defendants' unlawful and anticompetitive scheme is continuing.

203.   Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts: (1) repeated refusal to actively recruit naval engineers from one another's ranks, in spite of the obvious incentives to do so, including each time the Defendant seeks to hire for a naval engineering position for which competitors' employees would be appropriate but restricts recruitment to candidates applying of their own accord; (2) enforcing the anticompetitive agreement with communications involving implicit or explicit threats of retaliation for breaching the agreement; (3) sharing of sensitive salary and wage information during annual trade conferences; and (4) requesting targeted salary benchmarking services from third-party recruiters.

### B.   Fraudulent Concealment

204.   Plaintiffs' claims are not time-barred because Defendants affirmatively concealed the existence, true nature, and scope of their industry-wide "gentlemen's agreement." Defendants' efforts prevented Plaintiffs from discovering the facts necessary to pursue their claims despite the exercise of due diligence—including that Defendants had established an "unwritten rule" that no one Defendant would affirmatively recruit the other's naval engineers, and that Defendants' executives and hiring managers were engaged in information exchanges and salary benchmarking that further suppressed their wages.

1.      **Defendants Concealed the Scope and Nature of Their Conspiracy**

205.    Defendants actively concealed their unlawful conduct in several ways. First and foremost, Defendants concealed their conspiracy by carefully avoiding putting anything in writing. Instead, each Defendant abided by a "gentlemen's agreement" which was an industry-wide "unwritten rule."

206.    Maintaining an unwritten, broad secret agreement was crucial not only to evade detection or accountability but because Defendants also entered into less-restrictive, unconcealed hiring covenants with each other that misled Plaintiffs and Class Members and kept them from uncovering the conspiracy. As discussed previously, Defendants entered into written agreements not to recruit each other's naval engineers when working on the same project. Multiple industry participants have reported that these agreements were explicit contractual provisions. These explicit, unconcealed agreements misled Plaintiffs and Class Members into thinking they could be recruited whenever they were not working on the same project as a rival. But the written, unconcealed agreements hid the true nature of Defendants' conspiracy: that each had entered into a secret and much more expansive "gentlemen's agreement" not to affirmatively recruit others' naval engineers, regardless of whether the two companies were engaged on the same project and regardless of whether the engineers in question were working on that project. Defendants' inclusion of these narrower no-poach provisions in written agreements were affirmative acts to fraudulently conceal their unlawful conspiracy.

207.    Defendants also concealed their conspiracy by falsely representing that they offer "competitive" compensation and benefits packages. For example, the respective recruitment and career web pages for Defendants state the following:

- Bath Iron Works Corporation states that it is "proud to offer competitive compensation."

- Bollinger Shipyards LLC offers "competitive wages."

- General Dynamics Corporation states that it provides both "fair compensation" and "competitive benefits."

- General Dynamics Information Technology, Inc. offers "market-competitive salaries" and "competitive health and wellness packages."

- Huntington Ingalls Industries, Inc. provides "competitive pay" and "competitive benefits." These representations also apply to the HII divisions Newport News Shipbuilding, Ingalls Shipbuilding, and Mission Technologies.

- Fincantieri Marine Group offers "competitive wages" and "competitive compensation packages," including for its jobs at the Fincantieri Marinette Marine shipyard.

- Serco, Inc. indicates its employees can expect a "competitive salary."

- BMT also states that it offers a "competitive salary" and "tailor[s] benefits to ensure they remain competitive with the local geographies in which [BMT] operate[s]."

- Gibbs & Cox, Inc. offers "competitive salaries" and a "competitive benefits package."

- The Columbia Group also offers "competitive salaries" and a "very competitive benefits package."

- Tridentis LLC states that it provides "higher salaries" and "better benefits."

- CACI International, Inc. offers a "competitive mix of benefit options."

208.   In reality, due to their mutual no-poach agreements, Defendants have offered neither "competitive" pay nor "competitive" benefits throughout the Class period. Defendants' representations otherwise are affirmative acts taken to mask this reality from Plaintiffs and Class Members.

209.   Defendants also used false or misleading representations, euphemisms and code words to direct attention away from their conspiratorial agreement. For example, Huntington Ingalls's 2021 annual report describes offering "base wages and salaries that are competitive and consistent with employee positions, skill levels, experience, knowledge, and geographic location," though in fact those wages for naval engineers were not competitive. It notes that HII uses "nationally recognized surveys and outside compensation and benefits consulting firms to

independently evaluate the effectiveness of our employee and executive compensation and benefit programs and to provide benchmarking against our peers within the industry," when in fact such surveys are used (at least in part) to ensure that Defendants' no-poach conspiracy is achieving its intended objective of reducing wages for naval engineers. Finally, it states that "[o]ne of the key components of our approach to workforce development is to 'grow our own'"—explaining away its lack of competitive recruitment as a unilateral strategic choice rather than a bargained-for conspiratorial agreement. Other Defendants made similar public and private representations that they operated as competitors in the talent market rather than allied conspirators.

210.   Moreover, Defendants affirmatively represented that they adhere to values and ethics standards incompatible with the wage suppression conspiracy in which they were engaged. Multiple Defendants have articulated these values on their websites or in their published Codes of Conduct. For example:

- General Dynamics Corporation ("GDC") represents that its "defining moral character" is a dedication to "transparency, trust, . . . and honesty" including towards its "employees."

- General Dynamics Information Technology, Inc. also includes "honesty, transparency, . . . and trust" as a core value in how it interacts with "fellow employees."

- In its 2022 Code of Ethics booklet, HII states "[i]ntegrity is at the heart of who we are and what we do," that it will be "truthful, trustworthy and honorable in all aspects of [the] work," and it is "committed to being honest and fair with . . . employees."

- Bollinger Shipyards, LLC likewise lists "honesty and integrity" as part of its core values.

- Serco, Inc.'s code of conduct states that it conducts business "honestly" and "transparently" and that it "compete[s] fairly."

- Alion Science & Technology Corporation's "2013 Code of Ethics, Conduct, and Responsibility" indicates that its "core values" include "integrity," "honesty," and "fairness to [its] employees."

- CACI International, Inc. states that one of the two pillars to CACI's culture is "Character – our commitment to ethics and integrity in all we do."

- The Columbia Group indicates that it will "always conduct business with integrity, applying the highest ethical standards."

211.    These representations obscured Defendants' secretive, no-poach agreement as Plaintiffs and Class Members would expect Defendants to adhere to their self-proclaimed ethical standards and act with transparency, honesty, and integrity when setting their employees' compensation and benefits offerings.

212.    Defendants have also acted to conceal their conspiracy by representing in formal, published reports that they abide by federal laws. For example, the 2023 Employee Code of Conduct for Bollinger Shipyards, LLC establishes that "[a]ll Bollinger employees must completely abide by the laws and regulations of local, national and international governing bodies." Likewise, Alion Science & Technology Corporation's 2013 Code of Ethics, Conduct, and Responsibility represents that "Alion is committed to complying with the letter and spirit of all laws, [and] regulations . . . to which the Company is subject."

213.    Several Defendants have represented that they comply with the antitrust laws, specifically. For example, in its 2022 Standards of Business Ethics and Conduct, General Dynamics Corporation asserted, "We comply fully with the antitrust and competition laws of every jurisdiction where we do business." The report further indicates that GDC is "committed to fair and competitive sales practices" and "will not communicate formally or informally with competitors to fix or control prices, allocate markets, boycott customers or suppliers, or limit the sale of products." Finally, the report states that GDC will not "conspire to gain or use [its competitors'] proprietary information improperly."

214.    Similarly, in its 2022 Code of Ethics Booklet, HII indicates that it abides by the set of laws under which the U.S. government requires its contractors to operate, including the U.S. antitrust laws.

215.    Given Defendants' explicit representations that they comply with the antitrust laws, it was reasonable for Plaintiffs and Class Members to believe these representations to be true.

216.    Furthermore, Defendants represented that they preserve confidential business and employee information. By way of example, in its 2022 Standards of Business Ethics and Conduct, General Dynamics Corporation stated that employees "should only gather information about . . . competitors from public sources that are freely available to others" and further represented that employee "information and data are confidential and are used only for valid business purposes." Similarly, in its 2022 Code of Ethics Booklet, HII emphasized that employees' financial information should be protected and "should not be disclosed to persons inside or outside of the company except for legitimate business purposes and in accordance with the laws." These representations were intended to mislead Plaintiffs and Class Members into believing that Defendants, abiding by their own ethical codes, would not illegally share with one another their employees' compensation information.

217.    Defendants also misled employees by representing that they actively recruit potential employees while failing to disclose that throughout the Class Period, recruitment of competitors' employees was off-limits. For example, in its 2022 Corporate Sustainability Report, General Dynamics Corporation states that its "ongoing efforts include developing ways to attract and retain diverse talent" including by gathering data about overall promotions, recruitment and other processes across the employee lifecycle as a basis for continued improvement. On its recruitment website, Bath Iron Works indicates that its HR professionals engage in worker recruitment. Electric Boat states on its career website that it is "always seeking outstanding people" to join its engineering team. Fincantieri Marine Group's career web page indicates that the company is "actively seeking" skilled tradespeople and engineers at its Marinette facility. Gibbs

& Cox, Inc. likewise represents on its careers page that it is "always seeking and recruiting" talented, motivated and top-quality engineering and naval architecture experts. Thor Solutions LLC's open application recruitment web pages state that it is "actively seeking" naval architects and engineers. Finally, Tridentis LLC's career page indicates that the company is "currently looking" for highly skilled and motivated employees. On its recruitment website, BMT Group states that it recruits the best naval architects and engineers, and each year "also take[s] on many graduates." The website does not state that BMT Group will not recruit from its competitors, and by using the phrase "also" it suggests that it recruits from a population beyond recent graduates. None of those companies' websites discloses that those companies have agreed *not* to actively recruit naval engineers from their competitors.

218.    Defendants' representations obfuscate the truth that because of the no-poach agreements, Defendants have severely limited the pool of potential employees from which they will recruit, excluding their competitors' employees from this pool entirely. Many of these representations imply that Defendants actively recruit experienced candidates. They do not.

219.    Defendants discussed, monitored and enforced their conspiracy at trade conferences attended by industry executives and through salary surveys conducted by Faststream for specific companies by request. The informal cocktail hour conversations and client-specific salary surveys that facilitated this unlawful information exchange occurred well outside the public eye, permitting Defendants to suppress Plaintiffs' wages without raising suspicion.

220.    In addition, Defendants enforced the conspiracy through private phone calls between high-level executives and unofficial retribution through the companies' many working relationships.

221.   Each of these mechanisms involved affirmative actions taken by Defendants to conceal the existence, nature, and scope of their unlawful conspiracy from Plaintiffs and the Class.

### 2.   Plaintiffs Failed to Discover the Conspiracy Despite Due Diligence

222.   Plaintiffs at all times exercised due diligence with respect to the facts alleged here. Prior to April 2023, Plaintiffs did not and could not have uncovered Defendants' conspiracy with the exercise of reasonable diligence. The Plaintiffs at all times believed that they were being compensated at competitive levels and were unaware of the agreement to pay sub-competitive wages.

223.   While Defendants' conspiracy meant that many naval engineers were never solicited by rival firms during their careers, this would not have been enough for a reasonable plaintiff to suspect and uncover a multi-firm, decades-long conspiracy in an industry as heavily regulated with as much government involvement as naval engineering. To the contrary, a reasonable plaintiff would have assumed that a naval engineering firm employing cadres of employees with high level security clearances thoroughly vetted to work on sensitive projects on behalf of the U.S. government was complying with all relevant laws.

224.   For similar reasons, Plaintiffs could not have inferred the likelihood of Defendants' conspiracy from their sub-competitive wages. Estimation of competitive wage levels requires specialized expertise not available to ordinary naval engineers. Moreover, it is difficult for naval engineers to draw any conclusions about the sufficiency of their salaries because of a lack of transparency in the industry concerning salaries. This lack of transparency is not unique to naval engineering and makes it difficult to uncover no-poach conspiracies wherever they occur. For example, nearly 90% of job postings lack salary information. The majority of Americans have also never shared salary information with a coworker.

225.    Plaintiffs had no reason to suspect that Defendants were unlawfully exchanging wage information at trade conferences or engaging in salary benchmarking.

226.    Even had Plaintiffs had suspected Defendants' conspiracy, Defendants' comprehensive efforts to conceal the conspiracy would have prevented them from discovering it. Because Plaintiffs and Class Members did not and could not have known about Defendants' efforts to conceal their conduct, they had no occasion to investigate further.

## VIII.    CLASS ACTION ALLEGATIONS

227.    Plaintiffs bring this action on behalf of themselves and on behalf of the members of the following class ("Class Members") under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3):

> All naval architects and marine engineers employed by Defendants (except Defendant Faststream Recruitment Ltd.), their predecessors, subsidiaries, and/or related entities in the United States at any time from January 1, 2000, until Defendants' unlawful conduct ceases.

228.    The following persons and entities are excluded from the proposed Class: Defendants' executives, human resources managers, and human resources staff; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state, or local governmental entities.

229.    The Class definition provides clear, objective criteria that Class Members and Defendants alike can understand, and it allows the parties to identify the members of the Class.

230.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

231.    The Class is so numerous that joinder of all members in this action is impracticable. The proposed Class contains thousands of similarly situated workers.

232.    The Class is readily identifiable and is one for which records should exist.

233.   Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

234.   Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in naval architecture and marine engineering than they would have in a competitive market.

235.   Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic, to the Class.

236.   Questions of law and fact common to the Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the Class Members.

237.   Questions of law and fact common to the Class include:

   a.  Whether Defendants engaged in an agreement, combination, or conspiracy to restrict hiring and recruiting of naval engineers in the naval engineering industry;

   b.  Whether such agreements constituted violations of the Sherman Act;

   c.  Whether Defendants exchanged sensitive and confidential wage information at trade conferences and other industry-wide events;

   d.  Whether Defendants unlawfully engaged in salary benchmarking using sensitive and confidential wage information provided by third-party recruiting services;

   e.  The identity of the participants of the alleged conspiracy;

- 64 -

f. The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

g. Whether Defendants fraudulently concealed their misconduct;

h. Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members below competitive levels;

i. The nature and scope of injunctive relief necessary to restore competition; and

j. The measure of damages suffered by Plaintiffs and the Class.

238. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

239. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The individual joinder of all damaged members of the Class is impracticable, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

240. Defendants have acted on grounds generally applicable to the Class, making final injunctive relief appropriate with respect to the Class as a whole.

### IX.    CAUSE OF ACTION

**FIRST CLAIM FOR RELIEF:**
**CONSPIRACY TO DEPRESS COMPENSATION IN VIOLATION OF**
**SECTION 1 OF THE SHERMAN ANTITRUST ACT**
**(Against All Defendants)**

241.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242.    Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for Class Members' services through restrictions on hiring and recruiting naval engineers from, between, and among each other, in the form of a long-standing and unwritten "gentlemen's agreement" not to affirmatively recruit one another's naval engineers. This agreement was a *per se* violation of 15 U.S.C. § 1. However, even if Defendants' agreement were viewed through the quick-look or rule-of-reason lens, the manifest anticompetitive effects of the agreement render it unlawful.

243.    The relevant product or service market is the labor market for employment as naval engineers in the United States, and the relevant geographic market is the United States.

244.    Defendants collectively possess market power in the relevant market. Defendants and co-conspirators together control approximately 75 percent of the relevant market. Defendants' and co-conspirators' collective market power includes the power to jointly set compensation for naval engineers in the United States below competitive levels. This joint power clearly exists because it has been used by Defendants and co-conspirators to pay Class Members and sub-competitive compensation.

245.    Defendants could and did profitably suppress compensation paid to naval engineers in the United States below competitive levels. In such circumstances, naval engineers would not be able, and were not able, to defeat such artificial compensation suppression by switching their employment to non-conspiring employers, as Defendants and co-conspirators control approximately 75 percent of the market.

246.    A slight decrease in compensation to naval engineers in the United States from a competitive level could be imposed collectively by the Defendants without causing too many such workers to switch employment to occupations in other industries or other countries. Such a slight decrease in compensation would therefore be profitable for Defendants.

247.    Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by receiving less compensation from Defendants, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy and by depriving them of free and fair competition in the market for their services.

248.    Defendants' conspiracy violated Section 1 of the Sherman Act, whether analyzed under the *per se*, quick-look, or rule-of-reason standard.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

D.      Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

F.      Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

G.      Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper by this Court.

## XI.     JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

DATED: October 6, 2023            Respectfully Submitted,

By      /s/ *Steven J. Toll*          
            STEVEN J. TOLL
            (Va. Bar No. 15300)

Brent W. Johnson (*pro hac vice* forthcoming)
Robert W. Cobbs (*pro hac vice* forthcoming)
Alison S. Deich (Va. Bar No. 87452)
Zachary R. Glubiak (Va. Bar No. 93984)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
stoll@cohenmilstein.com
bjohnson@cohenmilstein.com
rcobbs@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com

By      /s/ *Shana E. Scarlett*        
            SHANA E. SCARLETT
            (*pro hac vice* forthcoming)

Rio S. Pierce (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

By _____/s/ *George F. Farah*_____
       GEORGE F. FARAH
       (*pro hac vice* forthcoming)

Rebecca P. Chang (*pro hac vice* forthcoming)
Nicholas Jackson (*pro hac vice* forthcoming)
**HANDLEY FARAH & ANDERSON PLLC**
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
njackson@hfajustice.com

William H. Anderson (*pro hac vice* forthcoming)
**HANDLEY FARAH & ANDERSON PLLC**
5353 Manhattan Circle, Suite 204
Boulder, CO 80303
Tel: (202) 559-2433
wanderson@hfajustice.com

Simon Wiener (*pro hac vice* forthcoming)
**HANDLEY FARAH & ANDERSON PLLC**
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567
swiener@hfajustice.com

***Counsel for Plaintiffs and the Proposed Class***

Candice J. Enders (*pro hac vice* forthcoming)
Julia R. McGrath (*pro hac vice* forthcoming)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark (*pro hac vice* forthcoming)
Stephen J. Teti (*pro hac vice* forthcoming)
Arielle S. Wagner (*pro hac vice* forthcoming)
Eura Chang (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
sjteti@locklaw.com
aswagner@locklaw.com
echang@lawlaw.com

***Additional Counsel for Plaintiffs and the
Proposed Class***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| SUSAN SCHARPF and | ) | |
| ANTHONY D'ARMIENTO, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | Case No. 1:23-cv-01372-AJT-WEF |
|     v. | ) | |
| | ) | Hon. Anthony J. Trenga |
| GENERAL DYNAMICS CORP., | ) | |
| BATH IRON WORKS CORP., | ) | |
| ELECTRIC BOAT CORP., | ) | |
| GENERAL DYNAMICS INFORMATION | ) | |
|    TECHNOLOGY, INC., | ) | |
| HUNTINGTON INGALLS | ) | |
|    INDUSTRIES, INC., | ) | |
| NEWPORT NEWS SHIPBUILDING | ) | |
|    AND DRY DOCK CO., | ) | |
| INGALLS SHIPBUILDING, INC., | ) | |
| HII MISSION TECHNOLOGIES CORP., | ) | |
| HII FLEET SUPPORT GROUP LLC, | ) | |
| MARINETTE MARINE CORPORATION, | ) | |
| BOLLINGER SHIPYARDS, LLC, | ) | |
| GIBBS & COX, INC., | ) | |
| SERCO, INC., | ) | |
| BMT INTERNATIONAL, INC., | ) | |
| TECHNOLOGY FINANCING, INC., | ) | |
| CACI INTERNATIONAL INC, | ) | |
| THE COLUMBIA GROUP, INC., | ) | |
| THOR SOLUTIONS, LLC, | ) | |
| TRIDENTIS, LLC, and | ) | |
| FASTSTREAM RECRUITMENT LTD., | ) | |
| | ) | |
|     Defendants. | ) | |

**DEFENDANTS' JOINT MOTION TO DISMISS**

Defendants (including all Defendants except Faststream Recruitment Ltd.), through their respective undersigned counsel, respectfully move this Court to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for the reasons set forth in the accompanying memorandum of law and authorities.

Dated: December 18, 2023                Respectfully Submitted,

/s/ *David G. Barger*
David G. Barger (VSB No. 21652)
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Tel: (703) 749-1307
bargerd@gtlaw.com

Douglas E. Litvack (*pro hac vice*)
Mathew S. Hellman (*pro hac vice* pending)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Tel: (202) 637-6357
dlitvack@jenner.com
mhellman@jenner.com

Michael A. Doornweerd (*pro hac vice*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 923-2631
mdoornweerd@jenner.com

*Counsel for Defendants Bath Iron Works Corp.,*
*Electric Boat Corp., General Dynamics Corp., and*
*General Dynamics Information Technology, Inc.*

/s/ *Adam Block Schwartz*
Adam Block Schwartz (VSB No. 75396)
Todd Stenerson (*pro hac vice*)
David Higbee (*pro hac vice*)
Djordje Petkoski (*pro hac vice*)
Joseph Paul Samuels (VSB No. 92494)
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Tel: (202) 508-8000
adam.schwartz@shearman.com
todd.stenerson@shearman.com
david.higbee@shearman.com
djordje.petkoski@shearman.com
joseph.samuels@shearman.com

2

Robbie Rogart Jost (VSB No. 84377)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
rjost@crowell.com

Sima Namiri-Kalantari (*pro hac vice*)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Tel: (213) 622-4750
snamiri@crowell.com

Chahira Solh (*pro hac vice*)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Tel: (949) 263-8400
csolh@crowell.com

*Counsel for Defendants Huntington Ingalls Industries, Inc., HII Fleet Support Group LLC, HII Mission Technologies Corp., Ingalls Shipbuilding, Inc., and Newport News Shipbuilding and Dry Dock Co.*

/s/ *John F. Terzaken, III*
John F. Terzaken, III (VSB No. 45927)
Abram J. Ellis (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC 20001
Tel: (202) 636-5500
john.terzaken@stblaw.com
aellis@stblaw.com

Allison W. Reimann (*pro hac vice*)
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Tel: (608) 257-3911
areimann@gklaw.com

Sean O'D. Bosack (*pro hac vice*)
Christie B. Carrino (*pro hac vice*)
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800

3

Milwaukee, WI 53202
Tel: (414) 273-3500
sbosack@gklaw.com
ccarrino@gklaw.com

*Counsel for Defendant Marinette Marine Corp.*


/s/ *Attison L. Barnes, III*
Attison L. Barnes, III (VSB No. 30458)
Krystal B. Swendsboe (VSB No. 89614)
Scott M. McCaleb (*pro hac vice*)
Jon W. Burd (*pro hac vice*)
Daniel T. Park (*pro hac vice*)
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000
abarnes@wiley.law
kswendsboe@wiley.law
smccaleb@wiley.law
jburd@wiley.law
dpark@wiley.law

*Counsel for Defendant Bollinger Shipyards, LLC*


/s/ *Perry Lange*
Perry Lange (VSB No. 71184)
Jennifer Milici (*pro hac vice*)
John W. O'Toole (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 663-6000
perry.lange@wilmerhale.com
jennifer.milici@wilmerhale.com
john.otoole@wilmerhale.com

*Counsel for Defendant Gibbs & Cox, Inc.*


/s/ *Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
Casey Erin Lucier (VSB No. 80363)
MCGUIREWOODS LLP

888 16th Street, NW
Washington, DC 20006
Tel: (202) 857-1700
bhatch@mcguirewoods.com
clucier@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Nicholas J. Giles (VSB No. 85684)
Joshua D. Wade (VSB No. 92588)
W. Cole Geddy (VSB No. 93511)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1018
bjustus@mcguirewoods.com
ngiles@mcguirewoods.com
jwade@mcguirewoods.com
cgeddy@mcguirewoods.com

*Counsel for Defendant Serco, Inc.*


/s/ *Yonaton Rosenzweig*
Yonaton Rosenzweig (*pro hac vice*)
Adam S. Sieff (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, CA 90017
Tel: (213) 633-6800
yonirosenzweig@dwt.com
adamsieff@dwt.com

Harvey S. Schochet (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, CA 94111
Tel: (415) 276-6500
harveyschochet@dwt.com

Patrick J. Curran Jr. (VSB No. 86144)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Tel: (202) 973-4200
patcurran@dwt.com

*Counsel for Defendants BMT International, Inc.
and Technology Financing, Inc.*


/s/ *Christopher C. Brewer*
Christopher C. Brewer (VSB No. 93406)
Ryan P. Phair (*pro hac vice*)
Michael F. Murray (*pro hac vice*)
Craig Y. Lee (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Tel: (202) 551-1700
chrisbrewer@paulhastings.com
ryanphair@paulhastings.com
michaelmurray@paulhastings.com
craiglee@paulhastings.com


*Counsel for Defendant CACI International Inc*


/s/ *William T. DeVinney*
William T. DeVinney (VSB No. 94032)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
Tel: (703) 942-8076
wdevinney@brigliahundley.com


*Counsel for Defendant The Columbia Group, Inc.*


/s/ *Matthew J. MacLean*
Matthew J. MacLean (VSB No. 44304)
Alvin Dunn (*pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Tel: (202) 663-8183
matthew.maclean@pillsburylaw.com
alvin.dunn@pillsburylaw.com


*Counsel for Defendant Thor Solutions, LLC*

/s/ *William Lawler*
William Lawler (*pro hac vice*)
Carolyn Cody-Jones (VSB No. 87402)
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006
Tel: (202) 420-2249
william.lawler@blankrome.com

*Counsel for Defendant Tridentis, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 18th day of December, 2023, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such (NEF) to the following:

Steven J. Toll
Brent W. Johnson
Robert W. Cobbs
Alison S. Deich
Zachary R. Glubiak
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
stoll@cohenmilstein.com
bjohnson@cohenmilstein.com
rcobbs@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com

Shana E. Scarlett
Rio S. Pierce
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

George F. Farah
Rebecca P. Chang
Nicholas Jackson
Handley Farah & Anderson PLLC
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
njackson@hfajustice.com

William H. Anderson
Handley Farah & Anderson PLLC
5353 Manhattan Circle, Suite 204
Boulder, CO 80303
Tel: (202) 559-2433
wanderson@hfajustice.com

Simon Wiener
Handley Farah & Anderson PLLC
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567
swiener@hfajustice.com

*Counsel for Plaintiffs and the Proposed Class*

Candice J. Enders
Julia R. McGrath
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark
Stephen J. Teti
Arielle S. Wagner
Eura Chang
Lockridge Grindal Nauen P.L.L.P
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
bdclark@locklaw.com

9

sjteti@locklaw.com
aswagner@locklaw.com
echang@lawlaw.com

*Additional Counsel for Plaintiffs and the Proposed Class*

/s/ *David G. Barger*
David G. Barger, Esq.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| SUSAN SCHARPF and | ) | |
| ANTHONY D'ARMIENTO, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | Case No. 1:23-cv-01372-AJT-WEF |
|     v. | ) | |
| | ) | Hon. Anthony J. Trenga |
| GENERAL DYNAMICS CORP., | ) | |
| BATH IRON WORKS CORP., | ) | |
| ELECTRIC BOAT CORP., | ) | |
| GENERAL DYNAMICS INFORMATION | ) | |
|     TECHNOLOGY, INC., | ) | |
| HUNTINGTON INGALLS | ) | |
|     INDUSTRIES, INC., | ) | |
| NEWPORT NEWS SHIPBUILDING | ) | |
|     AND DRY DOCK CO., | ) | |
| INGALLS SHIPBUILDING, INC., | ) | |
| HII MISSION TECHNOLOGIES CORP., | ) | |
| HII FLEET SUPPORT GROUP LLC, | ) | |
| MARINETTE MARINE CORPORATION, | ) | |
| BOLLINGER SHIPYARDS, LLC, | ) | |
| GIBBS & COX, INC., | ) | |
| SERCO, INC., | ) | |
| BMT INTERNATIONAL, INC., | ) | |
| TECHNOLOGY FINANCING, INC., | ) | |
| CACI INTERNATIONAL INC, | ) | |
| THE COLUMBIA GROUP, INC., | ) | |
| THOR SOLUTIONS, LLC, | ) | |
| TRIDENTIS, LLC, and | ) | |
| FASTSTREAM RECRUITMENT LTD., | ) | |
| | ) | |
|     Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' JOINT MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 5

    A.    Defendants Design, Construct, and Maintain Ships for the Military...................... 5

    B.    Defendants Regularly Team Up to Work on Government Contracts. ................... 7

    C.    Plaintiffs Allege That Defendants' Conspiracy Not to Recruit Each Other's Engineers Has Existed Since the Early 1980s. ......................................... 8

    D.    The Named Plaintiffs Last Worked as Naval Engineers in 2013 and 2004, Respectively............................................................................................... 9

STANDARD OF REVIEW ................................................................................... 9

ARGUMENT ...................................................................................................... 10

I.    Plaintiffs' Claims Are Time-Barred....................................................................... 10

    A.    Plaintiffs' Claims Accrued Long Before the Four-Year Limitations Period........ 10

    B.    Plaintiffs Have Not Met Their Burden to Plead Equitable Tolling Under Any Doctrine.............................................................................................. 12

        1.    The continuing violation doctrine does not save Plaintiffs' claims. .......................................................................................... 12

        2.    The fraudulent concealment doctrine does not save Plaintiffs' claims. .......................................................................................... 13

II.    Plaintiffs Do Not Plausibly Allege an Agreement Among Defendants........................... 19

    A.    Plaintiffs Do Not Plausibly Allege Direct Evidence of an Agreement................. 20

        1.    The allegations of purported direct evidence of an agreement are vague, conclusory, and rely on impermissible group pleading.................................................................................... 20

        2.    Plaintiffs' confidential witness statements do not plausibly allege an agreement.................................................................... 23

    B.    Plaintiffs Do Not Plausibly Allege That Defendants' Parallel Conduct Was the Result of an Agreement.................................................................... 25

1.  Plaintiffs cannot plead a plausible agreement merely by alleging parallel conduct. ..................................................................... 25

2.  Defendants' unilateral self-interest explains their alleged parallel hiring practices. .......................................................... 26

3.  Plaintiffs' alleged "plus" factors do not support inferring an agreement. ................................................................................. 31

III.   Plaintiffs Do Not Adequately Allege an Unreasonable Restraint of Trade. ..................... 34

A.   The *Per Se* Standard Does Not Apply. ................................................ 34

B.   Plaintiffs Do Not Adequately Allege Anticompetitive Conduct Under the Rule of Reason. ................................................................... 36

CONCLUSION................................................................................................ 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................9, 10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021) ............................................................................................35

*Bausch v. Philatelic Leasing, Ltd.*,
    34 F.3d 1066, 1994 WL 446758 (4th Cir. 1994) .............................................................14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................... *passim*

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
    223 F. Supp. 2d 718 (D. Md. 2002)..................................................................................36

*Borozny v. Raytheon Techs. Corp.*,
    2023 WL 348323 (D. Conn. Jan. 20, 2023)................................................................35, 38

*Cal. Dental Ass'n v. FTC*,
    526 U.S. 756 (1999)..........................................................................................................36

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ..........................................................................................23

*Cardiello v. Money Store, Inc.*,
    2001 WL 604007 (S.D.N.Y. June 1, 2001) ......................................................................16

*Carrier Corp. v. Outokumpu Oyj*,
    673 F.3d 430 (6th Cir. 2012) ............................................................................................20

*Chapman v. N.Y. State Div. for Youth*,
    546 F.3d 230 (2d Cir. 2008)..............................................................................................38

*Corder v. Antero Res. Corp.*,
    57 F.4th 384 (4th Cir. 2023) .............................................................................................13

*Coronavirus Reporter v. Apple, Inc.*,
    85 F.4th 948 (9th Cir. 2023) .............................................................................................36

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ............................................................................................34

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ...................................................................15

*GO Comput., Inc. v. Microsoft Corp.*,
    508 F.3d 170 (4th Cir. 2007) ..................................................................... *passim*

*Hall v. United Air Lines, Inc.*,
    296 F. Supp. 2d 652 (E.D.N.C. 2003)....................................................................33

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)....................................................................................27

*In re Interior Molded Doors Antitrust Litig.*,
    2019 WL 4478734 (E.D. Va. Sept. 18, 2019)........................................................19

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ..................................................................................36

*Jackson v. Warning*,
    2016 WL 7228866 (D. Md. Dec. 13, 2016).............................................................21

*In re Jan. 2021 Short Squeeze Trading Litig.*,
    2022 WL 1522054 (S.D. Fla. May 13, 2022) .........................................................35

*Kelsey K. v. NFL Enters., LLC*,
    254 F. Supp. 3d 1140 (N.D. Cal. 2017) .................................................................27

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)................................................................................................12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..........................................................................................34, 35

*Mayor of Balt. v. Actelion Pharms. Ltd.*,
    995 F.3d 123 (4th Cir. 2021) ..................................................................................11

*McAnaney v. Astoria Fin. Corp.*,
    2007 WL 2702348 (E.D.N.Y. Sept. 12, 2007) ......................................................16

*McCants v. NCAA*,
    201 F. Supp. 3d 732 (M.D.N.C. 2016) ..................................................................11

*In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*,
    2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ...........................................................15

*Mitchael v. Intracorp, Inc.*,
    179 F.3d 847 (10th Cir. 1999) ...............................................................................33

*Muigai v. IB Prop. Holdings, LLC,*
   2010 WL 5173313 (D. Md. Dec. 14, 2010)................................................................22

*Murrow Furniture Galleries, Inc v. Thomasville Furniture Indus., Inc.,*
   889 F.2d 524 (4th Cir. 1989) ................................................................36, 38

*In re Musical Instruments & Equip. Antitrust Litig.,*
   798 F.3d 1186 (9th Cir. 2015) ................................................................32

*Ohio v. Am. Express Co.,*
   138 S. Ct. 2274 (2018)................................................................34

*Oksanen v. Page Mem'l Hosp.,*
   945 F.2d 696 (4th Cir. 1991) ................................................................24

*Plumbers & Steamfitters Union Loc. No. 10 v. Waters,*
   451 F. Supp. 3d 543 (E.D. Va. 2020) ................................................................10

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,*
   828 F.2d 211 (4th Cir. 1987) ................................................................ *passim*

*Robertson v. Sea Pines Real Est. Cos.,*
   679 F.3d 278 (4th Cir. 2012) ................................................................14, 15, 16, 20

*Ryan v. Microsoft Corp.,*
   147 F. Supp. 3d 868 (N.D. Cal. 2015) ................................................................15

*SD3 II LLC v. Black & Decker (U.S.) Inc.,*
   888 F.3d 98 (4th Cir. 2018) ................................................................18

*SD3, LLC v. Black & Decker (U.S.), Inc.,*
   215 F. Supp. 3d 486 (E.D. Va. 2016) ................................................................11

*SD3, LLC v. Black & Decker (U.S), Inc.,*
   801 F.3d 412 (4th Cir. 2015) ................................................................ *passim*

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,*
   71 F.3d 119 (4th Cir. 1995) ................................................................14

*Tera Grp., Inc. v. Citigroup, Inc.,*
   2023 WL 5211252 (S.D.N.Y. Aug. 14, 2023) ................................................................21

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001)................................................................36

*Towers v. Iger,*
   2017 WL 6044035 (N.D. Cal. Mar. 10, 2017)................................................................15

*In re Treasury Sec. Auction Antitrust Litig.*,
    595 F. Supp. 3d 22 (S.D.N.Y. 2022) ....................................................................24

*Turton v. Va. Dep't of Educ.*,
    2014 WL 12539403 (E.D. Va. Sept. 23, 2014) ....................................................21

*Ulrich v. Moody's Corp.*,
    2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014) ............................................35, 38

*United States v. Brewbaker*,
    --- F.4th ----, 2023 WL 8286490 (4th Cir. Dec. 1, 2023) ..................................34, 35

*United States v. Patel*,
    2022 WL 17404509 (D. Conn. Dec. 2, 2022) ......................................................35

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011) ................................................................................32

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971) ............................................................................................10

**Statutes and Rules**

15 U.S.C. § 1 ................................................................................................... *passim*

48 C.F.R. § 9.602(a) ................................................................................................7

Federal Rule of Civil Procedure 9(b) ...................................................................13

Federal Rule of Civil Procedure 12(b)(6) ............................................................10

**Other Authorities**

Ioana Marinescu & Herbert Hovenkamp, *Anticompetitive Mergers in Labor
    Markets*, 94 Ind. L.J. 1031 (2019) .....................................................................38

U.S. Bureau Lab. Stats., *Occupational Outlook Handbook: Marine Engineers and
    Naval Architects; What Marine Engineers and Naval Architects Do*, https://
    www.bls.gov/ooh/architecture-and-engineering/marine-engineers-and-naval-
    architects.htm (last accessed Sept. 6, 2023) .......................................................37

## INTRODUCTION

Plaintiffs' suit is time-barred and meritless as a matter of law.  Plaintiffs allege a forty-year conspiracy among Defendants in the shipbuilding industry not to actively recruit "naval architects" or "marine engineers" from each other.  Plaintiffs' own allegations tell the tale of just how implausible this purported conspiracy is:

- Notwithstanding that the alleged agreement would have required the assent and cooperation of hundreds of individuals for nearly half a century, Plaintiffs allege it was communicated solely by word of mouth.  ECF No. 1, Class Action Compl. ("Compl.") ¶ 149.

- Plaintiffs acknowledge that Defendants routinely entered into lawful written "teaming" agreements with non-solicitation provisions that have the same effect as the supposed unlawful unwritten agreement.  Plaintiffs do not challenge this common "teaming" practice.  *Id.* ¶ 175 n.8.

- The alleged unwritten agreement is subject to a web of inconsistent exceptions.  For instance, Plaintiffs allege that Defendants routinely hire employees away from each other so long as the employee "appl[ies]" for the position rather than being recruited.  *Id.* ¶ 165.

- Defendants' *independent* interests, not conspiracy, explain any further lack of active solicitation.  As Plaintiffs allege, in this "interdependent" industry where Defendants must work together to win and complete projects, actively recruiting from prospective teammates would make teaming harder.  *Id.* ¶¶ 11, 167.

In other words, Plaintiffs allege that at unspecified times and in unspecified ways over the last forty years, Defendants secretly adopted an unlawful unwritten agreement (except when it was lawful and written) not to actively recruit each other's employees (except when the secret unwritten agreement permitted hiring)—despite the fact that Defendants had independent reason not to actively recruit apart from any supposed conspiracy.  Common sense says that Plaintiffs' "conspiracy" allegations are implausible, and well-settled law establishes that they are legally insufficient.

*First*, the statute of limitations on Plaintiffs' claims expired long ago.  Plaintiffs allege a conspiracy that suppressed the compensation of naval architects and marine engineers.  But

Plaintiffs admit that they have not worked in those professions since *2004* and *2013*, respectively. The Sherman Act's four-year statute of limitations expired years before Plaintiffs filed this action in October 2023.

Plaintiffs seek to evade this obvious conclusion in two ways, but blackletter law forecloses each. Plaintiffs contend that the continuing violation doctrine makes their claims timely because they allege that the conspiracy continues to this day. But that doctrine applies only where (at a minimum) Plaintiffs themselves suffered a *new injury* within the limitations period. Plaintiffs, who left the industry between ten and twenty years ago, cannot allege (and have not alleged) any injury within the past four years, making their allegations of a continuing violation irrelevant.

Equally meritless, Plaintiffs contend that Defendants "fraudulently conceal[ed]" their alleged conspiracy. *Id.* ¶ 206. Plaintiffs' allegations of "concealment" amount to assertions that Defendants made general statements that they offered "competitive salaries," complied with "antitrust laws," or considered "integrity" to be a "core value." *Id.* ¶¶ 207, 210, 213. The Fourth Circuit and other courts have routinely held that these purported failures to admit wrongdoing are inadequate as a matter of law to justify any delay—let alone a decade's delay or more—in bringing suit. Nor have Plaintiffs alleged that they undertook any due diligence to investigate their claims. Plaintiffs' claims became time-barred long ago, and this Court need go no further to dismiss this suit in its entirety.

***Second***, Plaintiffs fail to allege any actual agreement among Defendants. Plaintiffs dramatically proclaim that they have "direct evidence" of an agreement among Defendants, but their complaint reveals nothing of the sort. *Id.* ¶ 4. Their purportedly direct allegations do not identify which Defendants joined the purported agreement or when they did so. Plaintiffs' anonymous reports of an unspoken "gentlemen's agreement" formed at some unspecified time by

unspecified means among undifferentiated "Defendants" does not come close to providing the detail the law requires for direct allegations. *Id.*

Recognizing this deficiency, Plaintiffs fall back to circumstantial inferences of an agreement from Defendants' alleged parallel conduct in not actively recruiting from competitors. But as the Supreme Court taught in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), allegations of parallel conduct alone are legally insufficient to support an inference of agreement. Plaintiffs must allege "more"—showing that the parallel behavior reflects a plausible "meeting of the minds" rather than merely conduct that each Defendant would rationally pursue on its own. *Id.* at 556-57.

Plaintiffs not only fail to allege "more"; they affirmatively allege the very reasons why Defendants would independently choose not to actively recruit from competitors. According to Plaintiffs, Defendants operate in an "interdependent" industry where they "regular[ly]" enter "teaming arrangements" in "subcontracting with one another or when submitting joint bids to the U.S. government." Compl. ¶¶ 8, 11, 13, 174-75. Those teaming arrangements often expressly provide that Defendants will not recruit from each other, and Plaintiffs do not contest their legality. *Id.* ¶ 175 & n.8. In an industry where Defendants allegedly either *are* subject to an explicit no-recruiting covenant or *must* enter into teaming arrangements to obtain work, it would be unsurprising if Defendants—acting out of their unilateral self-interest—did not solicit employees from each other. Again, Plaintiffs' complaint spells out the point: Defendants "spend years developing trust and reputation among . . . peer firms" and "companies don't want to work with" other companies that recruit away personnel. *Id.* ¶¶ 11, 167. In short, Plaintiffs' own allegations point to what *Twombly* called an "obvious alternative explanation" to a conspiracy—namely, that

curtailing active recruitment is an independently rational decision in an industry built on teamwork.  550 U.S. at 567.

**_Third_**, Plaintiffs do not adequately allege an unreasonable restraint of trade, whether as a _per se_ violation or under the rule of reason.  This is not the exceedingly rare case where the _per se_ standard applies—the challenged conduct is not so obviously anticompetitive that it should be condemned without further inquiry.  Plaintiffs' complaint is replete with legitimate reasons, such as teaming arrangements, that explain and justify the need not to recruit each other's employees.  And under the rule of reason—the proper standard of review—Plaintiffs do not plausibly allege that Defendants collectively have the requisite power in a properly defined labor market to unreasonably restrain competition.  That would require Plaintiffs to plead a plausible product and geographic market that includes all reasonably interchangeable substitutes.  The single "industry" allegations here do not establish such a market.  Plaintiffs' proffered labor market of "naval engineers" who work for the government is both too narrow and too broad.  It is too narrow because it artificially covers only _U.S. government_-contract shipbuilding jobs even though Plaintiffs acknowledge that naval engineers can deploy their skills for commercial clients, too.  It is also too broad because Plaintiffs admit that "naval architects" and "marine engineers" hold different jobs with different tasks under different competitive employment conditions that are not interchangeable.  Plaintiffs' "nationwide" geographic market is likewise implausible because it assumes that the typically local labor market covers thousands of miles—from California, to Maine, to Mississippi, to Wisconsin—with no facts to support that unrealistic assumption.  Plaintiffs therefore fail to plausibly plead both the relevant product and geographic markets necessary to state a claim under the rule of reason.  For all these reasons, this Court should dismiss the complaint.

4

# BACKGROUND[1]

### A.      Defendants Design, Construct, and Maintain Ships for the Military.

Defendants serve the U.S. Navy, Coast Guard, and other government entities in engineering "the most powerful military fleet in the world."  Compl. ¶¶ 1-2.  Defendants include twenty companies that fall into three categories: (1) "shipbuilders that produce military vessels large and small"; (2) small "specialized engineering 'consultancies'" that "help design, refit, and maintain nearly every ship in the U.S. fleet"; and (3) "a recruiting firm that sometimes serves these companies."  *Id.* ¶ 3.  Defendants' construction and maintenance of the U.S. fleet is essential to the military's operation.  *See id.* ¶ 128.

***Shipbuilders.***  Eight Defendants are shipbuilders, or corporate affiliates of shipbuilders, that design and build military vessels pursuant to government contracts: General Dynamics Corporation; Bath Iron Works Corporation; Electric Boat Corporation; General Dynamics Information Technology, Inc. ("GDIT"); Huntington Ingalls Industries, Inc. ("HII"); Newport News Shipbuilding and Dry Dock Company; Ingalls Shipbuilding, Inc.; Marinette Marine Corporation; and Bollinger Shipyards, LLC.  *Id.* ¶¶ 23-41, 59-62, 116.  Several of these Defendants operate shipyards used to build military ships, which are located in Bath, Maine; Groton, Connecticut; Newport News, Virginia; Pascagoula, Mississippi; San Diego, California; Marinette, Wisconsin; and Lockport, Louisiana.  *Id.* ¶¶ 61, 116.  For major projects, the shipbuilding Defendants "do not design and build each piece of a ship in-house," but rather use "a host of subcontractors covering nearly every aspect" of the project, including engineering consultancies. *Id.* ¶ 129.

---

[1] Defendants assume the truth of well-pleaded factual allegations for purposes of this motion only.

*Engineering consultancies.*  Ten Defendants are engineering consultancies, providing naval design and engineering services: Gibbs & Cox, Inc.; Serco, Inc.; Technology Financing, Inc.; BMT International, Inc.; CACI International Inc; The Columbia Group, Inc.; Thor Solutions, LLC; Tridentis, LLC; HII Mission Technologies Corp.; and HII Fleet Support Group LLC.  *Id.* ¶¶ 42-58, 63-102, 130.  The consultancy Defendants are "frequently hired as subcontractors by major shipbuilders" and "may also subcontract between themselves."  *Id.* ¶ 130.  In this way, the consultancies frequently work with each other and with shipbuilders "in relationships ranging from co-equals to supervisors to subcontractors" from one project to the next.  *Id.* ¶ 137.

*Recruiters.*  The remaining Defendant, Faststream Recruitment Ltd. ("Faststream"), is an international recruiting firm that allegedly helped Defendants recruit "naval engineers" (as defined below) on occasion.  *Id.* ¶¶ 3, 103, 163.  Faststream is based in the United Kingdom and no longer operates in the United States.  *Id.* ¶¶ 103, 105.

*"Naval engineers."*  The alleged victims of the conspiracy design, build, and maintain "the nation's warships and other 'public fleet' vessels."  *Id.* ¶ 1.  All Defendants (except Faststream) employ so-called "naval engineers," a term Plaintiffs use to encompass "nearly 10,000" workers (as of 2020) with a wide range of titles and responsibilities, from "naval architects," who "design vessel hulls" and ensure vessels' "overall stability and performance," to "[m]arine engineers," who "design a wide array of onboard systems" and hold such "specialty titles like structural or electrical engineer."  *Id.* ¶¶ 116, 121-22.  According to Plaintiffs, naval engineers practice "a highly skilled profession with degree, citizenship, and security clearance requirements that serve as barriers to entry," and a median salary of "nearly $100,000."  *Id.* ¶ 123.  Shipbuilders and consultancies allegedly employ almost 80% of naval engineers working on the "U.S. public fleet" while the remaining 20% work for the federal government.  *Id.* ¶ 127.  Plaintiffs also acknowledge that an

unspecified number of naval engineers work on vessels that are not part of the public fleet. *Id.* ¶ 116.

**B.      Defendants Regularly Team Up to Work on Government Contracts.**

Designing and constructing a military ship requires coordination among a host of contractors and subcontractors and can take upwards of six years. *See* Compl. ¶¶ 119, 129. Defendants often submit joint bids for these projects and "complete the work together if awarded the contract." *Id.* ¶ 174; *cf.* 48 C.F.R. § 9.602(a) (allowing for teaming arrangements in federal government contracts, which "may be desirable from both a Government and industry standpoint"). Firms therefore "routinely work together" in performing government contracts, and "[t]wo firms in a contractor/subcontractor relationship on one contract may find their roles reversed on the next contract." Compl. ¶ 137.

"This repeat-player dynamic," Plaintiffs explain, "encourages close and cooperative inter-firm relationships that extend to the individual level—so much so that one industry veteran described the various firms as 'allied places.'" *Id.* Indeed, Plaintiffs allege that Defendants maintain "close and repeated working relationships" given the "interdependent nature" of the industry. *Id.* ¶¶ 11, 171. And Defendants "spend years developing trust and reputation among government customers and peer firms." *Id.* ¶ 167. According to Plaintiffs, not actively recruiting each other's naval engineers is an important component of that trust: "As one former project manager admitted, firms who recruit another firm's employees 'don't stay around that long because companies don't want to work with them.'" *Id.* ¶ 11.

To ensure cooperation while working together on a given contract, Defendants routinely enter into written "teaming agreements" when submitting joint bids. *Id.* ¶ 174. These agreements typically contain explicit "no-poach provisions" prohibiting "recruitment of personnel who

worked on the project to which a teaming agreement pertained, for the duration of the project." *Id.*

¶ 13 (emphasis omitted).

> **C.    Plaintiffs Allege That Defendants' Conspiracy Not to Recruit Each Other's Engineers Has Existed Since the Early 1980s.**

"Starting in at least 2000, and likely dating back to the 1980s, Defendants have [allegedly]

adhered to an informal 'gentlemen's agreement' among themselves not to recruit each other's

naval engineers." Compl. ¶ 9.  Plaintiffs claim that Defendants' decades-long conspiracy not to

solicit one another's naval engineers "was continuous and industry-wide" from 2000 onward and

"continues to this day." *Id.* ¶ 160.  The purported "goal" of the conspiracy was to "suppress [naval

engineers'] compensation" "below competitive levels." *Id*. ¶¶ 160, 245.  According to Plaintiffs:

- The conspiracy's "origins are obscure," but trace back to a "gentlemen's agreement" between two of twenty Defendants in the early 1980s. *Id.* ¶¶ 148, 160.

- "The agreement was never reduced to writing and passed on only as verbal instructions from executives to managers" over multiple decades. *Id.* ¶ 149; *see also id.* ¶ 205.

- The conspiracy extended to a third company in the late 1980s, "continued throughout the late 1990s," and "all defendant corporate families that existed in 2000 . . . joined it by that time." *Id.* ¶¶ 148-49; *see also id.* ¶ 160 ("[B]y at least 2000 all major players in the industry had reached a mutual understanding that they would not poach each other's employees.").

Notwithstanding the alleged conspiracy, Plaintiffs acknowledge that Defendants *did* routinely hire

each other's naval engineers.  As Plaintiffs repeatedly allege, firms could (and did) "hire a

competitor's employee if . . . the employee affirmatively reached out." *Id.* ¶ 148; *see id.* ¶¶ 9, 146,

153, 161, 165.  Plaintiffs also allege that, "[i]n some circumstances, a Defendant who lost a major

contract would allow its employees to be recruited by the winner of the contract," although "some

Defendants disapproved" of this practice. *Id.* ¶ 153.  Plaintiffs allege, too, that at least one

recruiter—Faststream—"helped Engineering Defendants recruit naval engineers." *Id.* ¶ 163.

**D.      The Named Plaintiffs Last Worked as Naval Engineers in 2013 and 2004, Respectively.**

Two Plaintiffs brought this action on behalf of a putative class.  *See* Compl. at 1.  One, Susan Scharpf, allegedly worked in the industry from 2007 to 2013 for three separate employers: as a naval architect for Alion Science & Technology Corporation ("Alion") from 2007 to 2009; as a naval marine engineer for Computer Sciences Corporation from 2009 to 2011; and as a marine engineer with Gibbs & Cox, Inc., from 2011 to 2013.  *Id.* ¶ 19.  Scharpf does not allege any relevant employment since 2013.  *Id.*  The other, Anthony D'Armiento, allegedly worked as a naval architect for Northrop Grumman Ship Systems at "Ingalls Shipyard" from 2002 to 2004.  *Id.* ¶ 20.  D'Armiento does not allege any relevant employment since 2004.  *Id.*[2]

Plaintiffs bring one count under Section 1 of the Sherman Act, claiming that Defendants' alleged conspiracy to depress wages constitutes a *per se* unlawful restraint of trade that is also unlawful under the rule of reason.  *Id.* ¶¶ 241-48.  Plaintiffs seek to represent a class consisting of "[a]ll naval architects and marine engineers employed by Defendants (except [Faststream]), their predecessors, subsidiaries, and/or related entities in the United States at any time [since] January 1, 2000," *id.* ¶ 227, which they estimate to "number in the tens of thousands," *id.* ¶ 199.

**STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility

---

[2] Plaintiffs allege that Alion's liabilities have been succeeded by HII Mission Technologies, Computer Sciences Corporation's liabilities have been succeeded by GDIT, and Northrop Grumman Ship Systems' liabilities have been succeeded by HII.  Compl. ¶¶ 31, 37, 57.

9

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court accepts as true the well-pleaded factual allegations for purposes of a motion to dismiss, but that tenet "is inapplicable to legal conclusions." *Id.* "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "[O]nly by taking care to require allegations that reach the level suggesting conspiracy" can the Court "hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a § 1 claim." *Twombly*, 550 U.S. at 559 (quotation and alteration omitted).

## ARGUMENT

### I.    Plaintiffs' Claims Are Time-Barred.

The Court should dismiss this action because the four-year statute of limitations on Plaintiffs' claims expired long ago. Claims that are time-barred based on the allegations in the complaint are subject to dismissal under Rule 12(b)(6). *See, e.g.*, *Plumbers & Steamfitters Union Loc. No. 10 v. Waters*, 451 F. Supp. 3d 543, 553 (E.D. Va. 2020) (granting motion to dismiss on timeliness grounds). Plaintiffs do not allege any injury in the last decade (in Scharpf's case) or in the last nineteen years (in D'Armiento's), which is when they last worked as naval engineers respectively.

#### A.    Plaintiffs' Claims Accrued Long Before the Four-Year Limitations Period.

"[D]amages are recoverable under the federal antitrust acts only if suit therefor is 'commenced within four years after the cause of action accrued,' … plus any additional number of years during which the statute of limitations was tolled." *Zenith Radio Corp. v. Hazeltine Rsch.*,

*Inc.*, 401 U.S. 321, 338 (1971) (quoting 15 U.S.C. § 15b); *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 217 (4th Cir. 1987) (applying four-year limitations period to Sherman Act Section 1 claim). "Accrual of a private antitrust cause of action . . . occurs when defendants commit an act that causes economic harm to a plaintiff," and not when the plaintiff discovers the injury. *Pocahontas*, 828 F.2d at 217; *see also Mayor of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131-32 (4th Cir. 2021).

Plaintiffs allegedly suffered economic harm by "receiving less in compensation for working in naval architecture and marine engineering than they would have in a competitive market." Compl. ¶ 234; *see also id.* ¶ 247. Plaintiffs' alleged injuries, therefore, could have occurred only while Defendants (or a non-defendant co-conspirator) employed Plaintiffs as naval architects or marine engineers. For Scharpf, this allegedly occurred from 2007 to 2013. *Id.* ¶ 19. For D'Armiento, the relevant years were 2002 to 2004. *Id.* ¶ 20.

Plaintiffs' allegations thus show that their claims accrued as early as 2002 and 2007, and in all events no later than 2004 and 2013, respectively. *See SD3, LLC v. Black & Decker (U.S.), Inc.*, 215 F. Supp. 3d 486, 494-95 (E.D. Va. 2016) (holding that antitrust claims accrued by date when plaintiffs suffered alleged "economic harm"), *aff'd*, 888 F.3d 98 (4th Cir. 2018). But Plaintiffs did not bring this action until October 6, 2023—a full decade or more after their respective claims accrued. Plaintiffs' claims are therefore well outside of the four-year limitations period and are time-barred.[3]

---

[3] Plaintiffs Scharpf and D'Armiento are the only plaintiffs before this Court, so their alleged injuries—and not the alleged injuries of any members of a putative uncertified class—are the only ones that matter for the limitations analysis on a motion to dismiss. *See, e.g.*, *McCants v. NCAA*, 201 F. Supp. 3d 732, 740 (M.D.N.C. 2016) ("In considering [a] motion to dismiss [a] putative class action [c]omplaint, the Court can only consider allegations related to the named plaintiffs . . . and not generalized allegations concerning unnamed plaintiffs or putative class members.").

**B.      Plaintiffs Have Not Met Their Burden to Plead Equitable Tolling Under Any Doctrine.**

Plaintiffs realize their claims accrued long ago and contend their claims are timely solely based on two tolling doctrines—continuing violation and fraudulent concealment.  Compl. ¶¶ 202-26.  Plaintiffs bear the burden to plausibly allege that either one applies, *GO Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007), and because Plaintiffs fail to meet their burden, the Court should dismiss their claims as untimely.

**1.      *The continuing violation doctrine does not save Plaintiffs' claims.***

Plaintiffs contend that their belated claims are timely because "Defendants' unlawful and anticompetitive scheme is continuing."  Compl. ¶¶ 202-03.  But alleged continuing misconduct is irrelevant for limitations purposes unless that recent conduct caused a fresh injury *within* the limitations period (here, since October 6, 2019).  Plaintiffs make no such allegation:  They allege that their employment with Defendants ended in 2004 and 2013, respectively, long before the four-year limitations period.

Under the continuing violation doctrine, "each overt act that is part of the violation *and that injures the plaintiff* . . . starts the statutory period running again."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quotation omitted) (emphasis added).  "But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."  *Id.*; *see also id.* at 190 (noting plaintiff cannot "use an independent, new predicate act as a bootstrap to recover for injuries caused by other *earlier* predicate acts that took place outside the limitations period" (emphasis added)).  In other words, Plaintiffs cannot recover for an old injury by alleging continuing misconduct.  "Even when defendants continue to perform overt acts in furtherance of an antitrust conspiracy within the

statutory period, *plaintiffs'* injuries also must fall within the limitations period in order not to be time-barred." *Pocahontas*, 828 F.2d at 218 (emphasis added).

In *Pocahontas*, the defendants allegedly conspired to set the price of coal, which caused the plaintiffs to lose a contract in 1979. *Id.* at 218-19. Although the price-fixing conspiracy continued after 1979, the plaintiffs suffered no further "actionable antitrust injury" from the defendants' subsequent conduct. *Id.* As such, the Fourth Circuit affirmed the district court's dismissal of the claim as time-barred because plaintiffs brought suit in 1984—five years after they lost the contract. *Id.*

The same rule requires dismissal here. Because Plaintiffs do not allege that they have worked as naval engineers since 2004 and 2013, respectively, they do not and cannot allege any new injury within the limitations period. Plaintiffs' claims are therefore time-barred irrespective of their allegations of a continuing violation. *See* Compl. ¶¶ 19-20, 202-03.

### 2. *The fraudulent concealment doctrine does not save Plaintiffs' claims.*

Plaintiffs alternatively contend that Defendants "fraudulently conceal[ed]" "the existence, true nature, and scope of their industry-wide 'gentlemen's agreement.'" Compl. ¶ 206; *see also id.* ¶¶ 204-21.

The bar for pleading fraudulent concealment is high. Plaintiffs must adequately allege that Defendants "[(1)] fraudulently concealed facts which are the basis of a claim, and that (2) [Plaintiffs] failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *GO Comput.*, 508 F.3d at 178 (quoting *Pocahontas*, 828 F.2d at 218). The fraud allegations must satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, which requires Plaintiffs to plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Corder v. Antero Res. Corp.*, 57 F.4th 384, 401 (4th Cir. 2023) (quotation omitted). "[G]eneral allegations

of concealment . . . are simply not enough to . . . toll a statute of limitations." *Bausch v. Philatelic Leasing, Ltd.*, 34 F.3d 1066, 1994 WL 446758, at *7 (4th Cir. 1994) (unpublished table decision) (quotation omitted).

a.   <u>Plaintiffs fail to plead affirmative acts of concealment.</u>

Plaintiffs fail to plausibly allege that Defendants undertook "*affirmative acts*" to conceal their illegal agreement. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 126 (4th Cir. 1995) (emphasis added).

***Failure to disclose alleged conspiracy.*** Plaintiffs first contend that Defendants "actively concealed their unlawful conduct" by "carefully avoiding putting anything in writing" and maintaining their "gentlemen's agreement" as an "unwritten rule." Compl. ¶ 205; *see id.* ¶¶ 220-21. Those allegations are insufficient as a matter of law. Allegations that defendants acted to keep an agreement "secret," *GO Comput.*, 508 F.3d at 179, or that they did not acknowledge the agreement when asked, amount "to no more than a failure to admit to wrongdoing" rather than a required affirmative act of concealment, *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 291 n.2 (4th Cir. 2012); *see also GO Comput.*, 508 F.3d at 179 ("Bill Gates's denial of [antitrust] wrongdoing amounts to little; wrongdoing is not a straightforward matter of fact, and it is not fraud to deny it."). These cases recognize that tolling based merely on failing to disclose a supposed illegal agreement "would effectively nullify the statute of limitations." *Pocahontas*, 828 F.2d at 218-19.

For example, in *Boland v. Consolidated Multiple Listing Service, Inc.*, the plaintiffs asserted fraudulent concealment based on allegations that the defendants were "meeting secretly," "giving pretextual reasons" for high product prices, and "agreeing at meetings not to discuss their [supposed agreement] publicly." 868 F. Supp. 2d 506, 517-18 (D.S.C. 2011), *aff'd*, 679 F.3d 278 (4th Cir. 2012). The court held on a motion to dismiss that those allegations were "legally

14

insufficient to state a claim of fraudulent concealment" because they were tantamount to a mere "failure to admit to wrongdoing" and thus did not constitute allegations of affirmative acts of concealment.  *Id.* at 518-19.  The Fourth Circuit affirmed that analysis as "proper[]" on appeal. *Robertson*, 679 F.3d at 291 n.2.  Likewise, in *Pocahontas*, the plaintiffs sought tolling based on the defendants' alleged failure to disclose their price-fixing agreement when the plaintiffs asked about their pricing practices.  In affirming the dismissal, the court brushed away that argument as "sophistry" that would reduce fraudulent concealment to "no more than an alleged failure to own up to illegal conduct."  828 F.2d at 218-19.  Plaintiffs' allegations of concealment via a "secret," "unwritten" agreement are equally inadequate as a matter of law.

*Defendants' generic statements.*  Plaintiffs next contend that Defendants concealed their conspiracy by making general representations in recruiting documents and on their websites that they "offer 'competitive' compensation"; adhere to "core values" like "transparency, honesty, and integrity"; and "comply with the antitrust laws."  Compl. ¶¶ 207, 209, 210-14.  These alleged generalized statements do not satisfy the high bar for pleading fraudulent concealment.

Courts have repeatedly concluded that a defendant's generic statements in public filings and "company documents that [its] hiring and compensation were competitive and that [it] obeyed all applicable antitrust laws" do not adequately plead fraudulent concealment.  *See Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 891 (N.D. Cal. 2015) (dismissing alleged no-poach conspiracy claims); *see also, e.g.*, *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1078 (N.D. Cal. 2016) ("[S]tatements in routine public filings that the defendant obeys antitrust laws and participates in a competitive market alone [do not] suffice to show fraudulent concealment."); *Towers v. Iger*, 2017 WL 6044035, at *11 (N.D. Cal. Mar. 10, 2017) (similar), *aff'd*, 912 F.3d 523 (9th Cir. 2018); *cf. In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at

*11 (S.D.N.Y. Mar. 4, 2021) (rejecting fraudulent concealment based on "everyday statements that corporations make" about "reputation, integrity, and compliance with ethical norms" because they are "inactionable 'puffery'" that no reasonable plaintiff would "rely upon . . . in foregoing an investigation" into possible claims (quotation omitted)), *aff'd sub nom. Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022).

These cases correctly hold that a plaintiff cannot delay—let alone delay for a decade or more—simply by invoking purportedly false generic corporate statements about lawful conduct, "core values" or "competitive salaries."  This Court should reach the same conclusion here.  *See, e.g.*, *Robertson*, 679 F.3d at 291 n.2; *Pocahontas*, 828 F.2d at 218-19.

These alleged misrepresentations also come far too late to save Plaintiffs' claims.  The claims allegedly accrued as early as 2002 and 2007, and in all events no later than 2004 and 2013.  Yet the statements Plaintiffs invoke as affirmative acts of concealment are, with one exception, from 2021, 2022, 2023, or otherwise undated.  *See* Compl. ¶¶ 206, 209-10, 212-14, 216-17, 219-20.  Those statements do not establish that Defendants concealed the basis of Plaintiffs' claims "during the time in which" they "could have brought" their claims.  *Cardiello v. Money Store, Inc.*, 2001 WL 604007, at *4 (S.D.N.Y. June 1, 2001), *aff'd*, 29 F. App'x 780 (2d Cir. 2002).  Plaintiffs' claims had already become time-barred when Defendants purportedly made these alleged misrepresentations, and thus those statements cannot resuscitate their claims.  *See McAnaney v. Astoria Fin. Corp.*, 2007 WL 2702348, at *10 (E.D.N.Y. Sept. 12, 2007) (allegations of fraudulent concealment failed because "the purported concealing conduct occurred *after* the time in which plaintiffs could have brought the action had already expired").[4]

---

[4] Plaintiffs allege a lone statement by Alion from 2013 stating that the firm's "core values" include "integrity" and "honesty."  Compl. ¶¶ 210, 212.  Even if that statement could constitute fraudulent

***Teaming agreements.***  Finally, Defendants supposedly concealed their unwritten no-poach agreement by including lawful non-solicitation clauses in teaming agreements.  Compl. ¶¶ 175, 206.  That theory is nonsensical.  To start, Plaintiffs fail to articulate how a written bilateral agreement conceals an unwritten multilateral one on a related topic.  They are not mutually exclusive, and Plaintiffs themselves allege the teaming agreements serve distinct and lawful purposes.

Moreover, it cannot be *fraud*—*i.e.*, an affirmative act of deception—to include a lawful provision in a legitimate teaming agreement.  And Plaintiffs do not allege any particularized facts to suggest that the clauses here were a sham or a pretext.  *See id*. ¶¶ 174-75, 206.  Accordingly, Plaintiffs cannot allege fraudulent concealment—*i.e.*, an affirmative act of deception—based on such agreements.

> b.    Plaintiffs fail to plead that they exercised due diligence.

Plaintiffs also do not allege sufficient facts to show that they "failed to discover" the conspiracy "within the statutory period, despite . . . the exercise of due diligence."  *GO Comput.*, 508 F.3d at 178 (quoting *Pocahontas*, 828 F.2d at 218).  Plaintiffs plead no facts to indicate that they engaged in *any* due diligence; they do not describe any affirmative steps that they took at any time to ascertain whether the supposedly pervasive, multi-defendant, multi-decade conspiracy impacted them.  *See* Compl. ¶ 222 (asserting, without any factual support, that "Plaintiffs at all times exercised due diligence with respect to the facts alleged here").  Instead, Plaintiffs simply allege that they "did not and could not have uncovered Defendants' conspiracy with the exercise of reasonable diligence."  *Id.*  And yet, without explanation, Plaintiffs somehow uncovered the alleged conspiracy sometime after April of 2023.  *Id.* ¶ 223.

---

concealment that (and it could not), neither Plaintiff worked for Alion in 2013, and the statement would not plausibly justify tolling for a decade in any case.

Plaintiffs "cannot simply ignore the diligence requirement and later claim that the alleged fraud was 'well-disguised.'" *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 113 (4th Cir. 2018) (quotation omitted); *see also Pocahontas*, 828 F.2d at 220 ("[A] plea of ignorance [is] insufficient to raise [an] inference of [the] exercise of diligence."). Yet that is precisely what Plaintiffs urge: By their own account, they took no steps to investigate their claims over the *last twenty years*. This Court need go no further to reject Plaintiffs' "due diligence" allegations as insufficient.

In any case, Plaintiffs' assertion that the agreement was so "well-disguised" that they should be excused from having conducted any due diligence also cannot be squared with their own allegations. *See SD3*, 888 F.3d at 113. A plaintiff who "knows of a pattern of particular actions that a defendant" has allegedly "taken" is charged with having to investigate even "though the pattern's precise scope might be unclear and its exact legal ramifications uncertain." *GO Comput.*, 508 F.3d at 179.

Here, Plaintiffs allegedly knew about a purported pattern of not actively recruiting among Defendants. Supposedly, "naval engineers generally spend their entire careers without being solicited by a rival firm." Compl. ¶ 7; *see also id.* ¶ 223 ("[M]any naval engineers were never solicited by rival firms during their careers."). Indeed, Plaintiffs allege that when an applicant "attempted to interview with other naval engineering firms, he was required to specify that he had independently pursued the opportunity and not been solicited." *Id.* ¶ 146; *see also id.* ¶ 9 ("[O]ne executive explained that, if a competitor 'offered my guy a position, they'd call me and say, 'We didn't poach him.'"). What is more, Plaintiffs allege that private-sector naval engineers "earn[] modest annual raises and salaries well below those of engineers with similar degrees of training and expertise in other industries," *id.* ¶ 7, and even significantly less than public-sector naval

18

engineers, contrary to the dynamic "in most industries," *id.* ¶ 191.  And, of course, Plaintiffs themselves at all times knew whether other firms were actively recruiting them, knew their salary information, and knew that they could ask their peers about their own recruitment and salary information.  In other words, Plaintiffs plead knowledge of the very facts—non-recruitment and pay levels—that they allege were concealed.  In these circumstances, reasonably diligent engineers would have had reason to further investigate these practices.

In short, tolling cannot apply for the independent reason that Plaintiffs "failed to plead that they conducted any inquiry to satisfy the diligence prong."  *In re Interior Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *8 (E.D. Va. Sept. 18, 2019).

\* \* \*

"There was a time when these claims could and should have been fairly adjudicated, but that time has long passed."  *GO Comput.*, 508 F.3d at 180.  Plaintiffs have "combined a fraudulent concealment argument" and "a continuing violations claim to stretch and swell the limitations period to roughly three or four times the one Congress specified."  *Id.*  "To allow this litigation to proceed would simply eviscerate Congress' intent."  *Id.*  Under well-established Fourth Circuit precedent, Plaintiffs' claims—which accrued well outside the four-year limitations period—must be dismissed as time-barred.

## II.     Plaintiffs Do Not Plausibly Allege an Agreement Among Defendants.

Even if Plaintiffs' Section 1 claims were timely, they would still fail as a matter of law. Plaintiffs' claims are based on an alleged twenty-plus year conspiracy among twenty Defendants (not to mention seven more alleged co-conspirators that are not named as defendants) to refrain from actively soliciting each other's naval engineers in order to reduce competition for such engineers.  To satisfy the concerted action element of their Section 1 claim, Plaintiffs must plead sufficient factual allegations to show that *all* Defendants *collectively* "made a conscious

commitment to a common scheme designed to achieve [the] unlawful objective." *SD3, LLC v. Black & Decker (U.S), Inc.*, 801 F.3d 412, 424 (4th Cir. 2015) (quotation omitted). To meet that burden, Plaintiffs must plead direct or circumstantial evidence that Defendants illegally agreed to unreasonably restrain trade. *Robertson*, 679 F.3d at 289. Plaintiffs have done neither here.

### A.  Plaintiffs Do Not Plausibly Allege Direct Evidence of an Agreement.

To adequately allege an agreement through direct evidence, Plaintiffs must offer factual allegations "specific enough to establish the relevant 'who, what, where, when, how or why'" of the antitrust misconduct. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 445 (6th Cir. 2012) (quotation omitted); *see also SD3*, 801 F.3d at 430 (citing *Carrier* with approval). "[A] conclusory allegation of agreement at some unidentified point . . . does not supply facts adequate to show illegality." *SD3*, 801 F.3d at 424 (quotation omitted).

### 1.  *The allegations of purported direct evidence of an agreement are vague, conclusory, and rely on impermissible group pleading.*

Plaintiffs boldly herald their collection of supposed direct evidence of the purported agreement, proclaiming that "participants in the no-poach conspiracy directly confirm[ed] its existence, operation and scope." Compl. at 35 (capitalization altered and emphasis omitted); *see also id.* ¶¶ 147-60. But the actual contents of the complaint contain nothing of the sort and are devoid of "the 'who, what, when and where' of the claimed antitrust misconduct." *SD3*, 801 F.3d at 433.[5]

---

[5] Unlike the complaint here, the one in *SD3* "allege[d] an actual agreement . . . in detail" and "d[id] not rely, . . . on parallel conduct alone." 801 F.3d at 433. For instance, the complaint in *SD3* "identifie[d] the particular time, place, and manner in which" the anticompetitive agreement "initially formed." *Id.* at 430. It also described "a separate meeting held for that purpose" in "October 2001," named "at least six specific individuals who took part," and identified "which defendant each person ostensibly represented." *Id.*

**Who.**  Plaintiffs generally allege "a decades-long conspiracy among Defendants," Compl. ¶ 9, without providing any factual allegations as to *which* Defendants did what, including when or how each particular defendant joined the supposed conspiracy.  Plaintiffs do not even specifically allege that each Defendant joined the agreement, as they must.  *See Tera Grp., Inc. v. Citigroup, Inc.*, 2023 WL 5211252, at *6 (S.D.N.Y. Aug. 14, 2023) (dismissing claims where plaintiffs failed to "specify[] which Defendant actually engaged in the alleged conduct").  Instead, Plaintiffs' complaint lumps together all "Defendants" using improper group pleading.  *See* Compl. ¶ 149 ("[A]ll defendant corporate families that existed in 2000 had joined [the conspiracy] by that time.").  The Fourth Circuit has warned that "[a] plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group."  *SD3*, 801 F.3d at 422.  Such a prohibited "'shotgun pleading' . . . . fail[s] to apprise [Defendants] of the particular claims against [them]" and "waste[s] judicial resources."  *Jackson v. Warning*, 2016 WL 7228866, at *4 (D. Md. Dec. 13, 2016) (quotations omitted); *see also Turton v. Va. Dep't of Educ.*, 2014 WL 12539403, at *2 (E.D. Va. Sept. 23, 2014) (noting that "shotgun pleadings" make it "virtually impossible to ascertain what claims are asserted against which defendants and on what legal basis the respective claims are founded").

**What.**  Plaintiffs implausibly allege a no-poach conspiracy that was both "tightly controlled" yet riddled with contradictory (and massive) "[e]xceptions."  *See* Compl. ¶ 153.  "The primary exception," according to Plaintiffs, "was that Defendants could hire employees who applied for a position on their own."  *Id.*  Plaintiffs refer to this exception as "the second prong of Defendants' policies," but make no effort to show that it makes any sense in connection with the supposed policy not to actively recruit in the first place.  *See id.* ¶ 165.  In another glaring exception to the no-poach rule, Plaintiffs allege that "[i]n some circumstances, a Defendant who lost a major

contract would allow its employees to be recruited by the winner of the contract." *Id.* ¶ 153.  Yet, the complaint is silent as to why the no-poach rule suddenly would evaporate when a Defendant lost a contract.  And whenever Defendants *were* working together on a contract, Plaintiffs allege that they "entered written agreements to not recruit each other's naval engineers" throughout the duration of the project, whose legality Plaintiffs do not challenge.  *Id.* ¶¶ 174, 175 n.8.  These unexplained exceptions make no sense and would swallow the alleged conspiracy.

**When.**  Plaintiffs admit they have no idea when Defendants formed the alleged agreement. *See id.* ¶ 160 (alleging that "the origins" of the conspiracy "are obscure").  Plaintiffs instead allege a twenty-year period in which the conspiracy *may* have been formed.  *See id.* ¶ 9 (alleging the agreement started "in at least 2000," yet "likely dat[es] back to the 1980s").  Such vague guesses are insufficient as a matter of law.  *See Muigai v. IB Prop. Holdings, LLC*, 2010 WL 5173313, at *4 (D. Md. Dec. 14, 2010) (dismissing complaint alleging "no specific facts as to how or when [the defendant] conspired," but only "mere legal conclusions . . . based on ambiguous behavior").

**Where and how.**  Plaintiffs do not allege *where* or *how* Defendants came to an agreement with each other or communicated that agreement, alleging only that the agreement was "never reduced to writing and passed on only as verbal instructions from executives to managers."  Compl. ¶ 149.  Plaintiffs do not allege a single inter-Defendant meeting, call, email, or letter—nothing from which the Court can infer that the industry-wide agreement they allege actually existed— ever.  Even the allegations as to intra-Defendant communications to implement the alleged conspiracy lack sufficient detail to be plausible.  Those allegations fail to identify any specific executives or managers, which of the twenty Defendants communicated those instructions, or when and how they gave those supposed instructions.

### 2.     *Plaintiffs' confidential witness statements do not plausibly allege an agreement.*

Plaintiffs' vague and conclusory allegations do not become sufficient just because Plaintiffs assert that they come from anonymous "[c]onfidential witnesses" and other unnamed individuals who supposedly knew of an agreement among Defendants. Compl. ¶¶ 1, 4; *see, e.g.*, *id.* ¶¶ 3, 151 ("former employee[s]"); *id.* ¶¶ 7, 9 ("[o]ne executive"); *id.* ¶¶ 4, 145 ("[f]ormer managers"); *id.* ¶ 152 ("an executive"). Adding a cloak-and-dagger moniker does not transform an otherwise conclusory allegation devoid of necessary detail into a well-pleaded fact. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109-10, 1109 n.5 (7th Cir. 1984) ("[I]nvocation of antitrust terms of art does not confer immunity from a motion to dismiss."). The alleged witness statements do nothing to push Plaintiffs' claims over the line from merely possible to plausible.

As an initial matter, none of the supposed confidential witness statements actually offers factual support for the supposed decades-long, industry-wide conspiracy Plaintiffs allege. None of the statements is tied to a particular point in time. Only a handful reference particular Defendants. And many are wholly conclusory. *See, e.g.*, Compl. ¶ 151 (alleging that "former employees" made "statements that the following Defendants or business units participated in the gentlemen's agreement not to recruit naval engineers from competitors"). With respect to most Defendants, Plaintiffs provide no meaningful detail about the identity of the "confidential witness" who "tied" the Defendant to the purported agreement. Compl. ¶ 4; *see id.* ¶¶ 142-43, 147-53. For instance, Plaintiffs allege that "[s]everal former managers directly confirmed that they had a standing 'gentlemen's agreement' not to poach naval engineers from other conspirators (using exactly those words)," but they do not say for which Defendants those managers worked, what positions they held, when they held those positions, who the "other conspirators" were, or how the managers knew that the respective company policies were the result of an industrywide agreement.

*See id.* ¶ 4.  Indeed, they do not even claim that their anonymous sources were ever employed by any Defendant between "the early 1980s" and 2000, by which time each Defendant had supposedly joined the conspiracy.  *Id.* ¶ 144.

Paragraph 159 is a telling example.  The paragraph purports to summarize Plaintiffs' "direct" allegations of an agreement.  *Id.* ¶ 159.  But it merely lists most (but not all) Defendants and asserts that with respect to each, "at least one industry witness either named it as part of the industry-wide no-poach conspiracy, discussed an application involving that entity of the no-poach agreement to a particular individual seeking to change employment in the industry, or acknowledged that it had a policy or practice of not recruiting competitors' employees."  *Id.*  The conclusory and sweeping nature of these allegations warrants rejecting them outright.  *See In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 42-43 & n.16 (S.D.N.Y. 2022) (generic group pleading fails to support conspiracy even if based on alleged confidential witness statement).

Moreover, Plaintiffs' supposed confidential witness allegations have another fatal flaw— the conduct they describe is consistent with independent action.  *See SD3*, 801 F.3d at 424. Paragraph 159 is again a paradigmatic example.  Plaintiffs assert that according to some unspecified "industry witness," Defendants "acknowledged that [they] had a policy or practice of not recruiting competitors' employees."  Compl. ¶ 159.  But a firm's independent policy or practice is not actionable under Section 1 of the Sherman Act.  *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) ("Section one of the Sherman Act applies only to concerted action; unilateral conduct is excluded from its purview.").

So, on inspection, what Plaintiffs call direct evidence of an unlawful agreement is at best an allegation that Defendants had *unilateral policies* of not recruiting—not that Defendants unlawfully "*agreed*" with each other to adopt such policies.  Indeed, Plaintiffs sum up their so-

called direct evidence by stating that "[e]ach Engineering Defendant in this action is tied to the conspiracy through the testimony of at least one witness who verified *the party's adherence* to the industry's no-poach regime."  Compl. ¶ 142 (emphasis added).  That is not an allegation of agreement—*i.e.*, allegations that tie Defendants to the *formation* of the purported conspiracy.  It merely contends that Defendants behaved the same way—an allegation of parallel conduct that, as explained below, is legally insufficient in its own right.

*  *  *

Plaintiffs do not make good on their claim that they have alleged direct evidence of an agreement among Defendants.  Their generalized and conclusory allegations are legally insufficient.

**B.      Plaintiffs Do Not Plausibly Allege That Defendants' Parallel Conduct Was the Result of an Agreement.**

Without direct evidence of an agreement, Plaintiffs must plead circumstantial evidence sufficient to support a plausible inference that Defendants "made a conscious commitment to a common scheme designed to achieve an unlawful objective."  *SD3*, 801 F.3d at 424 (quotation omitted).  Plaintiffs do not meet their burden to do so.

**1.      *Plaintiffs cannot plead a plausible agreement merely by alleging parallel conduct.***

Under *Twombly*, to allege an agreement based on circumstantial evidence, Plaintiffs must plead more than the fact that Defendants acted in parallel.  *See* 550 U.S. at 554.  "Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence[,] . . . is not in itself unlawful."  *Id.* at 553-54 (quotation omitted and alteration adopted).  "An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: . . . without some further factual enhancement it stops short of the line between possibility and plausibility of entitle[ment] to relief."  *Id.* at 557

(quotation omitted); *see also SD3*, 801 F.3d at 424 ("[P]arallel conduct, standing alone, does not establish the required agreement because it is equally consistent with lawful conduct.").

"For a § 1 claim to survive, then, a plaintiff must plead parallel conduct *and* something 'more.'" *SD3*, 801 F.3d at 424 (quoting *Twombly*, 550 U.S. at 557). "That 'more' must consist of further circumstance[s] pointing toward a meeting of the minds," and "must be placed in a context that raises a suggestion of a proceeding agreement, not merely parallel conduct that could just as well be independent action." *Id.* (quoting *Twombly*, 550 U.S. at 557). Otherwise, "an account of a defendant's commercial efforts stays in neutral territory." *Twombly*, 550 U.S. at 557. A plaintiff must allege, for instance, "that the parallel behavior 'would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *SD3*, 801 F.3d at 424 (quoting *Twombly*, 550 U.S. at 556 n.4).

The "more" is often characterized as "plus factors" and "must be evaluated holistically." *Id.* at 424-25 (quotation omitted). Without plus factors, "parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57. Simply put, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. Such a bare assertion is all that Plaintiffs offer here, and this Court should not infer an agreement where none is plausibly alleged.

## 2. *Defendants' unilateral self-interest explains their alleged parallel hiring practices.*

Plaintiffs repeatedly allege that Defendants engaged in a similar "practice or policy of not actively recruiting [each other's] naval engineers." Compl. ¶ 161; *see also id.* ¶¶ 159-60, 165. Critically, however, Plaintiffs fail to allege facts indicating that Defendants' practices resulted

from anything more than parallelism based on Defendants' independent self-interest.  That is because "the facts alleged in the complaint" along with "common economic experience . . . show that independent self-interest is an obvious alternative explanation for [D]efendants' common behavior."  *See In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 326 (3d Cir. 2010) (quotation omitted) (affirming dismissal of Section 1 claims).  Far from alleging that Defendants would have poached from rivals absent the agreement, Plaintiffs' allegations demonstrate the opposite.  *See Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1147 (N.D. Cal. 2017) (dismissing Section 1 claims where plaintiffs failed to show that poaching "would have been the norm in a free market"), *aff'd*, 757 F. App'x 524 (9th Cir. 2018).

   ***Defendants frequently team up on contracts to better serve their government clients.***  The extensive teaming arrangements described in the complaint explain why it would be in Defendants' independent interest not to recruit.  Plaintiffs allege that Defendants "routinely work together" on "extremely sensitive projects."  Compl. ¶¶ 137, 167; *see id*. ¶¶ 116, 135, 137, 167; *see also id*. ¶ 11 ("Defendants . . . frequently work together on the same projects.").  As Plaintiffs recount, "naval engineering consultancies work together with each other and with shipbuilders in relationships ranging from co-equals to supervisors to subcontractors," and "[t]wo firms in a contractor/ subcontractor relationship on one contract may find their roles reversed on the next contract."  *Id*. ¶ 137.  Plaintiffs acknowledge that "[t]his repeat-player dynamic encourages close and cooperative inter-firm relationships that extend to the individual level—so much so that one industry veteran described the various firms as 'allied places.'"  *Id*.  Plaintiffs also acknowledge that Defendants "spend years developing trust and reputation among . . . peer firms."  *Id*. ¶ 167.

   Consistent with Plaintiffs' allegations about Defendants' interests in maintaining this cooperative spirit, Plaintiffs allege that Defendants (i) frequently partner to build, repair, and

maintain military ships, and (ii) refrain from recruiting each other's naval engineers "when working on the same project" by entering into multi-year teaming agreements "when subcontracting with one another or when submitting joint bids to the U.S. government."[6]  *Id.* ¶¶ 13, 174.  And even when a given set of Defendants does not have an active teaming agreement, another agreement may be expected at any moment for the next shipbuilding project.  *See id.* ¶ 137.

Plaintiffs' allegations thus portray an industry where cooperation and teaming are commonplace, such that each Defendant has an independent incentive to maintain good relations with likely future partners.  Indeed, Plaintiffs' own allegations explain precisely why each Defendant is independently motivated to maintain the "trust and reputation" they "spend years developing," *id.* ¶ 167:  "Given [Defendants'] close and repeated working relationships, . . . *companies that recruit rivals' employees don't stay around that long because [other] companies don't want to work with them.*"  *Id.* ¶ 171 (quotation omitted, alterations adopted, and emphasis added).  In other words, Plaintiffs have it backwards when they allege that Defendants "acted against their unilateral self-interest" in allegedly not actively recruiting engineers from each other.  *See id.* ¶¶ 176-77.  Based on Plaintiffs' own allegations, Defendants' actions are consistent with their own unilateral self-interests, and Defendants' individual incentives provide an "obvious alternative explanation" for Defendants' common behavior.  *Twombly*, 550 U.S. at 567.

***Defendants hire from rivals when in their self-interest.***  Plaintiffs' own allegations about Defendants' hiring practices further demonstrate that Defendants' alleged actions are consistent with Defendants' unilateral self-interest, and inconsistent with the supposed conspiracy.  *See* Compl. ¶ 153.  As noted above, Plaintiffs allege that "competitors' employees who *themselves*

---

[6] Plaintiffs expressly disclaim any challenge to the legality of the no-poach restrictions in Defendants' "teaming agreements," which tacitly concedes that non-solicitation agreements may be efficient and pro-competitive.  Compl. ¶ 175 n.8.

*apply* for jobs may be hired."  *Id.* ¶ 165; *see also, e.g.*, *id.* ¶ 161 ("Defendants *could* (and often *did*) *hire* competing Defendants' naval engineers, provided the engineer made the initial approach.").  Plaintiffs also allege that "a Defendant who lost a major contract would allow its employees to be recruited by the winner of the contract."  *Id.* ¶ 153.  Plaintiffs theorize that this behavior "belies any innocent or procompetitive explanation for Defendants' policies."  *Id.* ¶ 165.

Again, Plaintiffs' own allegations undermine the inferences they seek.  In an industry where the government expects Defendants to work together in the interest of national security, Defendants have unilateral interests not to engage in active recruitment that may adversely affect their business relationships with each other.  But Defendants do engage in active recruitment, as Plaintiffs observe, because they can hire interested employees without harming cooperative relationships with other firms.  *See id.* ¶¶ 137, 167, 171.

***Plaintiffs do not allege inter-firm enforcement.***  Plaintiffs' allegations regarding enforcement further support an inference of unilateral conduct because they focus entirely on *intra*-firm enforcement of internal policies.  Plaintiffs allege, for instance, that Defendants passed the recruiting restrictions on "as verbal instructions from executives to managers" within a given firm.  *Id.* ¶ 149.  Plaintiffs also allege several specific instances in which a firm prevented itself from recruiting another firm's engineers.  *See id.* ¶ 152 (executive for Gibbs & Cox told another executive that a potential candidate could not be recruited because he worked for John J. McMullen & Associates).  By contrast, Plaintiffs fail to allege any instances of *inter*-firm enforcement of the agreement.  This discrepancy further undermines any plausible inference that Defendants' parallel conduct results from a common agreement among multiple Defendants.

***Defendants' naval engineers work far apart from each other.***  Plaintiffs also allege that Defendants' workforces are dispersed across isolated geographic locations.  While many

Defendants are headquartered in the Washington, D.C. metropolitan area, *id.* ¶ 11, the "five major shipbuilding yards" are separated by significant distances: Bath, Maine; Groton, Connecticut; Newport News, Virginia; Pascagoula, Mississippi; and San Diego, California. *Id.* ¶ 116. The other three primary shipbuilding companies are based in Wisconsin, Louisiana, and Alabama. *Id.* ¶ 118. Defendants therefore allegedly do not spend time actively soliciting engineers employed by other firms in distant parts of the country who are unlikely to move their families for another employer. Instead, they recruit engineers who already expressed interest by affirmatively reaching out or responding to job postings. *See, e.g.*, Compl. ¶ 45 (referring to job-focused social media posts). This behavior is consistent with Defendants' unilateral economic interests.

These allegations make this case very similar to *Twombly*. There, the plaintiffs alleged a multi-year conspiracy among major telecom firms to suppress competition by "fail[ing] . . . to pursue attractive business opportunit[ies]" in competitors' markets. 550 U.S. at 551 (quotation omitted). The plaintiffs alleged the industry was highly regulated and featured a few large firms that were strong in their respective markets but did not vigorously compete in a competitor's market. *Id.* at 567-68. Lacking direct evidence, the "plaintiffs rest[ed] their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement." *Id.* at 564.

The Supreme Court held that the plaintiffs failed to plead a "plausible suggestion of conspiracy" because "nothing in the complaint intimates" that the alleged parallel conduct "was anything more than the natural, unilateral reaction" of each Defendant based on its own self-interests. *Id.* at 566. The "complaint itself [gave] reasons to believe that the [defendants] would see their best interests in keeping" to their own "turf," recognizing the "adage about him who lives by the sword," and described how "each [defendant] had reasons to try to avoid" direct

competition. *Id.* at 547, 568.  And because "resisting competition [was] routine market conduct," there was "no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.* at 566.

The same result follows here.  Plaintiffs explicitly allege that "Defendants mutually recognize that they benefit *more* from a regime of mutual non-recruitment than they would from any individual hire." Compl. ¶ 165.  Plaintiffs further allege that, given the "close and repeated working relationships" among Defendants, "companies that recruit rivals' employees don't stay around that long because companies don't want to work with them." *Id.* ¶ 171 (quotation omitted and alterations adopted).  And Plaintiffs allege that each Defendant had strong incentives not to actively recruit its competitors' employees in an industry where the government encourages teaming, and the players must maintain "trust and cooperation" due to "extensive repeat-player working relationships." *Id.* ¶ 166.  Like in *Twombly*, Plaintiffs thus provide no reason to infer an agreement from Defendants' parallelism.[7]

### 3.   *Plaintiffs' alleged "plus" factors do not support inferring an agreement.*

Plaintiffs invoke several generic "plus" factors in an attempt to allege that "innocent explanations for Defendants' behavior are unlikely." Compl. ¶ 166.  None, however, creates a plausible inference that Defendants' behavior results from an unlawful agreement as opposed to mere parallelism.  *See Twombly*, 550 U.S. at 556.  Instead, Plaintiffs' "plus" factors either reflect features common to many industries or are entirely consistent with unilateral behavior.

---

[7] Also like in *Twombly*, Plaintiffs' sweeping allegation of a conspiracy spanning decades involving legions of employees across dozens of companies, without offering any meaningful specifics about the claimed agreement, would make the scope of discovery "sprawling, costly, and hugely time-consuming."  550 U.S. at 560 n.6; *see id.* at 558-59 (warning of the "unusually high cost of discovery in antitrust cases" and the risk of "discovery abuse" creating pressure to settle "even anemic cases").

***High barriers to entry.***  Plaintiffs allege that the naval engineering industry "is susceptible to collusion given the high barriers to creating a naval engineering firm."  Compl. ¶ 167.  This factor does not move the needle.  A "[h]igh barrier[] to entry" does not "help[] to distinguish between agreement and mere conscious parallelism as the root cause" of the challenged practices.  *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011).  This is a case in point:  As noted, the "relationship-driven" nature of Defendants' industry provides independent incentives not to actively recruit each other's engineers.  Compl. ¶ 167; *see supra* pp. 26-28.

***Shared financial incentives do not suggest an anticompetitive agreement.***  Plaintiffs next allege that Defendants shared "obvious financial incentives to keep salaries for naval engineers low."  Compl. ¶ 168.  This is true in virtually any industry, so courts do not consider "motive to conspire" to be a plus factor in price-fixing cases.  *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) ("[C]ommon motive does not suggest an agreement.").  This factor does nothing to bolster Plaintiffs' claims.

***Shared pressure from government customers.***  The same goes for Plaintiffs' allegation that "the government put unrealistic pressure on firms that employed naval engineers to keep salaries low."  Compl. ¶ 170.  In fact, this alleged pressure provides another independent incentive for Defendants not to actively recruit each other's engineers—and an especially compelling one.  Given Defendants' outsized reliance on government contracts, *see id.* ¶ 1, such government-side pressure would seem sufficient alone to justify Defendants' parallel conduct.  *See id.* ¶ 170.

***Repeat-player working relationships.***  Plaintiffs reiterate that Defendants "frequently worked on . . . contracts where rival firms were very likely to be involved" and that companies that recruit rivals' employees "don't stay around that long because companies don't want to work with them."  *Id.* ¶ 171.  But these "extensive repeat-player working relationships," *id.* ¶ 166, are precisely

why Defendants' alleged parallel policies result from their independent self-interest, not an unwritten agreement with unexplained exceptions for recruitment and hiring, as detailed above. *See supra* pp. 21-22. Moreover, Plaintiffs' allegation that the interdependent nature of the industry allowed Defendants to enforce their conspiracy by sharing compensation information, Compl. ¶¶ 172-73, 177, does not plausibly suggest a conspiracy without additional evidence of an agreement. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999).

*Forums for collusio*n. Plaintiffs aver that Defendants had opportunities "to discuss, implement, and reinforce their unlawful gentlemen's agreement" at industry-wide conferences, board meetings, and private social events. Compl. ¶¶ 172-73. But they do not allege a single inter-firm communication, despite having "confidential witnesses." It is "well-settled that 'the mere opportunity to conspire among antitrust defendants does not . . . permit the inference of conspiracy.'" *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 667-68 (E.D.N.C. 2003) (quotation omitted), *aff'd*, 118 F. App'x 680 (4th Cir. 2004) (*per curiam*).

*Teaming agreement*s. Lastly, it is nonsensical to suggest that teaming arrangements whose legality Plaintiffs do not challenge—and which are undertaken with the government's permission pursuant to regulation—support an inference of an illegal conspiracy, especially when those agreements already contain similar restrictions on active recruitment. *See supra* pp. 7-8, 17.

\*   \*   \*

Plaintiffs fail to allege any direct evidence that Defendants entered into an unwritten 'no-poach' agreement, and instead rely on sweeping group pleading and conclusory confidential witnesses that are insufficient as a matter of law. Likewise, Plaintiffs' alleged circumstantial evidence at best demonstrates that each Defendant acted in its own unilateral self-interest in adopting parallel recruitment policies. Plaintiffs thus fail to state a Section 1 claim.

III.    **Plaintiffs Do Not Adequately Allege an Unreasonable Restraint of Trade.**

The Supreme Court has "long recognized" that Section 1 of the Sherman Act "outlaw[s] only *unreasonable* restraints." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quotation omitted). Accordingly, Plaintiffs fail to state a claim for the independent reason that they have not plausibly alleged that Defendants "imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).

A.    **The *Per Se* Standard Does Not Apply.**

Courts typically evaluate whether restraints are reasonable according to one of two main modes of analysis: "the rule of reason and the *per se* rule." *United States v. Brewbaker*, --- F.4th ----, 2023 WL 8286490, at *5 (4th Cir. Dec. 1, 2023). Just recently, the Fourth Circuit—considering the same question while overturning a criminal conviction—reaffirmed that "[t]he rule of reason is the default." *Id.* (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007)). Condemning an agreement as *per se* unlawful, by contrast, "is a rare exception." *Leegin*, 551 U.S. at 886. This is no mere lip service. In *Brewbaker*, the Fourth Circuit cautioned that the *per se* rule's "blanket illegality" must not be "applied loosely," adding that the "classes of restraints" to which it applies "should be narrowly construed." 2023 WL 8286490, at *5. Therefore, *per se* treatment "is appropriate only after courts have had considerable experience with the type of restraint at issue and only if they can predict with confidence that the restraint would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886-87.

Agreements between competitors not to recruit each other's employees are not categorically subject to *per se* condemnation. *See, e.g.*, *United States v. Patel*, 2022 WL 17404509, at *8 (D. Conn. Dec. 2, 2022) ("[T]he Court has not located[] any case in which the Supreme Court or any Court of Appeals . . . has found that agreements to not hire or solicit employees should be categorically subject to *per se* treatment."); *Ulrich v. Moody's Corp.*, 2014 WL 12776746, at *26

(S.D.N.Y. Mar. 31, 2014) (collecting cases applying the rule of reason to "'[n]o-hire' or 'no-switching' agreements").

At the pleading stage, this Court can and should hold that the challenged conduct is not subject to *per se* treatment. *See Borozny v. Raytheon Techs. Corp.*, 2023 WL 348323, at *5 (D. Conn. Jan. 20, 2023) ("Determining whether conduct should be analyzed under the *per se* or rule of reason framework is a question of law for the Court to decide."); *In re Jan. 2021 Short Squeeze Trading Litig.*, 2022 WL 1522054, at *24 n.21 (S.D. Fla. May 13, 2022) (recognizing that "[c]ourts routinely determine which test applies at the motion-to-dismiss stage" and collecting cases). While Plaintiffs allege that Defendants compete to attract and hire engineers, they also acknowledge a complex web of collaborations and vertical relationships (*i.e.*, subcontractor relationships) among Defendants) to support the public fleet. These legitimate competitor collaborations may well justify limits on their active recruitment of employees from each other. *See Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 (9th Cir. 2021); *see also Brewbaker*, 2023 WL 8286490, at *5-7. Indeed, such recruiting may destroy future teaming and subcontractor relationships to the detriment of the federal government and national security interests. Accordingly, this is not the rare case where the challenged conduct is so obviously anticompetitive that the *per se* rule applies and thus displaces the presumption that rule-of-reason analysis governs.[8]

---

[8] For the same reasons, the court cannot apply quick look analysis to the challenged conduct. Quick look, a truncated version rule of reason analysis, is reserved for restraints that "an observer with even a rudimentary understanding of economics" would find illegal. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). The complicated and distinctive nature of the industry as alleged by Plaintiffs makes the quick look analysis inapplicable.

**B.      Plaintiffs Do Not Adequately Allege Anticompetitive Conduct Under the Rule of Reason.**

Plaintiffs' Section 1 claims fail under a rule-of-reason analysis.  To state a claim under the rule of reason, Plaintiffs "would have to show that the alleged conspiracy adversely affected competition, which requires a showing that one or more of the defendants had market power." *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 731 (D. Md. 2002) (citing *Murrow Furniture Galleries, Inc v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989)). In turn, "[t]o prove market power, the plaintiff must first establish the relevant product and geographic markets." *Murrow*, 889 F.2d at 528.  "Failing to define a relevant market alone is fatal to an antitrust claim" at the pleading stage, because if plaintiffs have not "define[d] the relevant market, it follows that they could not, and did not, establish that the [defendants] created an agreement that unreasonably restrained trade, as required for a Section 1 claim." *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023); *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681-83, 691 (4th Cir. 2016) (affirming dismissal of complaint based on failure to plead relevant market).

In a labor case like this one, the "market is comprised of buyers [*i.e.*, employers] who are seen by sellers [*i.e.*, employees] as being reasonably good substitutes." *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (quotation omitted).  Plaintiffs must therefore allege both a relevant product and geographic market in which the relevant group of workers view Defendants as a set of interchangeable substitutes.  Here, the complaint states that "[t]he relevant labor market is the market for naval engineers," Compl. ¶ 193, and that "[t]he relevant geographic market is the United States," *id.* ¶ 197.  But those propositions are not supported by the complaint's allegations.

***First***, Plaintiffs do not plausibly allege a relevant product market (what Plaintiffs call the "labor market").  As alleged, the product market of "naval engineers"—*i.e.*, those who "design

and build the nation's warships and other 'public fleet' vessels"—is too narrow because it artificially excludes commercial naval engineering jobs.  *Id.* ¶ 1.   Nothing about Plaintiffs' definition of "naval engineer" limits the relevant employees' skillset to employers who contract for the military.  Naval architects' specialty is "knowledge of hydrostatics, hydrodynamics, vessel motion physics, mechanics, strength of materials, and design of structures," while marine engineers' is "design[ing] onboard ship systems, including those related to propulsion, power generation, air conditioning, ventilation, water distillation, cargo handling, steering, and fuel."  *Id.* ¶ 5.  But Plaintiffs do not allege that these skills are applicable only to military and "public fleet" vessels, that workers with these engineering skills cannot switch to non-naval employers or to industries unrelated to ships, or that Defendants cannot recruit engineers from other industries. Nor can Plaintiffs so allege.  *See* U.S. Bureau Lab. Stats., *Occupational Outlook Handbook: Marine Engineers and Naval Architects; What Marine Engineers and Naval Architects Do*, https:// www.bls.gov/ooh/architecture-and-engineering/marine-engineers-and-naval-architects.htm   (last accessed Sept. 6, 2023) (defining market for "[m]arine engineers and naval architects" to include those who work on military and civilian applications).

**Second**, Plaintiffs' alleged product market of "naval engineers" is too broad.  As pled, the term encompasses multiple distinct jobs, including at a minimum roles for both "architects" and "engineers" which Plaintiffs themselves describe as involving fundamentally different tasks. Compl. ¶¶ 1-5.  As a result, Plaintiffs have not pled a proper market that captures "the reasonable interchangeability of use . . . between the product itself and substitutes for it."  *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238-39 (2d Cir. 2008) (quotations and alterations omitted); *see also Murrow Furniture*, 889 F.2d at 528 ("[T]he relevant product market is defined by 'the

reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962))).

*Finally*, Plaintiffs fail to plausibly allege that the entire nation is the relevant geographic market. Compl. ¶ 197. They allege that "naval engineers" work "in various states across the United States, including Virginia, the District of Columbia, Maine, Mississippi, and Connecticut." *Id.* ¶ 114. Typically, however, labor markets are local, as "[m]ore than 80% of job applications occur where the job applicant and prospective employer" are within "commuting" distance. Ioana Marinescu & Herbert Hovenkamp, *Anticompetitive Mergers in Labor Markets*, 94 Ind. L.J. 1031, 1049 (2019). Plaintiffs do not allege any facts to support an inference that the labor market for a "naval engineer" is different or that a "naval engineer" would see a job hundreds or even thousands of miles away as a reasonably interchangeable substitute. That failure alone warrants dismissing Plaintiffs' Section 1 claim. *See, e.g.*, *Borozny*, 2023 WL 348323, at *11 (holding plaintiffs failed to make any allegations that "show the national aerospace labor market is a plausible market in which competition could be impaired"); *Ulrich*, 2014 WL 12776746, at *26-27 (granting motion to dismiss where plaintiff failed to adequately allege the geographic market).

In sum, Plaintiffs have failed to plausibly plead a proper relevant market and thus do not state a Section 1 claim under the rule of reason.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant their joint motion to dismiss the complaint with prejudice.

Dated: December 18, 2023                    Respectfully Submitted,

                                            /s/ *David G. Barger*
                                            David G. Barger (VSB No. 21652)
                                            GREENBERG TRAURIG, LLP
                                            1750 Tysons Boulevard, Suite 1000
                                            McLean, VA 22102
                                            Tel: (703) 749-1307
                                            bargerd@gtlaw.com

                                            Douglas E. Litvack (*pro hac vice*)
                                            Mathew S. Hellman (*pro hac vice* pending)
                                            JENNER & BLOCK LLP
                                            1099 New York Avenue, NW, Suite 900
                                            Washington, DC 20001
                                            Tel: (202) 637-6357
                                            dlitvack@jenner.com
                                            mhellman@jenner.com

                                            Michael A. Doornweerd (*pro hac vice*)
                                            JENNER & BLOCK LLP
                                            353 North Clark Street
                                            Chicago, IL 60654
                                            Tel: (312) 923-2631
                                            mdoornweerd@jenner.com

                                            *Counsel for Defendants Bath Iron Works Corp.,*
                                            *Electric Boat Corp., General Dynamics Corp., and*
                                            *General Dynamics Information Technology, Inc.*

                                            /s/ *Adam Block Schwartz*
                                            Adam Block Schwartz (VSB No. 75396)
                                            Todd Stenerson (*pro hac vice*)
                                            David Higbee (*pro hac vice*)
                                            Djordje Petkoski (*pro hac vice*)
                                            Joseph Paul Samuels (VSB No. 92494)
                                            SHEARMAN & STERLING LLP
                                            401 9th Street, NW, Suite 800
                                            Washington, DC 20004

39

Tel: (202) 508-8000
adam.schwartz@shearman.com
todd.stenerson@shearman.com
david.higbee@shearman.com
djordje.petkoski@shearman.com
joseph.samuels@shearman.com
Robbie Rogart Jost (VSB No. 84377)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
rjost@crowell.com

Sima Namiri-Kalantari (*pro hac vice*)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Tel: (213) 622-4750
snamiri@crowell.com

Chahira Solh (*pro hac vice*)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Tel: (949) 263-8400
csolh@crowell.com

*Counsel for Defendants Huntington Ingalls Industries, Inc., HII Fleet Support Group LLC, HII Mission Technologies Corp., Ingalls Shipbuilding, Inc., and Newport News Shipbuilding and Dry Dock Co.*

/s/ *John F. Terzaken, III*
John F. Terzaken, III (VSB No. 45927)
Abram J. Ellis (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC 20001
Tel: (202) 636-5500
john.terzaken@stblaw.com
aellis@stblaw.com

Allison W. Reimann (*pro hac vice*)
GODFREY & KAHN, S.C.
One East Main Street, Suite 500

40

Madison, WI 53703
Tel: (608) 257-3911
areimann@gklaw.com

Sean O'D. Bosack (*pro hac vice*)
Christie B. Carrino (*pro hac vice*)
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
Tel: (414) 273-3500
sbosack@gklaw.com
ccarrino@gklaw.com

*Counsel for Defendant Marinette Marine Corp.*

/s/ *Attison L. Barnes, III*
Attison L. Barnes, III (VSB No. 30458)
Krystal B. Swendsboe (VSB No. 89614)
Scott M. McCaleb (*pro hac vice*)
Jon W. Burd (*pro hac vice*)
Daniel T. Park (*pro hac vice*)
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000
abarnes@wiley.law
kswendsboe@wiley.law
smccaleb@wiley.law
jburd@wiley.law
dpark@wiley.law

*Counsel for Defendant Bollinger Shipyards, LLC*

/s/ *Perry Lange*
Perry Lange (VSB No. 71184)
Jennifer Milici (*pro hac vice*)
John W. O'Toole (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 663-6000
perry.lange@wilmerhale.com
jennifer.milici@wilmerhale.com
john.otoole@wilmerhale.com

*Counsel for Defendant Gibbs & Cox, Inc.*


/s/ *Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
Casey Erin Lucier (VSB No. 80363)
MCGUIREWOODS LLP
888 16th Street, NW
Washington, DC 20006
Tel: (202) 857-1700
bhatch@mcguirewoods.com
clucier@mcguirewoods.com


J. Brent Justus (VSB No. 45525)
Nicholas J. Giles (VSB No. 85684)
Joshua D. Wade (VSB No. 92588)
W. Cole Geddy (VSB No. 93511)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1018
bjustus@mcguirewoods.com
ngiles@mcguirewoods.com
jwade@mcguirewoods.com
cgeddy@mcguirewoods.com


*Counsel for Defendant Serco, Inc.*


/s/ *Yonaton Rosenzweig*
Yonaton Rosenzweig (*pro hac vice*)
Adam S. Sieff (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, CA 90017
Tel: (213) 633-6800
yonirosenzweig@dwt.com
adamsieff@dwt.com


Harvey S. Schochet (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, CA 94111
Tel: (415) 276-6500
harveyschochet@dwt.com

Patrick J. Curran Jr. (VSB No. 86144)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Tel: (202) 973-4200
patcurran@dwt.com

*Counsel for Defendants BMT International, Inc. and Technology Financing, Inc.*


/s/ *Christopher C. Brewer*
Christopher C. Brewer (VSB No. 93406)
Ryan P. Phair (*pro hac vice*)
Michael F. Murray (*pro hac vice*)
Craig Y. Lee (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Tel: (202) 551-1700
chrisbrewer@paulhastings.com
ryanphair@paulhastings.com
michaelmurray@paulhastings.com
craiglee@paulhastings.com

*Counsel for Defendant CACI International Inc*


/s/ *William T. DeVinney*
William T. DeVinney (VSB No. 94032)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182
Tel: (703) 942-8076
wdevinney@brigliahundley.com

*Counsel for Defendant The Columbia Group, Inc.*


/s/ *Matthew J. MacLean*
Matthew J. MacLean (VSB No. 44304)
Alvin Dunn (*pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Tel: (202) 663-8183

matthew.maclean@pillsburylaw.com
alvin.dunn@pillsburylaw.com

*Counsel for Defendant Thor Solutions, LLC*

/s/ *William Lawler*
William Lawler (*pro hac vice*)
Carolyn Cody-Jones (VSB No. 87402)
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006
Tel: (202) 420-2249
william.lawler@blankrome.com

*Counsel for Defendant Tridentis, LLC*

44

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 18th day of December, 2023, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such (NEF) to the following:

> Steven J. Toll
> Brent W. Johnson
> Robert W. Cobbs
> Alison S. Deich
> Zachary R. Glubiak
> Cohen Milstein Sellers & Toll PLLC
> 1100 New York Avenue, NW, Suite 500
> Washington, DC 20005
> Tel: (202) 408-4600
> stoll@cohenmilstein.com
> bjohnson@cohenmilstein.com
> rcobbs@cohenmilstein.com
> adeich@cohenmilstein.com
> zglubiak@cohenmilstein.com
>
> Shana E. Scarlett
> Rio S. Pierce
> Hagens Berman Sobol Shapiro LLP
> 715 Hearst Avenue, Suite 202
> Berkeley, CA 94710
> Tel: (510) 725-3000
> shanas@hbsslaw.com
> riop@hbsslaw.com
>
> Steve W. Berman
> Hagens Berman Sobol Shapiro LLP
> 1301 Second Avenue, Suite 2000
> Seattle, WA 98101
> Tel: (206) 623-7292
> steve@hbsslaw.com
>
> Elaine T. Byszewski
> Hagens Berman Sobol Shapiro LLP
> 301 North Lake Avenue, Suite 920
> Pasadena, CA 91101
> Tel: (213) 330-7150
> elaine@hbsslaw.com

George F. Farah
Rebecca P. Chang
Nicholas Jackson
Handley Farah & Anderson PLLC
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
njackson@hfajustice.com

William H. Anderson
Handley Farah & Anderson PLLC
5353 Manhattan Circle, Suite 204
Boulder, CO 80303
Tel: (202) 559-2433
wanderson@hfajustice.com

Simon Wiener
Handley Farah & Anderson PLLC
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567
swiener@hfajustice.com

*Counsel for Plaintiffs and the Proposed Class*

Candice J. Enders
Julia R. McGrath
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark
Stephen J. Teti
Arielle S. Wagner
Eura Chang
Lockridge Grindal Nauen P.L.L.P
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
bdclark@locklaw.com

sjteti@locklaw.com
aswagner@locklaw.com
echang@lawlaw.com

*Additional Counsel for Plaintiffs and the Proposed Class*

/s/ *David G. Barger*
David G. Barger, Esq.

47

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| SUSAN SCHARPF and ANTHONY D'ARMIENTO, on behalf of themselves and all others similarly situated, | Case No. 1:23-cv-01372-AJT-WEF |
| Plaintiffs, | Hon. Anthony J. Trenga |
| v. | |
| GENERAL DYNAMICS CORP., et al., | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS.....................................................................................2

LEGAL STANDARD.............................................................................................5

ARGUMENT..........................................................................................................6

     I.     Plaintiffs Have Plausibly Alleged a *Per Se* Unlawful Conspiracy. ........................7

         A.    Plaintiffs have alleged substantial direct evidence of
agreement. ...................................................................................8

             1.    The Complaint alleges direct evidence of an
unwritten "gentlemen's agreement" not to poach
naval engineers from competitors....................................9

             2.    The Complaint alleges direct evidence tying each
Defendant to the no-poach conspiracy..........................11

         B.    Plaintiffs have alleged substantial circumstantial evidence
of the conspiracy. ......................................................................14

             1.    Plaintiffs allege the parallel conduct of each
Engineering Defendant participating in the
gentlemen's agreement not to poach one another's
naval engineers. ..........................................................15

             2.    Plaintiffs allege plus factors that, together with the
parallel conduct, establish the plausibility of
Defendants' no-poach agreement. ................................16

                  (a)    Plaintiffs' detailed fact allegations support
its plausibility....................................................16

                  (b)    Plaintiffs' allegations regarding Defendants'
motivation for common action support the
plausibility of agreement. .................................16

                  (c)    Plaintiffs' allegations of communications
and information sharing among Defendants
support its plausibility. .....................................17

(d)   Plaintiffs' allegations of market concentration and other market factors conducive to collusion support its plausibility.................................................18

(e)   Plaintiffs' allegations that Defendants attempted to hide their actions support the Complaint's plausibility....................................19

(f)   Defendants' actions against independent self-interests support the Complaint's plausibility....................................20

3.   Because Plaintiffs plausibly allege a no-poach conspiracy, Defendants' "alternative explanations" are immaterial. ............................................21

II.   Plaintiffs' Claims Are Timely. ....................................................24

A.   Defendants misread the Fourth Circuit's broad fraudulent concealment and Rule 9(b) pleading standards..........................24

B.   The complaint credibly alleges fraudulent concealment with more than adequate particularity. ...................................27

1.   Defendants affirmatively concealed their no-poach agreement. .......................................27

2.   Plaintiffs failed to discover the conspiracy despite reasonable diligence.................................38

C.   Defendants misread Plaintiffs' continuing violation allegations. .................................................42

D.   Defendants' argument turns on its head the equitable purpose of the Fourth Circuit's fraudulent concealment cases...............................................42

III.   Plaintiffs Have Plausibly Alleged a Rule of Reason Claim, Though the Court Should Not Reach the Issue at This Stage of the Case. .......44

A.   Plaintiffs allege a *per se* unlawful naked market allocation agreement..............................................44

B.   Plaintiffs have plausibly alleged that Defendants' no-poach conspiracy had anticompetitive effects within the relevant market. .................................................46

1.    Plaintiffs allege a plausible labor market. .......................................47

2.    Plaintiffs allege a plausible geographic market. ...........................49

3.    Plaintiffs plausibly allege market power. ......................................50

4.    Plaintiffs allege economically plausible anticompetitive effects. ...............................................................50

CONCLUSION ........................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004) ...................................................................8

*In re Animation Workers Antitrust Litig.*,
123 F. Supp. 3d 1175 (N.D. Cal. 2015) ................................................. 7, 10, 28

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ...................................................................44

*Baker v. United States*,
21 F.2d 903 (4th Cir. 1927) ...................................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................*passim*

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999) ...................................................................45

*Borozny v. Raytheon Techs. Corp.*,
2023 WL 348323 (D. Conn. Jan. 20, 2023) ........................................... 44, 46, 49

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) .....................................................11

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ...................................................................26

*In re Capacitors Antitrust Litig.*,
106 F. Supp. 3d 1051 (N.D. Cal. 2015) ..................................................29

*Cason-Merenda v. Detroit Med. Ctr.*,
862 F. Supp. 2d 603 (E.D. Mich. 2012) ................................................7

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ...................................................................21

*In re Copper Antitrust Litig.*,
436 F.3d 782 (7th Cir. 2006) ...................................................................43

*Corder v. Antero Resources Corp.*,
    57 F. 4th 384 (4th Cir. 2023) ........................................................................*passim*

*D&M Farms v. Birdsong Corp.*,
    2020 WL 2501444 (E.D. Va. May 14, 2020) ........................................................ 17, 21, 23

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    313 F. Supp. 3d 931 (N.D. Ill. 2018).................................................................................8

*Deslandes v. McDonald's U.S., LLC*,
    81 F.4th 699 (7th Cir. 2023) .........................................................................................45

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) .........................................................................................46

*Donaldson v. Primary Residential Mortg., Inc.*,
    2020 WL 3184089 (D. Md. June 12, 2020).................................................................26, 40

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ....................................................................................47, 49

*Edmonson v. Eagle Nat'l Bank*,
    922 F.3d 535 (4th Cir. 2019) ........................................................................*passim*

*Eichorn v. AT&T Corp.*,
    248 F.3d 131 (3d Cir. 2001) ..........................................................................................45

*Ekstrom v. Cong. Bank*,
    2020 WL 6565251 (D. Md. Nov. 9, 2020) ..................................................................35, 40

*Emery v. Am. Gen. Fin., Inc.*,
    134 F.3d 1321 (7th Cir. 1998) .......................................................................................26

*English v. Pabst Brewing Co.*,
    828 F.2d 1047 (4th Cir. 1987) ........................................................................... 30, 31, 33

*Fenerjian v. Nongshim Co. Ltd*,
    72 F. Supp. 3d 1058 (N.D. Cal. 2014)............................................................................43

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) ..........................................................................................20

*Fonseca v. Hewlett-Packard Co.*,
    2020 WL 6083448 (S.D. Cal. Feb. 3, 2020).....................................................................7

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016).........................................................................37

*George v. Urb. Settlement Servs.*,
    833 F.3d 1242 (10th Cir. 2016)..........................................................................26

*Giordano v. Saks. Inc.*,
    654 F. Supp. 3d 174 (E.D.N.Y. 2023)........................................................ 14, 23

*GO Computer, Inc. v. Microsoft Corp.*,
    508 F.3d 170 (4th Cir. 2007) ...................................................................*passim*

*Grand Strand & Water & Sewer Auth. v. Oltrin Sols., LLC*,
    2015 WL 13469927 (D.S.C. Mar. 30, 2015) ....................................................30

*Gregory v. Toler Appraisal Grp., LLC*,
    2023 WL 2581995 (S.D.W.Va. Mar. 20, 2023) ...............................................39

*Hexcel Corp. v. Ineos Polymers, Inc.*,
    681 F.3d 1055 (9th Cir. 2012) .........................................................................29

*Houck v. Substitute Tr. Servs., Inc.*,
    791 F.3d 473 (4th Cir. 2015) ..................................................... 5, 16, 21, 24

*Hunter v. Booz Allen Hamilton, Inc.*,
    418 F. Supp. 3d 214 (S.D. Ohio 2019)..............................................................45

*In re Interior Molded Doors Antitrust Litig*,
    2019 WL 4478734 (E.D. Va. Sept. 18, 2019) .......................................*passim*

*Jien v. Perdue Farms, Inc.*,
    2020 WL 5544183 (D. Md. Sept. 16, 2020)..........................................*passim*

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ...........................................................................38

*Kelsey K. v. NFL Enters., LLC*,
    254 F. Supp. 3d 1140 (N.D. Cal. 2017).............................................................22

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ........................................................................................42

*In re Korean Ramen Antitrust Litig.*,
    281 F. Supp. 3d 892 (N.D. Cal. 2017)...............................................................43

*Laber v. Harvey*,
    438 F.3d 404 (4th Cir. 2006)  ..........................................................................51

*Lansdowne on the Potomac Homeowners Ass'n v. Openband at Lansdowne LLC*,
    2011 WL 5872885 (E.D. Va. Nov. 22, 2011) ..............................................47, 50

*In re Lithium Ion Batteries Antitrust Litig.*,
    2014 WL 309192 (N.D. Cal. Jan 21, 2014)........................................................36

*Lumber Liquidators, Inc. v. Cabinets to Go, LLC*,
    415 F. Supp. 3d 703 (E.D. Va. 2019) ....................................................... 6, 7, 44

*McCleary-Evans v. Maryland Dep't of Transp.*,
    780 F.3d 582 (4th Cir. 2015) .....................................................................................5

*Med. Ctr. at Elizabeth Place v. Premier Health Partners*,
    2016 WL 9460026 (S.D. Ohio Oct. 6, 2016).............................................43

*Moore v. Kayport Package Exp., Inc.*,
    885 F.2d 531 (9th Cir. 1989) .....................................................................................26

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    2015 WL 5767415 (E.D. Pa. July 29, 2015)..............................................50

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ...............................................................................16

*Oak Plaza, LLC v. Buckingham*,
    2023 WL 2537661 (D. Md. Mar. 16, 2023) .................................... 26, 30

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ....................................................................................................6

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
    630 F. Supp. 3d 968 (N.D. Ill. 2022)....................................... 7, 20, 45

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
    764 F. Supp. 2d 991 (N.D. Ill. 2011)...................................................................8

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987) .................................................................*passim*

*In re Processed Egg Prods. Antitrust Litig.*,
    902 F. Supp. 2d 704 (E.D. Pa. 2012)...............................................................11

*Robertson v. Sea Pines Real Est. Cos., Inc.*,
    679 F.3d 278 (4th Cir. 2012) ....................................................................*passim*

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
    395 F. Supp. 3d 464 (W.D. Pa. 2019) .................................. 7, 20, 45, 46

*Ryan v. Microsoft Corp.*,
    147 F. Supp. 3d 868 (N.D. Cal. 2015)..............................................................37

*SD3 II LLC v. Black & Decker (U.S.) Inc.*,
   888 F.3d 98 (4th Cir. 2018) ............................................................... 38, 39, 41

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412, 425 (4th Cir. 2015).....................................................*passim*

*In re Jan. 2021 Short Squeeze Trading Litig.*,
   2022 WL 1522054 (S.D. Fla. May 13, 2022) ......................................46

*Smith v. Reddy*,
   101 F.3d 351 (4th Cir. 1996) ..............................................................8

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   2013 WL 595122 (E.D. Cal. Feb. 15, 2013)........................................8

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021) ..............................................................25

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
   71 F.3d 119 (4th Cir. 1995) ..............................................................*passim*

*Taylor v. United States*,
   2011 WL 9160526 (E.D. Va. May 3, 2011) ........................................25, 43

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ...............................................................17, 47, 48

*Towers v. Iger*,
   2017 WL 6044035 (N.D. Cal. Mar. 10, 2017).....................................37

*Turner v. McDonald's USA*,
   2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) .......................................23

*Ulrich v. Moody's Corp.*,
   2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014) ...................................45, 46, 49

*United States v. Brewbaker*,
   87 F.4th 563 (4th Cir. 2023) ...............................................................46

*United States v. DaVita Inc.*,
   2022 WL 266759 (D. Colo. Jan. 28, 2022) .........................................7

*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013)...............................................44

*United States v. Jindal*,
   2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) ....................................7

*United States v. Manahe*,
    2022 WL 3161781 (D. Me. Aug. 8, 2022) ............................................................7

*United States v. Patel*,
    2022 WL 17404509 (D. Conn. Dec. 2, 2022).................................................7, 46

*Verisign, Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) ............................................................................36

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011).............................................................................19

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971) .........................................................................................42

## Rules and Regulations

48 C.F.R § 9.604 .......................................................................................................45

Federal Rule of Civil Procedure Rule 9(b).............................................................*passim*

Federal Rule of Civil Procedure Rule 12(b)(6) ............................................. 5, 21, 47

Federal Rul of Civil Procedure 15(a)(2) ..................................................................51

## Other Authorities

Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES
    (4th & 5th eds. 2018–2023) ..............................................................................25

DOJ, Antitrust Div., *Antitrust Guidance for Human Resource Professionals* 3
    (Oct. 2016), https://www.justice.gov/atr/file/903511/download ...........................45

*Fraud*, BLACK'S LAW DICT. (11th ed. 2019) ...........................................................35

Wright & Miller, 4 FED. PRAC. & PROC. CIV. § 1298 (4th ed. 2015) ..........................26

TABLE OF DEFINITIONS

| Short Cite Used | Full Citation |
|---|---|
| Complaint | Class Action Complaint, ECF No. 1 (Oct. 6, 2023). All "Complaint" or "¶ __" references herein are to this document. |
| Joint Mot. | Memorandum of Law in Support of Defendants' Joint Motion to Dismiss, ECF No. 178-1 (Dec. 18, 2023). |
| Defendants | Usage varies by context; usually, Defendant signatories to the Joint Mot. |
| Engineering Defendants | Shipbuilder Defendants and Engineering Consultancy Defendants (as defined below). |
| Shipbuilder Defendants | General Dynamics Defendants, Huntington Ingalls Defendants, Marinette Marine, and Bollinger Shipyards (as defined below). |
| Engineering Consultancy Defendants | Gibbs & Cox, Serco, BMT Defendants, CACI, Columbia, Thor, and Tridentis (as defined below). |

| Short Cite Used | Full Defendant Names |
|---|---|
| General Dynamics Defendants | GDC, Bath Iron Works, Electric Boat, and GDIT (as defined below). |
| GDC | General Dynamics Corporation. |
| Bath Iron Works | Bath Iron Works Corporation. |
| Electric Boat | Electric Boat Corporation. |
| GDIT | General Dynamics Information Technology, Inc. |
| Huntington Ingalls Defendants | Huntington Ingalls Industries, Newport News Shipbuilding & Dry Dock, Ingalls Shipbuilding, and Huntington Ingalls Consultancies (as defined below). |
| Huntington Ingalls Industries | Huntington Ingalls Industries, Inc. |
| Newport News Shipbuilding & Dry Dock | Newport News Shipbuilding and Dry Dock Company. |
| Ingalls Shipbuilding | Ingalls Shipbuilding, Inc. |
| Huntington Ingalls Consultancies | HII Fleet Support Group LLC, HII Mission Technologies Corp. |
| Marinette Marine | Marinette Marine Corporation. |
| Bollinger Shipyards | Bollinger Shipyards, LLC. |
| Gibbs & Cox | Gibbs & Cox, Inc. |
| Serco | Serco, Inc. |
| BMT Defendants | BMT International, Inc., Technology Financing, Inc. |

| CACI | CACI International Inc. |
|------|------------------------|
| Columbia | The Columbia Group, Inc. |
| Thor | Thor Solutions LLC. |
| Tridentis | Tridentis, LLC. |
| Faststream | Faststream Recruitment Ltd. |

**INTRODUCTION**

Plaintiffs' complaint alleges, on the strength of an extensive pre-filing investigation, that Defendants—a collection of shipbuilders and engineering companies—conspired to reduce competition and depress compensation in the labor market for naval engineers. The conspiracy, maintained as an unwritten "gentlemen's agreement" among Defendants for more than twenty years, prohibited active recruitment of a Defendant's employees by any other. This is a classic form of anticompetitive agreement and is *per se* unlawful under the antitrust laws.

Plaintiffs' complaint pleads a wealth of direct evidence that is highly unusual for an antitrust complaint. The complaint alleges that witness after witness—former managers of Defendants' businesses with hiring authority over naval engineers—confirmed the existence of the conspiracy and even described it in similar terms: as an unwritten "gentlemen's agreement" prohibiting "poaching" each other's employees. Many of these witnesses are *directly quoted*: for example, one manager at Thor Solutions described a "non-ink-to-paper" agreement that "we would not poach from each other." *Each* Defendant is tied to the conspiracy by *specific* allegations drawn from Plaintiffs' pre-filing investigation. Allegations of such direct evidence are extraordinary at the pleading stage and are more than sufficient, standing alone, to defeat Defendants' contention that the conspiracy is "implausible." *See* section I.A.

Lest there be any doubt, however, the circumstantial evidence Plaintiffs allege affirms the conspiracy's plausibility. Plaintiffs allege each Defendant's parallel conduct, as well as "plus factors" including (1) Plaintiffs' detailed factual allegations about the agreement; (2) Defendants' common motive to keep wages low; (3) Defendants' communications with each other (among themselves and through recruiter Defendant Faststream), including detailed compensation information; (4) the market concentration and barriers to entry in the industry that rendered it conducive to collusion; (5) Defendants' consciousness of guilt evidenced by the "non-ink-to-

paper" nature of the agreement; and (6) that Defendants' parallel conduct makes no sense in the absence of the alleged conspiracy, because each individual firm has strong incentives to actively lure away specialized talent. Defendants posit alternative explanations for their conduct, but the law instructs courts not to weigh competing inferences at the pleading stage. *See* section I.B.

Plaintiffs' claims also are not time barred. Plaintiffs have sufficiently alleged that Defendants fraudulently concealed their conspiracy by (1) orchestrating an *unwritten* "gentlemen's agreement"—one that explicitly departs from ordinary business conduct to prevent discovery of the conspiracy and requires innumerable other affirmative acts of concealment to maintain; (2) inserting sham no-poach provisions into "teaming" agreements; and (3) issuing affirmative public misrepresentations on recruiting pages and investor materials concerning their recruiting practices and compliance with federal law. *See* section II.B. Defendants' arguments to the contrary cannot be squared with—and often wholly ignore—binding Fourth Circuit precedent, including the relaxed pleading standard applied to allegations of fraud by omission or concealment. Defendants argue that Plaintiffs did not exercise due diligence to uncover Defendants' hidden conspiracy, but Defendants ignore the black-letter principle that plaintiffs are not required to investigate wrongdoing of which they are not on inquiry notice. *See* sections II.A, II.B.

Finally, Defendants are simply incorrect that their no-poach agreement—a quintessential horizontal market allocation—is free from *per se* scrutiny under the antitrust laws. At any rate, Plaintiffs plausibly allege a no-poach agreement under the rule of reason. *See* section III.

The joint motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

The large Shipbuilder Defendants—General Dynamics and Huntington Ingalls—operate the only five shipyards in the country used to build large military vessels. ¶¶ 3, 118. The midsize

Shipbuilder Defendants—Bollinger Shipyards and Marinette Marine—operate shipyards focused on smaller military ships. *Id*. The Engineering Consultancy Defendants—Gibbs & Cox, Serco, BMT, CACI, Columbia, Thor, and Tridentis—help design, refit, and maintain nearly every ship in the U.S. fleet. ¶ 3. Behind closed doors, the Engineering Consultancy Defendants refer to themselves as the "Beltway Bandits," with most having offices along a single one-mile stretch of M Street Southeast in Washington, D.C., next to the Washington Navy Yard. ¶¶ 3, 11, 139, 152. In the early 1980s, a conspiracy began among the Engineering Consultancy Defendants then in existence; by the late 1980s, at least one major Shipbuilder Defendant had joined; and by 2000, all then-existing Defendants had joined. ¶¶ 148–49.

Defendants' former executives and managers confirm a standing "gentlemen's agreement" not to poach naval engineers from one other (using exactly those words) that exists to this day. ¶¶ 4, 9, 12, 141–42, 148, 151, 154–58. For instance, one industry veteran acknowledged that his firm did not "go after people at other companies." ¶ 4. And a former insider from Huntington Ingalls said that the company maintained a "do not hire list"—a list of companies from which Huntington Ingalls would not poach naval engineers. ¶¶ 4, 9, 146, 155. Every Defendant has been tied to the no-poach agreement by at least one witness. ¶¶ 4, 142, 146, 148–52, 155–60, 163.

Defendants concealed their agreement throughout the conspiracy by never putting it in writing and maintaining it "as an unwritten 'gentlemen's agreement' among themselves and their executives." ¶ 12; *see also* ¶¶ 4, 9, 141–42, 148, 151, 154–58, 205. An industry insider explained that participants deliberately kept their agreement secret and off-the-books, saying: "They don't put that in writing. You'd be hard pressed to find that in writing." ¶¶ 12, 149; *see also* ¶ 205. And a witness who worked as in-house recruiting staff for a Defendant confirmed the existence of a "non-ink-to-paper" agreement among Defendants that "we would not poach from each other."

¶¶ 12, 156. Instead, they wrote sham, duplicative narrow hiring covenants into "teaming agreements," contracts between competitors laying down rules for cooperative work. ¶¶ 13, 206. The purpose and effect of these provisions was to mislead Plaintiffs and class members as to the existence and scope of the conspiracy, memorializing narrow agreements to conceal the broader conspiracy. ¶ 206. Defendants also stocked their recruiting websites, ethics guidelines, and investor materials with affirmative misrepresentations about the competitiveness of their compensation packages and their compliance with federal laws. ¶¶ 207–18.

As a result of the no-poach agreement, wages for naval engineers have been depressed below competitive levels industry-wide. ¶¶ 1, 141, 184–91. Plaintiffs and class members are highly skilled professionals with specialized knowledge relating to the industry; they also meet citizenship and security clearance requirements which limit the supply of eligible candidates for naval engineering positions. ¶¶ 5-6, 123–25. As one industry insider put it: "[T]here was so much more demand [for employees] than there was talent." ¶¶ 10, 162. Despite the obvious benefits to Defendants of seeking qualified and trained employees from their competitors—and luring them away with higher compensation—there has been no such recruitment in the industry due to the gentlemen's agreement, and wages have remained low. ¶¶ 7–8, 176, 185–91.

To monitor the conspiracy and detect cheating, Defendants directly exchanged salary information at industry conferences, with hiring managers saying things like, "I'm paying $90,000 for my naval architects. What are you doing?" ¶¶ 177, 179. Third-party recruiter Defendant Faststream also facilitated information exchanges among the Engineering Defendants by making presentations at industry conferences that provided "detailed insights into salaries offered to naval engineers throughout the industry." ¶¶ 180–81. And Faststream prepared surveys containing "both

current salary averages for industry positions and specific examples of current salaries at specific companies." ¶ 182. This conduct violates Section 1 of the Sherman Act.

## LEGAL STANDARD

To prevail on a motion to dismiss under Rule 12(b)(6), the Fourth Circuit requires that a complaint "contain sufficient factual matter" to "'state a claim to relief that is plausible on its face.'"[1] *McCleary-Evans v. Maryland Dep't of Transp.*, 780 F.3d 582, 583 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). As the Supreme Court made clear in *Twombly*, this plausibility standard "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 545. Rather, it "requires only that the complaint's factual allegations 'be enough to raise a right to relief above the speculative level.'" *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555).

Indeed, in *SD3, LLC v. Black & Decker (U.S.) Inc.*, the Fourth Circuit urged district courts to "be careful" at the motion-to-dismiss stage "not to subject the complaint's allegations to the familiar 'preponderance of the evidence' standard." 801 F.3d 412, 425 (4th Cir. 2015). "When a court confuses probability and plausibility, it inevitably begins weighing the competing inferences that can be drawn from the complaint. But it is not our task at the motion-to-dismiss stage to determine 'whether a lawful alternative explanation appears more likely' from the facts of the complaint." *Id.* (quoting *Houck*, 791 F.3d at 484)*.* Instead, if a plaintiff's "explanation is plausible, her complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a more plausible alternative explanation." *Houck*, 791 F.3d at 484.

The *SD3* court also cautioned against "import[ing] the summary-judgment standard into the motion-to-dismiss stage," because the "'plausibly suggesting' threshold for a conspiracy

---

[1] Internal citations and quotations omitted and emphasis added throughout.

complaint remains considerably less than the 'tends to rule out the possibility [of independent action]' standard for summary judgment." 801 F.3d at 425. Allegations at the pleading stage need not render implausible a different possible explanation. Finally, when assessing the plausibility of plaintiffs' allegations, courts "accept as true all well-pled facts in the complaint and construe them in the light most favorable to [plaintiffs]." *Id.* at 422.

## ARGUMENT

The Complaint alleges violations of Section 1 of the Sherman Act, which proscribes "[e]very contract, combination, . . . or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. This sole cause of action is based on Defendants' agreement not to poach one another's naval engineers to depress their compensation. This is a *per se* violation of the antitrust laws, "so plainly anticompetitive that no elaborate study of the industry is needed to establish [its] illegality." *Lumber Liquidators, Inc. v. Cabinets to Go, LLC*, 415 F. Supp. 3d 703, 711 (E.D. Va. 2019). ¶ 242. In Section I, Plaintiffs demonstrate, relying on both direct and circumstantial evidence, that this no-poach agreement more than meets the pleading standard.

In Section II, Plaintiffs demonstrate that Defendants' statute-of-limitations arguments lack merit because the Complaint properly alleges fraudulent concealment and continuing violations. Defendants' arguments to the contrary depend on misreadings of case law that are incompatible, not only with the cases themselves, but with recent, on-point Fourth Circuit precedents Defendants fail to engage, especially *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535 (4th Cir. 2019).

Finally, even if this agreement were evaluated under the "rule of reason," which "requires courts to conduct a fact-specific assessment of market power and market structure" in order "to assess the restraint's actual effect on competition," *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018), Plaintiffs establish in Section III that their allegations of market effects are also more than sufficiently plausible to withstand dismissal.

I. **Plaintiffs Have Plausibly Alleged a *Per Se* Unlawful Conspiracy.**

As Judge Lauck explained in *Lumber Liquidators*, "[g]enerally, courts consider restraints that are horizontal in nature, or those imposed by agreement between competitors, to be unreasonable *per se*." 415 F. Supp. 3d at 712. Classic examples include price fixing and market allocation. *See id.* Naked "non-solicitation or no-poach agreement[s]" are a "form of market allocation agreement" and so "fit within an established category of *per se* unlawful restraints." [2] *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 989 (N.D. Ill. 2022); *accord Fonseca v. Hewlett-Packard Co.*, 2020 WL 6083448, at *9 (S.D. Cal. Feb. 3, 2020) ("*Per se* illegality can apply to agreements, such as a no-poach agreement, that depress competition in the employment market."); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 481 (W.D. Pa. 2019) (hereinafter "*Railway*") (*per se* violations include market allocation and "[a]ntitrust law does not treat employment markets differently from other markets"); *see* section III.A, below. Indeed, the Department of Justice's Antitrust Division has made clear that it believes "no-poach" conspiracies to be *per se* violations of the antitrust laws, subject to criminal prosecution, and courts have agreed, rejecting Defendants' motions to dismiss.[3]

Plaintiffs' *per se* antitrust claim can survive Defendants' motions to dismiss if the Complaint alleges plausible "direct" *or* "circumstantial" evidence that Defendants agreed not to

---

[2] Labor conspiracies, including no-poach agreements, also have the purpose and effect of suppressing compensation and are subject to *per se* treatment on a price-fixing theory. *See In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1213 (N.D. Cal. 2015); *see also Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *5 (D. Md. Sept. 16, 2020) (*per se* treatment of wage-fixing conspiracy carried out through exchange of compensation information); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 624 (E.D. Mich. 2012) (same).

[3] *See, e.g.*, *United States v. Patel*, 2022 WL 17404509, at *5–11 (D. Conn. Dec. 2, 2022); *United States v. DaVita Inc.*, 2022 WL 266759, at *8–9 (D. Colo. Jan. 28, 2022), *United States v. Manahe*, 2022 WL 3161781, at *2–3, 8–9 (D. Me. Aug. 8, 2022); *United States v. Jindal*, 2021 WL 5578687, at *4–8 (E.D. Tex. Nov. 29, 2021).

poach one another's engineers. *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 289 (4th Cir. 2012). The Complaint alleges both.

### A.    Plaintiffs have alleged substantial direct evidence of agreement.

The Complaint is replete with direct evidence that Defendants agreed not to poach one another's naval engineers. As the Fourth Circuit has explained, direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). Importantly, direct evidence includes "eyewitness account[s]." *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996). Thus, "an admission by an insider" with knowledge of conspiratorial meetings constitutes "direct evidence of agreement" that violates Section 1 of the Sherman Act. *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 998 (N.D. Ill. 2011). Indeed, courts regard "admissions by employees of the conspirators" as "textbook examples of adequate direct-evidence allegations." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018). "Such evidence is sufficient in [and] of itself to defeat summary judgment"—much less a motion to dismiss. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2013 WL 595122, at *8 (E.D. Cal. Feb. 15, 2013) (citing *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 441 (9th Cir. 1990)).

Contrary to Defendants' argument that the Complaint does not contain satisfactory direct evidence, Joint Mot. at 20–25, Plaintiffs present statements from multiple eyewitnesses confirming that they agreed not to poach one another's naval engineers. ¶¶ 141–60. Defendants mistakenly contend that the Fourth Circuit in *SD3* required direct evidence allegations to establish the "who, what, when and where" of antitrust misconduct. Joint Mot. at 20. But *SD3* did "not determine whether [the plaintiff] ha[d] adequately alleged direct evidence," instead considering only circumstantial evidence and holding that detailed, credible factual allegations served as a plus

factor, or part of "the 'more' necessary to move [the] allegations of parallel conduct into the realm of plausibility." 801 F.3d at 432 n.2., 429. So, Defendants' argument is misplaced: allegations of direct evidence on their *own* establish plausibility, because they require no further details to support an inference of liability. If eyewitnesses have *admitted* the existence of the alleged conspiracy, they need not also furnish details about its execution.[4]

### 1. The Complaint alleges direct evidence of an unwritten "gentlemen's agreement" not to poach naval engineers from competitors.

The Complaint alleges that "[e]xecutives in charge of hiring in the naval engineering industry have long adhered to a 'gentlemen's agreement' that prohibits any Defendant from actively recruiting naval engineers from other Defendants." ¶ 141. Eyewitness managers with hiring authority repeatedly and independently confirmed the existence of this industry-wide "gentlemen's agreement"—using those exact words—not to actively poach from competitors. ¶ 142; *see* ¶¶ 147–60 (collecting and describing witness statements). Indeed, former managers of Defendants confirmed broad agreements among all industry participants. ¶ 145. And a former employee of Faststream, one of a small handful of industry recruiters, confirmed the broad-based gentlemen's agreement. When asked if the Engineering Defendants placed limitations on his ability to recruit naval engineers from other companies, he replied: "100 percent," adding "that happened with everyone." ¶ 163.

The gentlemen's agreement consisted of two major provisions: (1) Engineering Defendants *could not* actively recruit naval engineers from their competitors; and (2) Engineering Defendants *could* hire naval engineers from their competitors when those engineers initiated contact. ¶¶ 9, 146,

---

[4] At any rate, the Complaint furnishes detailed allegations supporting the inference that Defendants' parallel conduct was agreed upon rather than independent. *See* section I.B.2 below.

148, 149, 152, 161.[5] So, for example, one naval engineer attempting to interview with a competitor firm "was required to specify that he had independently pursued the opportunity and not been solicited." ¶ 146. And, as one executive explained, "If Gibbs & Cox offered my guy a position, they'd call me and say, 'We didn't poach him.'" ¶ 152. As the Complaint alleges, however, "[n]o Engineering Defendant, much less *all Engineering Defendants*, would arrive at such a combination of practices independently," because without an agreement they "would have every incentive to recruit each other's employees" given the "education, specialized training, security clearance, and citizenship requirements" that "made the pool of naval engineers small and the cost of replacement significant."[6] ¶¶ 162–63; *see also* ¶¶ 6, 123–25.

Finally, eyewitness accounts also establish detailed facts about the duration of the conspiracy. A manager confirmed that, at least as far back as the early 1980s, a no-poach agreement existed among Gibbs & Cox, JJMA (now Serco), and other engineering consultancies.[7] ¶ 148. And eyewitnesses confirm that the gentlemen's agreement remained in effect through to the present. A manager involved in recruitment for a Defendant engineering consultancy in the mid-to-late 2010s confirmed the existence of a "non-ink-to-paper" agreement against poaching. ¶ 156.

---

[5] *See also* ¶ 153 ("In some circumstances, a Defendant who lost a major contract would allow its employees to be recruited by the winner of the contract.").

[6] Defendants claim that such exceptions "make no sense." Joint Mot. at 21–22. But their own former managers and executives confirmed exactly those rules, and the Court must credit Plaintiffs' allegations. Regardless, one explanation is clear: as the Fourth Circuit stated in *SD3*, "[c]ommercially sophisticated parties like the defendants could well understand the red flags that would be raised from a blanket, total refusal to negotiate." 801 F.3d at 428. Refusing to hire applicants from other competitors *who applied themselves* would drastically increase the risk that their unlawful agreement would be uncovered. Notably, the Defendants in *Animation Workers* were alleged to have had very similar rules against "cold calling" that sometimes permitted hiring employees who applied themselves. 123 F. Supp. 3d at 1181.

[7] That other Defendants joined later does not absolve them of liability. *Baker v. United States*, 21 F.2d 903, 905 (4th Cir. 1927) ("[O]ne may join a conspiracy after it has been formed, and, if he participates knowingly, he becomes a party thereto just as though he conceived the plot.").

A recruiter who placed naval engineers in the industry in the late 2010s stated that they were instructed to avoid recruiting from other companies in the industry. ¶ 157. A manager who left a Defendant in 2019 confirmed the existence of a widespread no-poach "gentlemen's agreement" in the industry. ¶ 158. And "[o]ther witnesses employed in managerial positions as recently as 2022 described ongoing agreements among competitors in the industry not to actively recruit employees from each other." *Id.* Indeed, one executive, who first entered the industry in 1969 and worked his way into management over the next five decades, summed up the long-standing agreement: "You didn't recruit people from other firms." ¶ 7. Each of these pieces of direct evidence strongly counsels against dismissal.

> **2.    The Complaint alleges direct evidence tying each Defendant to the no-poach conspiracy.**

Each Engineering Defendant is linked to the conspiracy through the testimony of at least one witness. ¶¶ 4, 142, 159. This satisfies the Fourth Circuit's requirement in *SD3* that a plaintiff allege that "each defendant conspired" in violation of the antitrust laws. 801 F.3d at 422; *see* Joint Mot. at 21. As stated in *In re Processed Egg Prods. Antitrust Litig.*, plaintiffs need not "plead each defendant's involvement in the alleged conspiracy in elaborate detail." 902 F. Supp. 2d 704, 710 (E.D. Pa. 2012). Indeed, "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 803 (N.D. Ill. 2017). Instead, it is sufficient for a complaint, taken as a whole, to "allege that each individual defendant joined the conspiracy and played *some* role in it." *Processed Egg*, 902 F. Supp. 2d at 715 n.11 (emphasis in original).

Defendants contend that paragraphs such as ¶ 159 should be rejected as "generic group pleading." Joint Mot. at 24. But Defendants ignore the *content* of the paragraphs they seek to

escape: that the allegations tying *each Defendant* to the conspiracy stem in each case from *at least one witness's* statements.[8] *See, e.g.*, ¶¶ 142, 159. In paragraph 159, for example, each witness either named the Defendant as part of the conspiracy, discussed a specific application of the conspiracy to a job candidate, or confirmed the Defendant's no-poaching policy or practice.[9] Those allegations are not conclusory—they specifically describe witness statements as to each Defendant that, if credited, raise a plausible inference of each Defendant's participation in the alleged conspiracy. At this stage, the Court must credit those well-pled allegations.

As the *Jien* court explained, "That factual allegations against [one Defendant] are the same or similar to those made against other Defendants is not evidence that the allegations are insufficient or vague, but rather reflects instead Plaintiffs' specific assertion that it engaged in the same conduct as its competitors." 2021 WL 927456, at *3. And, as the Fourth Circuit stated in *SD3*, there is no requirement that Plaintiffs "plead evidence." 801 F.3d at 431. When a defendant criticizes a confidential witness statement that it participated in a conspiracy as "unsupported by any factual detail"—as Defendants do here—it "improperly reformulates the motion to dismiss inquiry into something more rigorous than it is." *Jien*, 2021 WL 927456, at *5; *see also* Joint Mot. at 23–24. "[T]here is no indication that the allegation in question is speculative" when it includes "a source for the information," *i.e.*, "a former Pilgrim's employee." *Jien*, 2021 WL 927456, at *5.

Defendants also ignore the Defendant-specific allegations below that describe additional details, even quoting witnesses. These belie any notion that Plaintiffs' allegations are too incautious or speculative to be plausible.

---

[8] Notably, Paragraphs 151 and 159 are selective about the Defendants to whom they apply, affirming that Plaintiffs' choices were not arbitrary or unsupported "group pleading."

[9] *See also* ¶ 142 ("Each Engineering Defendant in this action is tied to the conspiracy through the testimony of at least one witness who *verified the party's adherence to the industry's no-poach regime.*")

**General Dynamics Defendants**: The Complaint alleges that the first Shipbuilder Defendant to join the conspiracy (by the late 1980s) was Bath Iron Works, a major shipyard acquired by General Dynamics in 1995. ¶ 148. One of Defendants' former employees stated that BIW participated in the no-poach gentlemen's agreement. ¶ 151; *see also* ¶ 159. At least one witness confirmed the participation in the conspiracy of Electric Boat Corporation and the legacy CSC/CSRA/CSC Advanced Marine Center business unit, some of whose liabilities lie with General Dynamics subsidiary GDIT. ¶¶ 30–31, 142, 159.

**Huntington Ingalls Defendants**: The Complaint alleges that a recruiter from Huntington Ingalls stated that its applicant tracking system contained a "do not hire list" of companies whose employees Huntington Ingalls' recruiters were not permitted to affirmatively recruit, including at least General Dynamics, its biggest shipbuilder competitor. ¶¶ 146, 155; *see also* ¶ 159. At least one witness confirmed the participation in the conspiracy of Huntington Ingalls Industries, Inc., Newport News Shipbuilding, Ingalls Shipbuilding, AMSEC LLC (now HII Fleet Support Group LLC), and the legacy JJMA business unit, some of whose liabilities lie with HII Mission Technologies Corp. ¶¶ 43–55, 142, 159.

**Marinette Marine**: The Complaint alleges that at least one of Defendants' former employees stated that it participated in the gentlemen's agreement not to recruit naval engineers from competitors. ¶ 151; *see also* ¶ 159.

**Bollinger Shipyards**: The Complaint alleges that a recruiter stated that they were instructed to avoid recruiting from other companies in the industry and recalled in particular that Bollinger Shipyards stated that it could not hire a candidate from Alion (now Serco), despite the candidate being an otherwise perfect fit. ¶ 157; *see also* ¶ 159.

**Gibbs & Cox**: The Complaint alleges that the conspiracy began in the early 1980s among the Engineering Consultancy Defendants, including Gibbs & Cox and JJMA (now Serco). ¶ 148. A recruiter who placed naval engineers in the industry in the late 2010s recalled an attempt to place a Gibbs & Cox employee that was stymied by an agreement not to recruit. ¶ 157. A manager who worked in the industry during the last five years confirmed the existence of a no-poach agreement among naval engineering competitors, including at least Gibbs & Cox and Alion (now Serco). ¶ 158. And one of Defendants' executives involved in recruiting confirmed that consultancies, including at least Gibbs & Cox, JJMA/Alion (now Serco), CSRA (now CACI), Columbia, and Tridentis, referred to each other collectively as the "Beltway Bandits" and shared an agreement among themselves not to actively recruit each other's employees. ¶ 152; *see also* ¶ 159.

**Serco**: The Complaint alleges that the conspiracy began in the early 1980s among the Engineering Consultancy Defendants, including JJMA (now Serco) and Gibbs & Cox. ¶ 148. The Complaint alleges that a recruiter stated that they were instructed to avoid recruiting from other companies in the industry and recalled in particular that Bollinger Shipyards stated that it could not hire a candidate from Alion (now Serco). ¶ 157. And an executive for Gibbs & Cox reported that he overheard a colleague say to another colleague in regard to recruiting a potential candidate, "He works for JJMA [now Serco], we can't do that." ¶ 152. Serco was also identified as one of the Beltway Bandits subject to a no-poach agreement among the Engineering Consultancy Defendants. *Id.*; *see also* ¶ 159.

**CACI**: At least one of Defendants' former employees stated that CACI's predecessor naval engineering unit participated in the no-poach gentlemen's agreement. ¶ 151. And CACI was also identified as one of the Beltway Bandits subject to a no-poach agreement among the Engineering Consultancy Defendants. ¶ 152; *see also* ¶ 159.

**Columbia**: Plaintiffs allege at least one of Defendants' former employees stated that it participated in the gentlemen's agreement not to recruit naval engineers from competitors. ¶ 151. Columbia was also identified as one of the Beltway Bandits subject to a no-poach agreement among the Engineering Consultancy Defendants. ¶ 152; *see also* ¶ 159.

**Thor**: Plaintiffs allege that a manager involved in recruitment for Thor in the mid-to-late 2010s confirmed the existence of a "non-ink-to-paper" agreement among Thor and companies with which it worked, including Alion (now Serco), that "we would not poach from each other." ¶ 156; *see also* ¶ 159.

**Tridentis**: An executive employed by one of the Beltway Bandits identified Tridentis as one of its members subject to a no-poach agreement among the Engineering Consultancy Defendants. ¶ 152; *see also* ¶ 159.

\* \* \* \* \*

These allegations of direct evidence establishing the agreement—as well as key details and participants—are alone sufficient to plead a plausible no-poach conspiracy. *See, e.g., Giordano v. Saks. Inc.*, 654 F. Supp. 3d 174, 197–98 (E.D.N.Y. 2023) (witnesses who "confirmed the existence of the no-hire agreements between Saks and each of the Brand Defendants" and "their adherence to the no-hire agreement" were "sufficient [to] allege[] the existence of an anticompetitive agreement."); *Robertson*, 679 F.3d at 289 ("Circumstantial evidence sufficient to suggest a preceding agreement is [] superfluous in light of the direct evidence . . . .").

**B.      Plaintiffs have alleged substantial circumstantial evidence of the conspiracy.**

The Complaint also presents circumstantial evidence that reinforces the plausibility of the no-poach conspiracy. In the absence of direct evidence, courts often determine the plausibility of a conspiracy by circumstantial evidence, looking for parallel conduct and something "more," referred to as "plus factors," that "render the [conspiracy] allegations plausible." *In re Interior Molded Doors Antitrust Litig*, 2019 WL 4478734, at *4 (E.D. Va. Sept. 18, 2019) (citing *Twombly*,

550 U.S. at 557, and *SD3*, 801 F.3d at 424). Plaintiffs' direct evidence is sufficient standing alone, but the parallel conduct and plus factors Plaintiffs allege reinforce that the conspiracy described by witnesses fits the conditions in the naval engineering industry.

According to the Fourth Circuit in *SD3* and the Eastern District of Virginia in *Interior Molded Doors*, plus factors include (1) "detailed fact allegations as to . . . the claimed antitrust misconduct";[10] (2) allegations of "motivation for common action"; (3) allegations of "communications among the defendants"; (4) allegations of a "market in which [] power is concentrated"; (5) allegations that defendants' "attempted to hide their actions"; and (6) allegations of behavior that "makes no business sense absent an illegal agreement." *SD3*, 801 F.3d at 430–32 (factors 1–5 above); *Interior Molded Doors*, 2019 WL 4478734, at *6–7 (factors 3–6). Courts "evaluate plus factors holistically and weigh them together with the allegations of parallel conduct," because allegations that "alone seem neutral 'can take on a different shape when considered in conjunction with other surrounding circumstances.'" *Interior Molded Doors*, 2019 WL 4478734, at *4 (quoting *SD3*, 801 F.3d at 242–43).

### 1. Plaintiffs allege the parallel conduct of each Engineering Defendant participating in the gentlemen's agreement not to poach one another's naval engineers.

The Fourth Circuit stated in *SD3* that a "plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly." 801 F.3d at 427. Here, the parallel conduct is just as "obvious" as it was in *SD3*, which alleged a group boycott in which the Defendants all failed to take licenses for the Plaintiff's technology. *Id.* at 427–28. As discussed above in section

---

[10] Defendants make much of *SD3*'s "who, what, when, and where" language used in describing this factor, but the case offers no support for Defendants' reading that Plaintiffs must offer details about each to sustain the plausibility of the conspiracy. Joint Mot. at 20. Rather, details like these work with allegations of parallel conduct and other plus factors to establish the conspiracy's plausibility. Where, as here, direct evidence of the conspiracy is alleged, that plausibility is overdetermined. Plaintiffs nonetheless provide considerable detail. *See* section I.B.2 below.

I.A.2, the Complaint alleges that each Engineering Defendant participated in the gentlemen's agreement not to poach one another's naval engineers. It alleges each Defendant followed the same hiring practices with respect to their naval engineers. ¶ 161. Defendants do not dispute that the Complaint alleges parallel hiring practices. Joint Mot. at 26–27.

### 2.   Plaintiffs allege plus factors that, together with the parallel conduct, establish the plausibility of Defendants' no-poach agreement.

#### (a)   Plaintiffs' detailed fact allegations support its plausibility.

The Fourth Circuit recognized in *SD3* that complaints "that include detailed fact allegations . . . of the claimed antitrust misconduct not surprisingly survive dismissal." 801 F.3d at 430. Such detail is not strictly necessary—all that is required, after all, is "that the complaint's factual allegations be enough to raise a right to relief above the speculative level." *Houck*, 791 F.3d at 484. But when a complaint does offer such detail "of 'further circumstances pointing towards a meeting of the minds,'" a plaintiff addresses "*Twombly*'s principal concern by" "allay[ing] the suspicion that the plaintiff is merely speculating a conspiracy into existence from coincidentally similar action." *SD3*, 801 F.3d at 430 (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs have done just that here. As explained above, Plaintiffs describe, in detail, each Defendant's participation in the no-poach conspiracy, the nature of the agreement, its temporal scope, and even methods of enforcement, *see* section I.A.2; ¶¶ 178–83. Setting aside that many of these allegations are direct evidence, their specificity and detail serve to rule out the possibility that Plaintiffs are "speculating" a conspiracy from "coinciden[ce]." *SD3*, 801 F.3d at 430.

#### (b)   Plaintiffs' allegations regarding Defendants' motivation for common action support the plausibility of agreement.

"[M]otivation for common action is a key circumstantial fact." *SD3*, 801 F.3d at 431. Defendants incorrectly state otherwise. Joint Mot. at 32 (citing instead *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015)). Here, Defendants share financial

incentives to constrain recruitment and maintain low salaries. Because the "demand for naval engineering talent far outstrips the pool of available personnel," under ordinary circumstances, "this imbalance between supply and demand would put tremendous upward pressure on salaries." ¶ 168. Together, however, the Engineering Defendants "can maintain stable, low wages in the industry by limiting the avenues through which they compete with each other for talent." *Id.*; *see also* ¶ 169. Defendants also face shared pressure from government customers to keep costs low, which incentivized each to collude with competitors to constrain labor costs. *Id.* Defendants alternatively posit that this shared pressure created an independent incentive for Defendants not to recruit from one another, but this ignores direct evidence to the contrary, *see* section I.A above, and requires weighing inappropriate at the motion-to-dismiss stage, *see* section I.B.3 below.

### (c)   Plaintiffs' allegations of communications and information sharing among Defendants support its plausibility.

In *SD3*, the Fourth Circuit emphasized that "[a]llegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire"[11] 801 F.3d at 432. Moreover, in *Todd v. Exxon Corp.*, the Second Circuit stated that "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." 275 F.3d 191, 198 (2d Cir. 2001). And *Todd* explained that the "characteristics of [] data exchange . . . that arouse suspicion of anticompetitive activity" include current, specific, and non-public information. *Id.* at 211–13.

Defendants assert that Plaintiffs "do not allege a single inter-firm communication, despite having 'confidential witnesses.'" Joint Mot. at 33. They are wrong; the Complaint alleges many

---

[11] *See also Interior Molded Doors*, 2019 WL 4478734, at *5; *D&M Farms v. Birdsong Corp.*, 2020 WL 2501444, at *3 (E.D. Va. May 14, 2020) ("Defendants had numerous opportunities to make such an arrangement by virtue of geographic proximity and the social and professional associations of the Defendants' leadership structure.").

such communications. *See, e.g.,* ¶ 152 ("If Gibbs & Cox offered my guy a position, they'd call me and say, 'We didn't poach him.'"); ¶ 179 (recruiter witness noting that at industry conferences, hiring managers would exchange salary information, saying things like "I'm paying $90,000 for my naval architects. What are you doing?"). Indeed, the gravamen of the suit is that Defendants *agreed* with each other not to poach each other's employees, and the allegations explain how this close-knit industry offered countless opportunities to strike, maintain and enforce this agreement.

Here, the Complaint alleges that the naval engineering industry is small and geographically concentrated, with close ties between firms; several witnesses described it as "incestuous." ¶¶ 135, 143, 171. Beyond "bump[ing] into each other on the street" near the Washington Navy Yard, ¶ 139, and working closely on projects, ¶ 137, Defendants' executives also met regularly at industry conferences, where they exchanged competitively sensitive information. ¶ 179. The Engineering Defendants also used Defendant Faststream as a conduit for exchanging sensitive information. ¶¶ 178–83. Defendants cannot wish these allegations away.

### (d) Plaintiffs' allegations of market concentration and other market factors conducive to collusion support its plausibility.

Allegations of a "market in which [] power is concentrated in the hands of the few" can facilitate collusion and thus support its plausibility. *SD3*, 801 F.3d at 432; *accord Interior Molded Doors,* 2019 WL 4478734, at *6 (noting that high barriers to entry and market concentration enable collusion). Fewer "minds" must "meet" in a concentrated market, and concentration "enable[s] firms . . . to be able to detect cheating." *Interior Molded Doors,* 2019 WL 4478734, at *6. "Because

industry structure that facilitates collusion constitutes supporting evidence of collusion, the nature of the [] market qualifies as a significant plus factor."[12] *Id.*

Here, power is quite concentrated, as "Defendants collectively employ approximately three out of four of the naval engineers in the United States." ¶ 198. In addition, naval engineering firms "face high barriers to entry given the contract-based, relationship-driven, and specialized nature of the work," which is dependent on years spent developing trust and reputation among government customers and peer firms. ¶ 167. These barriers prevent new competitors from taking market share from conspirators, ensuring the industry remains concentrated and rendering the conspiracy more plausible. *See Interior Molded Doors*, 2019 WL 4478734, at *6.

> ### (e)    Plaintiffs' allegations that Defendants attempted to hide their actions support the Complaint's plausibility.

In *SD3*, the Fourth Circuit stated that the defendants' "attempt[] to hide their actions, including a mutual agreement not to leave a paper trail," bolstered the plausibility of collusion because it "suggest[ed] consciousness of guilt." 801 F.3d at 432; *see also Interior Molded Doors*, 2019 WL 4478734, at *6. Here, that the conspiracy was maintained as a "non-ink-to-paper" "gentlemen's agreement" that Defendants "don't put [] in writing" and pass on "only as verbal instructions" also strongly suggests consciousness of guilt. ¶¶ 12, 142, 149, 156; *see also generally* section II, *infra*.

---

[12] Defendants again ignore on-point authorities from this Circuit, relying instead on an out-of-circuit *summary judgment* case in which the question was not whether high barriers to entry render a conspiracy more *plausible*, but whether such barriers *tend to rule out* permissible conscious parallelism. *Compare* Joint Mot. at 32 (quoting *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011)) *with White*, 635 F.3d at 577. Regardless, Plaintiffs need not, but do, plead a wealth of evidence, including witness statements, tending to rule out legal uncoordinated oligopoly behavior.

**(f)    Defendants' actions against independent self-interests support the Complaint's plausibility.**

In *Interior Molded Doors*, Judge Gibney noted that behavior that "makes no business sense absent an illegal agreement" also bolsters the plausibility of anticompetitive conduct. 2019 WL 4478734, at *6–7 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)); *see also id.* at *7 (citing *SD3*, 801 F.3d at 430) (reasoning that "evidence that [the defendant] acted contrary to its interests" makes "the plaintiffs' allegation of a conspiracy more plausible"). Similarly, in *Outpatient Medical Center*, the court stated that the no-poach agreements at issue were "contrary to [the defendants'] self-interest because outpatient medical services experience is highly valued" and "lateral hiring allows Defendant to avoid investing significant resources identifying, assessing, and training." 630 F. Supp. 3d at 985. Thus, it was "reasonable to infer" that "Defendants would only forfeit the advantages gained from soliciting and hiring their competitors' employees in exchange for promises that their top competitors would not solicit or hire each other's employees." *Id.* (quoting *Railway*, 395 F. Supp. 3d at 488). So too here.[13] *See* ¶¶ 161–65, 176–77. As the Complaint alleges, absent a no-poach conspiracy, Engineering Defendants "would have every incentive to recruit each other's employees" given the "education, specialized training, security clearance, and citizenship requirements" that "made the pool of naval engineers small and the cost of replacement significant." ¶¶ 162–63.

\* \* \* \* \*

---

[13] Defendants also acted against their self-interest by exchanging competitively sensitive compensation information, as discussed in section I.B.2.c above. As the Complaint alleges, "[i]n a competitive market—particularly one with a shortage of qualified workers—a firm acting in its unilateral self-interest would not share its compensation information with rivals because it would tell rivals how much they needed to offer to poach employees." ¶ 177.

As in *Interior Molded Doors*, Defendants "try to disaggregate the various plus factors, knocking down each individual allegation as insufficient to show that the defendants conspired." 2019 WL 4478734, at \*7. But Judge Gibney declined to "parse each 'plus factor' individually and ask whether that factor, standing alone, would be sufficient to provide the 'more.'" *Id.* (quoting *SD3*, 801 F.3d at 425); *see also D&M Farms*, 2020 WL 2501444, at \*3 ("[W]hile none of the Complaint's allegations are sufficient to state a Section 1 claim when considered in isolation, the totality of the factual assertions within the Complaint give rise to the plausible inference of a [] conspiracy."). Indeed, as the Supreme Court instructs, the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

Viewed together, Plaintiffs' "allegations of parallel conduct and plus factors are sufficient to survive a motion to dismiss," even on their own. *Interior Molded Doors*, 2019 WL 4478734, at \*7. In combination with Plaintiffs' direct evidence of the conspiracy, however, Plaintiffs' allegations also strongly rule out Defendants' non-conspiratorial explanations.

### 3. Because Plaintiffs plausibly allege a no-poach conspiracy, Defendants' "alternative explanations" are immaterial.

As discussed above, the Fourth Circuit has repeatedly underscored that if a plaintiff's "explanation is plausible, her complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a more plausible alternative explanation." *Houck*, 791 F.3d at 484; *see also SD3*, 801 F.3d at 425. So this Court should not "weigh[] the competing inferences that can be drawn from the complaint." *SD3*, 801 F.3d at 425. Defendants ignore this well-settled law

by inviting the Court to credit their alternative explanations for their conduct. Joint Mot. at 26–31; *see also id.* at 24, 32–33. In any event, these alternative explanations are unconvincing.[14]

Defendants argue that their unilateral self-interest explains their parallel refusal to recruit for five reasons. *First*, they claim that Plaintiffs fail to allege that "Defendants would have poached from rivals absent the agreement." Joint Mot. at 27. This is plainly wrong; the complaint repeatedly alleges that in a competitive market, Defendants would have recruited aggressively from each other due to the "inadequate supply" of highly skilled naval engineers.[15] *See* ¶¶ 6, 8–10, 123–26, 162–65, 176. *Second*, Defendants argue that they often work closely with one another and have an "independent incentive to maintain good relations" by not recruiting from competitors. Joint Mot. at 28. But this is Defendants' spin on the facts, inviting improper inferences *against* the Plaintiffs, and does not render Plaintiffs' account, *supported by eyewitnesses*, implausible. Indeed, Defendants' focus on the allegation that "companies that recruit rivals' employees don't stay around that long because [other] companies don't want to work with them" ignores the inference that companies don't want to work with them precisely because the rest have a gentlemen's agreement not to poach from rivals. Joint Mot. at 27–28 (citing ¶ 171); *see also* ¶ 198.

*Third*, Defendants argue that the hiring of naval engineers who reach out to them is in Defendants' self-interest because such hires will not harm "cooperative relationships with other firms." Joint Mot. at 28–29. Of course, in many competitive markets, including law firms, competitors aggressively recruit from each other but nonetheless maintain cooperative

---

[14] Defendants inexplicably claim that "Plaintiffs fail to allege facts indicating that Defendants' practices resulted from anything more than . . . independent self-interest"—notwithstanding many witness statements confirming the existence of the "gentlemen's agreement," which is plainly the opposite of independent action. Joint Mot. at 26–27; *see* section I.A, above.

[15] In contrast, in *Kelsey K. v. NFL Enters., LLC* there was no allegation of a "shortage of cheerleading services"; on the contrary, the complaint alleged that the cheerleader plaintiffs were told they "could be quickly replaced." 254 F. Supp. 3d 1140, 1147 (N.D. Cal. 2017).

relationships. In *this* market, however, an anticompetitive agreement determines which kinds of competition are "fair play." ¶ 153.

*Fourth*, in arguing that Plaintiffs do not allege inter-firm enforcement, Defendants ignore Plaintiffs' allegations. Joint Mot. at 29; *compare* ¶ 149 ("[The conspiracy] was . . . enforced when necessary by phone calls among high-level employees."); ¶ 220 ("Defendants enforced the conspiracy through private phone calls between high-level executives and unofficial retribution through the companies' many working relationships."); Compl. § VI.C ("Defendants monitored and enforced the no-poach agreement . . . by sharing information directly and through third parties."). *Fifth*, Defendants' assertion that naval engineers would not move for a higher salary is factually wrong (people move all the time for work, particularly in specialized fields with dispersed pockets of employment), and at minimum in dispute, *see* ¶ 197. Defendants' assertion is also highly speculative, as it makes claims about a counterfactual world. Joint Mot. at 29–30.

Thus, this case is not like *Twombly* where the plaintiffs did "not [rest their claim] on any independent allegation of actual agreement" and the former monopoly status of the industry was "an obvious alternative explanation." 550 U.S. at 564, 567–68; *see* Joint Mot. at 30–31. Rather, like in *D&M Farms*, where Judge Jackson rejected the defendants' "preferred interpretation" that prices "were a response to natural market forces and . . . not the price fixing conspiracy," here the Complaint is "not definitively contradicted by an obvious alternative explanation" that renders Plaintiffs' conspiracy implausible. 2020 WL 2501444, at *2–3. Instead, Plaintiffs' "allegations are economically plausible" because "no-hire agreements benefit employers at the expense of employees by lowering employee mobility and depressing wages." *Giordano*, 654 F. Supp. 3d at 198 (citing *Turner v. McDonald's USA*, 2020 WL 3044086, at *1–2 (N.D. Ill. Apr. 24, 2020)).

Competing *plausible* explanations are not for the Court to weigh at this stage. *SD3*, 801 F.3d at 432; *Houck*, 791 F.3d at 484. Accordingly, the motion to dismiss the *per se* claim should be denied.

## II.    Plaintiffs' Claims Are Timely.

Defendants further contend Plaintiffs have not adequately alleged that Defendants fraudulently concealed their unlawful conspiracy—and therefore may not toll the statute of limitations from the beginning of the Class Period through April 2023. Joint Mot. at 13–19. If they prevail on this point, Defendants argue that because neither named Plaintiff has worked in the naval engineering industry since 2013, Plaintiffs' claims are time-barred and the case should be dismissed. *See id.* at 9. This argument fails twice: first, because it ignores the Fourth Circuit's explicitly flexible approach to fraudulent concealment in cases (like this one) involving allegations of fraud by omission or concealment; and second, because even on its own terms it requires a mischaracterization of the allegations in Plaintiffs' complaint.[16]

### A.    Defendants misread the Fourth Circuit's broad fraudulent concealment and Rule 9(b) pleading standards.

Defendants argue the Complaint does not allege Defendants' fraudulent concealment with adequate specificity. *See id.* at 13–19. Their position is incompatible with Fourth Circuit precedent on fraudulent concealment, including the circuit's most recent (and most fulsome) exposition of the doctrine in *Edmonson v. Eagle National Bank*. 922 F.3d 535 (4th Cir. 2019). Tellingly, Defendants fail to even cite—must less distinguish—*Edmonson*,[17] which establishes a broad fraudulent concealment standard that instructs courts to "hesitate to dismiss a complaint . . . if the

_____

[16] Even if Defendants were correct that Plaintiffs' claims were time-barred, nothing would prevent Plaintiffs from amending the complaint to include a Plaintiff employed by Defendants during the limitation period.

[17] This omission is particularly galling because Defendants quote without citing *Edmonson*, through *Corder v. Antero Resources Corp.*, 57 F. 4th 384 (4th Cir. 2023), another precedent Defendants fail to meaningfully engage. Joint Mot. at 13.

- 24 -

court is satisfied (1) that the defendant has been made aware of the particular circumstances for which it will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* at 553.

"Fraudulent concealment is 'an equitable doctrine . . . read into every federal statute of limitations' that 'does not stop the clock; it moves the clock, starting it from when the wrong was discovered rather than when it was committed.'" *Taylor v. United States*, 2011 WL 9160526, at *1 (E.D. Va. May 3, 2011) (Trenga, J.) (quoting *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 177–78 (4th Cir. 2007)). "The purpose of the fraudulent concealment tolling doctrine is to prevent a defendant from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until' the defendant can 'plead the statute of limitations to protect it.'" *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995); *accord Edmonson*, 922 F.3d at 549 (quoting this language). The doctrine's broad equitable purpose looms large here, as "private enforcement of antitrust laws is an 'integral part of the congressional plan for protecting competition." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021). Indeed, "the legislative history of [§ 4B of the Clayton Act] suggests that in enacting [that provision,] Congress knew and approved of the applicability of the fraudulent concealment doctrine in antitrust cases." *Marlinton*, 71 F.3d at 124 n.2; *accord* Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES ¶ 320a (4th & 5th eds. 2018–2023).

The Fourth Circuit has consistently applied these principles in a three-step test: "[T]o toll a limitations period based on fraudulent concealment, 'a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.'" *Edmonson*, 922 F.3d at 548 (quoting *Marlinton*, 71 F.3d at 122).

Though fraudulent concealment allegations must be pled with Rule 9(b) particularity, courts recognize that when a defendant hides its wrongdoing "by omission or concealment, . . . [the] critical facts related to such allegations are uniquely within the defendant's knowledge and control." *Corder v. Antero Res. Corp.*, 57 F. 4th 384, 401 (4th Cir. 2023). For this reason, the Fourth Circuit applies a "relaxed" standard to allegations of "fraud by omission or concealment." *Id.* at 401–02.[18] This "relaxed" standard reflects a commonsense reality: "Rule 9(b) is less strictly applied with respect to claims of fraud by concealment or omission of material facts, as opposed to affirmative misrepresentations, because an omission cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation." *Donaldson v. Primary Residential Mortg., Inc.*, 2020 WL 3184089, at *12 (D. Md. June 12, 2020).[19] The alternative—"[a]pplying the ordinary Rule 9(b) standard in such cases"—"would 'create a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery.'" *Corder*, 57 F. 4th at 402 (quoting *Emery*, 134 F.3d at 1323); *see also Emery*, 134 F.3d at 1323 (noting that discovery is needed because the essential information is in defendants' possession and unavailable before filing the complaint). When push comes to shove, "a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made

---

[18] *Accord George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016); *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

[19] *Accord Oak Plaza, LLC v. Buckingham*, 2023 WL 2537661, at *17 (D. Md. Mar. 16, 2023) ("Courts recognize […] that, '[i]n cases involving alleged fraud by omission or concealment, it is well-nigh impossible for plaintiffs to plead all the necessary facts with particularity.'" (quoting *Corder*, 57 F.4th at 403)); Wright & Miller, 4 FED. PRAC. & PROC. CIV. § 1298 (4th ed. 2015) ("[C]ourts may relax Rule 9(b)'s fraud pleading requirement if the defendant is alleged to have concealed the facts that would permit the plaintiff to plead fraud with particularity.").

aware of the particular circumstances for which it will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."[20] *Corder*, 57 F.4th at 401. Defendants' suggestion that Plaintiffs must plead precisely drawn details of acts of concealment that Defendants themselves have obscured is not the law.

> **B.      The complaint credibly alleges fraudulent concealment with more than adequate particularity.**

Applying the three-part *Edmonson* test in light of the flexible standard applied to allegations of fraud by omission or concealment, the complaint more than sufficiently alleges each of the elements of fraudulent concealment.

> **1.      Defendants affirmatively concealed their no-poach agreement.**

To satisfy the first element of fraudulent concealment, "a plaintiff must provide evidence of affirmative acts of concealment by the defendants." *Edmonson*, 922 F.3d at 553. As noted above, "[t]hose acts . . . need not be separate and apart from the acts of concealment involved in the antitrust violation," and may instead "include acts of concealment involved in the alleged antitrust violation itself." *Marlinton*, 71 F.3d at 126. Allegations that "the defendant employed some trick or contrivance intended to exclude suspicion and prevent inquiry" are sufficient. *Edmonson*, 922 F.3d at 553. The complaint satisfies this flexible standard in at least three ways.

***Orchestrating an unwritten gentlemen's agreement.*** *First*, the complaint alleges in detail

---

[20] Defendants' language as to the details of time, place, and contents of a misrepresentation and the details of the malfeasor emerge from a context in which the gravamen of the complaint subject to Rule 9(b) is an affirmative fraud. *Harrison v. Westinghouse Savannah River Co.*, from which *Edmonson* draws this formulation, is exactly such a case. 176 F.3d 776, 783–84 (4th Cir. 1999). In such cases, details of the alleged misrepresentation(s), which plaintiffs would be expected to know, protect defendants from "frivolous suits" alleging only "fraud by hindsight" in which a plaintiff recasts the bad results of a business transaction as an unspecified fraud. *Id.* at 784. Beyond this paradigmatic fraud case, the facts may not fit this *Harrison* formulation precisely and different policy concerns animate the doctrine, as the cases cited above make plain.

the lengths to which Defendants and their top executives went to prevent Plaintiffs from discovering their conspiracy. As the complaint explains, one witness after another "directly confirmed that [Defendants] had a standing 'gentlemen's agreement' not to poach naval engineers from other conspirators (using exactly those words)." ¶ 4. Defendants "concealed their agreement throughout the conspiracy by never committing it to writing and instead maintaining it as an unwritten 'gentlemen's agreement' among themselves and their executives." ¶ 12. "As one industry insider explained, 'They don't put that in writing. You'd be hard pressed to find that in writing,'" while another "witness who worked as in-house recruiting staff for a Defendant confirmed the existence of a 'non-ink-to-paper' agreement between Defendants that 'we would not poach from each other.'" ¶ 12; *see also* ¶ 149 ("The agreement was never reduced to writing and passed on only as verbal instructions from executives to managers.").

Defendants' deliberate maintenance of this unlawful conspiracy as an unwritten "gentlemen's agreement" betrays the participants' intent and action to conceal the conspiracy. The phrase self-evidences an affirmative departure from the ordinary course of business: *this* agreement, unlike *ordinary* agreements, must rely, not on the legal enforceability of words on paper but on a "gentlemanly" code of honor among thieves and the unofficial enforcement mechanisms of a close-knit industry.[21] The decision to depart from the ordinary course of business to keep their agreement secret is exactly the kind of "contrivance" designed to "exclude suspicion and prevent inquiry" that *Edmonson* holds are affirmative acts of concealment. 922 F.3d at 553; *see also Animation Workers*, 123 F. Supp. 3d at 1201 (allegations that Defendants' "intentionally

---

[21] Even if there were some innocent reason why Defendants would deliberately choose not to memorialize their agreement in writing—and none occurs to Plaintiffs—the Court must nonetheless draw reasonable inferences in favor of the Plaintiffs and hypothesize the wrongful motive rather than the innocent one.

cho[se] to meet in-person or over the telephone, rather than risk memorializing details about the alleged conspiracy" raised "the reasonable inference that Defendants took affirmative steps to conceal the details of their conspiracy"); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1065–67 (N.D. Cal. 2015) (allegations that the defendants "generally agreed not to discuss the public nature of the scheme," and "did not take or distribute official minutes or record the meetings" supported fraudulent concealment).[22]

Beyond the simple agreement to keep the conspiracy secret, the *maintenance* of a conspiracy of this breadth and length in time necessarily required myriad affirmative acts of concealment from all participants, from the beginning of the class period through the present. These acts include each Defendant's decision to join the conspiracy and keep it secret—at least for Defendants like Thor, Tridentis, Serco, CACI, and Columbia, which joined after the beginning of the class period. They also include continuous affirmative acts of concealment every time new hiring managers and executives were "read into" the conspiracy and directed to keep it secret. Every decision to communicate about the conspiracy via unrecorded communication rather than in writing was another act of concealment. That the conspiracy was maintained so long, and remained secret, leads inevitably to the conclusion that these acts of concealment must have occurred continuously throughout the class period. The Court should draw the reasonable inference in Plaintiffs' favor that Defendants must have performed myriad affirmative acts of concealment within their exclusive knowledge.

These are exactly the kinds of "acts of concealment involved in the alleged antitrust violation itself" that also serve as acts of fraudulent concealment. *See Marlinton*, 71 F.3d at 126;

---

[22] The Ninth Circuit has a nearly identical fraudulent concealment standard to the Fourth Circuit's. *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).

*accord Edmonson*, 922 F.3d at 553. And these acts are alleged with more than enough particularity to put each Defendant on notice as to "the particular circumstances for which it will have to prepare a defense at trial." *Edmonson*, 922 F.3d at 553. These allegations are likewise more than enough to demonstrate Plaintiffs' possession of "substantial prediscovery evidence" of the fraud alleged in the complaint. *Id.* Indeed, Plaintiffs bring to bear statements from witnesses who participated in the conspiracy describing their conspiracy as a "gentlemen's agreement" or a "non-ink-to-paper" agreement—establishing Defendants' fraudulent concealment straight from the horse's mouth. As such, Plaintiffs' allegations satisfy Rule 9(b) as applied to fraud by omission or concealment.

Defendants argue these acts are mere "failure[s] to disclose [the] alleged conspiracy." Joint Mot. at 14. But they are wrong to suggest the "affirmative acts" standard categorically excludes decisions to conceal a conspiracy by omitting or withholding information or by departing from an ordinary course of action that would reveal the conspiracy. *See Corder*, 57 F.4th at 401 (applying "relaxed" 9(b) standard to "allegations of *fraud by omission or concealment*"); *Oak Plaza, LLC*, 2023 WL 2537661, at *17 (applying *Edmonson* and *Corder* and finding allegations of fraudulent concealment sufficient where defendants allegedly signed a private agreement to escrow funds and then secretively withdrew and disbursed those funds); *Grand Strand & Water & Sewer Auth. v. Oltrin Sols., LLC*, 2015 WL 13469927, at *4–*5 (D.S.C. Mar. 30, 2015) (concealment sustained where one defendant's letter reassigning plaintiff's contract to another defendant stated contract would otherwise continue normally).

In the cases Defendants cite to support their argument to the contrary, the defendant's alleged failure to disclose had *not* "wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987); *see Edmonson*, 922 F.3d at 549; *Marlinton*, 71 F.3d at 125.

In *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, the plaintiff claimed the defendants had "conspired to control the pricing and delivery of coal," and that "National Mines's [a defendant's] termination of the mining agreements with Pocahontas and Coal America [another contractor] was part of a general conspiracy among defendants" to drive Pocahontas and other competitors out of business. 828 F.2d 211, 215 (4th Cir. 1987). "The specific claim of concealment" on which the case (exclusively) turned was that . . . Pocahontas inquired of National Mines why National Mines refused to accept certain deliveries of coal and why the price paid for delivered coal was so low," and, "[i]nstead of responding that the pricing and delivery policies were the result of concerted, illegal antitrust activity, National Mines responded that the delivery quotas were due to a railroad strike that affected National Mines' ability to store the coal and that the pricing simply was the maximum allowable." *Id.* at 218. The court held the plaintiff's "timid inquiry," and the defendant's answer, did not suffice because "'[f]raudulent concealment' implies conduct more affirmatively directed at deflecting litigation . . . and 'due diligence' contemplates more than the unpursued inquiry allegedly made by Pocahontas." *Id.* at 219.

Defendants suggest the case means that "[a]llegations that defendants . . . did not acknowledge the agreement when asked," are not affirmative acts of concealment "as a matter of law." Joint Mot. at 14–15. The plain language of the standard forbids this interpretation; if the plaintiffs in *Pocahontas* had directly asked about the conspiracy and the defendants had denied its existence, that would be an affirmative act designed to "wrongfully deceive[] or misle[a]d the plaintiff in order to conceal the existence of a cause of action." *English*, 828 F.2d at 1049. But that is not what happened. Instead, in *Pocahontas*, the allegations did not support the inference that National Mines's conduct was deceitful or misleading, because Pocahontas's inquiry did not address the alleged wrongdoing at all. Pocahontas asked only why certain deliveries were refused

or prices were low; it did not ask if deliveries were refused and prices low because of National Mines' participation in a conspiracy to drive Pocahontas out of business in furtherance of a price-fixing scheme. National Mines's answers were not a denial of wrongdoing at all; they merely answered Pocahontas's questions, which did not suggest wrongdoing on National Mines's part, and the context did not plausibly support an inference that the answers were pretextual coverups intended to conceal the alleged conspiracy. *See Pocahontas*, 828 F.2d at 219 ("'Fraudulent concealment' implies conduct more affirmatively *directed at deflecting litigation*.").[23]

Similarly, in *Boland v. Consol. Multiple Listing Serv., Inc.*, the plaintiffs complained that "certain rules and practices of the Columbia Multiple Listing Service . . . unfairly restrain competition and violate the Sherman Antitrust Act." 868 F. Supp. 2d 506, 509 (D.S.C. 2011), *aff'd and remanded sub nom Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278 (4th Cir. 2012).[24] These rules and practices were memorialized in "[r]ules, regulations, by-laws, policies, and procedures" adopted by the boards of the defendant listing services. *Id.* at 513. The district court held that the plaintiffs had not alleged fraudulent concealment based on their claims that "Defendants never told them that they were fixing the prices of real estate," and that the defendants were "(1) meeting secretly, (2) giving pretextual reasons for costs of real estate, and (3) agreeing not to discuss publicly the nature of their communications in furtherance of their illegal scheme." *Id.* at 518. The court held that these allegations amounted to "no more than a failure to admit wrongdoing." *Id.* That does not mean that *any* failure to admit wrongdoing is, as a matter of law,

---

[23] *Pocahontas* may also conflate the due diligence and affirmative act prongs of a fraudulent concealment claim, letting its holding, which is clearly rooted in the plaintiff's failure to adequately allege due diligence, bleed into the other elements. *See Pocahontas*, 828 F.2d at 219 ("'due diligence' contemplates more than the unpursued inquiry allegedly made by Pocahontas.").

[24] Though Defendants cite *Robertson* four times, its discussion of fraudulent concealment is limited to a single cursory footnote. 679 F.3d at 291 n.2.

not an affirmative act of concealment; it meant that in *this* case, where the defendants were alleged to have *memorialized the challenged agreements in their "rules, regulations, by-laws, policies, and procedures*," the allegations failed to establish an inference that the defendants "wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action," *English*, 828 F.2d at 1049 (emphases added). That those by-laws were adopted in non-public meetings, and that communications about them were not publicized, did not suggest deliberate concealment.[25]

This case, in contrast, alleges that Defendants' efforts to keep its conspiracy secret were deceitful and misleading, directed at preventing the conspiracy's discovery. The maintenance of the conspiracy as a "non-ink-to-paper" "gentlemen's agreement" is a departure from ordinary business that evinces Defendants' *intent* to prevent plaintiffs and class members from learning of the conspiracy's existence (and to avoid a written record that could be used to hold them to account). Unlike *Boland/Robertson*, the challenged agreement was not "both plainly documented and readily available so that plaintiffs c[ould] describe the factual content of the agreement" in their complaint. *Robertson*, 679 F.3d at 290. Unlike *Pocahontas*, the Defendants' concealing conduct was not limited to an ambiguous answer to an off-topic question. In this case, Defendants agreed to secrecy to conceal the conspiracy from the plaintiffs. It worked.

Of course, some details of the times, places, and parties to concealing acts are unknown to Plaintiffs—*due to the Defendants' own concealment*. But this is expressly contemplated and condoned by Fourth Circuit case law. *See Corder*, 57 F.4th at 402; *Marlinton*, 71 F.3d at 126.

---

[25] *GO Computer*, the other case on which Defendants rely, does not consider "affirmative acts" questions at all; it is a due diligence case, resting only on the plaintiff's failure to investigate facts known to it. *Compare* Joint Mot. at 14 (invoking *GO Computer* in support of its argument that "failure to admit to wrongdoing" is not an "affirmative act of concealment") *with GO Computer*, 508 F.3d at 178–79 ("There can be no question that this profusion of information was sufficient, as a matter of law, to spur a reasonably diligent person to investigate an antitrust claim.").

Details such as the identities of executives and hiring managers going back to 2000 are "peculiarly within the defendant's knowledge." *Corder*, 57 F.4th at 402. That Plaintiffs do not know the *name* of each such person does not mean they are inadequately specified to Defendants, who maintain the personnel records needed to determine the relevant actors. *See id.* at 401 (explaining that Rule 9(b) requires only "that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial"). Many of the places of these acts are also clearly identified: Defendants' offices where their executives and hiring managers are located, principally in Washington, D.C. and Northern Virginia, but also in Hampton Roads, Bath, Pascagoula, Marinette, Groton, and Lockport. And Defendants also know the time period involved: continuously from 2000 through the present day. That this time period is *long* does not make it *not particular*. All that Rule 9(b) requires, after all, is that Plaintiffs "allege a particular starting point or explain why they lack sufficient information to do so." *Id.* at 403. This Plaintiffs have done.

**Inserting sham provisions into teaming agreements.** *Second*, Defendants entered into "teaming" agreements with no-poach clauses that prohibited recruitment of personnel who worked on the same project, for the duration of that project. These agreements "were used to cover up the Defendants' unlawful 'gentlemen's agreement' with more credibly defensible project-based limitations." ¶ 13. "The teaming agreements created the false impression that workers could be solicited and recruited by rivals who were not working on their projects, even though Defendants' agreement not to recruit one another's naval engineers applied to any naval engineer working for any Defendant." *Id.*; *see also* ¶¶ 174–75 ("Defendants' employees were led to mistakenly believe that the teaming agreements were the *only* recruiting restrictions in place.").

These agreements provided Defendants with a plausible cover if anyone had questioned their recruitment tactics. Defendants used these provisions, in other words, as a "trick or

contrivance . . . to exclude suspicion and prevent inquiry." *Edmonson*, 922 F.3d at 553; *see also id.* (finding plaintiffs had plausibly alleged affirmative acts based on "sham entities" meant to mask an unlawful scheme); *Ekstrom v. Cong. Bank*, 2020 WL 6565251, at *14 (D. Md. Nov. 9, 2020) (similar). The agreements are described specifically enough to give notice of "the particular circumstances for which it will have to prepare a defense at trial." *Edmonson*, 922 F.3d at 553.

Defendants object (with no authority) that "it cannot be *fraud—i.e.*, an affirmative act of deception—to include a lawful provision in a legitimate teaming agreement." Joint Mot. at 17. But frauds often consist of facially lawful conduct, such as making false statements.[26] *See Fraud*, BLACK'S LAW DICT. (11th ed. 2019) ("1. A knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment."). The duplicative—*i.e.*, sham—no-poach teaming provisions occlude the conspiracy by presenting an explanation for the industry's lack of recruitment in which the teaming agreement tail wags the no-poach dog.[27]

***Issuing affirmative misrepresentations***. *Third*, Defendants repeatedly and publicly stated that their recruiting practices were fully competitive and their conduct compliant with federal law. These statements include Defendants' representations on their recruitment and career web pages that they "offer 'competitive' compensation and benefits packages," ¶ 207, and their assurances that they "adhere to values and ethics standards incompatible with [their] wage suppression conspiracy," ¶ 210. Each statement was an affirmative "misrepresentation" that "wrongfully

---

[26] Defendants repeatedly claim Plaintiffs concede these teaming agreements "serve distinct and lawful purposes," Joint Mot. at 17; *see id.* at 8, 10, 11, 35 n.6, 40. The footnote from which Defendants derive this argument, however, reads as follows: "The no-poach restrictions in individual teaming agreements *may by their own terms violate the Sherman Act*, but Plaintiffs do not seek to resolve those questions in this action." ¶ 175 n.8.

[27] As elsewhere, Plaintiffs' allegations regarding the sham provisions are more than sufficient to put Defendants on notice of the circumstances they must defend and to establish substantial evidence supporting Plaintiffs' allegations.

deceived or misled" Plaintiffs into believing Defendants recruited competitively—when in fact Defendants were colluding to *reduce* competition. *Edmonson*, 922 F.3d at 549, 553. Defendants also offered assurances that they comply with federal laws—including federal antitrust laws. ¶¶ 212–14. These statements were again both false and misleading, serving "to conceal the existence of a cause of action." *Edmonson*, 922 F.3d at 549. These misrepresentations and affirmative acts of concealment had the effect of "exclud[ing] suspicion and prevent[ing] inquiry," *id.* at 553, and, as a result, satisfy the first element of fraudulent concealment.

Defendants attempt to wave aside these misrepresentations as no more than "generic statements" and "inactionable puffery." Joint Mot. at 15–16. This is a startling position. "Puffery," of course, covers such things as "exaggerated advertising, blustering, and boasting, or vague and general claims of superiority," and is often inactionable "on the theory that no reasonable person would rely on such superlatives." *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 302–03 (4th Cir. 2017). That Defendants would describe their somber representations of legal compliance this way betrays the weakness—and indeed, the absurdity—of their position. And of course, Defendants' public-facing statements regarding competitive compensation and benefits packages are designed to induce potential (and reasonable) applicants to seek employment.

At any rate, reliance is not required for this element of fraudulent concealment. The Fourth Circuit asks only whether Defendants undertook *affirmative acts of concealment*—a category that surely includes these knowing misrepresentations.[28] *See, e.g.*, *In re Lithium Ion Batteries Antitrust*

---

[28] The doctrine's second and third elements ask whether Plaintiffs failed to discover Defendants' wrongdoing despite the exercise of due diligence. In some cases, where plaintiffs *are on inquiry notice* of potential claims, analysis of due diligence resembles a reliance inquiry; in some cases, a diligent plaintiff might end inquiry in reliance on a defendant's misrepresentation. In other cases, extrinsic suspicious circumstances might forbid a diligent plaintiff from "taking defendant's word for it." *Cf. Pocahontas*, 828 F.2d at 218–19; *GO Computer*, 508 F.3d 178-79.

*Litig.*, 2014 WL 309192 (N.D. Cal. Jan 21, 2014) ("The complaints allege public, putatively false statements by various defendants affirming their compliance with applicable antitrust laws, as well as the existence of vigorous price competition in the lithium ion battery market. . . . Plaintiffs' allegations of fraudulent concealment are sufficient to survive the pleading stage.").

Defendants' citations to three cases from a single judge in an out-of-circuit court do not change this result. *See* Joint Mot. at 15. Two of those cases involved follow-on litigation filed years after an original complaint that itself followed a multi-year DOJ investigation, a situation in which plaintiffs could reasonably be expected to allege with a great deal of particularity the nature of defendants' affirmative acts of concealment. *See Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 872, 877 (N.D. Cal. 2015); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1052–53 (N.D. Cal. 2016). Defendants also omit a critical caveat in these cases—that "routine public filings that the defendant obeys antitrust laws and participates in a competitive market" cannot "*alone* suffice to show fraudulent concealment, *absent other evidence that the defendant attempted to conceal its alleged antitrust behavior*." *Garrison*, 159 F. Supp. 3d at 1078; *see also Ryan*, 147 F. Supp. 3d at 891. Here, of course, Plaintiffs offer such other evidence.[29]

Defendants are also wrong that these misrepresentations "come far too late to save Plaintiffs' claims." Joint Mot. at 16. The Complaint alleges that Defendants made repeated statements of a nature that were intended to (and did, in fact) conceal their conspiracy during the class period. *See* ¶¶ 205–18. That Plaintiffs illustrate this pattern of conduct with a number of recent examples does not foreclose the altogether reasonable inference that Defendants made

---

But this question is only relevant if plaintiffs are invoking reliance on a fraudulent statement, rather than concealment, as an excuse for not investigating their cause of action.

[29] Defendants' final case, *Towers v. Iger*, addresses only inquiry notice, and has precisely nothing to say about the issue at hand. 2017 WL 6044035, at *10 (N.D. Cal. Mar. 10, 2017).

similar ones throughout the class period. Defendants appear to suggest that they have only recently publicly advertised competitive compensation and active recruitment practices. This is an *unreasonable* inference in Defendants' favor, given Plaintiffs' allegations (and common sense). Lest there be any doubt, the Court can take judicial notice of similar representations earlier in the class period.[30] *See, e.g.*, *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).

### 2. Plaintiffs failed to discover the conspiracy despite reasonable diligence.

Plaintiffs likewise sufficiently allege that they "failed to discover those facts within the statutory period, despite . . . the exercise of due diligence." *Edmonson*, 922 F.3d at 548; *see* ¶¶ 222–26 ("Prior to April 2023, Plaintiffs did not and could not have uncovered Defendants' conspiracy with the exercise of reasonable diligence. The Plaintiffs at all times believed that they were being compensated at competitive levels and were unaware of the agreement to pay sub-competitive wages."). Nothing in the Complaint suggests that Plaintiffs on their own could have uncovered Defendants' conspiracy with reasonable diligence, without counsel's extensive investigation.

Defendants' argument ignores the long line of Fourth Circuit precedents—including cases they cite—holding that plaintiffs are *only* required to take reasonable steps to investigate once they are on inquiry notice of their claims. *See Marlinton*, 71 F.3d at 128; *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 108 (4th Cir. 2018) (plaintiff "must show (1) fraud by the [defendants], (2) a lack of actual notice by [plaintiff] of its claim, and (3) *either a lack of inquiry notice or, in*

---

[30]    *See, e.g.*, General Dynamics Corp., *2015 Corporate Sustainability Report*, https://web.archive.org/web/20170215061343/http://www.gd.com/sites/default/files/reports/sustainability_2015.pdf ("Our employee ethics handbook, commonly known as the 'Blue Book,' states our expectation that all employees conduct business in accordance with the law" and "We treat all of our employees with dignity and respect and provide them with fair compensation"); Huntington Ingalls Industries, Inc., *2017 Code of Ethics*, https://web.archive.org/web/20180515194450/https://huntingtoningalls.com/wp-content/uploads/2016/06/codeofethics.pdf (similar).

*the event it was on inquiry notice*, that it exercised reasonable diligence in investigating the claim."). Indeed, in *Edmonson*, the Fourth Circuit reiterated that "[t]his Court long has held that it is possible for a plaintiff to satisfy the due diligence requirement without demonstrating that it engaged in any specific inquiry" where "the plaintiff establishes that it was not (and should not have been) aware of facts that should have excited further inquiry." 922 F.3d at 554; *see also Gregory v. Toler Appraisal Grp., LLC*, 2023 WL 2581995, at *12 (S.D.W.Va. Mar. 20, 2023).[31]

A plaintiff is on inquiry notice of a claim "[w]here a plaintiff knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain." *GO Computer*, 508 F.3d at 179. The analysis focuses on the actions a reasonable plaintiff would have taken given the information she had. *See id*. at 178; *SD3 II*, 888 F.3d at 113 ("[I]f the plaintiff (1) believes he might have been harmed and (2) knows who is responsible for that harm, then he is on inquiry notice to act.").

Applying this test, the Fourth Circuit has found plaintiffs were *not* on inquiry notice of an illegal kickback scheme even when separate private litigation had been initiated (including against two of the same defendants), both federal and state enforcement actions were underway, and local media included coverage of the alleged scheme. *See Edmonson*, 922 F.3d at 555. The Court explained that, even with these "several pieces of public information," plaintiffs had sufficiently

---

[31] The Fourth Circuit's discussion of *Marlinton* in *GO Computer* clarifies that, once a plaintiff is on inquiry notice, plaintiff must take reasonable steps to investigate—even if the alleged fraud is well-disguised. 508 F.3d at 179; *see also In re Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *8 (E.D. Va. Sept. 18, 2019) (relying on *GO Computer* to reject Plaintiffs' argument that *Marlinton* meant Plaintiffs did not need to show diligence, as the Plaintiffs were on inquiry notice and needed to satisfy the diligence prong). But neither *GO Computer* nor *In re Molded Doors* alters *Marlinton*'s clear holding, reaffirmed in *Edmonson*, that a plaintiff who lacks inquiry notice does not have to demonstrate that it engaged in any inquiry at all to satisfy the due diligence requirement. Defendants are flat wrong when they insist that because Plaintiffs, "[b]y their own account, [] took no steps to investigate their claims, . . . [t]his Court need go no further to reject Plaintiffs' 'due diligence' allegations as insufficient." Joint Mot. at 18.

alleged that "they did not and could not have known about the Kickback Scheme, due to [defendants'] efforts to conceal the kickbacks." *Id.*; *see also Donaldson,* 2020 WL 3184089, at *21 (rejecting defendants' argument that "plaintiffs allege no diligence at all," because the plaintiffs "had no reason to investigate a potentially fraudulent relationship" between the defendant and another entity).

That logic applies with equal force here. Defendants affirmatively concealed their conspiracy, as discussed above. The conspiracy has remained a secret for more than two decades. There are no allegations suggesting Plaintiffs' awareness, prior to April 2023, of a wrongful pattern of actions by Defendants taken against them to trigger inquiry notice—"due to [Defendants'] efforts to conceal" their no-poach agreement. *Edmonson*, 922 F.3d at 555. The naval engineering industry is heavily regulated, and Defendants repeatedly and publicly stated that they offered competitive compensation and complied with federal laws. *See* ¶¶ 212–18, 223. The fact that many naval engineers were not recruited by rival firms would not have been enough for a reasonable engineer to suspect an extensive conspiracy among engineering firms. A reasonable engineer would have assumed that such firms were complying with all relevant laws. *Cf. Edmonson*, 922 F.3d at 556 ("Due diligence does not mean that borrowers must presume their bank is lying or dissembling and therefore that further investigation is needed").

While Plaintiffs were aware of their own salary information, courts are quick to reject claims that a plaintiff should have deduced the fact of an unlawful conspiracy due to knowledge of a symptom of the conspiracy like low wages. *See Ekstrom*, 2020 WL 6565251, at *14 ("[N]either the *Edmonson* nor *Donaldson* Courts considered how plaintiffs' knowledge of the inflated price affected the availability of the fraudulent concealment tolling because that would mischaracterize the injury and the relevant inquiry. Rather, the question for the Court is whether

- 40 -

American Bank concealed the facts of the allegedly fraudulent scheme, not just the excessive price that resulted from the scheme."). Feeling undercompensated is not knowledge of a wrong done.

Moreover, the estimation of competitive wage levels requires specialized expertise not available to an ordinary naval engineer. Reasonable diligence does not require engineers to undertake such calculations, particularly when the engineers had no hint of actions by Defendants that harmed them. *Cf. Edmonson*, 922 F.3d at 555 (rejecting defendants' reliance on public filings because plaintiffs did not have "any reason . . . to look at these records"). In any event, to the extent that there are questions about what constitutes reasonable conduct for naval engineers and the adequacy of Plaintiffs' diligence, those questions are properly reserved for the fact finder at a later stage. *See id.* at 558 (what constitutes reasonable conduct is an "issue [that] should be decided by the finder of fact and [was] not amenable to resolution on the pleadings or at summary judgment").

Ignoring *Edmonson*, Defendants cite *SD3 II* and *Pocahontas* to argue that Plaintiffs failed the due diligence requirement. But in both cases the Fourth Circuit first concluded that plaintiffs were on inquiry notice of wrongdoing *before* holding that plaintiffs failed to allege the reasonable steps they took to investigate in satisfaction of the diligence requirement. *See SD3 II*, 888 F.3d at 113–14; *Pocahontas*, 828 F.2d at 218, 220.[32] The same basic point distinguishes the other cases on which Defendants rely. In *GO Computer*, the plaintiff knew with some specificity the obstacles Microsoft was causing the company, was told by an FTC investigator that "[t]his looks like a textbook case of abuse of monopoly power," and even discussed with a law firm a related intellectual property suit against Microsoft. 508 F.3d at 178. This pattern of wrongful actions and

---

[32] Defendants insist Plaintiffs should have sought to uncover an unlawful conspiracy on the strength of their knowledge that they have never been recruited and were not particularly well compensated; yet only pages later, they argue that the unlawful conspiracy is *implausible* despite the *much more specific* facts alleged with the benefit of counsel's investigation.

the "multiplicity and specificity of the information" plaintiff had "plainly [put him] on inquiry notice." *Id.* at 179. In short, none of the facts that Defendants assert should have put Plaintiffs on notice prior to counsel's investigation would have moved a reasonable naval engineer to suspect that they had been harmed, not to mention harmed *by* Defendants. Thus, Plaintiffs' due diligence allegations are sufficient to establish fraudulent concealment.

### C. Defendants misread Plaintiffs' continuing violation allegations.

Defendants maintain that Plaintiffs seek to rely "on two tolling doctrines—continuing violation and fraudulent concealment," and then argue that "alleg[ing] continuing misconduct is irrelevant for limitations purposes." Joint Mot. at 12.[33] Defendants engage a straw man—those allegations are included because "in the case of a 'continuing violation,' . . . each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Defendants make no argument that class members could not recover for the past four years of harm. ¶¶ 202–03. It is true that a continuing violation does not permit "recover[y] for the injury caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189. But Plaintiffs make no such claim, properly pleading fraudulent concealment for that purpose. Defendants' arguments are, accordingly, beside the point.

### D. Defendants' argument turns on its head the equitable purpose of the Fourth Circuit's fraudulent concealment cases.

Defendants assume that *Zenith* means that antitrust claims accrue from the injury regardless of whether that injury was discoverable. Joint Mot. at 10-11 (citing *Zenith Radio Corp. v. Hazeltine*

---

[33] Despite being grouped by Defendants in a section concerning "Equitable Tolling," the continuing violation principles laid out in *Klehr* neither toll the statute of limitations nor sound in equity. *See Edmonson*, 922 F.3d at 548-52 (explaining equitable tolling doctrines in depth).

*Rsch., Inc.*, 401 U.S. 321, 338 (1971)). It is true that most courts have made a similar assumption— including the Fourth Circuit, though it has never explicitly considered the question. In recent years, however, some courts have held that an antitrust claim does not accrue, and the statute of limitations does not begin to run, until the injury would be reasonably discoverable by the plaintiff—that is, that antitrust claims accrue under a "discovery rule," rather than an "injury rule." *See, e.g.*, *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006); *Fenerjian v. Nongshim Co. Ltd*, 72 F. Supp. 3d 1058, 1076-78 (N.D. Cal. 2014); *Med. Ctr. at Elizabeth Place v. Premier Health Partners*, 2016 WL 9460026, at *14-16 (S.D. Ohio Oct. 6, 2016).

The Fourth Circuit has not needed to decide this issue, because this circuit's fraudulent concealment doctrine operates much like a discovery rule. *See Taylor*, 2011 WL 9160526, at *1 (explaining that fraudulent concealment "does not stop the clock; it moves the clock, starting it from when the wrong was discovered rather than when it was committed"); *accord GO Computer, Inc.*, 508 F.3d at 178 ("[W]hen the fraud has been concealed, or is of such a character as to conceal itself, *the statute does not begin to run until the fraud is discovered*.").[34] The Fourth Circuit establishes fraudulent concealment as the preferred method of avoiding an interpretation of the law that would reward Defendants for covering their tracks. *Edmonson*, 922 F.3d at 549. An alternative ground for decision that would reach the same result would be to follow the Seventh Circuit and the other courts in adopting a discovery rule for accrual of antitrust claims. If fraudulent concealment could not reach the claims here, such a rule would be effectively required by the policy concerns articulated most fully in *Edmonson* and the basic principle of equity animating fraudulent concealment doctrine.

---

[34] Other courts have declined to "choose a side on this split in authority" in this way—by "conclud[ing] the fraudulent concealment exception to the four year statute of limitations applies." *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 900–01 (N.D. Cal. 2017).

III.   **Plaintiffs Have Plausibly Alleged a Rule of Reason Claim, Though the Court Should Not Reach the Issue at This Stage of the Case.**

A.   **Plaintiffs allege a *per se* unlawful naked market allocation agreement.**

Defendants lastly argue the Court should analyze Plaintiffs' claims under the rule of reason and dismiss them for failing to plead a relevant market. Joint Mot. at 35. But as Judge Lauck held in *Lumber Liquidators*, "it would be premature to determine which antitrust standard—whether the 'rule of reason' or '*per se*'—applies" on motion to dismiss, because such a "fact-intensive" determination should not be made on a "sparse record."[35] 415 F. Supp. 3d at 713–14 (collecting cases). Whether to apply the *per se* rule to a no-poach agreement requires consideration of whether that agreement is a naked restraint or an ancillary one "reasonably necessary to achieve [] efficiency-enhancing benefits." *Borozny v. Raytheon Techs. Corp.*, 2023 WL 348323, at *8 (D. Conn. Jan. 20, 2023). But this depends on "factual evidence relating to the agreement's formation and character," such that at the motion to dismiss stage, the court "cannot determine as a matter of law that *per se* treatment will be inappropriate." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039–40 (N.D. Cal. 2013); *cf. Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109–10 (9th Cir. 2021) (following discovery, no-solicitation agreement properly determined ancillary to a "collaboration agreement to fulfill the demand of hospitals for travel nurses").

Even were the Court to determine the issue at the motion-to-dismiss stage, the Complaint alleges a naked no-poach agreement. ¶¶ 2, 201. In fact, Plaintiffs distinguish the alleged anticompetitive conduct at issue from the limited, formal no-poach provisions in Defendants' teaming agreements, which could raise questions whether the provisions are ancillary. ¶¶ 13, 174,

---

[35] "At times, the Supreme Court has indicated that a third mode of analysis exists . . . . Under this 'quick-look' rule of reason approach, a practice may be declared illegal where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect." *Lumber Liquidators*, 415 F. Supp. 3d at 712 n.9.

175 & n.8.[36] But the broader, "non-ink-to-paper" gentlemen's agreement was *not* ancillary to teaming agreements or "reasonably necessary to achieve" other procompetitive business purposes. And while Defendants suggest "national security interests" may justify their conspiratorial agreement, no factual allegations from the Complaint support the notion that these competitors cannot function in an unrestrained labor market or that national security contracts sanction violation of antitrust laws.[37] Joint Mot. at 35. This would be inappropriate to resolve at this stage, anyway. *See Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214, 222 (S.D. Ohio 2019).

Instead, *Railway* explains that courts examining "similar no-poach agreements have held that the agreements may be *per se* violative of the antitrust laws."[38] 395 F. Supp. 3d at 481 (collecting cases). Moreover, the "federal agencies charged with enforcing the antitrust laws consider naked no-poach agreements *per se* violations of the Sherman Act."[39] *Railway*, 395 F. Supp. 3d at 485. So, as in *Outpatient Medical Center*, Plaintiffs "have adequately alleged that the non-solicitation agreements were naked horizontal market allocation agreements and therefore plead a viable *per se* claim." 630 F. Supp. 3d at 988–90.

---

[36] Even then, the "problem" with treating these formal no-poach provisions as ancillary "is that it treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing). That's not right; it is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise." *Deslandes v. McDonald's U.S., LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (Easterbrook, J.).

[37] The Federal Acquisition Regulations specifically address teaming arrangements and specify that "[n]othing in this subpart authorizes contractor team arrangements in violation of antitrust statutes[.]" 48 C.F.R § 9.604.

[38] *See also Railway*, 395 F. Supp. 3d at 484 & n.7 (distinguishing *Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001), and *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999)). At the motion-to-dismiss stage, these conclusions are particularly reasonable. *Cf.* Joint Mot. at 34–35 (citing *Ulrich v. Moody's Corp.*, 2014 WL 12776746, at *26 (S.D.N.Y. Mar. 31, 2014), which in turn cites *Eichorn*, 248 F.3d at 144, and *Bogan*, 166 F.3d at 515, which were both decided following summary judgment).

[39] *See also* DOJ, Antitrust Div., *Antitrust Guidance for Human Resource Professionals* 3, (Oct. 2016), https://www.justice.gov/atr/file/903511/download.

Defendants' cases support Plaintiffs or are distinguishable. In *U.S. v. Brewbaker*, the Fourth Circuit confirmed that the *per se* rule applies to "certain categories of horizontal restraints, including agreements between competitors to fix prices or divide markets." 87 F.4th 563, 575 (4th Cir. 2023). The Court determined that *per se* analysis did not apply where the defendants were "at different levels of distribution, [] indicating that their agreement was vertical."[40] *Id.* at 576. In *U.S. v. Patel*, the district court *denied* the motion to dismiss because the no-poach agreement among the defendant aerospace companies constituted a market allocation that could "as a matter of law, constitute a *per se* violation."[41] 2022 WL 17404509, at *8–11 (D. Conn. Dec. 2, 2022). And in *Borozny*, the court also *denied* the motion to dismiss in the related civil matter because the alleged conspiracy was "one of market allocation, in which Defendants supposedly divided the labor of Aerospace Workers amongst themselves, in a horizontal fashion," which "could constitute a *per se* violation of the Sherman Act." 2023 WL 348323, at *7–8. Thus, as in *Railway*, Plaintiffs have "adequately alleged a *per se* violation of the antitrust laws, and, therefore, they are not required to plead a relevant market." 395 F. Supp. 3d at 480.

## B.   Plaintiffs have plausibly alleged that Defendants' no-poach conspiracy had anticompetitive effects within the relevant market.

As this Court has explained, a rule-of-reason "Section 1 claim requires a showing that the conspiracy produced adverse, anticompetitive effects within the relevant [labor] and geographic

---

[40] Defendants rely on *In re Jan. 2021 Short Squeeze Trading Litig.* for the proposition that "courts routinely determine which test applies at the motion-to-dismiss stage." Joint Mot. at 35 (citing 2022 WL 1522054, at *24 n.21 (S.D. Fla. May 13, 2022)). But that case involved a vertical restraint obviously subject to rule of reason, as did the Fourth Circuit case it in turn cited. *Id.* (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002) (noting that the "allegations . . . set forth two separate vertical conspiracies")).

[41] Defendants also cite to the report and recommendation issued in *Ulrich*, 2014 WL 12776746, at *26. *See* Joint Mot. at 34–35. But in adopting it with modifications, the district court specifically declined to address whether rule of reason applied. *Ulrich*, 2014 WL 4977562, at *18 n.14.

market." *Lansdowne on the Potomac Homeowners Ass'n v. Openband at Lansdowne LLC*, 2011 WL 5872885, at *3 (E.D. Va. Nov. 22, 2011) (Trenga, J.). But because "market definition is often a deeply fact-intensive inquiry," the Fourth Circuit cautions that "courts hesitate to grant motions to dismiss" on that basis. *Id.* at *4 (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011)). Nothing about this case suggests departing from that principle.

### 1.    Plaintiffs allege a plausible labor market.

In the context of employment, "the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant[s]."[42] *Jien*, 2020 WL 5544183, at *11. Plaintiffs have defined the relevant "labor market"[43] as the market for naval engineers, which includes both naval architects and marine engineers. ¶¶ 193, 234. This market is plausible because "there are no close economic and/or functional substitutes for employment in other industries." ¶ 194. Defendants contend that this labor market is too narrow because it excludes "commercial naval engineering jobs."[44] Joint Mot. at 36-37. But the Complaint alleges that "naval engineers have industry-specific credentials, skills, and experiences—including specialized bachelors' degrees and a specialized understanding of military ships—that are not transferable to other industries." ¶ 194. So if naval engineers sought employment in a field with more or different job requirements, they would likely have to "either (a) pay to receive training in that field or (b) accept a pay cut to work at a lower level in a different field while they built new expertise." ¶ 195. *Cf. Todd*, 275 F.3d at 203 ("employees' industry-specific experience may cause them to suffer a pay

---

[42] In *Jien*, the court analyzed the separate information-sharing claim under the rule of reason.

[43] While Defendants suggest use of "labor market" is somehow inappropriate, courts use that terminology in antitrust labor cases. *See, e.g.*, *Jien*, 2020 WL 5544183, at *9, 11, 12 & 13.

[44] Defendants also improperly rely on material outside the Complaint. Joint Mot. at 36-37. But "statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion." *Kolon,* 637 F.3d at 449.

cut if forced to switch industries."); *Jien*, 2020 WL 5544183, at *11 (the "labor market is plausible," because employees have "industry-specific skills . . . that would make transitioning to other jobs an imperfect substitute"). Moreover, Defendants' compilation of wage data "about a particular labor market [] suggests that the market is distinct because economic actors usually have accurate perceptions of economic realities." *Id.* (citing *Todd*, 275 F.3d at 205); ¶¶ 104, 182.

Defendants argue that the labor market is too broad because naval architects and marine engineers perform "different tasks." Joint Mot. at 37-38. But this argument misconstrues the relevant-market analysis, as the Second Circuit explained in *Todd*. There, the district court concluded that the proposed market was "over-inclusive because the plaintiff failed to explain how it is that accountants, lawyers, chemical engineers and other MPT employees in the oil and petrochemical industry are interchangeable with one another." 275 F.3d at 201. But this "analysis reflect[ed] a failure to reverse all of the factors involved in light of the buyer-side nature of the alleged activity." *Id.* at 202. Instead, the "proper focus is the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers." *Id.* So the "question is not the interchangeability of, for example, lawyers with engineers" but the "interchangeability, from the perspective of an MPT employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry."[45] *Todd*, 275 F.3d at 202. So too here. And, in any event, "only a bare minimum level of specificity is required at this early stage of the proceedings" to "clear the low bar of plausibility," and "Plaintiffs need not disprove alternative relevant markets proposed by the Defendant." *Jien*, 2020 WL 5544183, at *11.

---

[45] Defendants' cited cases are inapposite because they did not involve a buyer-side conspiracy as here. *See* Joint Mot. at 37–38.

### 2.     Plaintiffs allege a plausible geographic market.

The "relevant geographic market in antitrust cases is defined by the area within which the defendant's employees can practicably turn to alternative jobs." *Id.* at *10; *see also Kolon*, 637 F.3d at 441–42. The Fourth Circuit in *Kolon* explained that dismissals based on geographic market definition "are generally limited to instances in which the complaint either: (1) fails to allege a geographic market or the boundaries of a relevant geographic market; (2) defines a geographic market in an unreasonably and implausibly narrow manner; or (3) alleges a contradictory and vague delineation of the relevant geographic market."[46] 637 F.3d at 443–44.

Here, the Complaint alleges that the relevant geographic market is the United States. ¶ 197. Plaintiffs allege that "[i]f all employers collectively imposed a slight decrease in compensation for naval engineers from the competitive level, the vast majority of naval engineers would remain in the United States and within the industry, making the slight decrease in compensation profitable." *Id.*; *see also* ¶¶ 245–46. The Complaint alleges that naval engineers have U.S. citizenship, a U.S. security clearance, and specialized knowledge that serves the U.S. military. ¶ 197. A "plausible, distinct relevant geographic market" is sufficiently pled when a party alleges "market realities that could have led to the United States being a distinct market." *Kolon*, 637 F.3d at 444, 447.

Defendants argue that a job hundreds of miles away is not a reasonably interchangeable substitute. Joint Mot. at 38. But people move all the time for better jobs with better pay, and not all must be willing to move for competitive pricing to raise compensation industrywide. ¶ 187.

---

[46] The two cases on which Defendants rely, *see* Joint Mot. at 38, fall into this category. *Borozny*, 2023 WL 348323, at *11 ("As Plaintiffs set forth no allegations regarding the national labor market for Aerospace Workers, they have failed to show the national aerospace labor market is a plausible market in which competition could be impaired."); *Ulrich*, 2014 WL 12776746, at *27 ("[T]he complaint . . . does not identify a geographic boundary to limit the market in any way.").

Regardless, even if class members would *never* move for better pay, to dismiss for overbreadth "would be to overlook the very purpose of the geographic market." *Jien*, 2020 WL 5544183. As *Jien* explains, "Plaintiffs must outline a relevant market so that they can then allege that Defendants have sufficient market power within the market [] to restrain competition." *Id.* So it is "problematic to allege too *narrow* a geographic market, because it could create the illusion of market power where no market power exists." *Id.* (emphasis in original); *see also Lansdowne*, 2011 WL 5872885, at *4 ("[D]ismissal is appropriate where the complaint defines a geographic market in an unreasonably and implausibly narrow manner[.]"). But if the "geographic [m]arket definition is too large, that would only understate market power in the relevant market." *Jien*, 2020 WL 5544183, at *10 (citing *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *19 (E.D. Pa. July 29, 2015)). Thus, market overbreadth is not a basis for dismissal here.

### 3. Plaintiffs plausibly allege market power.

As stated in *Jien*, Plaintiffs must also sufficiently allege that Defendants "had enough market power" to achieve their anticompetitive aims. *Id.* at *12. Defendants collectively employ approximately 75% of naval engineers in the U.S., ¶¶ 198, 244, "which is on its face a large enough market share to plausibly suggest that they could have suppressed compensation in the relevant market." *Jien*, 2020 WL 5544183, at *12; *see also* section I.B.2.d, above. Defendants do not contest their market power.

### 4. Plaintiffs allege economically plausible anticompetitive effects.

Finally, "[h]aving found that the [] Complaint plausibly alleged market power within the relevant market, the Court must determine whether Plaintiffs pled that the [conspiracy] has had an anticompetitive effect." *Jien*, 2020 WL 5544183, at *12. As the Fourth Circuit held in *Robertson*, "[i]t is sufficient that the alleged anticompetitive effects are economically plausible in light of" the alleged restraint. 679 F.3d at 291.

The Complaint alleges that the specialized skill and training for naval engineers, combined with an inadequate supply of qualified employees, should have resulted in a competitive and high-paying labor market. ¶ 185. Instead, pay remained low and stagnant because Defendants agreed not to recruit from each other[47]—avoiding what otherwise would have been the ratchet effect present in competitive labor markets, where competing firms continually raise the bar to keep and attract talent. ¶ 187. This is "enough to make the alleged anticompetitive effects economically plausible in the relevant market." *Jien*, 2020 WL 5544183, at *12. Defendants do not dispute this point either.

\* \* \* \* \*

In sum, Plaintiffs have sufficiently alleged Defendants' market power within the U.S. naval engineer labor market, as well as plausible anticompetitive effects resulting from the no-poach agreement. Thus, Plaintiffs' Section 1 claim is well pled under either *per se* or rule of reason.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court deny Defendants' joint motion to dismiss in its entirety. However, if the motion is granted in any part, Plaintiffs request that any dismissal be without prejudice and with leave to amend.[48]

---

[47] ¶¶ 186, 190 ("[N]o raises were available beyond a 2% annual cost-of-living adjustment.").

[48] Fed. R. Civ. P. 15(a)(2) (courts "should freely give leave" to amend); *see, e.g.*, *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (explaining that Rule 15 is a "liberal rule" that "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities").

DATED: February 20, 2024                    Respectfully submitted,

                                            By      /s/ *Steven J. Toll*
                                                    STEVEN J. TOLL
                                                    (Va. Bar No. 15300)

                                            Brent W. Johnson (admitted *pro hac vice*)
                                            Robert W. Cobbs (admitted *pro hac vice*)
                                            Alison S. Deich (Va. Bar No. 87452)
                                            Zachary R. Glubiak (Va. Bar No.
                                            93984)
                                            Sabrina S. Merold (*pro hac vice*
                                            forthcoming)
                                            **COHEN MILSTEIN SELLERS &
                                            TOLL PLLC**
                                            1100 New York Ave. NW, Suite 500
                                            Washington, DC 20005
                                            Tel: (202) 408-4600
                                            stoll@cohenmilstein.com
                                            bjohnson@cohenmilstein.com
                                            rcobbs@cohenmilstein.com
                                            adeich@cohenmilstein.com
                                            zglubiak@cohenmilstein.com
                                            smerold@cohenmilstein.com

                                            Shana E. Scarlett (admitted *pro hac vice*)
                                            Rio S. Pierce (admitted *pro hac vice*)
                                            **HAGENS BERMAN
                                            SOBOL SHAPIRO LLP**
                                            715 Hearst Avenue, Suite 202
                                            Berkeley, CA 94710
                                            Tel: (510) 725-3000
                                            shanas@hbsslaw.com
                                            riop@hbsslaw.com

                                            Steve W. Berman (admitted *pro hac vice*)
                                            **HAGENS BERMAN
                                            SOBOL SHAPIRO LLP**
                                            1301 Second Avenue, Suite 2000
                                            Seattle, Washington 98101
                                            Tel: (206) 623-7292
                                            steve@hbsslaw.com

                                            Elaine T. Byszewski (admitted *pro hac vice*)
                                            **HAGENS BERMAN
                                            SOBOL SHAPIRO LLP**

301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

George F. Farah (admitted *pro hac vice*)
Nicholas Jackson (admitted *pro hac vice*)
**HANDLEY FARAH & ANDERSON
PLLC**
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
njackson@hfajustice.com

Simon Wiener (admitted *pro hac vice*)
**HANDLEY FARAH & ANDERSON
PLLC**
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567
swiener@hfajustice.com

***Counsel for Plaintiffs and the Proposed
Class***

Candice J. Enders (admitted *pro hac vice*)
Julia R. McGrath (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark (admitted *pro hac vice*)
Stephen J. Teti (admitted *pro hac vice*)
Arielle S. Wagner (admitted *pro hac vice*)
Eura Chang (admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
sjteti@locklaw.com

aswagner@locklaw.com
echang@locklaw.com

***Additional Counsel for Plaintiffs and the
Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Steven J. Toll*
Steven J. Toll

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| SUSAN SCHARPF and | ) | |
| ANTHONY D'ARMIENTO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:23-cv-01372-AJT-WEF |
| v. | ) | |
| | ) | Hon. Anthony J. Trenga |
| GENERAL DYNAMICS CORP., | ) | |
| BATH IRON WORKS CORP., | ) | |
| ELECTRIC BOAT CORP., | ) | |
| GENERAL DYNAMICS INFORMATION | ) | |
| TECHNOLOGY, INC., | ) | |
| HUNTINGTON INGALLS | ) | |
| INDUSTRIES, INC., | ) | |
| NEWPORT NEWS SHIPBUILDING | ) | |
| AND DRY DOCK CO., | ) | |
| INGALLS SHIPBUILDING, INC., | ) | |
| HII MISSION TECHNOLOGIES CORP., | ) | |
| HII FLEET SUPPORT GROUP LLC, | ) | |
| MARINETTE MARINE CORPORATION, | ) | |
| BOLLINGER SHIPYARDS, LLC, | ) | |
| GIBBS & COX, INC., | ) | |
| SERCO, INC., | ) | |
| BMT INTERNATIONAL, INC., | ) | |
| TECHNOLOGY FINANCING, INC., | ) | |
| CACI INTERNATIONAL INC, | ) | |
| THE COLUMBIA GROUP, INC., | ) | |
| THOR SOLUTIONS, LLC, | ) | |
| TRIDENTIS, LLC, and | ) | |
| FASTSTREAM RECRUITMENT LTD., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.     Plaintiffs Have Not Met Their Burden to Plead That Fraudulent Concealment
Saves Their Untimely Claims. ...................................................................... 3

        A.     Plaintiffs Do Not Plead Affirmative Concealment. ............................... 3

              1.     An Unwritten Agreement Does Not Constitute Affirmative
Concealment. ......................................................................... 4

              2.     Non-Solicit Provisions in Teaming Agreements Do Not
Constitute Affirmative Concealment. ...................................... 8

              3.     Generic Public Statements Do Not Constitute Affirmative
Concealment. ......................................................................... 10

        B.     Plaintiffs Undertook No Due Diligence in the Decade(s) After Their
Alleged Injuries Despite Being On Inquiry Notice. ............................... 11

        C.     The Discovery Rule Does Not Apply. .................................................. 12

II.    The Complaint Does Not Plausibly Allege an Agreement Among Defendants. ............. 13

        A.     The Complaint Fails to Allege Direct Evidence of an Agreement. ...................... 13

        B.     Plaintiffs' Circumstantial Allegations of an Agreement Are Insufficient. ........... 16

III.   The Complaint Does Not Adequately Allege an Unreasonable Restraint of Trade. ........ 22

        A.     The *Per Se* Standard Is Inappropriate. .................................................. 22

        B.     Plaintiffs Fail to Plausibly Allege Claims Under the Rule of Reason. ................. 23

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

CASES

*7–Up Bottling Co. of Jasper Inc. v. Archer Daniels Midland Co. (In re Citric Acid Litigation)*,
    191 F.3d 1090 (9th Cir. 1999) ................................................................21

*In re Animation Workers Antitrust Litigation*,
    123 F. Supp. 3d 1175 (N.D. Cal. 2015) ................................... 5-6, 7, 10

*In re Animation Workers Antitrust Litigation*,
    87 F. Supp. 3d 1195 (N.D. Cal. 2015) .......................................5, 10, 13

*ACA Financial Guaranty Corp. v. City of Buena Vista*,
    917 F.3d 206 (4th Cir. 2019) ................................................................25

*Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*,
    300 F.3d 620 (5th Cir. 2002) ...............................................................25

*Boland v. Consolidated Multiple Listing Service, Inc.*,
    868 F. Supp. 2d 506 (D.S.C. 2011)................................................4, 5, 8

*In re Capacitors Antitrust Litigation*,
    106 F. Supp. 3d 1051 (N.D. Cal. 2015) ................................................7

*Chapman v. New York State Division for Youth*,
    546 F.3d 230 (2d Cir. 2008)................................................................24

*City of New York v. Group Health, Inc.*,
    649 F.3d 151 (2d Cir. 2011)................................................................24

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corp.*,
    92 F.4th 381 (2d Cir. 2024) .....................................................16, 19, 20

*Corder v. Antero Resources Corp.*,
    57 F.4th 384 (4th Cir. 2023) ............................................................4, 8

*Coronavirus Reporter v. Apple, Inc.*,
    85 F.4th 948 (9th Cir. 2023) ...............................................................23

*Deslandes v. McDonald's USA, LLC*,
    81 F.4th 699 (7th Cir. 2023) ...............................................................24

*Detrick v. Panalpina, Inc.*,
    108 F.3d 529 (4th Cir. 1997) ...............................................................13

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...............................................................23

*Donaldson v. Primary Residential Mortgage, Inc.*,
  2020 WL 3184089 (D. Md. June 12, 2020)................................................................9

*Edmonson v. Eagle National Bank*,
  922 F.3d 535 (4th Cir. 2019) ...................................................................... *passim*

*Ekstrom v. Congressional Bank*,
  2020 WL 6565251 (D. Md. Nov. 9, 2020) ...............................................................9

*English v. Pabst Brewing Co.*,
  828 F.2d 1047 (4th Cir. 1987) ................................................................................8

*In re Evenflo Co. Marketing, Sales Practices & Products Liability Litigation*,
  2023 WL 8810517 (D. Mass. Dec. 20, 2023) .........................................................7

*Fangman v. Genuine Title, LLC*,
  2016 WL 6600509 (D. Md. Nov. 8, 2016) ...............................................................9

*Garrison v. Oracle Corp.*,
  159 F. Supp. 3d 1044 (N.D. Cal. 2016) .............................................................6, 10

*GO Computer, Inc. v. Microsoft Corp.*,
  508 F.3d 170 (4th Cir. 2007) ............................................................................11, 12

*Grand Strand & Water & Sewer Authority v. Oltrin Solutions, LLC*,
  2015 WL 13469927 (D.S.C. Mar. 30, 2015) ...........................................................8

*Grimmett v. Brown*,
  75 F.3d 506 (9th Cir. 1996) .....................................................................................7

*Hengle v. Treppa*,
  19 F.4th 324 (4th Cir. 2021) ..................................................................................13

*In re Interior Molded Doors Antitrust Litigation*,
  2019 WL 4478734 (E.D. Va. Sept. 18, 2019)...................................................21, 22

*Jien v. Perdue Farms, Inc.*,
  2020 WL 5544183 (D. Md. Sept. 16, 2020) ......................................................24, 25

*Kadow v. First Federal Bank*,
  2020 WL 5230560 (D. Md. Sept. 2, 2020) ..............................................................9

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)................................................................................................13

*In re Lithium Ion Batteries Antitrust Litigation*,
  2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ................................................. 7-8, 10

*Mathias v. HomeStreet Bank, Inc.*,
  2021 WL 4484549 (D. Haw. Sept. 29, 2021) ........................................................6

*Mayor of Baltimore v. Actelion Pharmaceuticals Ltd.*,
  995 F.3d 123 (4th Cir. 2021) ...........................................................................13

*McAnaney v. Astoria Financial Corp.*,
  2007 WL 2702348 (E.D.N.Y. Sept. 12, 2007) ..............................................7, 10

*Mullinax v. Radian Guaranty Inc.*,
  199 F. Supp. 2d 311 (M.D.N.C. 2002) ..................................................................6

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Industries, Inc.*,
  889 F.2d 524 (4th Cir. 1989) ...............................................................................24

*National Collegiate Athletic Ass'n v. Alston*,
  594 U.S. 69 (2021) .................................................................................................23

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans
  Archdiocesan Cemeteries*,
  56 F.4th 1026 (5th Cir. 2023) ...............................................................................24

*Oak Plaza, LLC v. Buckingham*,
  2023 WL 2537661 (D. Md. Mar. 16, 2023) ............................................................8

*Peterson v. JBS USA Food Co. Holdings (In re Cattle Antitrust Litigation)*,
  2020 WL 5884676 (D. Minn. Sept. 29, 2020) ......................................................16

*Pinney Dock & Transport Co. v. Penn Central Corp.*,
  838 F.2d 1445 (6th Cir. 1988) ...............................................................................6

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp*,
  828 F.2d 211 (4th Cir. 1987) ................................................................6, 7, 11, 12

*In re Pool Products Distribution Market Antitrust Litigation*,
  988 F. Supp. 2d 696 (E.D. La. 2013) .....................................................................6

*In re Processed Egg Products Antitrust Litigation*,
  962 F.3d 719 (3d Cir. 2020)..................................................................................22

*In re Railway Industry Employee No-Poach Antitrust Litigation*,
  395 F. Supp. 3d 464 (W.D. Pa. 2019).....................................................................23

*Ramsey v. National Ass'n of Music Merchants (In re Musical Instruments &
  Equip. Antitrust Litigation)*,
  798 F.3d 1186 (9th Cir. 2015) ..............................................................................21

*In re Refrigerant Compressors Antitrust Litigation*,
    795 F. Supp. 2d 647 (E.D. Mich. 2011)...................................................................6

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ...................................................................6

*Robertson v. Sea Pines Real Estate Cos.*,
    679 F.3d 278 (4th Cir. 2012) ........................................................................ *passim*

*Roy v. Bank of N.Y. Mellon*,
    2018 WL 3912281 (E.D.N.Y. Aug. 14, 2018).......................................................10

*Ruth v. Unifund CCR Partners*,
    604 F.3d 908 (6th Cir. 2010) ................................................................... 9-10, 11

*Rx.com, Inc. v. Medco Health Solutions, Inc.*,
    2008 WL 11449354 (E.D. Tex. Mar. 11, 2008) ....................................................7

*Ryan v. Microsoft Corp.*,
    147 F. Supp. 3d 868 (N.D. Cal. 2015) ...................................................................6

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ........................................................................ *passim*

*SD3 II LLC v. Black & Decker (U.S.) Inc.*,
    888 F.3d 98 (4th Cir. 2018) .................................................................................12

*Simmons Oil Corp. v. Tesoro Petroleum Corp.*,
    86 F.3d 1138 (Fed. Cir. 1996).............................................................................7

*Summerhill v. Terminix, Inc.*,
    637 F.3d 877 (8th Cir. 2011) .............................................................................12

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
    71 F.3d 119 (4th Cir. 1995) ..................................................................................7

*Taggart v. Wells Fargo Home Mortgage, Inc.*,
    2010 WL 3769091 (E.D. Pa. Sept. 27, 2010) .......................................................6

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)........................................................................21, 24

*Towers v. Iger*,
    2017 WL 6044035 (N.D. Cal. Mar. 10, 2017)......................................................6

*United States v. Brewbaker*,
    87 F.4th 563 (4th Cir. 2023) ...............................................................................23

*Williams v. Aries Financial, LLC*,
    2009 WL 3851675 (E.D.N.Y. Nov. 18, 2009) ............................................................... 6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971) .................................................................................................... 13

*Zigdon v. LVNV Funding, LLC*,
    2010 WL 1838637 (N.D. Ohio Apr. 23, 2010) ............................................................ 6

## STATUTES

National Defense Authorization Act for Fiscal Year 1998, Pub. L. No. 105-85,
    § 121(b), 111 Stat. 1648 ........................................................................................... 8-9

## OTHER AUTHORITIES

48 C.F.R. § 9.602(a) ....................................................................................................... 8

## INTRODUCTION

Plaintiffs' opposition brief confirms that their suit fails as a matter of law on multiple, independently sufficient grounds.  *See* Opp'n Joint Mot. Dismiss, ECF No. 202 ("Joint Opp'n").

Begin with timeliness.  Plaintiffs concede that nineteen years and ten years have elapsed since their respective alleged injuries.  Their claims accrued long ago.  Plaintiffs respond that "fraudulent concealment" justifies their decade(s)-long delay in bringing suit.  But the Fourth Circuit and other courts have roundly rejected Plaintiffs' argument that they are entitled to perpetual tolling merely because they contend that Defendants did not memorialize their supposed agreement in writing.  Equally meritless is Plaintiffs' contention that Defendants tried to fool them by entering into teaming agreements with "sham" prohibitions on recruiting.  Plaintiffs concede they are not challenging the legitimacy of those provisions, which are part of teaming agreements that the government encourages.  Those provisions are the very opposite of a sham.  And although in their complaint Plaintiffs made much of Defendants' public statements that they act with "integrity" and "offer competitive compensation," Plaintiffs now rightly acknowledge that such generic statements are insufficient to allege fraudulent concealment.

Plaintiffs are also not entitled to the extraordinary tolling they seek because they made no effort to investigate their claims in the intervening decades before they sued.  Plaintiffs contend they had no reason to suspect they had a claim, but their own allegations show otherwise.  Plaintiffs allege a severe labor shortage in a robust market for naval engineers, and surely they knew if they were never recruited.  Yet Plaintiffs concede that they did nothing to investigate that alleged incongruence—which they now insist can be explained "only" by the alleged conspiracy.  Compl. ¶ 164.  Nor do they offer any explanation as to how now, after all these years, Defendants' alleged plot was revealed.

Timeliness is only the complaint's first fatal legal flaw.  Plaintiffs also fail to plausibly allege an illegal agreement.  Plaintiffs' claims—involving a decades-long conspiracy passed by word of mouth among innumerable participants—are implausible on their face.  In response, Plaintiffs contend that their allegations are the product of an "extensive" investigation that yielded a "wealth of direct evidence" in which "witness after witness" "confirmed the existence of the conspiracy."  Joint Opp'n 1.  But Plaintiffs do not plead what they say they plead.

Time and again, the witness statements that Plaintiffs hold up as direct evidence of a "gentlemen's agreement" do not describe an agreement at all.  *See, e.g.*, Compl. ¶¶ 4, 9, 148, 150, 152, 155, 157.  Even assuming their truth, those paragraphs refer only to a Defendant's alleged independent policy or practice of not actively recruiting; none is direct evidence of an *agreement* among Defendants.  Plaintiffs' summation allegation is a paradigmatic example.  In careful disjunctive language, Plaintiffs allege that many Defendants *either* were "named" as "part" of the conspiracy, "discussed" an individual "seeking to change employment," *or* "had a policy or practice of not recruiting."  Compl. ¶ 159.  And in the limited instances where Plaintiffs do attempt to plead an agreement, they rely on impermissible group pleading and anonymous confidential witness allegations, *see, e.g.*, *id.* ¶¶ 156, 158, 160, that fall far short of providing the detail required to survive a motion to dismiss.

Without their touted "direct" allegations, Plaintiffs are really asking this Court to infer agreement from supposed parallel conduct, which makes this *Twombly redux*.  Like *Twombly*, the complaint itself makes clear that Defendants have their own reasons for taking the same actions.  Plaintiffs affirmatively allege that "repeat-player working relationships," including through "teaming arrangements" with non-solicit provisions, provide strong incentives not to actively recruit from industry participants.  *Id.* ¶¶ 166, 175.  And Plaintiffs' generic "plus" factors, like

2

Defendants' interest in keeping costs low or attendance at trade shows, would apply to almost any industry.  They do not allow the inferential leap from lawful parallelism to illegal agreement.

Finally, this is a rule of reason case but Plaintiffs have not adequately alleged rule of reason claims.  The complaint alleges a series of complex and overlapping relationships among the Defendants, all of whom have legitimate interests in working together to serve government customers and in not actively recruiting each other's employees in the process.  And Plaintiffs do not adequately allege a valid relevant product market, geographic market, or market power—all necessary elements of their rule of reason claims.

The Supreme Court warned in *Twombly* that the sprawling, costly, and time-consuming nature of antitrust cases makes it especially important to ensure that only legally sufficient and plausible claims advance beyond a motion to dismiss.  This suit, with its dated claims and allegations of merely parallel conduct, should be dismissed.[1]

## ARGUMENT

### I.    Plaintiffs Have Not Met Their Burden to Plead That Fraudulent Concealment Saves Their Untimely Claims.

Plaintiffs concede that their alleged injuries are a decade old and nearly two decades old, respectively.  *See* Joint Opp'n 24 & n.16.  Such extraordinarily dated claims require equally extraordinary allegations of fraudulent concealment and diligence to justify such extensive tolling. Plaintiffs fail to carry their burden.

### A.    Plaintiffs Do Not Plead Affirmative Concealment.

Plaintiffs acknowledge that under Rule 9(b) they must allege with particularity "affirmative acts of concealment" by Defendants.  Joint Opp'n 26-27 (quoting *Edmonson v. Eagle Nat'l Bank*,

---

[1] This reply is filed on behalf of the same group of Defendants who joined the motion to dismiss, save for Defendants BMT International, Inc. and Technology Financing, Inc., whom Plaintiffs have now voluntarily dismissed from this action.  *See* ECF No. 200.

922 F.3d 535, 553 (4th Cir. 2019)).  Plaintiffs identify three supposed acts of concealment: (1) failing to commit the conspiracy to writing, (2) inserting supposed "sham" non-solicit provisions into teaming agreements, and (3) making non-specific public statements about their hiring practices and legal compliance.  *Id.* at 27-38.  But these acts do not qualify as *affirmative* concealment, either alone or taken together.

Perhaps sensing the weakness of their tolling allegations, Plaintiffs begin by insisting that Rule 9(b) does not ask much of them.  *Id.* at 24-27.  Plaintiffs misstate the standard.  The very case they invoke for a "relaxed" Rule 9(b) requirement reaffirms that fraudulent concealment must be pleaded with "particularity," and holds that the allegations in that case were inadequate.  *See Corder v. Antero Res. Corp.*, 57 F.4th 384, 401 (4th Cir. 2023).  But Plaintiffs also miss the point: no amount of particularity could save their fraudulent concealment allegations because their allegations do not justify tolling as a matter of law.

### 1.  *An Unwritten Agreement Does Not Constitute Affirmative Concealment.*

Plaintiffs' lead argument is that Defendants fraudulently concealed their alleged agreement "by never committing it to writing."  Joint Opp'n 28; *see* Compl. ¶¶ 12, 205-06.  Plaintiffs do not cite a single case that permits tolling on that basis and they have no answer to the authority from the Fourth Circuit and elsewhere that rejects it.

Plaintiffs' tolling argument runs straight into the Fourth Circuit's decision in *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012).  There, the Court of Appeals affirmed that "agreeing not to discuss publicly the nature of their communications in furtherance of th[e] illegal scheme," "meeting secretly," and even "giving pretextual reasons" to avoid disclosing the agreement are "legally insufficient to state a claim of fraudulent concealment."  *Boland v. Consol. Multiple Listing Serv., Inc.*, 868 F. Supp. 2d 506, 518-19 (D.S.C. 2011), *aff'd sub nom. Robertson*

*v. Sea Pines Real Est. Cos.*, 679 F.3d 278 (4th Cir. 2012). *Robertson* explained that those were not "affirmative acts of concealment or affirmative steps to mislead," and instead "amount[ed] to no more than a failure to admit to wrongdoing, which does not suffice." 679 F.3d at 291 n.2 (quotation omitted).

Plaintiffs strain to distinguish *Robertson*, claiming that allegations of agreeing to keep unlawful communications secret, meeting secretly, and giving pretextual reasons do "not suggest deliberate concealment," whereas alleging an unwritten agreement does. Joint Opp'n 32-33. That misconstrues *Robertson*. Keeping an agreement secret or unwritten may be *some* form of concealment, but it is not an "*affirmative*" act of concealment that justifies tolling. *Id.* Were it otherwise, the Sherman Act's four-year limitations period would be all but meaningless in every case where an illegal agreement was alleged to be unwritten or otherwise kept secret.[2]

Courts around the country agree. In another no-recruit case brought by Plaintiffs' counsel here, the court held that "avoid[ing] memorializing the scheme in writing" or "attempt[ing] to keep the conspiracy secret from Plaintiffs," in and of itself, does not warrant tolling because it does not show "an affirmative effort on the part of any defendant." *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1215 (N.D. Cal. 2015) ("*Animation Workers I*") (quotation omitted). The court explained that "[i]f the mere fact of a secret conspiracy were sufficient to toll the statute of limitations under the fraudulent concealment doctrine, there would be little point in imposing a period of limitation in the first instance." *Id.* at 1216. Other analogous cases likewise recognize that such passive concealment does not justify tolling. *See, e.g.*, *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1199-1200, 1202 (N.D. Cal. 2015) ("*Animation Workers II*")

---

[2] Plaintiffs also dismiss *Robertson*'s discussion of fraudulent concealment as a "cursory footnote," Joint Opp'n 32 n.24, but that only reflects that the district court's analysis in *Boland* is plainly correct.

(reiterating that "silence or mere passive concealment cannot constitute affirmatively misleading conduct" in non-solicit case); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1077-78 (N.D. Cal. 2016) (same); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 891-93 (N.D. Cal. 2015) (same); *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988) ("unwillingness to divulge one's allegedly wrongful activities[] is not sufficient").[3]

Plaintiffs also have no answer for the Fourth Circuit's decision in *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp*, 828 F.2d 211 (4th Cir. 1987). There, the court held that providing an allegedly pretextual answer to avoid disclosing an illegal agreement was not an "affirmative[]" "technique[] of secrecy" that constituted fraudulent concealment. *Id.* at 218-19; *see also Robertson*, 679 F.3d at 291 n.2 (affirming that giving a pretextual answer does not justify tolling). If allegedly giving a pretextual answer to avoid revealing an illegal agreement is merely a failure to admit wrongdoing rather than affirmative concealment, then allegedly failing to write down the agreement is not even close. Plaintiffs again strain to avoid that straightforward conclusion. They insist that *Pocahontas* did not actually involve allegations of "misleading" conduct, Joint Opp'n 31-32, but it plainly did. When the plaintiff asked why the price paid was so low, "[i]nstead of responding that the [low price was] the result of concerted, illegal antitrust activity, [one of the defendants] responded that . . . the pricing simply was the maximum allowable." 828 F.2d at 218. Although that response was allegedly false (the allegedly real reason

---

[3] *See also, e.g.*, *Mathias v. HomeStreet Bank, Inc.*, 2021 WL 4484549, at *6, *8 n.13 (D. Haw. Sept. 29, 2021); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 992-93 (N.D. Cal. 2020); *Towers v. Iger*, 2017 WL 6044035, at *11 (N.D. Cal. Mar. 10, 2017); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 723 (E.D. La. 2013); *In re Refrigerant Compressors Antitrust Litig.*, 795 F. Supp. 2d 647, 664-65 (E.D. Mich. 2011); *Taggart v. Wells Fargo Home Mortg., Inc.*, 2010 WL 3769091, at *4 (E.D. Pa. Sept. 27, 2010); *Zigdon v. LVNV Funding, LLC*, 2010 WL 1838637, at *9-10 (N.D. Ohio Apr. 23, 2010); *Williams v. Aries Fin., LLC*, 2009 WL 3851675, at *9-10 (E.D.N.Y. Nov. 18, 2009); *Mullinax v. Radian Guar. Inc.*, 199 F. Supp. 2d 311, 329-30 (M.D.N.C. 2002).

was collusion), the Fourth Circuit held that fraudulent concealment requires "conduct more affirmatively directed at deflecting litigation" than an "alleged failure to own up to illegal conduct." *Id.* at 218-19. So too here: it "would effectively nullify the statute of limitations" to treat the passive act of not memorializing the alleged agreement or of maintaining its secrecy as "affirmative[]" conduct that warrants tolling. *See id.*[4]

None of Plaintiffs' cited cases says otherwise. Notwithstanding Plaintiffs' cherry-picked descriptions, all of their cases involved detailed allegations of affirmative concealment *beyond* not reducing the agreement to writing. *See* Joint Opp'n 28-29. In *Animation Workers II*, upon which Plaintiffs heavily rely, plaintiffs offered "detailed allegations" about defendants' "affirmative attempts to maintain the secrecy of the conspiracy," including specific "efforts to eliminate a paper trail." 123 F. Supp. 3d at 1200-02 & n.14. For instance, the plaintiffs alleged the defendants used personal email addresses and a specific code-name when discussing the agreement in writing and instructed each other to ask questions by phone. *See id.* at 1201; ECF No. 121 ¶¶ 135-43, *In re Animation Workers Antitrust Litig.*, No. 14-cv-04062 (N.D. Cal. May 15, 2015). *In re Capacitors Antitrust Litigation* likewise involved detailed allegations of affirmative efforts to maintain secrecy, including instructions to "delete" emails after reading them. 106 F. Supp. 3d 1051, 1065 (N.D. Cal. 2015); *see also In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *16

---

[4] Plaintiffs suggest *Pocahontas* is limited to the due diligence prong. *See* Joint Opp'n 32 n.23. But *Pocahontas* drove the adoption of the affirmative acts standard, *see Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122-25 (4th Cir. 1995), and the Fourth Circuit has cited *Pocahontas* in affirming that a denial of wrongdoing is insufficient to "allege affirmative acts of concealment," *see Robertson*, 679 F.3d at 291 n.2 (quoting *Pocahontas*, 828 F.3d at 218-19). So have numerous other courts. *See, e.g.*, *Grimmett v. Brown*, 75 F.3d 506, 515 (9th Cir. 1996); *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1143 (Fed. Cir. 1996); *In re Evenflo Co. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2023 WL 8810517, at *8 (D. Mass. Dec. 20, 2023); *Rx.com, Inc. v. Medco Health Sols., Inc.*, 2008 WL 11449354, at *10 (E.D. Tex. Mar. 11, 2008); *McAnaney v. Astoria Fin. Corp.*, 2007 WL 2702348, at *8 (E.D.N.Y. Sept. 12, 2007).

(N.D. Cal. Jan. 21, 2014) (alleging defendants maintained secrecy by "instructing the recipient of documents or emails to destroy, delete, or discard them after reading"); *cf. Grand Strand & Water & Sewer Auth. v. Oltrin Sols., LLC*, 2015 WL 13469927, at \*4-5 (D.S.C. Mar. 30, 2015) (reiterating that "'silence is not enough' and neither is 'failure to admit wrongdoing'" (quoting *Boland*, 868 F. Supp. 2d at 518)).[5]

Plaintiffs' complaint is devoid of any such allegations of affirmative efforts to maintain secrecy. *See* Compl. ¶¶ 13, 205-06. And they are not entitled to tolling based solely on allegations that Defendants did not commit their alleged agreement to writing.

### 2. *Non-Solicit Provisions in Teaming Agreements Do Not Constitute Affirmative Concealment.*

Plaintiffs next contend that Defendants deceived them by including "sham" non-solicit provisions in written teaming agreements. Joint Opp'n 34. Yet Plaintiffs themselves acknowledge that they are not challenging the legitimacy of such provisions in connection with teaming agreements. *Id.* at 35 & n.26 (citing Compl. ¶ 175 n.8). And the government recognizes that teaming agreements serve the national interest by facilitating the production of military vessels. *See* 48 C.F.R. § 9.602(a) (noting teaming may "be desirable from both a Government and industry standpoint [and] [o]ffer the Government the best combination of performance, cost, and delivery for the system or product being acquired"); *cf.* Compl. ¶ 174 (alleging that Defendants team up "when submitting joint bids to the U.S. government"). Indeed, the government sometimes *requires* Defendants to enter into teaming agreements. *See, e.g.*, National Defense Authorization Act for

---

[5] The other cases on which Plaintiffs rely are entirely inapposite. *See Corder*, 57 F.4th at 401-02 (addressing state-law "fraud by omission" claims); *Oak Plaza, LLC v. Buckingham*, 2023 WL 2537661, at \*17 (D. Md. Mar. 16, 2023) (same); *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049-51 (4th Cir. 1987) (holding asserted acts of concealment were not supported by the record).

Fiscal Year 1998, Pub. L. No. 105-85, § 121(b), 111 Stat. 1629, 1648 ("condition[ing]" funding for major submarine procurement contract "on a Team Agreement between [two Defendants]").

By contrast, a "sham" under Fourth Circuit law, including *Edmonson*, the case on which Plaintiffs primarily rely, refers to something that is bogus—typically, fake corporate entities or fake business agreements used to cover up illicit activity.  In *Edmonson*, for example, the complaint alleged in detail that the defendants "created and used 'sham' entities to channel" allegedly unlawful "kickbacks," "entered into 'sham'" services agreements as a cover for the payments, and "'back-dated' those agreements to further disguise the kickback scheme."  922 F.3d at 553.  Other cases from this Circuit concern similar kinds of "shams."[6]  The sham corporate entities and financial agreements used to cover up misconduct in those cases bear no resemblance to the disclosed non-solicit provisions in teaming agreements at issue here.

Plaintiffs contend that the teaming agreements "provided Defendants with a plausible cover if anyone had questioned their recruitment tactics" and that Defendants "used these provisions . . . as a 'trick or contrivance . . . to exclude suspicion and prevent inquiry.'"  Joint Opp'n 34-35 (quoting *Edmonson*, 922 F.3d at 553).  But the complaint does not actually allege or even suggest that Defendants ever used teaming agreements as a cover for an unwritten industrywide conspiracy.  *See* Compl. ¶¶ 13, 174-175.  Nor does the complaint allege Plaintiffs were ever aware of any teaming agreements or underlying non-solicit provisions while working in the industry.  Those provisions therefore cannot possibly have concealed the conspiracy from Plaintiffs or "prevent[ed] [them] from discovering" the alleged conspiracy "during the limitations period."  *See*

---

[6] *See Ekstrom v. Cong. Bank*, 2020 WL 6565251, at *14 (D. Md. Nov. 9, 2020); *Donaldson v. Primary Residential Mortg., Inc.*, 2020 WL 3184089, at *2 (D. Md. June 12, 2020); *Kadow v. First Fed. Bank*, 2020 WL 5230560, at *5 (D. Md. Sept. 2, 2020); *Fangman v. Genuine Title, LLC*, 2016 WL 6600509, at *6 (D. Md. Nov. 8, 2016).

*Ruth v. Unifund CCR Partners*, 604 F.3d 908, 910-11 (6th Cir. 2010); *see also, e.g.*, *Roy v. Bank of N.Y. Mellon*, 2018 WL 3912281, at *6 (E.D.N.Y. Aug. 14, 2018); *McAnaney v. Astoria Fin. Corp.*, 2007 WL 2702348, at *10 (E.D.N.Y. Sept. 12, 2007).[7]

### 3.   *Generic Public Statements Do Not Constitute Affirmative Concealment.*

Finally, Plaintiffs contend Defendants concealed the alleged agreement through public statements that they comply with law, offer competitive wages and benefits, and adhere to certain values and ethical standards.  *See* Joint Opp'n 35-38.  These allegations are not enough, either.  Indeed, Plaintiffs now *concede* that these allegations are insufficient "*absent other evidence that the defendant[s] attempted to conceal its alleged antitrust behavior.*"  *Id.* at 37 (quoting *Garrison*, 159 F. Supp. 3d at 1078 (emphasis added in opposition brief)).

Plaintiffs are forced to make that concession because the cases they cite hold that allegedly misleading public statements alone are not enough to plead fraudulent concealment.  *Animation Workers II* explained that only "the combination" of "misleading, pretextual statements *and* . . . affirmative efforts taken to . . . keep the conspirac[y] secret that support[s] . . . fraudulent concealment allegations."  123 F. Supp. 3d at 1200 (quoting *Animation Workers I*, 87 F. Supp. 3d at 1216 (emphasis added)).  Likewise, *Lithium Ion* involved allegations of *both* "putatively false [public] statements" affirming defendants' "compliance with applicable antitrust laws" and "vigorous price competition," *and* affirmative acts to conceal the conspiracy, such as "instructing the recipient of documents or emails to destroy, delete, or discard them after reading."  2014 WL 309192, at *16.

---

[7] Plaintiffs assert that "reliance is not required for this element of fraudulent concealment," Joint Opp'n 36, but a plaintiff must at least allege the conspiracy was concealed *as to them* to justify tolling.  *Cf. Edmonson*, 922 F.3d at 548 (requiring that "*the plaintiff* failed to discover those facts within the statutory period" (emphasis added)).

The alleged public statements are also legally inadequate on multiple other grounds.  For one, the statements at best simply deny or fail to admit wrongdoing.  That "is not fraud," *GO Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007), nor is it "affirmatively directed at deflecting litigation," *Pocahontas*, 828 F.2d at 219.  Furthermore, Plaintiffs do not dispute that almost all of the representations they plead are from 2021 or later.  *See* Joint Opp'n 37-38; Compl. ¶¶ 207-17.  The alleged statements thus come too late to help Plaintiffs and could not have "prevent[ed] [them] from discovering" the conspiracy "during the limitations period." *See Ruth*, 604 F.3d at 910-11.

## B.      Plaintiffs Undertook No Due Diligence in the Decade(s) After Their Alleged Injuries Despite Being On Inquiry Notice.

Plaintiffs also concede that they made no effort to discover the alleged conspiracy after their alleged injuries, but contend they were not on inquiry notice.  Joint Opp'n 38-39.  Plaintiffs are wrong.  A plaintiff is on inquiry notice when the plaintiff "knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain."  *GO Comput.*, 508 F.3d at 179; *see* Joint Opp'n 39.

That is this case.  Plaintiffs allege facts showing they knew of a pattern of non-solicitation that should have prompted them to investigate the lack of recruitment.  Plaintiffs allege that "naval engineers generally spend their entire careers without being solicited by a rival firm," and do not allege they were ever solicited while working in the industry, despite what should have been rampant demand due to a "persistent shortage of qualified naval engineers."  Compl. ¶¶ 7, 10.

Plaintiffs counter that such non-recruitment "would not have been enough for a reasonable engineer to suspect an extensive conspiracy" because they "would have assumed" Defendants "were complying with all relevant laws."  Joint Opp'n 40.  But Fourth Circuit precedent prohibits assuming such compliance even in the face of an *express* denial of wrongdoing.  *Go Comput.*, 508

F.3d at 179; *Pocahontas*, 828 F.2d at 218-19. *Edmonson* is not to the contrary; it observed that a plaintiff need not presume the defendant is concealing *absent* facts that should have excited suspicion, and that publicly available information plaintiff is not aware of does not excite suspicion. *See* 922 F.3d at 554-56. "Once on inquiry notice," however, Plaintiffs could not "simply ignore the diligence requirement and later claim that the alleged fraud was well-disguised." *SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 113 (4th Cir. 2018) (quotation omitted). Because Plaintiffs do not allege they took *any* steps to investigate an allegedly suspicious pattern of non-recruitment, they do not satisfy the due diligence requirement of fraudulent concealment.

Plaintiffs also allege no facts "as to the time when the fraud, mistake, concealment or misrepresentation was discovered . . . so that the court may clearly see, whether by the exercise of ordinary diligence, the discovery might not have been before made" earlier. *Pocahontas*, 828 F.2d at 219 (quotation omitted). This Circuit and others have repeatedly held that failure to allege "when and how [the plaintiff] discovered [the defendant's] alleged fraud" dooms an attempt to plead fraudulent concealment. *E.g.*, *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 881 (8th Cir. 2011). Because the complaint is devoid of any such details, fraudulent concealment does not save Plaintiffs' claims.

### C.     The Discovery Rule Does Not Apply.

In a final effort to save their time-barred claims, Plaintiffs briefly suggest that the Court should apply the discovery rule rather than the injury rule of accrual. Joint Opp'n 42-43. This position is foreclosed under existing Fourth Circuit precedent.

The Supreme Court has twice stated that antitrust claims accrue when the plaintiff suffers an injury and has explicitly distinguished this "pure injury accrual rule" that "applies in traditional antitrust cases" from the discovery accrual rules courts have applied in the civil RICO context.

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997); *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).[8]  Building on *Klehr* and *Zenith*, the Fourth Circuit and most other courts apply the injury rule to antitrust claims.  *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 538 (4th Cir. 1997); *Mayor of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131-32 (4th Cir. 2021); *see also, e.g.*, *Animation Workers I*, 87 F. Supp. 3d at 1210 (rejecting discovery rule in light of "longstanding" Supreme Court and circuit authority, including *Detrick*).  Plaintiffs' claims thus accrued at the time of alleged injury—*i.e.*, nineteen and ten years ago, respectively—and are time-barred.

## II.    The Complaint Does Not Plausibly Allege an Agreement Among Defendants.

Even if Plaintiffs' claims were timely (and they decidedly are not), Plaintiffs also fail to plead a violation of Section 1 of the Sherman Act.  To survive a motion to dismiss, the complaint must plausibly allege either direct or circumstantial evidence of an unlawful agreement.  *Robertson*, 679 F.3d at 289.  This complaint does neither.

### A.    The Complaint Fails to Allege Direct Evidence of an Agreement.

As Plaintiffs acknowledge, "direct evidence is explicit and requires no inferences to establish the proposition . . . being asserted."  Joint Opp'n 8 (quotation omitted).  What Plaintiffs tout as "a wealth of direct evidence" of agreement, *id.* at 1, is nothing of the sort.

Instead, time and again, Plaintiffs' purported examples of direct evidence describe only the *independent policies* or *practices* of individual Defendants—not an industrywide *agreement*.  *See id.* at 13-14.  Plaintiffs assert in a long string cite at the top of their brief that each of the allegations below is evidence of an "agreement."  *Id.* at 3.  But none actually describe a global agreement (*i.e.*,

---

[8] Although *Klehr* is dicta, the Fourth Circuit "afford[s] great weight to Supreme Court dicta." *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (quotation omitted).

Defendants collectively agreeing to an unlawful course of conduct) as opposed to a description of a Defendant's alleged own unilateral policy:

- An "industry veteran" "admitted that his firm did not 'go after people at other companies,'" and a "former insider from Huntington Ingalls" reported "a 'do not hire list'" of companies from which its "recruiters could not activity recruit." Compl. ¶¶ 4, 155. No agreement is alleged.

- An "executive, who first entered the industry in 1969 and worked his way into management over the next five decades," stated that "'You didn't recruit people from [other] firms,'" and that, "in the event someone floated the possibility of recruiting from a competitor, the answer was predictable: 'He works for [a competitor]; we can't do that.'" *Id.* ¶ 7 (alteration in original). No agreement is alleged.

- "[S]enior managers" at three Defendants "confirmed that they would not actively recruit from competitor firms," and "[o]ne witness" stated that "'I never recruited anyone actively from a competitor.'" *Id.* ¶ 150. No agreement is alleged.

- "A management-level employee with hiring authority" at an unnamed Defendant stated "that 'you didn't recruit people' from competitors." *Id.* ¶ 148. No agreement is alleged.

- "[O]ne executive … overheard a colleague say to another colleague in regard to recruiting a potential candidate, 'He works for [a competitor], we can't do that,'" and another "executive" explained that if a Defendant "'offered my guy a position, they'd call me and say, 'We didn't poach him.'" *Id.* ¶¶ 9, 152. No agreement is alleged.

- An "independent recruiter[]" working "in the late 2010s noted that they were instructed to avoid recruiting from other companies in the industry," and "[h]iring managers sometimes explained these restrictions by describing competitors as 'friends,' or by saying 'we have a relationship.'" *Id.* ¶ 157; *see id.* ¶ 12. No agreement is alleged.

Plaintiffs' summation of their allegations in Paragraph 159 confirms the emptiness of their assertion of "direct evidence." Although Plaintiffs urge the Court to consider the "*content*" of that Paragraph, Joint Opp'n 12, it alleges only that "each witness *either* named the Defendant as part of the conspiracy, discussed a specific application of the conspiracy to a job candidate, *or* confirmed the Defendant's no poach policy or practice." *Id*. (citing Compl. ¶ 159 (emphasis added)). Plaintiffs' use of the disjunctive "or" gives the game away. Even assuming the truth of the allegation, alleging that each Defendant *either* agreed to a conspiracy to do X *or* had a practice of doing X does not establish that *any* Defendant agreed to do anything.

14

Plaintiffs defend their allegations by repeatedly asserting they come from "confidential witnesses" who supposedly have "eyewitness" knowledge. *E.g.*, Joint Opp'n 8-10. But if Plaintiffs' "extensive pre-filing investigation," *id.* at 1, had actually revealed witnesses who were "eyewitness" to Defendants striking an illegal agreement, Plaintiffs would have alleged just that. None of the anonymous sources in the complaint purport to have any knowledge of "conspiratorial meetings" or anything suggestive of the *formation* of an actual agreement. *Id.* at 8. Instead, Plaintiffs repeatedly allege individual practices of individual Defendants, which is not "direct" "eyewitness" support of a conspiracy. That the complaint's supposed "admissions by employees" relate to an individual Defendant's policy or practice—not a conscious commitment to a common scheme among all Defendants—distinguishes this case from the cases Plaintiffs cite. *See id.*

The limited and conclusory allegations of an agreement that Plaintiffs do offer (and repeat) are equally insufficient. *See, e.g.*, Compl. ¶ 151 ("Defendants … participated in the gentlemen's agreement not to recruit"); *id.* ¶ 156 ("non-ink-to-paper" agreement); *id.* ¶ 158 ("widespread" agreement). Plaintiffs' protestations notwithstanding, *see* Joint Opp'n 11-14, these allegations do precisely what the Fourth Circuit has held does not state a Section 1 claim: "assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group," *SD3 LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015). Plaintiffs do not plead the "who, what, where, when, how or why" of the alleged agreement, despite a wealth of authority requiring that detail. *See* Mem. Supp. Joint Mot. Dismiss 20, ECF No. 178-1 ("Mem.") (citing, *inter alia*, *SD3*, 801 F.3d at 430).

In addition to that fatal defect, all of their allegations come from anonymous witnesses, such as "managers with hiring authority," "former managers," or "a former employee." Joint Opp'n 9; *see id.* at 9-11; *see* Mem. 23-25. But Plaintiffs do not plead any facts about the witnesses'

"jobs" and "how their interactions in those jobs would lead to them acquiring the knowledge" of an alleged secret unwritten industrywide conspiracy.  *Peterson v. JBS USA Food Co. Holdings (In re Cattle Antitrust Litig.)*, 2020 WL 5884676, at \*5 (D. Minn. Sept. 29, 2020) (citing *Hinds Cnty. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 396 n.5 (S.D.N.Y. 2010)); *see also City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 396 (2d Cir. 2024) (affirming that confidential witness allegations were not direct evidence of agreement where the complaint "fail[ed] to allege that the [source] was in a position to know whether a conspiracy existed"). Those sparse allegations are insufficient to state a claim under Section 1.

### B.       Plaintiffs' Circumstantial Allegations of an Agreement Are Insufficient.

Having failed to plead an agreement directly, Plaintiffs must rely on circumstantial allegations.  But they fail the basic requirement to "plead parallel conduct *and* something 'more.'" *SD3*, 801 F.3d at 424 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  To meet that standard, Plaintiffs must "demonstrate[] that the parallel behavior 'would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *Id.* (quoting *Twombly*, 550 U.S. at 556 n.4).  And if Plaintiffs plead the "obvious alternative explanation" for Defendants' alleged conscious parallel conduct, *Twombly* requires dismissal.  *Twombly*, 550 U.S. at 567.

Plaintiffs are right that "[c]ourts evaluate plus factors holistically and weigh them together with the allegations of parallel conduct."  Joint Opp'n 15 (quotation omitted).  But Plaintiffs are wrong that their generic and conclusory allegations—even taken as true, and whether considered together or individually—support a plausible inference of agreement.  Indeed, the bulk of Plaintiffs' plus-factor analysis would apply in any industry.  If these generic plus factors were enough to infer an illegal agreement, then plaintiffs could often state a claim without alleging more

16

than parallel conduct.  That is exactly the regime that *Twombly* rejected.  *See* 550 U.S. at 556-57.  And here, as in *Twombly*, the complaint sets out exactly why Plaintiffs' allegations are implausible.

As their primary plus factor, Plaintiffs assert that Defendants acted against their "independent self-interests" by engaging in "behavior that makes no business sense absent an illegal agreement."  Joint Opp'n 20 (quotation omitted and format altered).  Plaintiffs contend Defendants have "every incentive to recruit each other's employees."  *Id.*  But the complaint's allegations leave no doubt that *not* actively recruiting rivals' employees is in each Defendant's unilateral interest.

For example, the complaint explains that "naval engineering consultancies work together with each other and with shipbuilders in relationships ranging from co-equals to supervisors to subcontractors," and "[t]wo firms in a contractor/subcontractor relationship on one contract may find their roles reversed on the next contract."  Compl. ¶ 137.  The complaint further alleges that "[t]his repeat-player dynamic encourages close and cooperative inter-firm relationships."  *Id.*  And the work often necessitates teaming agreements between competitors—with no-recruitment provisions similar to the purported agreement Plaintiffs allege.  *Id.* ¶¶ 13, 174.  As the complaint itself puts it, Defendants must maintain cooperative relationships with other firms that might be unusual in other industries.  *Id.* ¶ 171.

Plaintiffs allege that "in a competitive market, Defendants would have recruited aggressively from each other," and contend that Defendants are seeking inferences in their favor.  Joint Opp'n 22.  But Plaintiffs' *own allegations* undermine their circumstantial case because they explain precisely why a Defendant would choose *not to* actively solicit competitors' employees, even in a tight labor market.  Plaintiffs cannot establish a plausible inference of a conspiracy simply by invoking generic economic principles when the "allegedly conspiratorial actions could equally

have been prompted by lawful, independent goals which do not constitute a conspiracy." *Twombly*, 550 U.S. at 566-67 (quotation omitted); *see also id.* at 567 n.12 (adding, "Adam Smith . . . may be surprised to learn" that parallel conduct would indicate an illegal conspiracy).[9]

Other features of the alleged agreement further underscore its implausibility. For example, the description of hard-to-police exceptions to the alleged agreement belies an inference of a global agreement. *See* Mem. 21-22. In response, Plaintiffs speculate that such exceptions may have been designed to conceal the conspiracy. Joint Opp'n 10 & n.6. But the complaint alleges no facts to support such speculation. Nor does the complaint allege "inter-firm enforcement," despite Plaintiffs' insistence to the contrary. Joint Opp'n 23 (citing Compl. ¶¶ 149, 220). The complaint's allegations speak for themselves—and say nothing to suggest the alleged enforcement "phone calls" or "monitor[ing]" occurred *between* Defendants as opposed to within one. *See* Compl. ¶¶ 219-220.

Permitting lateral hiring when a candidate makes the first approach, or after a contract is awarded, makes good business sense in a close-knit industry of repeat players. *See* Mem. 28-30. So too, it makes perfect sense to know when a candidate is approaching on her own, to inform competitors when hiring their employees, to permit such hiring at unspecified times without retribution, and to reprimand employees who fail to follow company policy. *See* Joint Opp'n 22-23. Whatever Plaintiffs hypothesize about other markets, they cannot escape the hard truth that

---

[9] Plaintiffs contend that Defendants' argument as to why independent self-interests explain the alleged parallel conduct are "immaterial," because Plaintiffs' theory does not have to be the *most plausible* competing theory, just plausible on its own. Joint Opp'n 21; *see id.* at 21-24. But Defendants' contention is that Plaintiffs' theory is utterly *implausible* given the allegations in the complaint. *See Twombly*, 550 U.S. at 567-69 & n.14 (affirming dismissal because plaintiffs' allegations "failed *in toto* to render plaintiffs' entitlement to relief plausible" in part because "the complaint itself gives [non-conspiratorial] reasons" for defendants' parallel conduct).

their own complaint alleges in detail that soliciting naval engineers will "harm 'competitive relationships with other firms'" in the industry at issue here.  *See id.* at 22-23.

Plaintiffs' industry-specific allegations thus align each Defendant's alleged parallel behavior with its independent interests and negate Plaintiffs' theory that Defendant's conduct would not have occurred absent an agreement.  In effect, Plaintiffs plead the "obvious alternative explanation" for Defendants' conscious parallel conduct.  *Twombly*, 550 U.S. at 567.  That parallel conduct itself thus does not support an inference of agreement.[10]

Plaintiffs next argue that their supposed "detailed fact allegations" and "direct evidence" of the alleged agreement also qualify as plus factors that support an inference of an agreement.  Joint Opp'n 16 (citing *SD3*, 801 F.3d at 430).  But this just reprises Plaintiffs' inadequate direct allegations, which allege only parallel conduct and are not the basis from which to infer an agreement.  *See, e.g.*, *Pontiac*, 92 F.4th at 397 (finding confidential witness statements that did not show direct evidence of agreement also did not show circumstantial evidence of agreement).  Moreover, Plaintiffs omit that to meet that standard they must provide "detailed fact allegations *as to the 'who, what, when and where' of the claimed antitrust misconduct*."  *SD3*, 801 F.3d at 430 (emphasis added).  As discussed above, Plaintiffs have not done that here.  *See supra* pp. 13-16.

Plaintiffs further assert a series of supposed plus factors that, if sufficient as pleaded here, would obliterate *Twombly*'s requirement that an antitrust plaintiff must plead something more than parallel conduct.  Plaintiffs say Defendants shared "motivation for common action" because each Defendant wishes to keep costs low and had the "opportunity to conspire" at trade organization

---

[10]  Plaintiffs contend that the confidential witness statements show Defendants' policies reflect a "gentlemen's agreement" and could not have been the result of independent action.  Joint Opp'n 22 n.14.  But those alleged statements do not "confirm[]" an agreement at all.  *Id.*  As discussed above, at best, they only indicate certain Defendants' unilateral policies or practices.  *See supra* pp. 13-15.

19

and industry meetings.   Joint Opp'n 15-19.   Plaintiffs also say many Defendants and their employees are centered in the same general geographic area.  *Id.* at 49-50.  But these "plus factors" would be satisfied in virtually any industry, virtually all the time, without the existence of a conspiracy.   Competing firms have the shared motive to reduce labor costs, to engage on matters of industrywide interest, and to be near their principal client or cluster operations to capture synergies.   That Defendants allegedly adopted similar policies to accomplish these goals indicates profit-maximizing behavior expected in a well-functioning competitive market—not unlawful collusion.  *See Twombly*, 550 U.S. at 554, 566-67 & n.12; *Pontiac*, 92 F.4th at 410-11 & n.14.

Plaintiffs further contend that Defendants' supposed failure to put the alleged agreement in writing is relevant because "consciousness of guilt" is a plus factor.   Joint Opp'n 19 (quoting *SD3*, 801 F.3d at 432).   That is absurd.   *Twombly* would be turned on its head if the failure to disclose an alleged agreement supported an inference that the agreement existed in the first place.   And as discussed above, Plaintiffs have not adequately alleged that Defendants *concealed* an agreement or agreed "not to 'leave a paper trail'" anyway.  *SD3*, 801 F.3d at 432; *see supra* pp. 4-8.

Plaintiffs fare no better arguing the relevance of Defendants' alleged "information exchange," through which consultants "offered . . . insights" on market compensation.  Joint Opp'n 17-18 (quotation omitted); *see* Compl. ¶¶ 104, 172, 179, 180-183.  Plaintiffs do not explain how benchmarking data on compensation would enable Defendants to monitor and enforce the alleged non-solicit conspiracy.   And Plaintiffs do not allege necessary details from which to infer monitoring and enforcement, such as the frequency of alleged exchanges, their contents, or whether any Defendant actually knew what others paid their naval engineers.  What is more, "mere participation in trade-organization meetings where information is exchanged" is not a plus factor.

*See Ramsey v. Nat'l Ass'n of Music Merchants (In re Musical Instruments & Equip. Antitrust Litig.)*, 798 F.3d 1186, 1196 (9th Cir. 2015); *see also 7–Up Bottling Co. of Jasper Inc. v. Archer Daniels Midland Co. (In re Citric Acid Litig.)*, 191 F.3d 1090, 1099 (9th Cir. 1999).

Plaintiffs' failure to provide any meaningful detail about how communications and information sharing would have facilitated a conspiracy distinguishes this case from both cases on which Plaintiffs rely. *See* Joint Opp'n 17-18. In *SD3*, the complaint described the details of "phone calls, meetings, and discussions," including a key "meeting where the alleged conspiracy formed." 801 F.3d at 432; *see id.* at 419. And in *Todd v. Exxon Corp.*, the plaintiffs alleged extensive details of "the primary forms of salary information exchange," the precise manner in which "defendants supplemented this information with data from other sources," and the categories of employees who "held regular meetings—at least three times per year." 275 F.3d 191, 196-97 (2d Cir. 2001).

Plaintiffs' final plus factor, based on allegations of "market concentration," is similarly weak. *See* Joint Opp'n 18-19. The complaint alleges that nineteen Defendants and at least four other entities *collectively* control 75% of the relevant labor market. Compl. ¶¶ 244-245; *see id.* ¶¶ 107-112. In other words, this is *not* an industry where "power is concentrated in the hands of the few." Joint Opp'n 18 (quoting *SD3*, 801 F.3d at 432). The number and diversity of Defendants also belies the contention that market realities foreclose new or small entrants. *See, e.g.*, Compl. ¶¶ 166-167, 198. Indeed, although the conspiracy supposedly dates to the 1980s, more than one-third of Defendants did not join the market until well into the 2000s. *See, e.g.*, Compl. ¶¶ 97, 100.

Throughout their plus-factor analysis, Plaintiffs also rely heavily on *In re Interior Molded Doors Antitrust Litigation*, 2019 WL 4478734 (E.D. Va. Sept. 18, 2019). The case is easily distinguishable. There, the complaint plausibly alleged two companies—which had 85% of the market—made business decisions that were directly "contrary to [their] interests," such as

withdrawing from a profitable market and announcing price increases despite falling input costs, while "blam[ing] their price increases on rising input costs." *Id.* at *5-7. Here, by contrast, Plaintiffs merely alleged parallel conduct consistent with Defendants' unilateral self-interest and have not alleged facts to show Defendants took any actions that make no business sense absent a conspiracy.

In short, the complaint alleges that certain Defendants have policies limiting recruitment from rivals. But the complaint also explains the reasons why Defendants would have unilaterally adopted those policies. When viewed in light of the market realities alleged in Plaintiffs' own complaint, these factors—considered alone and holistically—fail to create a plausible inference that there was a secret industrywide conspiracy for over four decades.

## III.   The Complaint Does Not Adequately Allege an Unreasonable Restraint of Trade.

Even if Plaintiffs had properly and timely alleged an illegal agreement, dismissal is still warranted because they do not allege an unreasonable restraint of trade.

### A.   The *Per Se* Standard Is Inappropriate.

Plaintiffs fail to establish that this case is the "rare exception" that warrants a departure from "the default" rule of reason. *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 730-31 (3d Cir. 2020). Plaintiffs argue they have plausibly alleged a naked horizontal market allocation agreement, but the complaint alleges something quite different. *See* Joint Opp'n 44-46. According to Plaintiffs, "Defendants frequently worked on 'gigantic' contracts where rival firms were very likely to be involved," including being "contracted by the U.S. government for the same project or subcontracted by the same general defense contractor." Compl. ¶ 171. Plaintiffs acknowledge a dynamic web of inter-Defendant relationships. *Id.* ¶ 133. They also allege "naval engineering consultancies work together with each other and with shipbuilders in relationships ranging from

co-equals to supervisors to subcontractors." *Id.* ¶ 137. And Plaintiffs recognize that these relationships are often formalized in legitimate teaming agreements. *Id*. ¶ 13.

Such allegations of legitimate collaboration distinguish this case from the naked no-poach agreements in the cases cited by Plaintiffs in their opposition brief. *See, e.g.*, *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 471 (W.D. Pa. 2019). Instead, their complaint concedes complex and legitimate relationships between Defendants that make *per se* treatment inappropriate. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 88-89 (2021) (emphasizing the need to "take special care not to deploy" the *per* se rule because "there are often hard-to-see efficiencies attendant to complex business arrangements"); *United States v. Brewbaker*, 87 F.4th 563, 574, 582-83 (4th Cir. 2023) (emphasizing that "courts must consider the restraint in context—including how the parties are related—before applying the *per se* rule").

### B.    Plaintiffs Fail to Plausibly Allege Claims Under the Rule of Reason.

Plaintiffs do not adequately allege a violation of Section 1 under rule of reason analysis because they do not plausibly allege that Defendants have sufficient power in the labor market to restrain competition.[11] Plaintiffs' rule of reason claims depend on plausibly alleging Defendants have market power in a properly defined relevant product and geographic market. *See Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023) ("Failing to define a relevant market alone is fatal to an antitrust claim."). Plaintiffs fail to meet their burden.

To start, Plaintiffs fail to plausibly allege that the market for naval engineers should be limited to employers that work on public vessels. A properly defined product market in a labor

---

[11] Contrary to Plaintiffs' assertion, Defendants do contest that they possess market power. *See* Mem. 36-38. The purpose of defining relevant antitrust markets under the rule of reason is to determine market power and likely anticompetitive effects. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 211-12 (4th Cir. 2002).

case "is comprised of buyers [i.e., employers] who are seen by sellers [i.e., employees] as being reasonably good substitutes." *Todd*, 275 F.3d at 202 (quotation omitted).

Plaintiffs fail this test.  They fail to explain, for example, why a structural or electrical engineer, or "workers with some variation of the job title 'marine engineer' as well as specialized electrical, HVAC, structural, and other engineers whose work focuses on marine applications," Compl. ¶ 5, would not see a commercial shipbuilder as a "reasonably good substitute[]" for employment.  *Todd*, 275 F.3d at 202; *accord Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989).  That makes this case different from *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183 (D. Md. Sept. 16, 2020).  There, the plaintiffs offered detailed allegations of "industry-specific skills," including "hanging live birds, carving bird meat, cleaning and repairing poultry-specific equipment, and supervising poultry-specific plant operations."  *Id.* at *11.  Here, by contrast, Plaintiffs offer only conclusory allegations of "industry-specific credentials, skills, and experiences," Compl. ¶ 194, or generic qualifications applicable to countless highly-paid professional jobs, *see id.* ¶ 124. [12]

As a result, Plaintiffs allege a market that "is legally insufficient because it is defined by [their] preferences, not according to the rule of reasonable interchangeability and the cross-elasticity of demand," *City of N.Y. v. Grp. Health, Inc.*, 649 F.3d 151, 156 (2d Cir. 2011), and Courts of Appeals have routinely affirmed dismissal of complaints in such circumstances, *see, e.g.*, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 702-03 (7th Cir. 2023); *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1037-39 (5th Cir. 2023); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

---

[12] *Jien* also misapplied the proper standard insofar as it analyzed whether "industry-specific skills . . . would make transitioning to other jobs an *imperfect substitute*," rather than a reasonably interchangeable one.  *See* 2020 WL 5544183, at *11 (emphasis added).

Whereas Plaintiffs' product market is too narrow, their alleged national geographic market is too broad.  Again, Plaintiffs rely heavily on *Jien*, and again this reliance is misplaced.  *See* Joint Opp'n 49-50.  In *Jien*, it was "essential" that plaintiffs "alleged specific facts to support finding a national market plausible," including the national scope of defendants' compensation practices and the use of national compensation data in setting compensation.  2020 WL 5544183, at *11.  But the complaint here offers no such allegations.  Also unlike *Jien*, where defendants employed putative class members at over 200 facilities nationwide, and each defendant operated a facility within thirty-two miles of another, *id*. at *1, Defendants here operate at a mere handful of discrete, far-flung, and disparate locations in Connecticut, Maine, Texas, Virginia, Mississippi, Wisconsin, and Louisiana.  Compl. ¶¶ 23-106.  Yet Plaintiffs fail to allege a plausible reason to depart from the intuitively local employment markets implied by the facts they allege.  That error is fatal.  *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 633 (5th Cir. 2002) (affirming dismissal where "the alleged geographic market did not correspond to commercial realities of the industry").  An overbroad geographic market will incorrectly include Defendants who do not compete with each other for naval engineers and would have no reason to participate in the alleged conspiracy.

\* \* \*

Accordingly, this Court should dismiss the claims against Defendants with prejudice.  Dismissal with prejudice is warranted because Plaintiffs themselves allege that they have undertaken an "extensive pre-filing investigation," Joint Opp'n Br. 1, and they do not identify any additional allegation they would make with the benefit of amendment.  *See ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 218 (4th Cir. 2019).

## CONCLUSION

For the reasons stated above and in Defendants' opening brief, Defendants respectfully request that the Court grant their joint motion to dismiss the complaint with prejudice.

Dated:  March 5, 2024

Respectfully Submitted,

/s/ *David G. Barger*
David G. Barger (VSB No. 21652)
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA 22102
Tel: (703) 749-1307
bargerd@gtlaw.com

Douglas E. Litvack (*pro hac vice*)
Matthew S. Hellman (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
Tel: (202) 637-6357
dlitvack@jenner.com
mhellman@jenner.com

Michael A. Doornweerd (*pro hac vice*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 923-2631
mdoornweerd@jenner.com

*Counsel for Defendants Bath Iron Works Corp.,*
*Electric Boat Corp., General Dynamics Corp., and*
*General Dynamics Information Technology, Inc.*

/s/ *Adam Block Schwartz*
Adam Block Schwartz (VSB No. 75396)
Todd Stenerson (*pro hac vice*)
David Higbee (*pro hac vice*)
Djordje Petkoski (*pro hac vice*)
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Tel: (202) 508-8000
adam.schwartz@shearman.com
todd.stenerson@shearman.com
david.higbee@shearman.com
djordje.petkoski@shearman.com

Robbie Rogart Jost (VSB No. 84377)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
rjost@crowell.com

Sima Namiri-Kalantari (*pro hac vice*)
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Tel: (213) 622-4750
snamiri@crowell.com

Chahira Solh (*pro hac vice*)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Tel: (949) 263-8400
csolh@crowell.com

*Counsel for Defendants Huntington Ingalls Industries, Inc., HII Fleet Support Group LLC, HII Mission Technologies Corp., Ingalls Shipbuilding, Inc., and Newport News Shipbuilding and Dry Dock Co.*


/s/ *John F. Terzaken*
John F. Terzaken, III (VSB No. 45927)
Abram J. Ellis (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC 20001
Tel: (202) 636-5500
john.terzaken@stblaw.com
aellis@stblaw.com

Allison W. Reimann (*pro hac vice*)
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Tel: (608) 257-3911
areimann@gklaw.com

Sean O'D. Bosack (*pro hac vice*)
Christie B. Carrino (*pro hac vice*)

27

GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
Tel: (414) 273-3500
sbosack@gklaw.com
ccarrino@gklaw.com

*Counsel for Defendant Marinette Marine Corp.*

/s/ *Attison L. Barnes, III*
Attison L. Barnes, III (VSB No. 30458)
Krystal B. Swendsboe (VSB No. 89614)
Scott M. McCaleb (*pro hac vice*)
Jon W. Burd (*pro hac vice*)
Daniel T. Park (*pro hac vice*)
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000
abarnes@wiley.law
kswendsboe@wiley.law
smccaleb@wiley.law
jburd@wiley.law
dpark@wiley.law

*Counsel for Defendant Bollinger Shipyards, LLC*

/s/ *Perry Lange*
Perry Lange (VSB No. 71184)
Jennifer Milici (*pro hac vice*)
John W. O'Toole (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 663-6000
perry.lange@wilmerhale.com
jennifer.milici@wilmerhale.com
john.otoole@wilmerhale.com

*Counsel for Defendant Gibbs & Cox, Inc.*

/s/ *Benjamin L. Hatch*
Benjamin L. Hatch (VSB No. 70116)
Casey Erin Lucier (VSB No. 80363)

28

MCGUIREWOODS LLP
888 16th Street, NW
Washington, DC 20006
Tel: (202) 857-1700
bhatch@mcguirewoods.com
clucier@mcguirewoods.com

J. Brent Justus (VSB No. 45525)
Nicholas J. Giles (VSB No. 85684)
Joshua D. Wade (VSB No. 92588)
W. Cole Geddy (VSB No. 93511)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Tel: (804) 775-1018
bjustus@mcguirewoods.com
ngiles@mcguirewoods.com
jwade@mcguirewoods.com
cgeddy@mcguirewoods.com

*Counsel for Defendant Serco, Inc.*

/s/ *Christopher C. Brewer*
Christopher C. Brewer (VSB No. 93406)
Ryan P. Phair (*pro hac vice*)
Michael F. Murray (*pro hac vice*)
Craig Y. Lee (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
Tel: (202) 551-1700
chrisbrewer@paulhastings.com
ryanphair@paulhastings.com
michaelmurray@paulhastings.com
craiglee@paulhastings.com

*Counsel for Defendant CACI International Inc*

/s/ *William T. DeVinney*
William T. DeVinney (VSB No. 94032)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA 22182

Tel: (703) 942-8076
wdevinney@brigliahundley.com

*Counsel for Defendant The Columbia Group, Inc.*


/s/ *Matthew J. MacLean*
Matthew J. MacLean (VSB No. 44304)
Alvin Dunn (*pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Tel: (202) 663-8183
matthew.maclean@pillsburylaw.com
alvin.dunn@pillsburylaw.com

*Counsel for Defendant Thor Solutions, LLC*


/s/ *William Lawler*
William Lawler (*pro hac vice*)
Amanda DeLaPerriere* (VSB No. 95758)
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006
Tel: (202) 420-2249
william.lawler@blankrome.com

*Counsel for Defendant Tridentis, LLC*

*Admitted in Virginia, not admitted in Washington,
D.C.; practice is limited to matters and proceedings
before federal courts and agencies*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of March, 2024, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send notification of such (NEF)

to the following:

Steven J. Toll
Brent W. Johnson
Robert W. Cobbs
Alison S. Deich
Zachary R. Glubiak
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
stoll@cohenmilstein.com
bjohnson@cohenmilstein.com
rcobbs@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com

Shana E. Scarlett
Rio S. Pierce
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

31

George F. Farah
Rebecca P. Chang
Nicholas Jackson
Handley Farah & Anderson PLLC
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
njackson@hfajustice.com

William H. Anderson
Handley Farah & Anderson PLLC
5353 Manhattan Circle, Suite 204
Boulder, CO 80303
Tel: (202) 559-2433
wanderson@hfajustice.com

Simon Wiener
Handley Farah & Anderson PLLC
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567
swiener@hfajustice.com

*Counsel for Plaintiffs and the Proposed Class*

Candice J. Enders
Julia R. McGrath
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark
Stephen J. Teti
Arielle S. Wagner
Eura Chang
Lockridge Grindal Nauen P.L.L.P
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
bdclark@locklaw.com

sjteti@locklaw.com
aswagner@locklaw.com
echang@lawlaw.com

*Additional Counsel for Plaintiffs and the Proposed Class*

/s/ *David G. Barger*
David G. Barger, Esq.

33

```
 1                UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Alexandria Division

 3   SUSAN SCHARPF, on behalf of    :   Civil Case
     herself and all others        :   No. 1:23-cv-01372-AJT-WEF
 4   similarly situated,           :
             Plaintiffs            :
 5                                 :
             v.                    :
 6                                 :
     GENERAL DYNAMICS CORP.,        :   March 20, 2024
 7   et al.,                       :   10:05 a.m.
             Defendants            :
 8   ...........................   :   .......................

 9               TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE ANTHONY J. TRENGA
10                UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12     FOR THE PLAINTIFFS:        ROBERT WHITE COBBS
                                  STEVEN JEFFREY TOLL
13                                COHEN MILSTEIN SELLERS &
                                  TOLL, PLLC
14                                1100 New York Avenue, NW
                                  Suite 500
15                                Washington, DC  20005
                                  202-408-4699
16
                                  NICHOLAS JAMES JACKSON
17                                HANDLEY FARAH & ANDERSON, PLLC
                                  33 Irving Place
18                                New York, NY  10003
                                  347-826-1308
19
       FOR THE DEFENDANTS         DAVID GLENN BARGER
20     GENERAL DYNAMICS CORP.,    GREENBERG TRAURIG, LLP
       BATH IRON WORKS,           1750 Tysons Blvd.
21     ELECTRIC BOAT CORP., AND   Suite 1000
       GENERAL DYNAMICS           McLean, VA  22102
22     INFORMATION TECHNOLOGY,
       INC.:                      DOUGLAS EUGENE LITVACK
23                                MATTHEW S. HELLMAN
                                  JENNER & BLOCK, LLP
24                                1099 New York Avenue, NW
                                  Suite 900
25                                Washington, DC  20001
                                  202-639-6000
```

```
1    FOR THE HUNTINGTON INGALLS     TODD MICHAEL STENERSON
     INDUSTRIES, INC.               ADAM BLOCK SCHWARTZ
2    DEFENDANTS:                    SHEARMAN & STERLING, LLP
                                    401 9th Street, NW
3                                   Washington, DC  20004
                                    202-508-8000
4
     FOR THE DEFENDANT              WILLIAM LAWLER, III
5    TRIDENTIS, LLC:                BLANK ROME, LLP
                                    1825 Eye Street, NW
6                                   Washington, DC  20006
                                    202-420-2200
7

8    OFFICIAL COURT REPORTER:       REBECCA STONESTREET, RPR, CRR
                                    U.S. District Court, 9th Floor
9                                   401 Courthouse Square
                                    Alexandria, Virginia  22314
10                                  (240) 426-7767

11
                          ( Pages 1 - 67)
12

13
              COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
14

15

16

17

18

19

20

21

22

23

24

25
```

                          **P R O C E E D I N G S**

1

2          COURTROOM CLERK:  Civil Action 23-1372, Susan Scharpf

3    versus General Dynamics Corporation, et al.

4          Would counsel please note their appearances for the

5    record.

6          MR. BARGER:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. BARGER:  David Barger on behalf of the

9    General Dynamics defendants, Bath Iron Works, Electric Boat,

10   General Dynamics and then GDIT, Your Honor.

11         Would you like me to introduce the rest of counsel, or

12   let them...

13         THE COURT:  Well, why don't we just have them all come

14   up and I'll put a name to a face.

15         MR. BARGER:  Thank you, Your Honor.

16         MR. LITVACK:  Good morning, Your Honor.  Doug Litvack

17   from Jenner & Block on behalf of the General Dynamics

18   defendants.

19         THE COURT:  All right.

20         MR. STENERSON:  Good morning, Your Honor.

21   Todd Stenerson on behalf of the Huntington Ingalls defendants.

22         MR. HELLMAN:  Good morning, Your Honor.

23   Matthew Hellman from Jenner & Block on behalf of the

24   General Dynamics defendants.

25         THE COURT:  Welcome.

1    MR. SCHWARTZ:  Hi, Your Honor.  Adam Schwartz, also for

2 the Huntington Ingalls defendants.

3    MR. LAWLER:  Good morning, Your Honor. William Lawler

4 for Tridentis.

5    THE COURT:  All right.  And for the plaintiffs?

6    MR. TOLL:  Good morning, Your Honor.  Steven Toll of

7 Cohen Milstein for the plaintiffs.  And my colleague,

8 Robert Cobbs, my partner, will argue the joint motion, and

9 Nick Jackson, from our co-counsel, will argue the individual

10 motions.

11    THE COURT:  All right.  We're here on motions to

12 dismiss.  I've reviewed the fulsome briefings in this matter and

13 will be prepared to hear from counsel.

14    What I would like to do is first have argument on the

15 statute of limitations issue, go back and forth on that one, and

16 then we'll take up the failure to state a claim issue.  All

17 right?

18    Counsel?

19    MR. BARGER:  I assume defendants, Your Honor, go first?

20    THE COURT:  Yes.

21    MR. BARGER:  Your Honor, with regard to plaintiffs'

22 counsel's mention of the individual briefs, the way we planned

23 to proceed - of course we'll defer to how the Court wants to do

24 it - is I will address the joint brief of the defendants.  We do

25 have counsel for the individual defendants who filed individual

1    briefs here.  If the Court has questions about those, we

2    certainly will address them, but I was not planning to address

3    it specifically in our argument.

4              THE COURT:  All right.  That's fine.

5              MR. BARGER:  Your Honor, I would like to use my time to

6    emphasize, perhaps expand, on a few points from our brief.  And

7    I would like to start - thankfully, consistent with my papers -

8    with the statute of limitations that the Court indicated, and

9    address the allegations of essentially what are alleged to be a

10   40-year unwritten no-poach conspiracy in and among thousands of

11   people, across what is alleged to be a nationwide or

12   industry-wide conspiracy that went undetected for years and

13   years, until plaintiffs' counsel apparently discovered it, and

14   what they ended up with was a total of two alleged victims from

15   10 to 20 years ago.  By implication, they apparently have not

16   found a victim within the statute of limitations time period.

17             As the Court knows, the statute of limitations on

18   antitrust is a four-year period, so clearly the plaintiffs are

19   outside the statute.  The two plaintiffs are outside the statute

20   of limitations.  They seek to save their lawsuit by asserting

21   that the conspiracy, and their injuries that flowed, allegedly,

22   from it, were hidden and undetectable as a result of the

23   alternative actions of the alleged conspirators, Your Honor.

24             So as the plaintiffs have identified and as we've

25   identified in our brief, there are essentially three affirmative

1    acts of concealment that the plaintiffs have alleged that

2    supposedly toll the statute of limitations.  And if you look at

3    a number of cases that we've cited, *Pocahantas*, for example,

4    *Edmonson*, for example, both from the Fourth Circuit, there are

5    essentially three elements for the plaintiffs to plead for

6    fraudulent concealment.  First, they must plead that they

7    fraudulently concealed facts that formed the basis of the claim;

8    secondly, that it went undiscovered within the four-year period;

9    and third, despite the exercise of due diligence.

10        The first fraudulent act that the plaintiffs allege is

11   that the alleged conspiracy was unwritten.  The plaintiffs have

12   not cited a single case, Your Honor, that stands for the

13   proposition that an unwritten conspiracy tolls the statute of

14   limitations.  There must be something more.  Presumably this was

15   their best affirmative act because they led with it.  But as

16   we've cited in the cases, Your Honor - and we can go through

17   those a little bit - the case law essentially requires something

18   other than simply an unwritten, you know, quote, unquote,

19   gentlemen's agreement to have the conspiracy.  That simply is

20   not enough.

21        And if it were enough -- and I think it's *SD3* and other

22   cases make this point.  If you accept the plaintiffs' premise -

23   that is, simply an unwritten conspiracy tolls the statute of

24   limitations - then essentially we don't have a statute of

25   limitations where you have an alleged conspiracy.  And so we'll

1   always see those allegations.  It essentially eviscerates the

2   statute of limitations.

3          The second affirmative act, Your Honor, that the

4   plaintiffs allege -- I've reversed the order a little bit in the

5   brief, but the second order -- the second item that they claim

6   is that the defendants made public statements, for example, on

7   their websites, that they acted with integrity, paid competitive

8   compensation, and complied with the law.

9          We've also cited a number of cases on that particular

10  affirmative act, *Pocahontas*, *GO Computer*, other examples where

11  the courts have said simply denying that you violated the law,

12  or affirmatively saying you complied with the law, is not

13  sufficient to constitute an affirmative act of concealment.

14         In this instance, on the second component, Your Honor,

15  perhaps even more significantly, the plaintiffs essentially

16  concede or acknowledge that their best evidence of these website

17  commentaries and public statements go back no further than 2021.

18  And so it's not possible that these particular plaintiffs - and

19  it's these particular plaintiffs that we have to look at for

20  statute of limitations purposes - either knew of or relied upon

21  those particular representations from the defendants, setting

22  aside the fact that the case law says those are not sufficient.

23  So those statements certainly can't be useful for these

24  plaintiffs to claim that the statute of limitations is tolled as

25  to them.

1          The third affirmative act of alleged concealment is

2     perhaps the one that's a little bit more interesting.  And that

3     is the allegation that the defendants had teaming agreements -

4     not an unusual circumstance in government contracts - and that

5     these teaming agreements had what they called no-poach

6     provisions, or agreements not to solicit, as part of the teaming

7     arrangement where these particular contractors worked together.

8          Essentially the plaintiffs argue that they were fooled

9     by the presence of these no-solicitation provisions within the

10    teaming agreements.  In their brief, they pivot a little bit and

11    claim that the no-poach provisions, or what they call the

12    no-poach provisions were shams.  They're not saying the entire

13    teaming agreement was improper, but they now seem to say this

14    particular part of it was a sham.

15         And if you look at some of the case law we've cited for

16    examples of shams, and I think it was the case in Baltimore

17    involving RESPA, where the court specifically talked about -- in

18    that instance they had alleged false bank accounts, fake

19    companies, fake financial transaction documents that were

20    involved in that particular antitrust case, and those -- the

21    court said those were examples of real shams.

22         What we have here is a legitimate teaming agreement, a

23    legitimate non-solicitation provision in that teaming agreement,

24    and as the plaintiffs' own complaint alleges, there are good,

25    sound reasons for those kinds of agreements to exist in this

particular industry.  There are occasions when the contractors

work together, there are occasions when one works for the other.

And so there are good business reasons, as we know in the

government contracting industry, why those make sense.

Perhaps an additional significant reason here,

Your Honor, when you look at the paragraphs where the plaintiffs

allege the teaming agreement and the non-solicitation portions,

they do not say when these agreements were entered into, they

provide no details as to the dates or how these particular

defendants -- I'm sorry, plaintiffs would have known about them,

or did know about them or did rely upon them.

And so without that kind of specificity -- remember, in

fraudulent concealment, it is subject to Rule 9, 9(b),

specificity, and detail, so -- because they're alleging fraud.

So that kind of detail is lacking here, so there's nothing to

suggest these particular plaintiffs were fooled by or relied

upon or even knew of the teaming agreements.

So those essentially are the three provisions,

Your Honor, that the plaintiffs specifically rely upon to toll

the statute of limitations.

The second and third elements, Your Honor, of

fraudulent concealment, as I mentioned, were that it was not

discovered despite the exercise of due diligence.  I think

essentially I've covered those with regard to each specific

example of either -- the best one, I suppose they can argue that

1   they could not have discovered was the unwritten aspect of the

2   alleged conspiracy.  But as we've discussed and as the cases

3   show, that doesn't constitute an affirmative act of concealment,

4   and they must first rise to the level of a legitimate

5   affirmative act of concealment before we get into the second and

6   third elements.

7          And for the second and third elements for the websites,

8   which they've acknowledged were new, and the sham agreements,

9   which they don't allege when these were entered into and how the

10  plaintiffs would have even known or relied upon them, they have

11  not pled sufficient facts to even get to those second and third

12  elements as well, Your Honor.

13         Your Honor, unless the Court has specific questions

14  about other aspects of our argument, I think that's sufficient

15  for now.

16         THE COURT:  All right.  Let me hear from the

17  plaintiffs.

18         MR. COBBS:  Robert Cobbs from Cohen Milstein for the

19  plaintiffs.

20         THE COURT:  Good morning.

21         MR. COBBS:  So, Your Honor, when it comes to fraudulent

22  concealment, I think the temptation is to jump right away into

23  the legal standard of what constitutes an affirmative act of

24  concealment.  I think it's a temptation because the

25  Fourth Circuit law directly rejects the defendants' reading of

1  that standard, and does so in a way that clarifies a very

2  confused area of the law.  I think it's interesting.

3      But I think, as is often the case, the most important

4  thing here is the facts, and I think that defendants have

5  misconstrued the facts of the case.

6      Let's start with attempts to conceal the conspiracy.

7  Actually, let's start with the standard here.  As *Corder* says,

8  Rule 9(b) allegations are subject to a relaxed pleading standard

9  when the facts are peculiarly within the knowledge of the

10  defendant.  That's the case here.  My colleague, Mr. Barger,

11  took issue with our not pleading specific teaming agreements.

12  Those agreements are nonpublic.  We know they exist, witnesses

13  talked about them.  I managed to pull one from a court case in

14  which it was filed on the public docket, but we don't have

15  routine access to them.  So we don't have to plead the who,

16  what, where, why, and when as to those agreements.

17      So defendants claim that all that we're alleging with

18  respect to their efforts to prevent the conspiracy from being

19  discovered by not making a paper trail are non-acts.  And that's

20  not the case.  If you read the allegations, I think you get a

21  sense for a variety of actions taken to prevent discovery that

22  can only be characterized as affirmative.

23      Let's start with the agreement that their no-poach

24  agreement would be a gentlemen's agreement, as multiple

25  independent witnesses confirm.  That's Paragraphs 12, 142, 148,

1    and 158 of the complaint.  By agreeing to maintain their

2    conspiracy as a gentlemen's agreement, the agreement to keep the

3    conspiracy off the books is an affirmative act of concealment.

4    It is not like some of the cases that they describe where the

5    defendants are just not doing anything.  Right?  They've agreed

6    to keep their conspiracy secret, and that is itself an

7    affirmative act of concealment.

8              THE COURT:  How do you reconcile that, though, with

9    *Robertson* and *Boland*, where the --

10             MR. COBBS:  I think actually *Boland* is our case, not

11   defendants.  What *Boland* does is it identifies the counter

12   example to their argument that this is meaningless, and if we --

13   if covering your tracks is an affirmative act of concealment,

14   the statute of limitations is meaningless.  Right?

15             So *Marlinton* says that -- I have the quote here.

16             THE COURT:  Well, the Fourth Circuit blessed the

17   District Court's conclusion that meeting secretly an affirmative

18   act of concealment.

19             MR. COBBS:  So what I think is going on in *Boland*,

20   right, is that the defendants are these Multiple Listing

21   Services and brokerages who are members of the board of the

22   Multiple Listing Service.  And the allegation is that they

23   conspired in the board meetings of these Multiple Listing

24   Services to institute rules for the market that were

25   anticompetitive.  And the facts in *Boland* are that they

1    memorialized these anticompetitive rules in writing, in

2    regulations, rules, bylaws, and other paper.  Right?

3         I think what is -- what's going on in *Boland* is that

4    that action of memorializing their conspiracy in writing is

5    inconsistent with an intent to conceal the conspiracy.  *Edmonson*

6    says, "It is sufficient to allege a trick or contrivance

7    intended to exclude suspicion or prevent inquiry" -- or "and

8    prevent inquiry."

9         And I think memorializing the rules that are alleged to

10   be anticompetitive is an indicator that actually the defendants

11   in this case didn't think they had anything to conceal.  Right?

12   And I think the -- there are other allegations in that case,

13   right?  They portray the meetings, these board meetings, as

14   secret, and they say that defendants agreed not to discuss the

15   nature of their conspiratorial communications in public - I

16   think that is read as they didn't talk about what they had said

17   in the board meetings - and they allege that Realtors gave

18   pretextual reasons for why real estate prices were what they

19   were.

20        I think *Boland* found that none of those allegations

21   were sufficient under Rule 9(b).  Right?  They didn't hold -- it

22   did not hold that any of those allegations would be insufficient

23   fraudulent concealment if they had more detail.  Right?

24        THE COURT:  Well, the issue is not so much concealment.

25   Clearly you could argue that deciding not to memorialize your

1    conspiracy is an act of concealment.  The issue is whether there

2    was a fraudulent concealment, whether there was affirmative acts

3    that deceived the plaintiffs into thinking there was no

4    conspiracy.

5          What do you have here by way of not memorializing this

6    gentlemen's agreement that would be deemed fraudulent?

7          MR. COBBS:  So I think you said two things there, one

8    of which is right and the other I think is not right.

9          THE COURT:  All right.

10         MR. COBBS:  So the first is -- well, let's start

11   with -- so, yes, there needs to be -- the question is whether

12   there is a fraudulent concealment, right, a trick or contrivance

13   designed to exclude suspicion or prevent inquiry.

14         THE COURT:  Right.

15         MR. COBBS:  Then you say the question is whether it's

16   affirmative in the sense of an act versus on omission or active

17   versus passive concealment.  And that's not the law in this

18   circuit.

19         The Fourth Circuit, in fact, specifically rejects that

20   position in *Marlinton*, where they say, "We can see no valid

21   reason to differentiate between those conspiracies in which the

22   conspirators document their antitrust violations and

23   subsequently shred their documents from those in which the

24   conspirators are careful not to write down evidence of their

25   antitrust violations in the first place, 71 F.3d at 125.

1          And the facts of *Marlinton* bear that out, Your Honor.

2    In *Marlinton*, the fraudulent concealment allegations turned on

3    the evidence of one witness.  Quote, "One of the defendants

4    testified that meetings to fix prices were, 'in-person,

5    prearranged, and conducted away from the office in parking lots,

6    restaurants, or private automobiles.'  Aware that price-fixing

7    violated the law, French related that he would not discuss the

8    subject over the telephone or if non-conspirators were present.

9    French further testified that he would fill out his expense

10   accounts in such a manner that no one, including his coworkers

11   at Valley Rich, would know of these meetings with rival dairy

12   officials."  That's *Marlinton* at 121.

13         And the other facts of the case make clear that he --

14   what he did to disguise his expense reports was, he just didn't

15   include the last names of the people he was meeting with.

16         I think those facts are basically indistinguishable

17   from the facts at the bar.  What they are is -- particularly, I

18   mean, not discussing the subject over the telephone or if

19   non-conspirators were present is exactly what defendants here

20   allege is not an affirmative act of concealment.  The

21   Fourth Circuit rejects that standard.

22         I think the --

23         THE COURT:  I'm sorry, are there allegations that that

24   happened in this case?

25         MR. COBBS:  Yeah.

1           THE COURT:  There were conversations with

2      non-conspirators that --

3           MR. COBBS:  I'm sorry?

4           THE COURT:  There were allegations that there were

5      conversations with non-conspirators in which they said there was

6      not a gentlemen's agreement?

7           MR. COBBS:  No, no, no.  The allegation in *Marlinton* is

8      that the witness said he would not discuss the subject, the

9      conspiracy, over the telephone or if non-conspirators were

10     present.  Right?  So he's just not talking about the conspiracy

11     if there's --

12          THE COURT:  All right.

13          MR. COBBS:  He's not talking about the conspiracy in

14     writing and he's not talking about it when there are

15     non-conspirators around.

16          I think that's indistinguishable from, we made a

17     gentlemen's agreement that is not to be written down, we're only

18     going to communicate about the conspiracy orally, we're going to

19     pass down to our subordinates and successors information about

20     the conspiracy only in writing.  You know, those allegations are

21     exactly what was happening in *Marlinton*.

22          THE COURT:  All right.

23          MR. COBBS:  I want to note that -- so we do have those

24     allegations that defendants passed on the conspiracy only as

25     verbal instructions, 149; passing on the conspiracy to another

1   person is an affirmative act.  We allege that they enforced the

2   conspiracy through private phone calls between high level

3   executives and unofficial retribution; making a private phone

4   call instead of writing an email is an affirmative act, keeping

5   the conspiracy between high level executives as opposed to, you

6   know, whatever line manager is an affirmative act.

7           And, you know, don't take my word for it.  Apart from

8   *Marlinton*, other cases have found very similar experiences to be

9   affirmative acts of concealment.  So compare *Animation*

10  *Workers II*, where the court found, quote, "That defendants

11  actively attempted to conceal the existence of the conspiracy,

12  here" -- the court found that defendants actively attempted to

13  conceal the existence of the conspiracy, because, for instance,

14  quote, "in lieu of emails, the defendant opted for in-person

15  meetings," that, quote, "Coker explained that the

16  non-solicitation agreement was termed a gentlemen's agreement

17  because it was not written down, and that defendants had made

18  affirmative efforts to eliminate the paper trail, including a

19  requirement that all discussions of DNR needed to be conducted

20  over the phone."

21          THE COURT:  Which case are you reading from?

22          MR. COBBS:  That's *Animation Workers II*.  It is 1201.

23          THE COURT:  I have it.

24          MR. COBBS:  In *Lithium Ion*, the court cited as

25  affirmative acts, quote, "public putatively false statements by

1   various defendants affirming their compliance with applicable

2   antitrust laws, as well as the existence of vigorous price

3   competition in the battery market, instructing personnel to

4   refrain from memorializing conversations, and using code to

5   refer to particular entities and topics."

6           We also have code word allegations, Your Honor, in

7   Paragraphs 12, 157, and 209.

8           THE COURT:  All right.

9           MR. COBBS:  Now, defendants are going to come back and

10  say, well, in at least some of these cases there weren't --

11  there were other allegations of more affirmative acts.  And in

12  some cases that's true.  Right?  You know, concealment of a

13  conspiracy often comes with, like, a lot of evidence.  But I

14  don't think that they can plausibly argue that those facts

15  weren't found to be affirmative in those cases.

16          Also, compare *Jien*, the poultry wages case, secret

17  compensation meetings -- committee meetings were alleged to be

18  affirmative acts, keeping meetings off the books, required

19  in-person attendance at secret meetings to avoid leaving a paper

20  trail, the court concluded that each of those was affirmative

21  acts of concealment, hiding wage compensation discussions at the

22  core of plaintiffs' collusion claims.  That's at 13 of the *Jien*

23  case.

24          In *Vitamins*, in DDC, affirmative acts included,

25  "Instructing members of the conspiracy not to divulge the

1    existence of the conspiracy to any non-participants, the

2    convening of secret meetings, confining the conspiracy plan to a

3    small group of key officials at each company, avoiding

4    references in documents or the creation of documents which would

5    reveal these antitrust violations."  That's at *3 of that case.

6         The case noted that clandestine meetings and telephone

7    conversations are sufficient in themselves, quoting

8    *In Re:  Catfish*, 826 F.Supp at 1031 from the Northern District

9    of Mississippi.  And the *Vitamins* court also noted that,

10   "Defendants' efforts to keep a conspiracy secret included

11   confining knowledge to a limited group of core officers are

12   sufficient affirmative acts," citing *In Re:  Nine West* and

13   *Commercial Explosives*.  The *Vitamins* case is at 2000 WL1475705

14   in DDC.

15        I think the core problem with defendants' argument that

16   these attempts to cover up the conspiracy are not affirmative

17   acts is that they are trying to distinguish between active and

18   passive concealment, as the Ninth Circuit does.

19        The Fourth Circuit, as I said, has rejected that

20   position.  The Fourth Circuit doesn't see any difference between

21   shredding documents and not creating them in the first place.

22        THE COURT:  And that's the *Marlinton* case?

23        MR. COBBS:  That's *Marlinton*, yeah.

24        And I think the mask comes off in defendants' reply on

25   page 5.  Right?  They say, "Keeping an agreement secret or

1    unwritten might be some kind of concealment, but not affirmative

2    concealment."

3           Now, that is directly contrary to the purposes of the

4    fraudulent concealment doctrine at *Edmonson*.  *Edmonson* says,

5    quote, "The purpose of fraudulent concealment doctrine is to

6    ensure that wrongdoers are not permitted or encouraged to take

7    advantage of the limitations period to commit secret illegal

8    conduct without penalty."  That's at 549, it's quoting

9    *Marlinton*.

10          The *Edmonson* case also says the doctrine, quote,

11   "prevents a defendant from concealing a fraud or committing a

12   fraud in a manner that it concealed itself until the defendant

13   can plead the statute of limitations to protect it."  Same page,

14   also quoting *Marlinton*.

15          *Marlinton* also, at page 125 of that case, quotes the

16   *Allan Construction* case from the Fifth Circuit, and says, "The

17   equitable doctrine of fraudulent concealment recognizes that

18   this benefit of the statute of limitations should not be

19   available to a wrongdoer who takes undue advantage of the

20   statute by attempting to conceal his conduct."

21          Now, that quote from defendants' reply, that it might

22   be some kind of concealment but not affirmative concealment,

23   concedes, as they must, that the defendants, as alleged, made

24   efforts to conceal their conspiracy.  The point of keeping the

25   agreement as a gentlemen's agreement, the point of transmitting

1   it to -- communicating about it only orally with other

2   defendants, and communicating it to subordinates and successors

3   only orally, the point is to prevent discovery of a conspiracy.

4   Right?  So the core reason for the fraudulent concealment

5   doctrine obviously applies.

6          Now, defendants say that, well, if you have this rule,

7   the statute of limitations would be meaningless.  That's not

8   right, and that doesn't justify the departure from the purpose

9   of fraudulent concealment.

10         We know it's not right because *Marlinton* says so.

11  *Marlinton* rejects it out of hand.  It says that, "This argument

12  is wrong for two reasons."  First, quote, "The adoption of the

13  intermediate affirmative acts standard would not gut the

14  antitrust of statute of limitations.  Not all antitrust

15  violations typically involve acts of secrecy or concealment.

16  For example, attempts to monopolize, in violation of Section 2

17  and cases of interlocking directorates, do not typically involve

18  secrecy or concealment.  The four-year statute of limitations

19  period would generally apply to these actions without any

20  equitable tolling."  71 F.3d at 124.

21         Second, it says, "Indeed, contrary to the suggestion of

22  the District Court, application of this intermediate standard

23  would not necessarily even result in equitable tolling in cases

24  involving allegations of antitrust violations, like

25  price-fixing, that are usually secret.  In those cases,

1    plaintiffs would still be required to pursue their claims with

2    due diligence, and the failure to demonstrate such diligence

3    would prevent them from establishing the third element of the

4    fraudulent concealment test."

5         So it's just wrong to say that if you allow -- if you

6    allow plaintiffs to plead fraudulent concealment every time

7    they've covered up their conspiracy, the statute of limitations

8    would be meaningless.  No.  If you haven't concealed the

9    conspiracy or if you have concealed the conspiracy and

10   plaintiffs have slept on their inquiry notice, both of those --

11   in both those situations, the reasons that ordinarily apply for

12   the statute of limitations apply, and the defendants can't plead

13   it.

14        Neither of those cases -- neither of those

15   circumstances is the case here.  And *Marlinton* also notes that

16   antitrust conspiracy cases almost always involve secret

17   conspiracies.

18        So I think it's plain that defendants' reading of the

19   *Marlinton* affirmative acts standard is wrong.  *Marlinton* is the

20   case that starts the affirmative acts standard, so its

21   understanding of the standard as reaching, quote, unquote,

22   "passive concealment" and rejecting defendants' argument is the

23   understanding that the Fourth Circuit has.  Right?

24        I think the *Edmonson* case affirms that understanding in

25   its reliance on the trick or contrivance intended to exclude

1    suspicion and prevent inquiry.  Particularly a contrivance,

2    Your Honor, is just a scheme, right, a device to exclude

3    suspicion and prevent inquiry.  Secrecy, right, just not talking

4    about the thing, and making a decision not to talk about the

5    thing, is what betrays the act of concealment.

6          The thing about *Marlinton*, the way it rationalizes the

7    case law is to make clear that the affirmative acts of

8    concealment standard is about concealment.  Right?  The act has

9    to be affirmative in the sense that the -- what the defendants

10   do has to confirm that they are concealing the conspiracy as

11   opposed to just acting in the world.  Right?

12         This is *Boland*.  Right?  What the defendants did in

13   that case wasn't concealing.  The reason the *Boland* case found

14   that the allegations weren't pleaded with enough specificity to

15   find fraudulent concealment, is that from the facts of the case,

16   it appears that what they're doing is just artful pleading.

17   Right?

18         But if the defendants could plead additional secret

19   meetings that betrayed the intention to conceal the conspiracy,

20   to keep it secret as opposed to just private, if those

21   allegations were pled with enough specificity to draw the

22   conclusion that -- the reasonable inference, rather, that it is

23   plausible that defendants were concealing their conspiracy, then

24   the case would survive.

25         THE COURT:  All right.

1          MR. COBBS:  Moving on to sham.

2          THE COURT:  Yeah.

3          MR. COBBS:  So this is another kind of simple fact that

4     you can dispose of the case on without having to decide the

5     interesting kind of, "what does affirmative acts mean" issue.

6          Defendants argue, quote, "We do not allege or even

7     suggest that defendants ever used teaming agreements as a cover

8     for an unwritten industry-wide conspiracy," reply 9.

9          We say, quote, "These written teaming agreements were

10    used to cover up the defendants' unlawful gentlemen's agreement

11    with more credibly defensible project-based limitations.  The

12    teaming agreements created the false impression that workers

13    could be solicited and recruited by rivals who were not working

14    on their projects, even though defendants' agreement not to

15    recruit one another's naval engineers applied to any naval

16    engineer working for any defendant.

17         Now, in the context of the defendants' decades-long

18    anticompetitive conspiracy, which defendants concede they sought

19    to conceal, we allege defendants inserted provisions into their

20    teaming agreements that, quote, "hid the true nature of

21    defendants' conspiracy that each had entered into a secret and

22    much more expansive gentlemen's agreement not to affirmatively

23    recruit others naval engineers, regardless of whether the two

24    companies were engaged on the same project and regardless of

25    whether the engineers in question were working on that project.

1  I'm not sure if I mentioned, the first paragraph I read was

2  Paragraph 13 of the complaint.  The one I just read now was

3  Paragraph 206.

4       Now, giving appropriate credit to these allegations, as

5  the Court must, it's clear they're affirmative acts of

6  concealment, even if you buy defendants' distinction that the

7  *Marlinton* court rejected.  Defendants' only argument on this

8  point is that the provisions were, as a matter of law, not a

9  sham.  That's wrong, and because it's wrong, their fraudulent

10 concealment argument falls apart just on this point.

11      So, first, defendants argue with no support whatsoever

12 that, quote -- that, quote, "A sham under Fourth Circuit

13 law...refers to something that is bogus, typically fake

14 corporate entities or fake business agreements used to cover up

15 illicit activity."  That's reply 9.

16      So for starters, that's exactly what we allege.  The

17 no-poach provisions in defendants' teaming agreements are,

18 quote, "fake" -- they're fake business agreements used to cover

19 up illicit activity.

20      Defendants' argument here also relies on a very fragile

21 equivocation in the meaning of the term "agreement" in that

22 sentence.  Apparently defendants' unsupported position is that

23 the sham must be a sham as to the entire agreement that it's a

24 part of, and that an agreement on sham provisions within a

25 broader agreement is somehow exempt.

1    This is untenable because *Edmonson*.  Right?  In

2  *Edmonson*, among the sham entities was a company called

3  Competitive Advantage that provided "leads, postage, marketing

4  materials, and services to mortgage brokers and lenders,"

5  Page 541.  The allegation was that this company was used to

6  provide kickbacks by providing in-kind payments to the lenders

7  who steered customers toward Genuine Title.

8    THE COURT:  This is a little off topic, but what impact

9  would these teaming agreements and these non-solicitation

10  provisions have on defining the class that you're seeking to

11  certify?

12    MR. COBBS:  I'm sorry, say it again?

13    THE COURT:  How would these teaming agreements and

14  these non-solicitation provisions in teaming agreements, which

15  you're not directly attacking, how would that impact the

16  definition of a class if we were to get that far?

17    MR. COBBS:  I don't think it would, Your Honor.

18    THE COURT:  Why?  If somebody wasn't solicited pursuant

19  to a teaming agreement provision because they were part of a

20  team, wouldn't that affect who would be in the class?

21    MR. COBBS:  I follow you, yeah.  No, I don't think so.

22    First off -- well, I think what you've articulated is a

23  causation argument, and I think the -- as we articulate in the

24  section of the complaint about the economic impacts of the

25  conspiracy.

1      So salaries are set in the context of the labor market

2  as a whole.  Right?  The market is supposed to set -- is

3  supposed to set levels for everybody's employment.  When you

4  have -- when you recruit an employee, when you offer to them,

5  hey, I will pay you more over here, right, not only does it

6  benefit that employee, but it affects the market compensation

7  rate for the entire market.

8      THE COURT:  Right.  I understand that.  That's not what

9  we're dealing with right now.

10      MR. COBBS:  Sure.  Yeah, it's not an argument the

11  defendants have made.

12      THE COURT:  Right.

13      MR. COBBS:  So in the *Edmonson* case, right, you have

14  Competitive Advantage that is executing these kickbacks by

15  providing in-kind services to the brokers who are defendants.

16  According to the complaint, Genuine Title would pay the

17  marketing company the amount of the kickback and then the

18  lenders would receive a credit in that amount to brokers -- to

19  the brokers so that they could use Competitive Advantage's

20  services.

21      Now, defendants say a sham is something that's totally

22  bogus.  But that can't be right in *Edmonson*, because

23  Competitive Advantage is a company that is providing services to

24  companies.  Right?  It's clear that there is a legitimate, you

25  know, provision of services going on in this case.  There are

1    also no allegations that Competitive Advantage is, like, you

2    know, falsely registered or anything like that.  Right?

3         Sham, just like fraud, just like equity, is all about

4    facts and context.  What makes Competitive Advantage a sham is

5    not that its services were bogus, but that it was being used as

6    a trick or contrivance to conceal the kickbacks involved.

7         The same is true of the sham agreements here.  Right?

8    We don't need to show that every aspect of these teaming

9    agreements was illegitimate.  The point is that they were used

10   as a contrivance to prevent discovery of the conspiracy.

11        Defendants also -- so in support of their argument,

12   defendants cite *Edmonson* and a handful of other Fourth Circuit

13   cases, all of which are RESPA cases having to do with two title

14   companies executing the exact same scheme, Genuine Title and a

15   company called All Star Title.  Exact same fact pattern with

16   each.

17        And defendants say that --

18        THE COURT:  Is there anything in the complaint that

19   alleges a factual basis for the notion that these teaming

20   agreements were used, and the provisions in these teaming

21   agreements were used for the purposes of giving cover to the

22   secret agreement, the gentlemen's agreement?  Is there any

23   allegation that the witnesses, the identified witnesses that

24   have been providing information, have made that suggestion?

25        MR. COBBS:  I mean, I read you the allegations in the

1    complaint that they were used that way.

2            THE COURT:  But that's fairly conclusory, isn't it?  I

3    mean, what would be the factual basis, if any, for that?

4            MR. COBBS:  Sure.  I think that -- I recall that we

5    allege somewhere in the complaint that witnesses talked about

6    these teaming agreements; that when we talked to them about

7    recruiting in the industry, they often resorted to these teaming

8    agreements instead of -- yeah, here we go.

9            We say, "The teaming agreements created the false

10   impression that workers could be solicited and recruited by

11   rivals who were not working on their projects, even though

12   defendants' agreement not to recruit one another's naval

13   engineers applied to any naval engineer working for any

14   defendant."

15           You know, I think that --

16           THE COURT:  What paragraph is that?

17           MR. COBBS:  That's Paragraph 13.

18           THE COURT:  Is that attributed to any particular

19   witness?

20           MR. COBBS:  No, it's not.

21           THE COURT:  All right.

22           MR. COBBS:  I think the exact extent to which -- like,

23   the -- as I mentioned before, the exact details of the teaming

24   agreements are nonpublic, and so I think it 's -- and within

25   defendants' knowledge.  I think it's difficult to plead with

1    particularity at this stage, without discovery, exactly the

2    function that they played.

3            But I think within the context of the conspiracy as a

4    whole, where defendants were concealing the conspiracy

5    undoubtedly, right, clearly intentionally concealing the

6    conspiracy, it is at least plausible to read those teaming

7    agreements as an effort to fraudulently conceal.

8            THE COURT:  All right.  I understand.

9            MR. COBBS:  All right.  Just to circle back to the

10    point, so defendants only cite these RESPA cases involving sham

11    kickback entities, and they conclude therefrom that, well, what

12    we allege isn't a sham.  But they don't have any case on the

13    other side to guide where the limits of sham are.  Right?

14            All we have about what a sham is in the Fourth Circuit

15    is the word "sham."  Right?  And I submit that, you know, fake

16    provisions used to cover up the conspiracy are sham provisions.

17    We allege that they're duplicative, right, they have no actual

18    effect, and I think that's -- it's reasonable to conclude

19    therefrom that they're shams.

20            THE COURT:  All right.

21            MR. COBBS:  Okay.  Affirmative statements, or public

22    statements.  So defendants argue that these statements alone are

23    not enough to sustain a finding of fraudulent concealment.

24            THE COURT:  Right.

25            MR. COBBS:  I think that's plainly wrong.  Right?  If

1   public statements are affirmative acts of concealment, as the

2   *Lithium Ion* court found, as *Garrison* found -- or, rather, as

3   *Animation Workers II* found, I think if something is an

4   affirmative act of concealment, *Edmonson* requires the conclusion

5   that it's an affirmative act of concealment, and enough to

6   sustain the case.  The fact that public statements that

7   misrepresent the conspiracy are -- usually appear with other

8   acts of concealment should not be either surprising or mandate a

9   conclusion that you need those statements.

10          With respect to diligence, Your Honor, the

11  Fourth Circuit is extremely clear that unless the plaintiffs are

12  on inquiry notice, no investigation whatsoever is required.

13          THE COURT:  The one thing the plaintiffs argue is that

14  there are no allegations here concerning when and how these

15  plaintiffs finally discovered the conspiracy, and that's -- it's

16  hard to find that they've discharged their due diligence, given

17  the length of this non-solicitation, which should have been

18  obvious to them as a lack of recruitment, without some

19  allegation concerning how they in fact did finally find out

20  about it.

21          MR. COBBS:  Sure.  So to start with, the information

22  that defendants say should have tipped the plaintiffs off to

23  this conspiracy is not the kind of information that puts you on

24  inquiry notice.  Right?  *Edmonson* is the best case for this.  It

25  talks about how there had been prior cases on this, a very

1   public prior case about exactly this defendant and exactly this

2   kickback scheme.  It talks about, I think it was a CFPB or maybe

3   a CFTC investigation that was publicized in the paper.  Right?

4   *Edmonson* sets a very high bar for inquiry notice.

5           It also says plaintiffs are not required to go around

6   seeing conspiracy around every corner.  I can find the quote.

7   *Edmonson* says, "You're not required to assume the bank is lying

8   to you."  And the same is true here.

9           THE COURT:  What about allegations about when they in

10  fact first learned about it and how?

11          MR. COBBS:  Sure.  I think, Your Honor, that, first

12  off, the two cases that defendants cite for that proposition,

13  neither of them dismiss the case for that reason.  I think

14  the -- and I think if they had, that would be contrary to the

15  *Edmonson* affirmative acts statement.  Right?  *Edmonson* says, all

16  you have to plead is -- and actually, *SD3*, also.  Right?  So *SD3*

17  phrases it as, to plead -- successfully plead fraudulent

18  concealment, all you have to plead is an affirmative act, the

19  plaintiffs' lack of actual knowledge, and either a lack of

20  inquiry notice or due diligence.  Right?

21          So I don't think defendants are required -- plaintiffs

22  are required to plead exactly how they discovered the

23  conspiracy.

24          THE COURT:  How about generally?

25          MR. COBBS:  Generally?  So I think in our case, we

```
1     allege that the plaintiffs didn't have any way to know about the

2     conspiracy until 2024.  I think in our case, the details of how

3     the plaintiffs learned about the alleged conduct are

4     attorney-client privileged, or they at least touch sensitive

5     attorney-client communications, and I don't think we can be

6     required to plead privileged communications in the complaint.

7          And so I think it's sufficient to plead that they had

8     no way of knowing about the conspiracy until April 2024, and

9     that, you know, they discovered it in April 2024.

10         THE COURT:  All right.

11         MR. COBBS:  Any other questions, Your Honor?

12         THE COURT:  No.  Thank you.

13         MR. COBBS:  Thank you.

14         THE COURT:  I'll give you the last word on this.

15         MR. BARGER:  May I respond?

16         THE COURT:  Yes, please.  Talk about the *Marlinton*

17    case, because plaintiffs clearly are relying heavily on that.

18         MR. BARGER:  Yes, Your Honor.  The way I would like to

19    start talking about the *Marlinton* case is to refer the Court to

20    the *Edmonson* case, which is well after the *Marlinton* case.  And

21    specifically -- and I will answer the Court's question, because

22    there's portions of *Edmonson* that talk specifically about

23    *Marlinton* that I will note.

24         THE COURT:  Right.

25         MR. BARGER:  This is *Edmonson*, which is 922 F.3d 535
```

1    at -- sorry, Your Honor, I'm trying to get the right page.

2    Looks like it's at 553.  The court in *Edmonson*, which, by the

3    way, is well after the *Marlinton* case.  So *Edmonson* is 2019, and

4    I don't remember the exact date on *Marlinton*, but *Marlinton* is

5    at 71 F.3d --

6                THE COURT:  1995.

7                MR. BARGER:  Okay.  Thank you, Your Honor.

8                And the court in Edmonson notes -- or states

9    specifically, and we're talking about affirmative acts of

10   concealment:  "Additionally, under Rule 9, a party must state

11   with particularly the circumstances constituting the fraud or

12   mistake."  It goes on to say, "To satisfy Rule 9, a plaintiff

13   must plead the time, place, and contents of the false

14   representations, as well as the identity of the person making

15   the misrepresentation and what he obtained thereby."

16               And we'll talk in a little bit more detail about that.

17   But using the case that plaintiffs cite to extensively, *Edmonson*

18   really undercuts the way they've pled these allegations.

19   Because with regard to affirmative acts of concealment, they

20   don't do time, place, contents, et cetera.

21               The court goes on in *Edmonson*, Your Honor, on 554, to

22   talk about *Marlinton* and juxtapose *Marlinton* to the *Edmonson*

23   case, to talk about how *Marlinton* really was focusing on whether

24   the plaintiffs there had engaged in any kind of due diligence,

25   but whether they even had to; whether there was enough

1    information to put them on inquiry notice.

2         And the court in *Edmonson* talked about -- talking about

3    the *Edmonson* case, "Lenders principally argue that plaintiffs

4    cannot satisfy the diligence requirement because plaintiffs

5    conceded that they did not engage in any inquiry during the

6    limitations period.  But this court has long held that it is

7    possible for a plaintiff to satisfy the due diligence

8    requirement without demonstrating that it engaged in any

9    specific inquiry, if they didn't have to give inquiry notice."

10   And the court in Edmonson in that quote is citing to *Marlinton*.

11        In this instance, it sounds to me like the plaintiffs

12   are arguing:  We didn't have any duty to look.  And with regard

13   to the alleged sham provision:  We couldn't have found it.

14        I do want to talk briefly about a couple of points

15   there with regard to their inquiry obligation, but I do want to

16   come back and talk about their discussion about the sham

17   provision.

18        In this instance, the plaintiffs alleged -- with regard

19   to Ms. Scharpf, Ms. Scharpf, I think in the complaint, says she

20   moved three times.  She started her employment 17 years ago and

21   left it 10 years ago; Mr. D'Armiento started 22 years ago and

22   left 20 years ago.  So with regard to those two individuals,

23   there's nothing in the complaint that alleges they were ever

24   recruited.  And essentially their complaint is, right, we didn't

25   affirmatively recruit.  So they certainly knew whether or not

1    they were recruited.

2          According to the plaintiffs, there is a significant

3    labor shortage and a high demand for naval engineers.  And so

4    presumably the plaintiffs knew that.  So they certainly had the

5    benefit of that information, and they would know whether or not

6    they were recruited.  So at least with regard to those facts

7    specifically within their knowledge, they would have some duty

8    to do something, and in this instance, the plaintiffs haven't

9    alleged they did anything with regard to any of the affirmative

10   acts.

11         Let me go back briefly to the sham.  As I said, I think

12   that's the best one they can try to use.  The affirmative --

13   arguing that we didn't put the alleged conspiracy in writing, as

14   we said, they've cited no case that stands for that proposition,

15   and that's different from the cases that Mr. Cobbs argued about

16   that talked about affirmatively taking acts to, for example,

17   have an agreement in writing and then destroy it, or having

18   secret meetings where we say, we're not going to put things in

19   writing, or having emails that you then destroy.  None of that

20   is alleged here, and none of that fits into the box of, we don't

21   have an agreement in writing.

22         And I know I've said it, and I know plaintiffs --

23         THE COURT:  I'll have to go back and look at the

24   allegations, but as I understood plaintiffs' counsel's argument,

25   there are allegations in the complaint that the efforts at

1    concealment went beyond simply not putting it in writing.  It

2    was not talking about it before others who weren't part of the

3    conspiracy, giving oral instructions to people rather than in

4    writing.

5            Again, I have to go back and look at allegations, but

6    the allegations are much broader than simply not putting it in

7    writing, as I understand the plaintiffs' position.

8            MR. BARGER:  And I have -- I confess, with all of the

9    pare-backs, I would have to go back and look as well.  I don't

10   remember that kind of detail.

11           But even if they made that general suggestion, they

12   continue to run afoul of group pleading and conclusory

13   allegations, and they're sorely lacking in what *Edmonson* says

14   you're going to need.  If that's going to be your argument about

15   those or some of the acts of concealment, you've got to tell us

16   who, what, when, where, and your opportunity to know that.  And

17   they don't do that.

18           And we still don't know what, if any, effort these

19   plaintiffs took to discover the alleged conspiracy.  Right?  The

20   test is, were there affirmative acts of concealment that

21   prevented these plaintiffs, not the plaintiffs' counsel.  Not

22   whether the plaintiffs did some kind of investigation and did

23   some market analysis and then went and found plaintiffs, it's

24   whether these plaintiffs were prevented from knowing, within

25   that four-year period, whether it's when they began -- and we

1    have not dealt with, well, did the injury accrue when they

2    started or when they left.  It really doesn't matter because it

3    was so long ago, we don't have to decide that.  But it's within

4    the four-year period after it accrues, what were they prevented

5    from learning.

6          With regard to the discussion about whether the

7    no-poach as part of the teaming agreement is a sham provision, I

8    again point to the *Edmonson* case, and the court's analysis of

9    the specific allegations there that constituted shams.

10   Plaintiffs' argument appears to be, well, there was a company

11   that did a few things legitimately, but did all these other

12   kickback things and concealed things, and so it doesn't mean

13   that the entire thing is a sham.  But what plaintiffs have now

14   claimed is that -- it sounds like they're saying the no-poach

15   provision of the teaming agreement, that part is a sham, even

16   though they have to concede it is a legitimate component of a

17   teaming agreement.

18         And I think going back to the Court's question of, does

19   it impact the class members, my reaction was -- is, absolutely

20   yes.  Because if you have two companies, or however many

21   companies are in a teaming agreement that have this provision

22   that they won't solicit each other's employees during the life

23   of that teaming relationship, plaintiffs can't possibly be

24   arguing that that non-solicitation provision is not a valid

25   provision vis-a-vis those two team members.  I mean, essentially

1    they seem to suggest that that no-poach provision has no legal

2    consequence whatever, and that it is a sham because of the

3    alleged overarching nationwide 40-year conspiracy.

4           But I do think the Court's question touches on

5    something very important, and that is how many class members or

6    potential class members were subject to a legitimate teaming

7    agreement and legitimate non-solicitation provisions.  So it

8    most definitely would have an impact on the size of the class.

9           But for affirmative act purposes, I understand their

10   argument, well, the teaming agreements are often confidential so

11   we don't know much about them.  All right.  You don't know much

12   about them, then it's hard for you to rely very significantly,

13   you know, on them as an affirmative act of concealment, when

14   you've not even alleged that these existed and were somehow --

15   that these plaintiffs, who worked in the business, you know,

16   that they knew about teaming agreements, and that these teaming

17   agreements with these prohibited provisions or these sham

18   provisions existed during the time they were employed there.

19   There's nothing like that whatsoever.

20          It's somewhat analogous to, Judge, they made public

21   statements on their websites.  But we now know that the most --

22   the earliest one they have for that is 2021.  And with regard to

23   the public statements, I do submit there is a difference between

24   an individual denying that there's an agreement and -- or that

25   I'm complying with the law, and the generic statements that are

1    made in the public documents on the websites.

2            But even in situations where you have an individual

3    denying culpability -- and I think it was the *GO Computer vs.*

4    *Microsoft* case, one of the allegations was Bill Gates denied

5    that there was any wrongdoing, and the court said that's not an

6    affirmative act.  That's not enough.  So even when it's an

7    individual, the plaintiffs are going to need more than simply

8    denials of illegality.

9            I can't remember if I said it a second time, and if I

10   did, I apologize to say it a third time.  If you accept the

11   plaintiffs' argument about an unwritten, with nothing more,

12   agreement to conspire, there is no statute of limitations.

13           THE COURT:  All right.

14           MR. COBBS:  Can I respond briefly, Your Honor?

15           THE COURT:  Very briefly.

16           MR. COBBS:  Sure.  So to begin with, nothing in

17   *Edmonson* casts doubt on the language I quoted from *Marlinton*.

18   *Marlinton* isn't about inquiry notice, it's the case in which

19   they set out the affirmative acts standard.  And if *Edmonson* is

20   about inquiry notice, then it doesn't confront the holding about

21   affirmative acts in *Marlinton*.  And I think the language of

22   *Edmonson* also makes clear that the affirmative acts standard is

23   what it is.

24           Mr. Barger distinguishes cases in which the defendants

25   destroy documents.  *Marlinton* rejects that distinction.

1        Mr. Barger talked about the plaintiffs' knowledge of

2   their own recruitment.  Obviously plaintiffs have knowledge that

3   they haven't been recruited, but they don't necessarily have

4   knowledge of anybody else who wasn't being recruited.  They

5   don't have the 360-degree view required to even be moderately

6   suspicious in this conspiracy.

7        Mr. Barger mentioned group pleading and conclusory

8   allegations.  We don't group plead, we name names.  I can talk

9   more about that if you would like.

10       I think *GO Computer* is an inquiry notice case, but it

11  also exactly illustrates the principle that I've been talking

12  about here.  *GO Computer*, the denial of wrongdoing in question

13  was a letter that said, "No, we did not steal trade secrets in

14  your technology."  And the court says that legal wrongdoing is

15  not a straightforward question of fact.  What the court is

16  saying is that the denial of wrongdoing as a legal position

17  is -- does not evince concealment.  Right?

18       THE COURT:  Well, how does that differ from affirmative

19  statements that were complying with the law:  We're a great

20  company, we have integrity, we have transparency?

21       MR. COBBS:  Well, I think, as other cases have shown,

22  right, saying that -- well, I think the statements are more

23  specific than that.  Right?  They say, "We offer competitive

24  salaries."  Right?  "We recruit competitively, we follow the

25  antitrust laws," things like that.  I think, you know, you could

1    go either way on some of those statements, but I think if you

2    read them against the other public statements cases,

3    particularly *Animation Workers II*, they're specific enough to be

4    public statements.

5          THE COURT:  All right.

6          MR. COBBS:  Also, Mr. Barger suggests that these

7    plaintiffs need to specifically know about the concealments that

8    we allege.  I don't think that's right.  I think the

9    Fourth Circuit doesn't suggest that that's right.  I think the

10   Fourth Circuit recognizes that in cases of omission or

11   concealment under *Corder*, it's very difficult to pin down a

12   causal relationship between any one particular concealment and

13   the plaintiffs' lack of knowledge.

14          I'll note that the who, what, why, when, where

15   standard, *Edmonson* immediately says, nonetheless, courts should

16   hesitate to dismiss if the defendants are on notice as to the

17   kinds of claims they're going to be required to defend.  And

18   there's evidence that we have substantial evidence behind that.

19   We do.

20          Finally, Your Honor, if you think that we're deficient

21   in any regard on this issue, we would ask for leave to amend.

22   Because I think any of the deficiencies we've been talking about

23   here, they should all be rejected, as we've said, but I think

24   that there are additional facts that we could easily remedy.

25          THE COURT:  Mr. Barger, I'll give you the last word,

1    briefly, if you have anything to respond specifically to that.

2            MR. BARGER:  Yes, just two brief points in response,

3    Your Honor.

4            First point is, plaintiffs' counsel cites the Court to

5    *Animation Workers II*.  And I would also -- the Court is probably

6    already well ahead of me.  If you look at *Animation Workers I*,

7    in that case the court found the allegations deficient and

8    dismissed, and it included allegations that the court found

9    deficient, such as defendants' secret meetings, minimizing

10   written record of conspiracy, defendants' effort to mislead the

11   public through the Croner survey, which was a salary survey.  So

12   that was my first point.

13           Second point, their request for leave to amend.  Our

14   view is this motion is teed up for ruling, and we would ask the

15   Court to rule on it.  If they decide that they now have, or have

16   had but didn't use, plaintiffs within the four-year statute of

17   limitations, they can -- you know, if the Court grants them

18   leave, certainly they can plead that.  But we respectfully

19   submit that this one should be ruled upon.

20           Again, I don't know the plaintiffs' tactical position

21   here, but if they had other people and they chose these two that

22   are so old, my inference is they wanted a lengthy conspiracy for

23   damages purposes, and if they're not going to get that because

24   they're hoisted on their own petard, then the Court should rule

25   on the motion, we respectfully submit should dismiss, and if

1    they get leave to amend, then we can see who the new plaintiffs

2    are.

3             THE COURT:  All right.  Thank you.

4             MR. BARGER:  Thank you, Judge.

5             THE COURT:  I'm going to take a 10-minute recess before

6    we take up the rest of the motions.

7             Let me just ask counsel, I want to emphasize, I have

8    reviewed all the briefings for the next motion, so if you would

9    highlight what you think you need to and impress upon the Court.

10            All right.  The Court will take a brief recess.

11            MR. COBBS:  So is Your Honor's intention to address the

12   plausibility allegations in the joint motion and then the

13   individual motions?

14            THE COURT:  Yes.  Let's see where we are after the

15   joint.

16            (Recess taken at 11:16 a.m.)

17            THE COURT:  Let's hear the joint motion on the failure

18   to state a claim.

19            MR. BARGER:  Yes, Your Honor.  Thank you.  Your Honor,

20   I will be brief.  I'll summarize our position.  Generally we

21   would, of course, stand on our briefs, but I'll summarize, and

22   then if the Court has questions or if I've -- or if it's

23   necessary to respond to the plaintiffs' argument, then we will

24   do so.

25            THE COURT:  All right.

1          MR. BARGER:  So this portion, Your Honor, as the Court

2     noted, concerns whether the plaintiffs have plausibly alleged

3     this nationwide 40-years-or-so conspiracy amongst purportedly

4     thousands of individual employees at these different companies

5     to have an unwritten no-poach agreement, and have somehow been

6     able to implement that, purportedly up until recently,

7     undetected.

8          Your Honor, so in order for the plaintiffs to meet

9     their burden, as the Court knows, they have to allege direct

10    evidence.  And if they're not going to use direct evidence, they

11    have to have sufficient indirect evidence, which generally is

12    parallel conduct, and what the courts in *Twombly*, for example,

13    call the plus factors that have to be sufficient to get them

14    over the hump of -- sufficient parallel conduct and plus factors

15    to get to the plausible conspiracy.

16         With regard to direct evidence, as the Court knows,

17    we're talking about situations that require no inference.  It

18    is -- as the cases talk about, it is rare.  But there are

19    examples in the cases that we've cited.  Some cases have an

20    actual copy of the conspiratorial agreement or a recording of

21    the conspiratorial agreement.  None of that is present here.

22         And as we indicated in our briefs, essentially the

23    plaintiffs, in alleging this nationwide conspiracy, have

24    frequently resorted to a group pleading.  And while Rule 9

25    doesn't apply to this stage, plaintiffs still have to give

1    particulars, the who, what, when, where, why, the opportunity to

2    see, the opportunity to know what you're alleging.

3          And each of those allegations that they've pled, we've

4    argued and submit, do not rise to the level of actual direct

5    evidence.  There are numerous gaps between what they generically

6    allege and the argument that that is direct evidence of the

7    conspiracy.

8          On the indirect side, Your Honor, on the parallel

9    conduct side, as *Twombly* and the other courts note, specifically

10   the *SD3* -- I would say the *SD3*, the first court, the

11   Fourth Circuit ruling, which I think was Judge Hilton's case,

12   and then the *Treasury Securities* case, which is a

13   Southern District of New York case with Judge Gardephe that's

14   fairly new.

15         Basically, in all those cases the courts note that if

16   you're going to allege parallel conduct, you must plausibly show

17   that the parallel conduct was the result of the conspiracy; in

18   other words, it came after, that the agreement preceded the

19   alleged conduct here.  And in order, again, to get there with

20   the parallel conduct, you have to allege sufficient plus

21   factors.

22         And just at a high level, the plaintiffs have resulted

23   in what we call generic group factors, the kind of -- or plus

24   factors, the kind of factors that are common really to any

25   business in any industry across the nation; things such as that

1    the defendants are interested in lowering labor costs and

2    lowering costs and maximizing profits, that they participate in

3    trade shows.  There are -- again, all of those examples are

4    common to the industry in general, and do not rise, we submit,

5    to the level of enough specificity to get you over the hump on

6    what we essentially, for the sake of pleading purposes, agree

7    they've alleged parallel conduct.

8           Your Honor, that's my summary.  Unless the Court has

9    specific questions right now, I'll address argument by

10   plaintiffs' counsel.

11          THE COURT:  All right.  Counsel?

12          MR. COBBS:  Good morning again, Your Honor.

13          THE COURT:  Yes.

14          MR. COBBS:  So let's start with the standard here.

15   Right?  According to *Twombly*, all we need to do is raise a

16   plausible inference that the conspiracy is as we allege it.

17   Right?  We don't need to show that the conspiracy -- that as a

18   matter of fact the conspiracy definitely existed; we don't need

19   to exclude the possibility of independent conduct.  We do,

20   right, because we allege eyewitness statements from multiple

21   witnesses saying that the conspiracy existed.  I submit that

22   that kind of evidence excludes the possibility that this is

23   independent parallel conduct.

24          Let me go over some of the things that defendants say

25   aren't direct evidence.  Paragraph 4, "Several former managers

1    directly confirmed that they had a standing 'gentlemen's

2    agreement' not to poach naval engineers from other conspirators,

3    using exactly those words."

4             Paragraph 142, "Managers with hiring authority

5    repeatedly and independently confirmed the existence of an

6    industry-wide 'gentlemen's agreement,' using that term, 'not to

7    actively poach from competitors.'"

8             Paragraph 145, "Former managers of the defendant

9    confirmed broad agreements among all industry participants."

10            Paragraph 151 -- and here's, I think, Mr. Barger's

11   group pleading argument becomes -- this puts the lie to that

12   argument.  "Defendants' former employees made statements that

13   the following defendants or business units participated in the

14   gentlemen's agreement not to recruit naval engineers from

15   competitors:  Gibbs & Cox; Alion, now Serco; CSC Advanced Marine

16   Enterprises, now General Dynamics and/or CACI; BMT Designers &

17   Planners; the Columbia Group; AMSEC, now HII Fleet Support; Bath

18   Iron Works; and Marinette Marine."  Notably, that is most, but

19   by no means all, defendants.

20            It's also very specific as to which business units are

21   named.  Notably absent in that list, for instance, is JJMA, even

22   though many other conspiracy allegations concern JJMA.  This is

23   not careless group pleading, these are allegations that have

24   eyewitness testimony behind them.

25            Paragraph 152, "Several of the engineering consultancy

1 defendants, including at least Gibbs & Cox; JJMA; Alion, now

2 Serco; CSRA, now CACI; AMSEC; Tridentis; and the Columbia Group

3 referred to each other collectively as The Beltway Bandits.

4 According to an executive employed by one of those defendants

5 who was involved in recruiting naval engineers, these companies

6 shared an agreement among themselves not to actively recruit

7 each other's employees."

8          The defendants can wish these allegations away,

9 Your Honor, but that doesn't work.  I think once you have direct

10 evidence that this conspiracy existed, that establishes

11 certainly, as a matter of law, the plausibility of the

12 conspiracy with respect to the defendants that are named.

13          Now, I think defendants take issue with the first

14 couple of statements that I mentioned that don't name specific

15 defendants, that talk about an industry-wide conspiracy.  We

16 can't put statements in our witness' mouths, Your Honor, so we

17 pleaded those, you know, exactly as we could.  But it's just

18 wrong to say that we didn't plead direct evidence of this

19 conspiracy.

20          Now, on to plus factors.  So defendants -- we didn't

21 make these plus factors up, Your Honor.  Most of them come from

22 *SD3*.  That's a Fourth Circuit case, it's precedential.  The

23 defendants' efforts to suggest that those aren't plus factors

24 are just foreclosed by that case.  Right?

25          And there's good reason for those plus factors.  Right?

1   *Twombly* only asks, with respect to circumstantial evidence,

2   right, is there enough -- or are there enough facts for you, as

3   the Court, to conclude that it is plausible that the parallel

4   conduct that's alleged is the result of an anticompetitive

5   agreement rather than independent parallel conduct.  And the

6   plus factors that defendants say are meaningless, right, shared

7   incentives to lower costs and stuff like that, independent

8   incentives to -- not to collude -- or, I'm sorry, independent --

9   pardon me, Your Honor.

10          So we covered -- well, the next one, I think, is -- let

11  me look at my notes.

12          THE COURT:  Sure.

13          MR. BARGER:  So the ones they take issue with,

14  motivation for common action, opportunity to conspire, and

15  consciousness of guilt.  That's reply 19 to 21.  All of those

16  are articulated specifically in *SD3*, and they're good reasons to

17  think that having motivation for common action and opportunities

18  to conspire, and evidence that the defendants are conscious of

19  their guilt, all make it more plausible that the parallel

20  conduct is the result of a concerted agreement rather than

21  independent conduct.

22          They particularly say that consciousness of guilt is,

23  quote, unquote -- is, quote, "absurd."  It's not.  Right?  If

24  the defendants are aware of their guilt, and, as we do, we plead

25  that they attempted to cover up their conspiracy, it makes it

1    very unlikely that their actions to cover up -- they're taking

2    actions to cover up a conspiracy that didn't exist.

3           I think the rest of the plus factors that defendants

4    argue about, particularly their independent economic incentives,

5    are just factual arguments, Your Honor.  Right?  I think we

6    allege that each of these companies has an independent

7    incentive, in this tight labor market with specialized

8    educational requirements, citizenship requirements, so they

9    can't recruit from overseas, and security clearance

10   requirements, that it makes a lot of sense to go actively

11   recruiting your personnel.

12          Defendants say, no, that's not true.  Right?  We have

13   all these incentives not to actively recruit that are

14   independent.  The Court can't accept that as true.  Right?  It's

15   also -- I mean, so we're talking about, for them to be right,

16   every single defendant has to have exactly the same set of

17   incentives not to recruit.  And they're asking you, Judge, to

18   appoint yourself CEO of each of these companies, companies that

19   are diverse, right?  They range from the largest shipbuilders in

20   the country to tiny consultancies with no, like, large corporate

21   parent.  You have to appoint yourself CEO of each of those

22   companies and say, yes, as a matter of law, your independent

23   economic incentives are not to recruit from your competitors,

24   and you have to do that for each and every defendant.  I don't

25   think you can do that.

1          I think there are some other things that defendants, on

2     reply, say in their plausibility section that are just baffling.

3     Right?  They say we do not plead any facts about the witnesses'

4     jobs, and how their interactions in those jobs would lead them

5     to acquiring the knowledge of an alleged secret unwritten

6     industry-wide conspiracy, but we name all the witnesses by title

7     and their role in recruiting.

8          Defendants argue we're required to plead the who, what,

9     where, when, how, and why of the alleged agreement.  That's

10    reply 15.  That's plainly wrong.  That quote comes from *SD3*'s

11    plus factors.  And the point in *SD3* is that if you have details

12    about the conspiracy, they make it plausible that the conspiracy

13    existed.  Nowhere in *SD3* do they suggest that that material is

14    necessary to a finding of plausibility, and it doesn't apply to

15    direct evidence.

16         Unless Your Honor has additional questions about

17    this...

18         THE COURT:  All right.  That's fine.  Thank you.

19         Counsel?

20         MR. BARGER:  Yes, Your Honor.  Thank you.  Briefly in

21    response, Your Honor, let me start with the last point first,

22    whether the case law requires the plaintiffs to plead who, what,

23    when, where, why as to direct evidence.  Whether or not it's

24    required, you still, common-sensically, have to look at the

25    allegations to see if what the plaintiffs have pled rises to the

1    level of direct evidence, or whether, you know, candidly, it's

2    clever but shallow.

3        And I think that's what some of the specific examples

4    that the plaintiffs give in this section, Your Honor, when you

5    look at the specific paragraphs, that the plaintiff gave

6    examples of, Paragraphs 4, 142, 145, 151, and 152.  When you

7    take them separately, individually, and then again, in total, as

8    the case law talks about, they really are not very specific.

9        Paragraph 4 of the complaint, in 155, "Industry veteran

10   admitted they don't go after people at other companies."  That's

11   not an allegation.  And they claim this is direct evidence.

12   That's not evidence of an agreement, that's evidence of what

13   this particular person, unknown as to time, place, company,

14   details, why they would know that, how they would know that, who

15   they spoke with that allows them to make that kind of

16   allegation.  It's not evidence of an agreement at all, and you

17   really don't know much from that.  And so basically, every one

18   of those kinds of allegations fall back into generic group kinds

19   of pleading that require inference upon inference to get to

20   contending that it is direct evidence.

21       When they make those allegations, I look at it and I

22   go, I don't know how you know that.  I can't tell how you know

23   that.  You say you worked there, but you don't say when, you

24   don't say why you would know these things.  I mean, there may be

25   some inferences that would say, okay, a hiring manager may know

1    some things, but we don't even know, for example, of when you

2    say you can't recruit, are we talking only about naval

3    engineers?  We're not told that.

4           And I don't know if this is a fair analogy.  I think it

5    is.  Certainly in my background, the criminal side, if we're

6    looking at a confidential informant or a confidential witness,

7    and we're going to use that information to go get a search

8    warrant or we're going to use it in our case - and I'm not

9    suggesting here that the plausibility standard is the same - but

10   if you're going to rely on someone and go, I'm not going to tell

11   you who they are, but I'm going to tell you that they know a lot

12   that gets us to the point of showing the conspiratorial

13   agreement, then you need to give me a lot more than what they've

14   given me.  And I think they're deficient in all of those

15   instances.

16          And that brings us back to the indirect evidence and

17   the inferences that they make -- or they want the Court to make

18   from, again, what are essentially generic comments.

19          Plaintiffs' counsel also said -- they gave an example

20   of consciousness of guilt, and said plaintiffs have pled that

21   the defendants covered up the conspiracy.  Well, we just spent

22   the last hour going through what they alleged they did to cover

23   up the conspiracy, and that is, there's no written agreement,

24   the supposed sham provisions of the valid teaming agreements,

25   and public statements on the websites that they claim are

1   obeying the law.  Those, I would submit, don't show

2   consciousness of guilt at all.  Those don't really help the

3   plaintiffs.

4           Your Honor, I think that's it, unless the Court has

5   questions.

6           THE COURT:  All right.

7           MR. BARGER:  May I have just have a second to make sure

8   my brain trust doesn't have anything I missed?

9           THE COURT:  Yes.

10          MR. BARGER:  The brain trust says I'm good.

11          THE COURT:  All right.  Before I hear from you, I will

12  give the other defendants an opportunity to say anything they

13  would like specific to their particular clients in their

14  supplemental motions, which I have reviewed.  If anyone wants to

15  fill the time here, it's been well spent.

16          MR. BARGER:  Your Honor, we were going to stand on

17  those briefs unless the Court has specific questions.

18          THE COURT:  That's fine.  That's fine.  I don't.

19          Yes, go ahead.

20          MR. COBBS:  Literally two sentences, Your Honor.

21  First, not every allegation in the complaint has to be direct

22  evidence of an agreement.

23          THE COURT:  Right.

24          MR. COBBS:  Some of the statements that they point out,

25  that they focus on, are direct evidence of what the witnesses

1 said, and what the witnesses said raises an inference that that

2 defendant participated in the conspiracy or things were

3 otherwise conspiratorial.

4     And also, once you have direct evidence of a

5 conspiracy, not a lot of additional information is required to

6 conclude that a defendant who had an independent economic

7 interest in actively recruiting, and adhered to the rules of the

8 conspiracy, participated in that conspiracy.

9     Thank you, Your Honor.

10     MR. BARGER:  Nothing further, Your Honor.

11     THE COURT:  All right.  Thank you.  I appreciate

12 counsel's argument, I'll take it under advisement, and I'll get

13 you a decision to you as soon as I can.

14     Counsel are excused, court stands in recess.

15     (Off the record at 11:55 a.m.)

16

17

18     **CERTIFICATE OF OFFICIAL COURT REPORTER**

19

20     **I, Rebecca Stonestreet, certify that the foregoing is a**

21 **correct transcript from the record of proceedings in the**

22 **above-entitled matter.**

23

24 **____//Rebecca Stonestreet_____          __3/20/24____**

25 **SIGNATURE OF COURT REPORTER                DATE**

**'** 

**'in** [1] - 15:4
**'in-person** [1] - 15:4
**'not** [1] - 48:6

**/**

**//Rebecca** [1] - 56:24

**1**

**1** [1] - 2:11
**10** [2] - 5:15, 35:21
**10-minute** [1] - 44:5
**1000** [1] - 1:21
**10003** [1] - 1:18
**1031** [1] - 19:8
**1099** [1] - 1:24
**10:05** [1] - 1:7
**1100** [1] - 1:14
**11:16** [1] - 44:16
**11:55** [1] - 56:15
**12** [2] - 11:25, 18:7
**1201** [1] - 17:22
**121** [1] - 15:12
**124** [1] - 21:20
**125** [2] - 14:25, 20:15
**13** [3] - 18:22, 25:2, 29:17
**142** [3] - 11:25, 48:4, 53:6
**145** [2] - 48:8, 53:6
**148** [1] - 11:25
**149** [1] - 16:25
**15** [1] - 52:10
**151** [2] - 48:10, 53:6
**152** [2] - 48:25, 53:6
**155** [1] - 53:9
**157** [1] - 18:7
**158** [1] - 12:1
**17** [1] - 35:20
**1750** [1] - 1:20
**1825** [1] - 2:5
**19** [1] - 50:15
**1995** [1] - 34:6
**1:23-cv-01372-AJT-WEF** [1] - 1:3

**2**

**2** [1] - 21:16
**20** [3] - 1:6, 5:15, 35:22
**2000** [1] - 19:13
**20001** [1] - 1:25
**20004** [1] - 2:3
**20005** [1] - 1:15
**20006** [1] - 2:6
**2019** [1] - 34:3

**202-408-4699** [1] - 1:15
**202-420-2200** [1] - 2:6
**202-508-8000** [1] - 2:3
**202-639-6000** [1] - 1:25
**2021** [2] - 7:17, 39:22
**2024** [4] - 1:6, 3:2, 33:8, 33:9
**206** [1] - 25:3
**209** [1] - 18:7
**21** [1] - 50:15
**22** [1] - 35:21
**22102** [1] - 1:21
**22314** [1] - 2:9
**23-1372** [1] - 3:2
**240** [1] - 2:10

**3**

**3** [1] - 19:5
**3/20/24** [1] - 56:24
**33** [1] - 1:17
**347-826-1308** [1] - 1:18
**360-degree** [1] - 41:5

**4**

**4** [3] - 47:25, 53:6, 53:9
**40-year** [2] - 5:10, 39:3
**40-years-or-so** [1] - 45:3
**401** [2] - 2:2, 2:9
**426-7767** [1] - 2:10

**5**

**5** [1] - 19:25
**500** [1] - 1:14
**535** [1] - 33:25
**541** [1] - 26:5
**549** [1] - 20:8
**553** [1] - 34:2
**554** [1] - 34:21

**7**

**71** [3] - 14:25, 21:20, 34:5

**8**

**826** [1] - 19:8

**9**

**9** [6] - 9:13, 24:8,

25:15, 34:10, 34:12, 45:24
**9(b** [2] - 9:13, 11:8
**9(b)** [1] - 13:21
**900** [1] - 1:24
**922** [1] - 33:25
**9th** [2] - 2:2, 2:8

**A**

**a.m** [3] - 1:7, 44:16, 56:15
**able** [1] - 45:6
**above-entitled** [1] - 56:22
**absent** [1] - 48:21
**absolutely** [1] - 38:19
**absurd** [1] - 50:23
**accept** [3] - 6:22, 40:10, 51:14
**access** [1] - 11:15
**according** [4] - 27:16, 36:2, 47:15, 49:4
**accounts** [2] - 8:18, 15:10
**accrue** [1] - 38:1
**accrues** [1] - 38:4
**acknowledge** [1] - 7:16
**acknowledged** [1] - 10:8
**acquiring** [1] - 52:5
**act** [27] - 6:10, 6:15, 7:3, 7:10, 7:13, 8:1, 10:3, 10:5, 10:23, 12:3, 12:7, 12:13, 12:18, 14:1, 14:16, 15:20, 17:1, 17:4, 17:6, 23:5, 23:8, 31:4, 31:5, 32:18, 39:9, 39:13, 40:6
**acted** [1] - 7:7
**acting** [1] - 23:11
**action** [3] - 13:4, 50:14, 50:17
**Action** [1] - 3:2
**actions** [5] - 5:23, 11:21, 21:19, 51:1, 51:2
**active** [2] - 14:16, 19:17
**actively** [7] - 17:11, 17:12, 48:7, 49:6, 51:10, 51:13, 56:7
**activity** [2] - 25:15, 25:19
**acts** [30] - 6:1, 11:19, 14:2, 17:9, 17:25, 18:11, 18:18, 18:21, 18:24, 19:12, 19:17,

21:13, 21:15, 22:19, 22:20, 23:7, 24:5, 25:5, 31:1, 31:8, 32:15, 34:9, 34:19, 36:10, 36:16, 37:15, 37:20, 40:19, 40:21, 40:22
**actual** [4] - 30:17, 32:19, 45:20, 46:4
**Adam** [1] - 4:1
**act'n** [1] - 27:19
**ADAM** [1] - 2:1
**additional** [5] - 9:5, 23:18, 42:24, 52:16, 56:5
**Additionally** [1] - 34:10
**address** [4] - 4:24, 5:2, 5:9, 44:11, 47:9
**adhered** [1] - 56:7
**admitted** [1] - 53:10
**adoption** [1] - 21:12
**Advanced** [1] - 48:15
**Advantage** [5] - 26:3, 27:14, 27:23, 28:1, 28:4
**advantage** [2] - 20:7, 20:19
**Advantage's** [1] - 27:19
**advisement** [1] - 56:12
**affect** [1] - 26:20
**affects** [1] - 27:6
**affirmatively** [4] - 7:12, 24:22, 35:25, 36:16
**affirming** [1] - 18:1
**affirms** [1] - 22:24
**afoul** [1] - 37:12
**ago** [6] - 5:15, 35:20, 35:21, 35:22, 38:3
**agree** [1] - 47:6
**agreed** [2] - 12:5, 13:14
**agreeing** [1] - 12:1
**agreement** [53] - 6:19, 8:13, 8:22, 8:23, 9:7, 11:23, 11:24, 12:2, 14:6, 16:6, 16:17, 17:16, 19:25, 20:25, 24:10, 24:14, 24:22, 25:21, 25:23, 25:24, 25:25, 26:19, 28:22, 29:12, 36:17, 36:21, 38:7, 38:15, 38:17, 38:21, 39:7, 39:24, 40:12, 45:5, 45:20, 45:21, 46:18, 48:6, 48:14, 49:6, 50:5, 50:20, 52:9, 53:12,

53:16, 54:13, 54:23, 55:22
**agreement'** [1] - 48:2
**agreements** [35] - 8:3, 8:5, 8:6, 8:10, 8:25, 9:8, 9:17, 10:8, 11:11, 11:12, 11:16, 24:7, 24:9, 24:12, 24:20, 25:14, 25:17, 25:18, 26:9, 26:13, 26:14, 28:7, 28:9, 28:20, 28:21, 29:6, 29:8, 29:9, 29:24, 30:7, 39:10, 39:16, 39:17, 48:9, 54:24
**ahead** [2] - 43:6, 55:19
**al** [2] - 1:7, 3:3
**Alexandria** [2] - 1:2, 2:9
**Alion** [2] - 48:15, 49:1
**Allan** [1] - 20:16
**allegation** [9] - 8:3, 12:22, 16:7, 26:5, 28:23, 31:19, 53:11, 53:16, 55:21
**allegations** [41] - 5:9, 7:1, 11:8, 11:20, 13:12, 13:20, 13:22, 15:2, 15:23, 16:4, 16:20, 16:24, 18:6, 18:11, 21:24, 23:14, 23:21, 25:4, 28:1, 28:25, 31:14, 32:9, 34:18, 36:24, 36:25, 37:5, 37:6, 37:13, 38:9, 40:4, 41:8, 43:7, 43:8, 44:12, 46:3, 48:22, 48:23, 49:8, 52:25, 53:18, 53:21
**allege** [23] - 6:10, 7:4, 9:7, 10:9, 13:6, 13:17, 15:20, 17:1, 24:6, 24:19, 25:16, 29:5, 30:12, 30:17, 33:1, 42:8, 45:9, 46:6, 46:16, 46:20, 47:16, 47:20, 51:6
**alleged** [29] - 5:9, 5:11, 5:14, 5:23, 6:1, 6:11, 6:25, 8:1, 8:18, 10:2, 13:9, 18:17, 20:23, 33:3, 35:13, 35:18, 36:9, 36:13, 36:20, 37:19, 39:3, 39:14, 45:2, 46:19, 47:7, 50:4, 52:5, 52:9, 54:22
**allegedly** [1] - 5:21
**alleges** [3] - 8:24,

28:19, 35:23
**alleging** [4] - 9:14, 11:17, 45:23, 46:2
**allow** [2] - 22:5, 22:6
**allows** [1] - 53:15
**almost** [1] - 22:16
**alone** [1] - 30:22
**alternative** [1] - 5:23
**amend** [3] - 42:21, 43:13, 44:1
**amount** [2] - 27:17, 27:18
**AMSEC** [2] - 48:17, 49:2
**analogous** [1] - 39:20
**analogy** [1] - 54:4
**analysis** [2] - 37:23, 38:8
**AND** [1] - 1:21
**ANDERSON** [1] - 1:17
**Animation** [6] - 17:9, 17:22, 31:3, 42:3, 43:5, 43:6
**another's** [2] - 24:15, 29:12
**answer** [1] - 33:21
**ANTHONY** [1] - 1:9
**anticompetitive** [5] - 12:25, 13:1, 13:10, 24:18, 50:4
**antitrust** [11] - 5:18, 8:20, 14:22, 14:25, 18:2, 19:5, 21:14, 21:24, 22:16, 41:25
**apart** [2] - 17:7, 25:10
**apologize** [1] - 40:10
**appear** [1] - 31:7
**APPEARANCES** [1] - 1:11
**appearances** [1] - 3:4
**applicable** [1] - 18:1
**application** [1] - 21:22
**applied** [2] - 24:15, 29:13
**applies** [1] - 21:5
**apply** [5] - 21:19, 22:11, 22:12, 45:25, 52:14
**appoint** [2] - 51:18, 51:21
**appreciate** [1] - 56:11
**appropriate** [1] - 25:4
**April** [2] - 33:8, 33:9
**area** [1] - 11:2
**argue** [13] - 4:8, 4:9, 8:8, 9:25, 13:25, 18:14, 24:6, 25:11, 30:22, 31:13, 35:3, 51:4, 52:8
**argued** [2] - 36:15,

46:4
**arguing** [3] - 35:12, 36:13, 38:24
**argument** [24] - 4:14, 5:3, 10:14, 12:12, 19:15, 21:11, 22:22, 25:7, 25:10, 25:20, 26:23, 27:10, 28:11, 36:24, 37:14, 38:10, 39:10, 40:11, 44:23, 46:6, 47:9, 48:11, 48:12, 56:12
**arguments** [1] - 51:5
**arrangement** [1] - 8:7
**artful** [1] - 23:16
**articulate** [1] - 26:23
**articulated** [2] - 26:22, 50:16
**aside** [1] - 7:22
**aspect** [2] - 10:1, 28:8
**aspects** [1] - 10:14
**asserting** [1] - 5:20
**assume** [4] - 4:19, 32:7
**attacking** [1] - 26:15
**attempted** [3] - 17:11, 17:12, 50:25
**attempting** [1] - 20:20
**attempts** [3] - 11:6, 19:16, 21:16
**attendance** [1] - 18:19
**attorney** [2] - 33:4, 33:5
**attorney-client** [2] - 33:4, 33:5
**attributed** [1] - 29:18
**authority** [1] - 48:4
**automobiles** [1] - 15:6
**available** [1] - 20:19
**Avenue** [2] - 1:14, 1:24
**avoid** [1] - 18:19
**avoiding** [1] - 19:3
**aware** [2] - 15:6, 50:24

## B

**background** [1] - 54:5
**backs** [1] - 37:9
**baffling** [1] - 52:2
**Baltimore** [1] - 8:16
**Bandits** [1] - 49:3
**bank** [2] - 8:18, 32:7
**bar** [1] - 15:17, 32:4
**BARGER** [22] - 1:19, 3:6, 3:8, 3:15, 4:19, 4:21, 5:5, 33:15, 33:18, 33:25, 34:7, 37:8, 43:2, 44:4, 44:19, 45:1, 50:13,

52:20, 55:7, 55:10, 55:16, 56:10
**Barger** [7] - 3:8, 11:10, 40:24, 41:1, 41:7, 42:6, 42:25
**Barger's** [1] - 48:10
**based** [1] - 24:11
**basis** [3] - 6:7, 28:19, 29:3
**BATH** [1] - 1:20
**Bath** [2] - 3:9, 48:17
**battery** [1] - 18:3
**bear** [1] - 15:1
**becomes** [1] - 48:11
**BEFORE** [1] - 1:9
**began** [1] - 37:25
**begin** [1] - 40:16
**behalf** [5] - 1:3, 3:8, 3:17, 3:21, 3:23
**behind** [2] - 42:18, 48:24
**Beltway** [1] - 49:3
**benefit** [3] - 20:18, 27:6, 36:5
**best** [5] - 6:15, 7:16, 9:25, 31:24, 36:12
**betrayed** [1] - 23:19
**betrays** [1] - 23:5
**between** [8] - 14:21, 17:2, 17:5, 19:17, 19:20, 39:23, 42:12, 46:5
**beyond** [1] - 37:1
**Bill** [1] - 40:4
**bit** [5] - 6:17, 7:4, 8:2, 8:10, 34:16
**BLANK** [1] - 2:5
**blessed** [1] - 12:16
**Block** [2] - 3:17, 3:23
**BLOCK** [2] - 1:23, 2:1
**Blvd** [1] - 1:20
**BMT** [1] - 48:16
**board** [4] - 12:21, 12:23, 13:13, 13:17
**Boat** [1] - 3:9
**BOAT** [1] - 1:21
**bogus** [3] - 25:13, 27:22, 28:5
**Boland** [9] - 12:9, 12:10, 12:11, 12:19, 12:25, 13:3, 13:20, 23:12, 23:13
**books** [2] - 12:3, 18:18
**box** [1] - 36:20
**brain** [2] - 55:8, 55:10
**brief** [8] - 4:24, 5:6, 5:25, 7:5, 8:10, 43:2, 44:10, 44:20
**briefings** [2] - 4:12,

44:8
**briefly** [6] - 35:14, 36:11, 40:14, 40:15, 43:1, 52:20
**briefs** [5] - 4:22, 5:1, 44:21, 45:22, 55:17
**brings** [1] - 54:16
**broad** [1] - 48:9
**broader** [2] - 25:25, 37:6
**brokerages** [1] - 12:21
**brokers** [4] - 26:4, 27:15, 27:18, 27:19
**burden** [1] - 45:9
**business** [7] - 9:3, 25:14, 25:18, 39:15, 46:25, 48:13, 48:20
**buy** [1] - 25:6
**bylaws** [1] - 13:2

## C

**CACI** [2] - 48:16, 49:2
**candidly** [1] - 53:1
**cannot** [1] - 35:4
**careful** [1] - 14:24
**careless** [1] - 48:23
**Case** [1] - 1:3
**case** [66] - 6:12, 6:17, 7:22, 8:15, 8:16, 8:20, 11:3, 11:5, 11:10, 11:13, 11:20, 12:10, 13:11, 13:12, 15:13, 15:24, 17:21, 18:16, 18:23, 19:5, 19:6, 19:13, 19:22, 20:10, 20:15, 20:16, 22:15, 22:20, 22:24, 23:7, 23:13, 23:15, 23:24, 24:4, 27:13, 27:25, 30:12, 31:6, 31:24, 32:1, 32:13, 32:25, 33:2, 33:17, 33:19, 33:20, 34:3, 34:17, 34:23, 35:3, 36:14, 38:8, 40:4, 40:18, 41:10, 43:7, 46:11, 46:12, 46:13, 49:22, 49:24, 52:22, 53:8, 54:8
**cases** [29] - 6:3, 6:16, 6:22, 7:9, 10:2, 12:4, 17:8, 18:10, 18:12, 18:15, 21:17, 21:23, 21:25, 22:14, 22:16, 28:13, 30:10, 31:25, 32:12, 36:15, 40:24, 41:21, 42:2, 42:10, 45:18, 45:19, 46:15
**casts** [1] - 40:17

44:8
**catfish** [1] - 19:8
**causal** [1] - 42:12
**causation** [1] - 26:23
**CEO** [2] - 51:18, 51:21
**certainly** [5] - 5:2, 7:23, 35:25, 36:4, 43:18, 49:11, 54:5
**CERTIFICATE** [1] - 56:18
**certify** [2] - 26:11, 56:20
**cetera** [1] - 34:20
**CFPB** [1] - 32:2
**CFTC** [1] - 32:3
**characterized** [1] - 11:22
**chose** [1] - 43:21
**circle** [1] - 30:9
**Circuit** [18] - 6:4, 10:25, 12:16, 14:19, 15:21, 19:18, 19:19, 19:20, 20:16, 22:23, 25:12, 28:12, 30:14, 31:11, 42:9, 42:10, 46:11, 49:22
**circuit** [1] - 14:18
**circumstance** [1] - 8:4
**circumstances** [2] - 22:15, 34:11
**circumstantial** [1] - 50:1
**cite** [4] - 28:12, 30:10, 32:12, 34:17
**cited** [8] - 6:3, 6:12, 6:16, 7:9, 8:15, 17:24, 36:14, 45:19
**cites** [1] - 43:4
**citing** [2] - 19:12, 35:10
**citizenship** [1] - 51:8
**Civil** [1] - 1:3
**civil** [1] - 3:2
**claim** [9] - 4:16, 6:7, 7:5, 7:24, 8:11, 11:17, 44:18, 53:11, 54:25
**claimed** [1] - 38:14
**claims** [3] - 18:22, 22:1, 42:17
**clandestine** [1] - 19:6
**clarifies** [1] - 11:1
**class** [7] - 26:10, 26:16, 26:20, 38:19, 39:5, 39:6, 39:8
**clear** [6] - 15:13, 23:7, 25:5, 27:24, 31:11, 40:22
**clearance** [1] - 51:9
**clearly** [4] - 5:18, 13:25, 30:5, 33:17

**CLERK** [1] - 3:2
**clever** [1] - 53:2
**client** [2] - 33:4, 33:5
**clients** [1] - 55:13
**co** [1] - 4:9
**co-counsel** [1] - 4:9
**COBBS** [46] - 1:12, 10:18, 10:21, 12:10, 12:19, 14:7, 14:10, 14:15, 15:25, 16:3, 16:7, 16:13, 16:23, 17:22, 17:24, 18:9, 19:23, 24:1, 24:3, 26:12, 26:17, 26:21, 27:10, 27:13, 28:25, 29:4, 29:17, 29:20, 29:22, 30:9, 30:21, 30:25, 31:21, 32:11, 32:25, 33:11, 33:13, 40:14, 40:16, 41:21, 42:6, 44:11, 47:12, 47:14, 55:20, 55:24
**Cobbs** [3] - 4:8, 10:18, 36:15
**code** [2] - 18:4, 18:6
**Cohen** [2] - 4:7, 10:18
**COHEN** [1] - 1:13
**Coker** [1] - 17:15
**colleague** [2] - 4:7, 11:10
**collectively** [1] - 49:3
**collude** [1] - 50:8
**collusion** [1] - 18:22
**Columbia** [2] - 48:17, 49:2
**commentaries** [1] - 7:17
**comments** [1] - 54:18
**Commercial** [1] - 19:13
**commit** [1] - 20:7
**committee** [1] - 18:17
**committing** [1] - 20:11
**common** [5] - 46:24, 47:4, 50:14, 50:17, 52:24
**common-sensically** [1] - 52:24
**communicate** [1] - 16:18
**communicating** [2] - 21:1, 21:2
**communications** [3] - 13:15, 33:5, 33:6
**companies** [13] - 8:19, 24:24, 27:24, 28:14, 38:20, 38:21, 45:4, 49:5, 51:6, 51:18, 51:22, 53:10
**company** [9] - 19:3,

26:2, 26:5, 27:17, 27:23, 28:15, 38:10, 41:20, 53:13
**compare** [2] - 17:9, 18:16
**compensation** [4] - 7:8, 18:17, 18:21, 27:6
**competition** [1] - 18:3
**competitive** [2] - 7:7, 41:23
**Competitive** [6] - 26:3, 27:14, 27:19, 27:23, 28:1, 28:4
**competitively** [1] - 41:24
**competitors** [3] - 48:7, 48:15, 51:23
**complaint** [15] - 8:24, 12:1, 25:2, 26:24, 27:16, 28:18, 29:1, 29:5, 33:6, 35:19, 35:23, 35:24, 36:25, 53:9, 55:21
**compliance** [1] - 18:1
**complied** [2] - 7:8, 7:12
**complying** [2] - 39:25, 41:19
**component** [2] - 7:14, 38:16
**Computer** [4] - 7:10, 40:3, 41:10, 41:12
**COMPUTERIZED** [1] - 2:13
**conceal** [11] - 11:6, 13:5, 13:11, 17:11, 17:13, 20:20, 20:24, 23:19, 24:19, 28:6, 30:7
**concealed** [5] - 6:7, 20:12, 22:8, 22:9, 38:12
**concealing** [6] - 20:11, 23:10, 23:13, 23:23, 30:4, 30:5
**concealment** [61] - 6:1, 6:6, 7:13, 8:1, 9:13, 9:22, 10:3, 10:5, 10:22, 10:24, 12:7, 12:13, 12:18, 13:23, 13:24, 14:1, 14:2, 14:12, 14:17, 15:2, 15:20, 17:9, 18:12, 18:21, 19:18, 20:1, 20:2, 20:4, 20:5, 20:17, 20:22, 21:4, 21:9, 21:15, 21:18, 22:4, 22:6, 22:22, 23:5,

23:8, 23:15, 25:6, 25:10, 30:23, 31:1, 31:4, 31:5, 31:8, 32:18, 34:10, 34:19, 37:1, 37:15, 37:20, 39:13, 41:17, 42:11, 42:12
**concealments** [1] - 42:7
**concede** [3] - 7:16, 24:18, 38:16
**conceded** [1] - 35:5
**concedes** [1] - 20:23
**concern** [1] - 48:22
**concerning** [2] - 31:14, 31:19
**concerns** [1] - 45:2
**concerted** [1] - 50:20
**conclude** [4] - 30:11, 30:18, 50:3, 56:6
**concluded** [1] - 18:20
**conclusion** [4] - 12:17, 23:22, 31:4, 31:9
**conclusory** [3] - 29:2, 37:12, 41:7
**conduct** [17] - 20:8, 20:20, 33:3, 45:12, 45:14, 46:9, 46:16, 46:17, 46:19, 46:20, 47:7, 47:19, 47:23, 50:4, 50:5, 50:20, 50:21
**conducted** [2] - 15:5, 17:19
**confess** [1] - 37:8
**confidential** [3] - 39:10, 54:6
**confining** [2] - 19:2, 19:11
**confirm** [2] - 11:25, 23:10
**confirmed** [3] - 48:1, 48:5, 48:9
**confront** [1] - 40:20
**confused** [1] - 11:2
**conscious** [1] - 50:18
**consciousness** [4] - 50:15, 50:22, 54:20, 55:2
**consequence** [1] - 39:2
**consistent** [1] - 5:7
**conspiracies** [2] - 14:21, 22:17
**conspiracy** [92] - 5:10, 5:12, 5:21, 6:11, 6:13, 6:19, 6:23, 6:25, 10:2, 11:6, 11:18, 12:2, 12:3,

12:6, 13:4, 13:5, 14:1, 14:4, 16:9, 16:10, 16:13, 16:18, 16:20, 16:24, 16:25, 17:2, 17:5, 17:11, 17:13, 18:13, 18:25, 19:1, 19:2, 19:10, 19:16, 20:24, 21:3, 22:7, 22:9, 22:16, 23:10, 23:19, 23:23, 24:8, 24:18, 24:21, 26:25, 28:10, 30:3, 30:4, 30:6, 30:16, 31:7, 31:15, 31:23, 32:6, 32:23, 33:2, 33:8, 36:13, 37:3, 37:19, 39:3, 41:6, 43:10, 43:22, 45:3, 45:15, 45:23, 46:7, 46:17, 47:16, 47:17, 47:18, 47:21, 48:22, 49:10, 49:12, 49:15, 49:19, 50:25, 51:2, 52:6, 52:12, 54:21, 54:23, 56:2, 56:5, 56:8
**conspiratorial** [5] - 13:15, 45:20, 45:21, 54:12, 56:3
**conspirators** [10] - 5:23, 14:22, 14:24, 15:8, 15:19, 16:2, 16:5, 16:9, 16:15, 48:2
**conspire** [3] - 40:12, 50:14, 50:18
**conspired** [1] - 12:23
**constitute** [2] - 7:13, 10:3
**constituted** [1] - 38:9
**constitutes** [1] - 10:23
**constituting** [1] - 34:11
**Construction** [1] - 20:16
**consultancies** [1] - 51:20
**consultancy** [1] - 48:25
**contending** [1] - 53:20
**contents** [2] - 34:13, 34:20
**context** [4] - 24:17, 27:1, 28:4, 30:3
**continue** [1] - 37:12
**contracting** [1] - 9:4
**contractors** [2] - 8:7, 9:1
**contracts** [1] - 8:4
**contrary** [3] - 20:3,

21:21, 32:14
**contrivance** [6] - 13:6, 14:12, 22:25, 23:1, 28:6, 28:10
**convening** [1] - 19:2
**conversations** [4] - 16:1, 16:5, 18:4, 19:7
**copy** [1] - 45:20
**Corder** [2] - 11:7, 42:11
**core** [4] - 18:22, 19:11, 19:15, 21:4
**corner** [1] - 32:6
**CORP** [3] - 1:6, 1:20, 1:21
**corporate** [2] - 25:14, 51:20
**Corporation** [1] - 3:3
**correct** [1] - 56:21
**costs** [3] - 47:1, 47:2, 50:7
**counsel** [15] - 3:4, 3:11, 4:9, 4:13, 4:18, 4:25, 5:13, 37:21, 43:4, 44:7, 47:10, 47:11, 52:19, 54:19, 56:14
**counsel's** [4] - 4:22, 36:24, 56:12
**counter** [1] - 12:11
**country** [1] - 51:20
**couple** [2] - 35:14, 49:14
**course** [2] - 4:23, 44:21
**Court** [26] - 2:8, 4:23, 5:1, 5:8, 5:17, 10:13, 21:22, 25:5, 33:19, 43:4, 43:5, 43:15, 43:17, 43:24, 44:9, 44:10, 44:22, 45:1, 45:9, 45:16, 47:8, 50:3, 51:14, 54:17, 55:4, 55:17
**COURT** [73] - 1:1, 2:8, 3:7, 3:13, 3:19, 3:25, 4:5, 4:11, 4:20, 5:4, 10:16, 10:20, 12:8, 12:16, 13:24, 14:9, 14:14, 15:23, 16:1, 16:4, 16:12, 16:22, 17:21, 17:23, 18:8, 19:22, 23:25, 24:2, 26:8, 26:13, 26:18, 27:8, 27:12, 28:18, 29:2, 29:16, 29:18, 29:21, 30:8, 30:20, 30:24, 31:13, 32:9, 32:24, 33:10, 33:12,

33:14, 33:16, 33:24,
34:6, 36:23, 40:13,
40:15, 41:18, 42:5,
42:25, 44:3, 44:5,
44:14, 44:17, 44:25,
47:11, 47:13, 50:12,
52:18, 55:6, 55:9,
55:11, 55:18, 55:23,
56:11, 56:18, 56:25
**court** [23] - 8:17, 8:21,
11:13, 17:10, 17:12,
17:24, 18:20, 19:9,
25:7, 31:2, 34:2,
34:8, 34:21, 35:2,
35:6, 35:10, 40:5,
41:14, 41:15, 43:7,
43:8, 46:10, 56:14
**court's** [1] - 38:8
**Court's** [4] - 12:17,
33:21, 38:18, 39:4
**Courthouse** [1] - 2:9
**COURTROOM** [1] -
3:2
**courts** [5] - 7:11,
42:15, 45:12, 46:9,
46:15
**cover** [11] - 19:16,
24:7, 24:10, 25:14,
25:18, 28:21, 30:16,
50:25, 51:1, 51:2,
54:22
**covered** [4] - 9:24,
22:7, 50:10, 54:21
**covering** [1] - 12:13
**coworkers** [1] - 15:10
**Cox** [2] - 48:15, 49:1
**created** [2] - 24:12,
29:9
**creating** [1] - 19:21
**creation** [1] - 19:4
**credibly** [1] - 24:11
**credit** [2] - 25:4, 27:18
**criminal** [1] - 54:5
**Croner** [1] - 43:11
**CRR** [1] - 2:8
**CSC** [1] - 48:15
**CSRA** [1] - 49:2
**culpability** [1] - 40:3
**customers** [1] - 26:7

---

**D**

**D'Armiento** [1] - 35:21
**dairy** [1] - 15:11
**damages** [1] - 43:23
**DATE** [1] - 56:25
**date** [1] - 34:4
**dates** [1] - 9:9
**DAVID** [1] - 1:19
**David** [1] - 3:8

**DC** [4] - 1:15, 1:25,
2:3, 2:6
**DDC** [2] - 18:24, 19:14
**dealing** [1] - 27:9
**dealt** [1] - 38:1
**decades** [1] - 24:17
**decades-long** [1] -
24:17
**deceived** [1] - 14:3
**decide** [3] - 24:4, 38:3,
43:15
**deciding** [1] - 13:25
**decision** [2] - 23:4,
56:13
**deemed** [1] - 14:6
**defend** [1] - 42:17
**defendant** [12] -
11:10, 17:14, 20:11,
20:12, 24:16, 29:14,
32:1, 48:8, 51:16,
51:24, 56:2, 56:6
**DEFENDANT** [1] - 2:4
**defendants** [74] - 3:9,
3:18, 3:21, 3:24, 4:2,
4:19, 4:24, 4:25, 7:6,
7:21, 8:3, 9:10, 11:4,
11:17, 12:5, 12:11,
12:20, 13:10, 13:14,
15:3, 15:19, 16:24,
17:10, 17:12, 17:17,
18:1, 18:9, 20:23,
21:2, 21:6, 22:12,
23:9, 23:12, 23:18,
23:23, 24:6, 24:7,
24:18, 24:19, 25:11,
27:11, 27:15, 27:21,
28:11, 28:12, 28:17,
30:4, 30:10, 30:22,
31:22, 32:12, 32:21,
40:24, 42:16, 47:1,
47:24, 48:13, 48:19,
49:1, 49:4, 49:8,
49:12, 49:13, 49:15,
49:20, 50:6, 50:18,
50:24, 51:3, 51:12,
52:1, 52:8, 54:21,
55:12
**Defendants** [1] - 1:7
**DEFENDANTS** [2] -
1:19, 2:2
**Defendants'** [1] -
19:10
**defendants'** [21] -
10:25, 19:15, 19:24,
20:21, 22:18, 22:22,
24:10, 24:14, 24:17,
24:21, 25:6, 25:7,
25:17, 25:20, 25:22,
29:12, 29:25, 43:9,
43:10, 48:12, 49:23

**defensible** [1] - 24:11
**defer** [1] - 4:23
**deficiencies** [1] -
42:22
**deficient** [4] - 42:20,
43:7, 43:9, 54:14
**defining** [1] - 26:10
**definitely** [2] - 39:8,
47:18
**definition** [1] - 26:16
**demand** [1] - 36:3
**demonstrate** [1] -
22:2
**demonstrating** [1] -
35:8
**denial** [2] - 41:12,
41:16
**denials** [1] - 40:8
**denied** [1] - 40:4
**denying** [3] - 7:11,
39:24, 40:3
**departure** [1] - 21:8
**describe** [1] - 12:4
**designed** [1] - 14:13
**Designers** [1] - 48:16
**despite** [2] - 6:9, 9:23
**destroy** [3] - 36:17,
36:19, 40:25
**detail** [5] - 9:14, 9:15,
13:23, 34:16, 37:10
**details** [5] - 9:9, 29:23,
33:2, 52:11, 53:14
**device** [1] - 23:2
**differ** [1] - 41:18
**difference** [2] - 19:20,
39:23
**different** [2] - 36:15,
45:4
**differentiate** [1] -
14:21
**difficult** [2] - 29:25,
42:11
**diligence** [10] - 6:9,
9:23, 22:2, 31:10,
31:16, 32:20, 34:24,
35:4, 35:7
**direct** [16] - 45:9,
45:10, 45:16, 46:4,
46:6, 47:25, 49:9,
49:18, 52:15, 52:23,
53:1, 53:11, 53:20,
55:21, 55:25, 56:4
**directly** [4] - 10:25,
20:3, 26:15, 48:1
**directorates** [1] -
21:17
**discharged** [1] - 31:16
**discover** [1] - 37:19
**discovered** [7] - 5:13,
9:23, 10:1, 11:19,

31:15, 32:22, 33:9
**discovery** [4] - 11:21,
21:3, 28:10, 30:1
**discuss** [3] - 13:14,
15:7, 16:8
**discussed** [1] - 10:2
**discussing** [1] - 15:18
**discussion** [2] -
35:16, 38:6
**discussions** [2] -
17:19, 18:21
**disguise** [1] - 15:14
**dismiss** [4] - 4:12,
32:13, 42:16, 43:25
**dismissed** [1] - 43:8
**dispose** [1] - 24:4
**distinction** [2] - 25:6,
40:25
**distinguish** [1] - 19:17
**distinguishes** [1] -
40:24
**District** [5] - 2:8,
12:17, 19:8, 21:22,
46:13
**DISTRICT** [3] - 1:1,
1:1, 1:10
**diverse** [1] - 51:19
**Division** [1] - 1:2
**divulge** [1] - 18:25
**DNR** [1] - 17:19
**docket** [1] - 11:14
**doctrine** [5] - 20:4,
20:5, 20:10, 20:17,
21:5
**document** [1] - 14:22
**documents** [7] - 8:19,
14:23, 19:4, 19:21,
40:1, 40:25
**doubt** [1] - 40:17
**Doug** [1] - 3:16
**DOUGLAS** [1] - 1:22
**down** [5] - 14:24,
16:17, 16:19, 17:17,
42:11
**draw** [1] - 23:21
**due** [7] - 6:9, 9:23,
22:2, 31:16, 32:20,
34:24, 35:7
**duplicative** [1] - 30:17
**during** [3] - 35:5,
38:22, 39:18
**duty** [2] - 35:12, 36:7
**DYNAMICS** [3] - 1:6,
1:20, 1:21
**Dynamics** [6] - 3:3,
3:9, 3:10, 3:17, 3:24,
48:16

---

**E**

**earliest** [1] - 39:22
**easily** [1] - 42:24
**EASTERN** [1] - 1:1
**economic** [4] - 26:24,
51:4, 51:23, 56:6
**Edmonson** [35] - 6:4,
13:5, 20:4, 20:10,
22:24, 26:1, 26:2,
27:13, 27:22, 28:12,
31:4, 31:24, 32:4,
32:7, 32:15, 33:20,
33:22, 33:25, 34:2,
34:3, 34:8, 34:17,
34:21, 34:22, 35:2,
35:3, 35:10, 37:13,
38:8, 40:17, 40:19,
40:22, 42:15
**educational** [1] - 51:8
**effect** [1] - 30:18
**effort** [3] - 30:7, 37:18,
43:10
**efforts** [6] - 11:18,
17:18, 19:10, 20:24,
36:25, 49:23
**either** [5] - 7:20, 9:25,
31:8, 32:19, 42:1
**ELECTRIC** [1] - 1:21
**Electric** [1] - 3:9
**element** [1] - 22:3
**elements** [5] - 6:5,
9:21, 10:6, 10:7,
10:12
**eliminate** [1] - 17:18
**email** [1] - 17:4
**emails** [2] - 17:14,
36:19
**emphasize** [2] - 5:6,
44:7
**employed** [2] - 39:18,
49:4
**employee** [2] - 27:4,
27:6
**employees** [4] -
38:22, 45:4, 48:12,
49:7
**employment** [2] -
27:3, 35:20
**encouraged** [1] - 20:6
**ended** [1] - 5:14
**enforced** [1] - 17:1
**engage** [1] - 35:5
**engaged** [3] - 24:24,
34:24, 35:8
**engineer** [2] - 24:16,
29:13
**engineering** [1] -
48:25
**engineers** [9] - 24:15,

24:23, 24:25, 29:13, 36:3, 48:2, 48:14, 49:5, 54:3
**ensure** [1] - 20:6
**entered** [3] - 9:8, 10:9, 24:21
**Enterprises** [1] - 48:16
**entire** [4] - 8:12, 25:23, 27:7, 38:13
**entities** [4] - 18:5, 25:14, 26:2, 30:11
**entitled** [1] - 56:22
**equitable** [3] - 20:17, 21:20, 21:23
**equity** [1] - 28:3
**equivocation** [1] - 25:21
**essentially** [15] - 5:9, 5:25, 6:5, 6:17, 6:24, 7:1, 7:15, 8:8, 9:18, 9:24, 35:24, 38:25, 45:22, 47:6, 54:18
**establishes** [1] - 49:10
**establishing** [1] - 22:3
**estate** [1] - 13:18
**et** [3] - 1:7, 3:3, 34:20
**EUGENE** [1] - 1:22
**evidence** [30] - 7:16, 14:24, 15:3, 18:13, 42:18, 45:10, 45:11, 45:16, 46:5, 46:6, 47:22, 47:25, 49:10, 49:18, 50:1, 50:18, 52:15, 52:23, 53:1, 53:11, 53:12, 53:16, 53:20, 54:16, 55:22, 55:25, 56:4
**evince** [1] - 41:17
**eviscerates** [1] - 7:1
**exact** [5] - 28:14, 28:15, 29:22, 29:23, 34:4
**exactly** [11] - 15:19, 16:21, 25:16, 30:1, 32:1, 32:22, 41:11, 48:3, 49:17, 51:16
**example** [10] - 6:3, 6:4, 7:6, 9:25, 12:12, 21:16, 36:16, 45:12, 54:1, 54:19
**examples** [7] - 7:10, 8:16, 8:21, 45:19, 47:3, 53:3, 53:6
**exclude** [5] - 13:7, 14:13, 22:25, 23:2, 47:19
**excludes** [1] - 47:22
**excused** [1] - 56:14

**executing** [2] - 27:14, 28:14
**executive** [1] - 49:4
**executives** [2] - 17:3, 17:5
**exempt** [1] - 25:25
**exercise** [2] - 6:9, 9:23
**exist** [3] - 8:25, 11:12, 51:2
**existed** [6] - 39:14, 39:18, 47:18, 47:21, 49:10, 52:13
**existence** [5] - 17:11, 17:13, 18:2, 19:1, 48:5
**expand** [1] - 5:6
**expansive** [1] - 24:22
**expense** [2] - 15:9, 15:14
**experiences** [1] - 17:8
**explained** [1] - 17:15
**Explosives** [1] - 19:13
**extensively** [1] - 34:17
**extent** [1] - 29:22
**extremely** [1] - 31:11
**Eye** [1] - 2:5
**eyewitness** [2] - 47:20, 48:24

## F

**F.3d** [4] - 14:25, 21:20, 33:25, 34:5
**F.Supp** [1] - 19:8
**face** [1] - 3:14
**fact** [9] - 7:22, 14:19, 24:3, 28:15, 31:6, 31:19, 32:10, 41:15, 47:18
**factors** [13] - 45:13, 45:14, 46:21, 46:23, 46:24, 49:20, 49:21, 49:23, 49:25, 50:6, 51:3, 52:11
**facts** [17] - 6:7, 10:11, 11:4, 11:5, 11:9, 12:25, 15:1, 15:13, 15:16, 15:17, 18:14, 23:15, 28:4, 36:6, 42:24, 50:2, 52:3
**factual** [3] - 28:19, 29:3, 51:5
**failure** [3] - 4:16, 22:2, 44:17
**fair** [1] - 54:4
**fairly** [2] - 29:2, 46:14
**fake** [7] - 8:18, 8:19, 25:13, 25:14, 25:18, 30:15
**fall** [1] - 53:18

**falls** [1] - 25:10
**false** [5] - 8:18, 17:25, 24:12, 29:9, 34:13
**falsely** [1] - 28:2
**far** [1] - 26:16
**FARAH** [1] - 1:17
**few** [2] - 5:6, 38:11
**Fifth** [1] - 20:16
**filed** [2] - 4:25, 11:14
**fill** [2] - 15:9, 55:15
**finally** [3] - 31:15, 31:19, 42:20
**financial** [1] - 8:19
**fine** [4] - 5:4, 52:18, 55:18
**first** [20] - 4:14, 4:19, 6:6, 6:10, 10:4, 14:10, 14:25, 19:21, 21:12, 25:1, 25:11, 26:22, 32:10, 32:11, 43:4, 43:12, 46:10, 49:13, 52:21, 55:21
**fits** [1] - 36:20
**fix** [1] - 15:4
**fixing** [2] - 15:6, 21:25
**Fleet** [1] - 48:17
**Floor** [1] - 2:8
**flowed** [1] - 5:21
**focus** [1] - 55:25
**focusing** [1] - 34:23
**follow** [2] - 26:21, 41:24
**following** [1] - 48:13
**fooled** [2] - 8:8, 9:16
**FOR** [5] - 1:1, 1:12, 1:19, 2:1, 2:4
**foreclosed** [1] - 49:24
**foregoing** [1] - 56:20
**formed** [1] - 6:7
**former** [2] - 47:25, 48:12
**Former** [1] - 48:8
**forth** [1] - 4:15
**four** [6] - 5:18, 6:8, 21:18, 37:25, 38:4, 43:16
**four-year** [6] - 5:18, 6:8, 21:18, 37:25, 38:4, 43:16
**Fourth** [16] - 6:4, 10:25, 12:16, 14:19, 15:21, 19:19, 19:20, 22:23, 25:12, 28:12, 30:14, 31:11, 42:9, 42:10, 46:11, 49:22
**fragile** [1] - 25:20
**fraud** [5] - 9:14, 20:11, 20:12, 28:3, 34:11
**fraudulent** [21] - 6:6, 6:10, 9:13, 9:22,

10:21, 13:23, 14:2, 14:6, 14:12, 15:2, 20:4, 20:5, 20:7, 21:4, 21:9, 22:4, 22:6, 23:15, 25:9, 30:23, 32:17
**fraudulently** [2] - 6:7, 30:7
**French** [2] - 15:7, 15:9
**frequently** [1] - 45:24
**fulsome** [1] - 4:12
**function** [1] - 30:2

## G

**gaps** [1] - 46:5
**Gardephe** [1] - 46:13
**Garrison** [1] - 31:2
**Gates** [1] - 40:4
**GDIT** [1] - 3:10
**general** [2] - 37:11, 47:4
**General** [6] - 3:3, 3:9, 3:10, 3:17, 3:24, 48:16
**GENERAL** [3] - 1:6, 1:20, 1:21
**generally** [5] - 21:19, 32:24, 32:25, 44:20, 45:11
**generic** [4] - 39:25, 46:23, 53:18, 54:18
**generically** [1] - 46:5
**gentlemen's** [14] - 6:19, 11:24, 12:2, 14:6, 16:6, 16:17, 17:16, 20:25, 24:10, 24:22, 28:22, 48:1, 48:6, 48:14
**Genuine** [3] - 26:7, 27:16, 28:14
**Gibbs** [2] - 48:15, 49:1
**given** [2] - 31:16, 54:14
**GLENN** [1] - 1:19
**GO** [4] - 7:10, 40:3, 41:10, 41:12
**government** [2] - 8:4, 9:4
**grants** [1] - 43:17
**great** [1] - 41:19
**GREENBERG** [1] - 1:20
**Group** [2] - 48:17, 49:2
**group** [10] - 19:3, 19:11, 37:12, 41:7, 41:8, 45:24, 46:23, 48:11, 48:23, 53:18
**guide** [1] - 30:13

**guilt** [6] - 50:15, 50:19, 50:22, 50:24, 54:20, 55:2
**gut** [1] - 21:13

## H

**hand** [1] - 21:11
**handful** [1] - 28:12
**HANDLEY** [1] - 1:17
**hard** [4] - 4:13, 39:12
**hear** [4] - 4:13, 10:16, 44:17, 55:11
**HEARING** [1] - 1:9
**heavily** [1] - 33:17
**held** [1] - 35:6
**HELLMAN** [2] - 1:23, 3:22
**Hellman** [1] - 3:23
**help** [1] - 55:2
**herself** [1] - 1:3
**hesitate** [1] - 42:16
**hi** [1] - 4:1
**hid** [1] - 24:20
**hidden** [1] - 5:22
**hiding** [1] - 18:21
**high** [5] - 17:2, 17:5, 32:4, 36:3, 46:22
**highlight** [1] - 44:9
**HII** [1] - 48:17
**Hilton's** [1] - 46:11
**hiring** [2] - 48:4, 53:25
**hoisted** [1] - 43:24
**hold** [2] - 13:21, 13:22
**holding** [1] - 40:20
**Honor** [58] - 3:6, 3:10, 3:15, 3:16, 3:20, 3:22, 4:1, 4:3, 4:6, 4:19, 4:21, 5:5, 5:23, 6:12, 6:16, 7:3, 7:14, 9:6, 9:19, 9:21, 10:12, 10:13, 10:21, 15:1, 18:6, 23:2, 26:17, 31:10, 32:11, 33:11, 33:18, 34:1, 34:7, 34:21, 40:14, 42:20, 43:3, 44:19, 45:1, 45:8, 46:8, 47:8, 47:12, 49:9, 49:16, 49:21, 50:9, 51:5, 52:16, 52:20, 52:21, 53:4, 55:4, 55:16, 55:20, 56:9, 56:10
**Honor's** [1] - 44:11
**HONORABLE** [1] - 1:9
**hour** [1] - 54:22
**hump** [2] - 45:14, 47:5
**Huntington** [2] - 3:21, 4:2

**HUNTINGTON** [1] - 2:1

## I

**identified** [3] - 5:24, 5:25, 28:23
**identifies** [1] - 12:11
**identity** [1] - 34:14
**II** [5] - 17:10, 17:22, 31:3, 42:3, 43:5
**III** [1] - 2:4
**illegal** [1] - 20:7
**illegality** [1] - 40:8
**illegitimate** [1] - 28:9
**illicit** [2] - 25:15, 25:19
**illustrates** [1] - 41:11
**immediately** [1] - 42:15
**impact** [4] - 26:8, 26:15, 38:19, 39:8
**impacts** [1] - 26:24
**implement** [1] - 45:6
**implication** [1] - 5:15
**important** [2] - 11:3, 39:5
**impress** [1] - 44:9
**impression** [2] - 24:12, 29:10
**improper** [1] - 8:13
**in-kind** [2] - 26:6, 27:15
**in-person** [2] - 17:14, 18:19
**INC** [2] - 1:22, 2:1
**incentive** [1] - 51:7
**incentives** [6] - 50:7, 50:8, 51:4, 51:13, 51:17, 51:23
**include** [1] - 15:15
**included** [3] - 18:24, 19:10, 43:8
**including** [3] - 15:10, 17:18, 49:1
**inconsistent** [1] - 13:5
**Indeed** [1] - 21:21
**independent** [12] - 11:25, 47:19, 47:23, 50:5, 50:7, 50:8, 50:21, 51:4, 51:6, 51:14, 51:22, 56:6
**independently** [1] - 48:5
**indicated** [2] - 5:8, 45:22
**indicator** [1] - 13:10
**indirect** [3] - 45:11, 46:8, 54:16
**indistinguishable** [2] - 15:16, 16:16

**individual** [9] - 4:9, 4:22, 4:25, 39:24, 40:2, 40:7, 44:13, 45:4
**individually** [1] - 53:7
**individuals** [1] - 35:22
**INDUSTRIES** [1] - 2:1
**Industry** [1] - 53:9
**industry** [11] - 5:12, 9:1, 9:4, 24:8, 29:7, 46:25, 47:4, 48:6, 48:9, 49:15, 52:6
**industry-wide** [5] - 5:12, 24:8, 48:6, 49:15, 52:6
**inference** [7] - 23:22, 43:22, 45:17, 47:16, 53:19, 56:1
**inferences** [2] - 53:25, 54:17
**informant** [1] - 54:6
**information** [8] - 16:19, 28:24, 31:21, 31:23, 35:1, 36:5, 54:7, 56:5
**INFORMATION** [1] - 1:22
**Ingalls** [2] - 3:21, 4:2
**INGALLS** [1] - 2:1
**injuries** [1] - 5:21
**injury** [1] - 38:1
**inquiry** [18] - 13:7, 13:8, 14:13, 22:10, 23:1, 23:3, 31:12, 31:24, 32:4, 32:20, 35:1, 35:5, 35:9, 35:15, 40:18, 40:20, 41:10
**inserted** [1] - 24:19
**instance** [7] - 7:14, 8:18, 17:13, 35:11, 35:18, 36:8, 48:21
**instances** [1] - 54:15
**instead** [2] - 17:4, 29:8
**institute** [1] - 12:24
**instructing** [1] - 18:3
**Instructing** [1] - 18:25
**instructions** [2] - 16:25, 37:3
**insufficient** [1] - 13:22
**integrity** [2] - 7:7, 41:20
**intended** [2] - 13:7, 22:25
**intent** [1] - 13:5
**intention** [2] - 23:19, 44:11
**intentionally** [1] - 30:5
**interactions** [1] - 52:4

**interest** [1] - 56:7
**interested** [1] - 47:1
**interesting** [3] - 8:2, 11:2, 24:5
**interlocking** [1] - 21:17
**intermediate** [2] - 21:13, 21:22
**introduce** [1] - 3:11
**investigation** [3] - 31:12, 32:3, 37:22
**involve** [3] - 21:15, 21:17, 22:16
**involved** [3] - 8:20, 28:6, 49:5
**involving** [3] - 8:17, 21:24, 30:10
**Ion** [2] - 17:24, 31:2
**Iron** [2] - 3:9, 48:18
**IRON** [1] - 1:20
**Irving** [1] - 1:17
**issue** [9] - 4:15, 4:16, 11:11, 13:24, 14:1, 24:5, 42:21, 49:13, 50:13
**item** [1] - 7:5
**itself** [2] - 12:6, 20:12

## J

**JACKSON** [1] - 1:16
**Jackson** [1] - 4:9
**JAMES** [1] - 1:16
**JEFFREY** [1] - 1:12
**Jenner** [2] - 3:17, 3:23
**JENNER** [1] - 1:23
**Jien** [2] - 18:16, 18:22
**JJMA** [3] - 48:21, 48:22, 49:1
**jobs** [1] - 52:4
**joint** [5] - 4:8, 4:24, 44:12, 44:15, 44:17
**Judge** [5] - 39:20, 44:4, 46:11, 46:13, 51:17
**JUDGE** [1] - 1:10
**jump** [1] - 10:22
**justify** [1] - 21:8
**juxtapose** [1] - 34:22

## K

**keep** [4] - 12:2, 12:6, 19:10, 23:20
**keeping** [3] - 17:4, 18:10, 20:24
**Keeping** [1] - 19:25
**key** [1] - 19:3
**kickback** [4] - 27:17, 30:11, 32:2, 38:12

**kickbacks** [3] - 26:6, 27:14, 28:6
**kind** [16] - 9:12, 9:15, 20:1, 20:22, 24:3, 24:5, 26:6, 27:15, 31:23, 34:24, 37:10, 37:22, 46:23, 46:24, 47:22, 53:15
**kinds** [4] - 8:25, 42:17, 53:18
**knowing** [2] - 33:8, 37:24
**knowledge** [10] - 11:9, 19:11, 29:25, 32:19, 36:7, 41:1, 41:2, 41:4, 42:13, 52:5
**known** [2] - 9:10, 10:10
**knows** [3] - 5:17, 45:9, 45:16

## L

**labor** [4] - 27:1, 36:3, 47:1, 51:7
**lack** [4] - 31:18, 32:19, 42:13
**lacking** [2] - 9:15, 37:13
**language** [2] - 40:17, 40:21
**large** [1] - 51:20
**largest** [1] - 51:19
**last** [5] - 15:15, 33:14, 42:25, 52:21, 54:22
**law** [19] - 6:17, 7:8, 7:11, 7:12, 7:22, 8:15, 10:25, 11:2, 14:17, 15:7, 23:7, 25:8, 39:25, 41:19, 49:11, 51:22, 52:22, 53:8, 55:1
**law...refers** [1] - 25:13
**Lawler** [1] - 4:3
**LAWLER** [2] - 2:4, 4:3
**laws** [2] - 18:2, 41:25
**lawsuit** [1] - 5:20
**lead** [1] - 52:4
**leads** [1] - 26:3
**learned** [2] - 32:10, 33:3
**learning** [1] - 38:5
**least** [5] - 18:10, 30:6, 33:4, 36:6, 49:1
**leave** [4] - 42:21, 43:13, 43:18, 44:1
**leaving** [1] - 18:19
**led** [1] - 6:15
**left** [3] - 35:21, 35:22, 38:2

**legal** [4] - 10:23, 39:1, 41:14, 41:16
**legitimate** [7] - 8:22, 8:23, 10:4, 27:24, 38:16, 39:6, 39:7
**legitimately** [1] - 38:11
**lenders** [3] - 26:4, 26:6, 27:18
**Lenders** [1] - 35:3
**length** [1] - 31:17
**lengthy** [1] - 43:22
**letter** [1] - 41:13
**level** [7] - 10:4, 17:2, 17:5, 46:4, 46:22, 47:5, 53:1
**levels** [1] - 27:3
**lie** [1] - 48:11
**lieu** [1] - 17:14
**life** [1] - 38:22
**limitations** [26] - 4:15, 5:8, 5:16, 5:17, 5:20, 6:2, 6:14, 6:24, 6:25, 7:2, 7:20, 7:24, 9:20, 12:14, 20:7, 20:13, 20:18, 21:7, 21:14, 21:18, 22:7, 22:12, 24:11, 35:6, 40:12, 43:17
**limited** [1] - 19:11
**limits** [1] - 30:13
**line** [1] - 17:6
**list** [1] - 48:21
**Listing** [3] - 12:20, 12:22, 12:23
**literally** [1] - 55:20
**Lithium** [2] - 17:24, 31:2
**LITVACK** [2] - 1:22, 3:16
**Litvack** [1] - 3:16
**LLC** [1] - 2:5
**LLP** [4] - 1:20, 1:23, 2:2, 2:5
**look** [13] - 6:2, 7:19, 8:15, 9:6, 35:12, 36:23, 37:5, 37:9, 43:6, 50:11, 52:24, 53:5, 53:21
**looking** [1] - 54:6
**looks** [1] - 34:2
**lower** [1] - 50:7
**lowering** [1] - 47:1, 47:2
**lying** [1] - 32:7

## M

**maintain** [1] - 12:1
**managed** [1] - 11:13

**manager** [2] - 17:6, 53:25
**managers** [2] - 47:25, 48:8
**Managers** [1] - 48:4
**mandate** [1] - 31:8
**manner** [2] - 15:10, 20:12
**March** [1] - 1:6
**Marine** [2] - 48:15, 48:18
**Marinette** [1] - 48:18
**market** [8] - 12:24, 18:3, 27:1, 27:2, 27:6, 27:7, 37:23, 51:7
**marketing** [2] - 26:3, 27:17
**Marlinton** [35] - 12:15, 14:20, 15:1, 15:2, 15:12, 16:7, 16:21, 17:8, 19:22, 19:23, 20:9, 20:14, 20:15, 21:10, 21:11, 22:15, 22:19, 23:6, 25:7, 33:16, 33:19, 33:20, 33:23, 34:3, 34:4, 34:22, 34:23, 35:10, 40:17, 40:18, 40:21, 40:25
**mask** [1] - 19:24
**material** [1] - 52:13
**materials** [1] - 26:4
**matter** [7] - 4:12, 25:8, 38:2, 47:18, 49:11, 51:22, 56:22
**MATTHEW** [1] - 1:23
**Matthew** [1] - 3:23
**maximizing** [1] - 47:2
**McLean** [1] - 1:21
**mean** [8] - 15:18, 24:5, 28:25, 29:3, 38:12, 38:25, 51:15, 53:24
**meaning** [1] - 25:21
**meaningless** [5] - 12:12, 12:14, 21:7, 22:8, 50:6
**means** [1] - 48:19
**meet** [1] - 45:8
**meeting** [2] - 12:17, 15:15
**meetings** [16] - 12:23, 13:13, 13:17, 15:4, 15:11, 17:15, 18:17, 18:18, 18:19, 19:2, 19:6, 23:19, 36:18, 43:9
**members** [6] - 12:21, 18:25, 38:19, 38:25, 39:5, 39:6

**memorialize** [1] - 13:25
**memorialized** [1] - 13:1
**memorializing** [4] - 13:4, 13:9, 14:5, 18:4
**mention** [1] - 4:22
**mentioned** [5] - 9:22, 25:1, 29:23, 41:7, 49:14
**MICHAEL** [1] - 2:1
**Microsoft** [1] - 40:4
**might** [2] - 20:1, 20:21
**MILSTEIN** [1] - 1:13
**Milstein** [2] - 4:7, 10:18
**minimizing** [1] - 43:9
**misconstrued** [1] - 11:5
**mislead** [1] - 43:10
**misrepresent** [1] - 31:7
**misrepresentation** [1] - 34:15
**missed** [1] - 55:8
**Mississippi** [1] - 19:9
**mistake** [1] - 34:12
**moderately** [1] - 41:5
**monopolize** [1] - 21:16
**morning** [9] - 3:6, 3:7, 3:16, 3:20, 3:22, 4:3, 4:6, 10:20, 47:12
**mortgage** [1] - 26:4
**most** [5] - 11:3, 39:8, 39:21, 48:18, 49:21
**MOTION** [1] - 1:9
**motion** [6] - 4:8, 43:14, 43:25, 44:8, 44:12, 44:17
**motions** [5] - 4:10, 4:11, 44:6, 44:13, 55:14
**motivation** [2] - 50:14, 50:17
**mouths** [1] - 49:16
**moved** [1] - 35:20
**moving** [1] - 24:1
**MR** [72] - 3:6, 3:8, 3:15, 3:16, 3:20, 3:22, 4:1, 4:3, 4:6, 4:19, 4:21, 5:5, 10:18, 10:21, 12:10, 12:19, 14:7, 14:10, 14:15, 15:25, 16:3, 16:7, 16:13, 16:23, 17:22, 17:24, 18:9, 19:23, 24:1, 24:3, 26:12, 26:17, 26:21,

27:10, 27:13, 28:25, 29:4, 29:17, 29:20, 29:22, 30:9, 30:21, 30:25, 31:21, 32:11, 32:25, 33:11, 33:13, 33:15, 33:18, 33:25, 34:7, 37:8, 40:14, 40:16, 41:21, 42:6, 43:2, 44:4, 44:11, 44:19, 45:1, 47:12, 47:14, 50:13, 52:20, 55:7, 55:10, 55:16, 55:20, 55:24, 56:10
**multiple** [2] - 11:24, 47:20
**Multiple** [3] - 12:20, 12:22, 12:23
**must** [9] - 6:6, 6:14, 10:4, 20:23, 25:5, 25:23, 34:10, 34:13, 46:16

**N**

**name** [4] - 3:14, 41:8, 49:14, 52:6
**named** [2] - 48:21, 49:12
**names** [2] - 15:15, 41:8
**nation** [1] - 46:25
**nationwide** [4] - 5:11, 39:3, 45:3, 45:23
**nature** [2] - 13:15, 24:20
**naval** [10] - 24:15, 24:23, 29:12, 29:13, 36:3, 48:2, 48:14, 49:5, 54:2
**necessarily** [2] - 21:23, 41:3
**necessary** [2] - 44:23, 52:14
**need** [10] - 28:8, 31:9, 37:14, 40:7, 42:7, 44:9, 47:15, 47:17, 47:18, 54:13
**needed** [1] - 17:19
**needs** [1] - 14:11
**New** [4] - 1:14, 1:18, 1:24, 46:13
**new** [3] - 10:8, 44:1, 46:14
**next** [2] - 44:8, 50:10
**NICHOLAS** [1] - 1:16
**Nick** [1] - 4:9
**Nine** [1] - 19:12
**Ninth** [1] - 19:18
**no-poach** [10] - 5:10, 8:5, 8:11, 8:12,

11:23, 25:17, 38:7, 38:14, 39:1, 45:5
**no-solicitation** [1] - 8:9
**non** [16] - 8:23, 9:7, 11:19, 15:8, 15:19, 16:2, 16:5, 16:9, 16:15, 17:16, 19:1, 26:9, 26:14, 31:17, 38:24, 39:7
**non-acts** [1] - 11:19
**non-conspirators** [6] - 15:8, 15:19, 16:2, 16:5, 16:9, 16:15
**non-participants** [1] - 19:1
**non-solicitation** [8] - 8:23, 9:7, 17:16, 26:9, 26:14, 31:17, 38:24, 39:7
**none** [4] - 13:20, 36:19, 36:20, 45:21
**nonetheless** [1] - 42:15
**nonpublic** [2] - 11:12, 29:24
**Northern** [1] - 19:8
**notably** [2] - 48:18, 48:21
**note** [5] - 3:4, 16:23, 33:23, 42:14, 46:9, 46:15
**noted** [3] - 19:6, 19:9, 45:2
**notes** [3] - 22:15, 34:8, 50:11
**NOTES** [1] - 2:13
**nothing** [6] - 9:15, 35:23, 39:19, 40:11, 40:16, 56:10
**notice** [1] - 22:10, 31:12, 31:24, 32:4, 32:20, 35:1, 35:9, 40:18, 40:20, 41:10, 42:16
**notion** [1] - 28:19
**nowhere** [1] - 52:13
**number** [2] - 6:3, 7:9
**numerous** [1] - 46:5
**NW** [4] - 1:14, 1:24, 2:2, 2:5
**NY** [1] - 1:18

**O**

**obeying** [1] - 55:1
**obligation** [1] - 35:15
**obtained** [1] - 34:15
**obvious** [1] - 31:18
**obviously** [2] - 21:5,

41:2
**occasions** [2] - 9:1, 9:2
**OF** [5] - 1:1, 1:9, 2:13, 56:18, 56:25
**offer** [2] - 27:4, 41:23
**office** [1] - 15:5
**officers** [1] - 19:11
**OFFICIAL** [2] - 2:8, 56:18
**officials** [2] - 15:12, 19:3
**often** [4] - 11:3, 18:13, 29:7, 39:10
**old** [1] - 43:22
**omission** [2] - 14:16, 42:10
**once** [2] - 49:9, 56:4
**one** [20] - 4:15, 8:2, 9:2, 9:25, 11:13, 14:7, 15:3, 15:10, 24:15, 25:2, 29:12, 31:13, 36:12, 39:22, 40:4, 42:12, 43:19, 49:4, 50:10, 53:17
**One** [1] - 15:3
**ones** [1] - 50:13
**opportunities** [1] - 50:17
**opportunity** [5] - 37:16, 46:1, 46:2, 50:14, 55:12
**opposed** [3] - 17:5, 23:11, 23:20
**opted** [1] - 17:14
**oral** [1] - 37:3
**orally** [3] - 16:18, 21:1, 21:3
**order** [4] - 7:4, 7:5, 45:8, 46:19
**ordinarily** [1] - 22:11
**otherwise** [1] - 56:3
**outside** [2] - 5:19
**overarching** [1] - 39:3
**overseas** [1] - 51:9
**own** [3] - 8:24, 41:2, 43:24

**P**

**Page** [1] - 26:5
**page** [4] - 19:25, 20:13, 20:15, 34:1
**pages** [1] - 2:11
**paid** [1] - 7:7
**paper** [5] - 11:19, 13:2, 17:18, 18:19, 32:3
**papers** [1] - 5:7
**paragraph** [3] - 25:1,

29:16, 48:25
**Paragraph** [8] - 25:2, 25:3, 29:17, 47:25, 48:4, 48:8, 48:10, 53:9
**paragraphs** [2] - 9:6, 53:5
**Paragraphs** [3] - 11:25, 18:7, 53:6
**parallel** [11] - 45:12, 45:14, 46:8, 46:16, 46:17, 46:20, 47:7, 47:23, 50:3, 50:5, 50:19
**pardon** [1] - 50:9
**pare** [1] - 37:9
**pare-backs** [1] - 37:9
**parent** [1] - 51:21
**parking** [1] - 15:5
**part** [7] - 8:6, 8:14, 25:24, 26:19, 37:2, 38:7, 38:15
**participants** [2] - 19:1, 48:9
**participate** [1] - 47:2
**participated** [3] - 48:13, 56:2, 56:8
**particular** [15] - 7:9, 7:18, 7:19, 7:21, 8:7, 8:14, 8:20, 9:1, 9:9, 9:16, 18:5, 29:18, 42:12, 53:13, 55:13
**particularity** [1] - 30:1
**particularly** [6] - 15:17, 23:1, 34:11, 42:3, 50:22, 51:4
**particulars** [1] - 46:1
**partner** [1] - 4:8
**party** [1] - 34:10
**pass** [1] - 16:19
**passed** [1] - 16:24
**passing** [1] - 16:25
**passive** [3] - 14:17, 19:18, 22:22
**pattern** [1] - 28:15
**pay** [2] - 27:5, 27:16
**payments** [1] - 26:6
**peculiarly** [1] - 11:9
**penalty** [1] - 20:8
**people** [5] - 5:11, 15:15, 37:3, 43:21, 53:10
**perhaps** [4] - 5:6, 7:15, 8:2, 9:5
**period** [8] - 5:16, 5:18, 6:8, 20:7, 21:19, 35:6, 37:25, 38:4
**permitted** [1] - 20:6
**person** [6] - 15:4, 17:1, 17:14, 18:19,

34:14, 53:13
**personnel** [2] - 18:3, 51:11
**petard** [1] - 43:24
**phone** [3] - 17:2, 17:3, 17:20
**phrases** [1] - 32:17
**pin** [1] - 42:11
**pivot** [1] - 8:10
**Place** [1] - 1:17
**place** [5] - 14:25, 19:21, 34:13, 34:20, 53:13
**plain** [1] - 22:18
**plainly** [2] - 30:25, 52:10
**plaintiff** [3] - 34:12, 35:7, 53:5
**plaintiffs** [69] - 1:4, 4:5, 4:7, 5:18, 5:19, 5:24, 6:1, 6:5, 6:10, 6:11, 7:4, 7:15, 7:18, 7:19, 7:24, 8:8, 9:6, 9:10, 9:16, 9:19, 10:10, 10:17, 10:19, 14:3, 22:1, 22:6, 22:10, 31:11, 31:13, 31:15, 31:22, 32:5, 32:21, 33:1, 33:3, 33:17, 34:17, 34:24, 35:3, 35:4, 35:11, 35:18, 36:2, 36:4, 36:8, 36:22, 37:19, 37:21, 37:22, 37:23, 37:24, 38:13, 38:23, 39:15, 40:7, 41:2, 42:7, 43:16, 44:1, 45:2, 45:8, 45:23, 45:25, 46:22, 52:22, 52:25, 53:4, 54:20, 55:3
**PLAINTIFFS** [1] - 1:12
**plaintiffs'** [18] - 4:21, 5:13, 6:22, 8:24, 18:22, 32:19, 36:24, 37:7, 37:21, 38:10, 40:11, 41:1, 42:13, 43:4, 43:20, 44:23, 47:10, 54:19
**plan** [1] - 19:2
**planned** [1] - 4:22
**Planners** [1] - 48:17
**planning** [1] - 5:2
**plausibility** [5] - 44:12, 49:11, 52:2, 52:14, 54:9
**plausible** [7] - 23:23, 30:6, 45:15, 47:16, 50:3, 50:19, 52:12
**plausibly** [3] - 18:14,

45:2, 46:16
**played** [1] - 30:2
**plead** [23] - 6:5, 6:6, 11:15, 20:13, 22:6, 22:12, 23:18, 29:25, 32:16, 32:17, 32:18, 32:22, 33:6, 33:7, 34:13, 41:8, 43:18, 49:18, 50:24, 52:3, 52:8, 52:22
**pleaded** [2] - 23:14, 49:17
**pleading** [10] - 11:8, 11:11, 23:16, 37:12, 41:7, 45:24, 47:6, 48:11, 48:23, 53:19
**pled** [6] - 10:11, 23:21, 34:18, 46:3, 52:25, 54:20
**PLLC** [2] - 1:13, 1:17
**plus** [11] - 45:13, 45:14, 46:20, 46:23, 49:20, 49:21, 49:23, 49:25, 50:6, 51:3, 52:11
**poach** [12] - 5:10, 8:5, 8:11, 8:12, 11:23, 25:17, 38:7, 38:14, 39:1, 45:5, 48:2, 48:7
**Pocahantas** [1] - 6:3
**Pocahontas** [1] - 7:10
**point** [16] - 6:22, 20:24, 20:25, 21:3, 25:8, 25:10, 28:9, 30:10, 38:8, 43:4, 43:12, 43:13, 52:11, 52:21, 54:12, 55:24
**points** [3] - 5:6, 35:14, 43:2
**portion** [1] - 45:1
**portions** [2] - 9:7, 33:22
**portray** [1] - 13:13
**position** [7] - 14:20, 19:20, 25:22, 37:7, 41:16, 43:20, 44:20
**possibility** [2] - 47:19, 47:22
**possible** [2] - 7:18, 35:7
**possibly** [1] - 38:23
**postage** [1] - 26:3
**potential** [1] - 39:6
**poultry** [1] - 18:16
**prearranged** [1] - 15:5
**preceded** [1] - 46:18
**precedential** [1] - 49:22
**premise** [1] - 6:22

**prepared** [1] - 4:13
**presence** [1] - 8:9
**present** [4] - 15:8, 15:19, 16:10, 45:21
**presumably** [2] - 6:14, 36:4
**pretextual** [1] - 13:18
**prevent** [10] - 11:18, 11:21, 13:7, 13:8, 14:13, 21:3, 22:3, 23:1, 23:3, 28:10
**prevented** [3] - 37:21, 37:24, 38:4
**prevents** [1] - 20:11
**price** [3] - 15:6, 18:2, 21:25
**price-fixing** [2] - 15:6, 21:25
**prices** [2] - 13:18, 15:4
**principally** [1] - 35:3
**principle** [1] - 41:11
**private** [4] - 15:6, 17:2, 17:3, 23:20
**privileged** [2] - 33:4, 33:6
**problem** [1] - 19:15
**proceed** [1] - 4:23
**proceedings** [1] - 56:21
**profits** [1] - 47:2
**prohibited** [1] - 39:17
**project** [3] - 24:11, 24:24, 24:25
**project-based** [1] - 24:11
**projects** [2] - 24:14, 29:11
**proposition** [2] - 6:13, 32:12, 36:14
**protect** [1] - 20:13
**provide** [2] - 9:9, 26:6
**provided** [1] - 26:3
**providing** [4] - 26:6, 27:15, 27:23, 28:24
**provision** [11] - 8:23, 26:19, 27:25, 35:13, 35:17, 38:7, 38:15, 38:21, 38:24, 38:25, 39:1
**provisions** [18] - 8:6, 8:9, 8:11, 8:12, 9:18, 24:19, 25:8, 25:17, 25:24, 26:10, 26:14, 28:20, 30:16, 39:7, 39:17, 39:18, 54:24
**public** [16] - 7:6, 7:17, 11:14, 13:15, 17:25, 30:21, 31:1, 31:6, 32:1, 39:20, 39:23,

40:1, 42:2, 42:4, 43:11, 54:25
**publicized** [1] - 32:3
**pull** [1] - 11:13
**purportedly** [2] - 45:3, 45:6
**purpose** [2] - 20:5, 21:8
**purposes** [6] - 7:20, 20:3, 28:21, 39:9, 43:23, 47:6
**pursuant** [1] - 26:18
**pursue** [1] - 22:1
**put** [5] - 3:14, 35:1, 36:13, 36:18, 49:16
**putatively** [1] - 17:25
**puts** [2] - 31:23, 48:11
**putting** [2] - 37:1, 37:6

---

**Q**

**questions** [8] - 5:1, 10:13, 33:11, 44:22, 47:9, 52:16, 55:5, 55:17
**quote** [23] - 6:18, 12:15, 15:3, 17:10, 17:14, 17:15, 17:25, 20:5, 20:10, 20:21, 21:12, 22:21, 24:6, 24:9, 24:20, 25:12, 25:18, 32:6, 35:10, 50:23, 52:10
**quoted** [1] - 40:17
**quotes** [1] - 20:15
**quoting** [3] - 19:7, 20:8, 20:14

---

**R**

**raise** [1] - 47:15
**raises** [1] - 56:1
**range** [1] - 51:19
**rare** [1] - 45:18
**rate** [1] - 27:7
**rather** [5] - 23:22, 31:2, 37:3, 50:5, 50:20
**rationalizes** [1] - 23:6
**Re** [2] - 19:8, 19:12
**reaching** [1] - 22:21
**reaction** [1] - 38:19
**read** [7] - 11:20, 13:16, 25:1, 25:2, 28:25, 30:6, 42:2
**reading** [3] - 10:25, 17:21, 22:18
**real** [2] - 8:21, 13:18
**really** [7] - 34:18, 34:23, 38:2, 46:24,

53:8, 53:17, 55:2
**Realtors** [1] - 13:17
**reason** [6] - 9:5, 14:21, 21:4, 23:13, 32:13, 49:25
**reasonable** [2] - 23:22, 30:18
**reasons** [6] - 8:25, 9:3, 13:18, 21:12, 22:11, 50:16
**REBECCA** [1] - 2:8
**Rebecca** [1] - 56:20
**receive** [1] - 27:18
**recently** [1] - 45:6
**recess** [3] - 44:5, 44:10, 56:14
**Recess** [1] - 44:16
**recognizes** [2] - 20:17, 42:10
**reconcile** [1] - 12:8
**record** [4] - 3:5, 43:10, 56:15, 56:21
**recording** [1] - 45:20
**recruit** [13] - 24:15, 24:23, 27:4, 29:12, 35:25, 41:24, 48:14, 49:6, 51:9, 51:13, 51:17, 51:23, 54:2
**recruited** [7] - 24:13, 29:10, 35:24, 36:1, 36:6, 41:3, 41:4
**recruiting** [5] - 29:7, 49:5, 51:11, 52:7, 56:7
**recruitment** [2] - 31:18, 41:2
**refer** [2] - 18:5, 33:19
**references** [1] - 19:4
**referred** [1] - 49:3
**refrain** [1] - 18:4
**regard** [13] - 4:21, 9:24, 34:19, 35:12, 35:15, 35:18, 35:22, 36:6, 36:9, 38:6, 39:22, 42:21, 45:16
**regardless** [2] - 24:23, 24:24
**registered** [1] - 28:2
**regulations** [1] - 13:2
**rejected** [3] - 19:19, 25:7, 42:23
**rejecting** [1] - 22:22
**rejects** [5] - 10:25, 14:19, 15:21, 21:11, 40:25
**related** [1] - 15:7
**relationship** [2] - 38:23, 42:12
**relaxed** [1] - 11:8
**reliance** [1] - 22:25

**relied** [3] - 7:20, 9:16, 10:10
**relies** [1] - 15:20
**rely** [4] - 9:11, 9:19, 39:12, 54:10
**relying** [1] - 33:17
**remedy** [1] - 42:24
**remember** [4] - 9:12, 34:4, 37:10, 40:9
**repeatedly** [1] - 48:5
**reply** [7] - 19:24, 20:21, 24:8, 25:15, 50:15, 52:2, 52:10
**REPORTER** [3] - 2:8, 56:18, 56:25
**reports** [1] - 15:14
**representations** [2] - 7:21, 34:14
**request** [1] - 43:13
**require** [2] - 45:17, 53:19
**required** [8] - 18:18, 22:1, 31:12, 32:5, 32:7, 32:21, 32:22, 33:6, 41:5, 42:17, 52:8, 52:24, 56:5
**requirement** [2] - 17:19, 35:4, 35:8
**requirements** [3] - 51:8, 51:10
**requires** [3] - 6:17, 31:4, 52:22
**resorted** [2] - 29:7, 45:24
**RESPA** [3] - 8:17, 28:13, 30:10
**respect** [4] - 11:18, 31:10, 49:12, 50:1
**respectfully** [2] - 43:18, 43:25
**respond** [4] - 33:15, 40:14, 43:1, 44:23
**response** [2] - 43:2, 52:21
**rest** [3] - 3:11, 44:6, 51:3
**restaurants** [1] - 15:6
**result** [5] - 5:22, 21:23, 46:17, 50:4, 50:20
**resulted** [1] - 46:22
**retribution** [1] - 17:3
**reveal** [1] - 19:5
**reversed** [1] - 7:4
**reviewed** [3] - 4:12, 44:8, 55:14
**Rich** [1] - 15:11
**rise** [3] - 10:4, 46:4, 47:4
**rises** [1] - 52:25

**rival** [1] - 15:11
**rivals** [2] - 24:13, 29:11
**Robert** [2] - 4:8, 10:18
**ROBERT** [1] - 1:12
**Robertson** [1] - 12:9
**role** [1] - 52:7
**ROME** [1] - 2:5
**routine** [1] - 11:15
**RPR** [1] - 2:8
**rule** [3] - 21:6, 43:15, 43:24
**Rule** [6] - 9:13, 11:8, 13:21, 34:10, 34:12, 45:24
**ruled** [1] - 43:19
**rules** [5] - 12:24, 13:1, 13:2, 13:9, 56:7
**ruling** [2] - 43:14, 46:11
**run** [1] - 37:12

## S

**sake** [1] - 47:6
**salaries** [2] - 27:1, 41:24
**salary** [1] - 43:11
**satisfy** [3] - 34:12, 35:4, 35:7
**save** [1] - 5:20
**SCHARPF** [1] - 1:3
**Scharpf** [3] - 3:2, 35:19
**scheme** [3] - 23:2, 28:14, 32:2
**Schwartz** [1] - 4:1
**SCHWARTZ** [2] - 2:1, 4:1
**SD3** [9] - 6:21, 32:16, 46:10, 49:22, 50:16, 52:11, 52:13
**SD3's** [1] - 52:10
**search** [1] - 54:7
**second** [12] - 7:3, 7:5, 7:14, 9:21, 10:5, 10:7, 10:11, 21:21, 40:9, 43:13, 55:7
**secondly** [1] - 48:9
**secrecy** [3] - 21:15, 21:18, 23:3
**secret** [17] - 12:6, 13:14, 18:16, 18:19, 19:2, 19:10, 19:25, 20:7, 21:25, 22:16, 23:18, 23:20, 24:21, 28:22, 36:18, 43:9, 52:5
**secretly** [1] - 12:17
**secrets** [1] - 41:13

**Section** [1] - 21:16
**section** [3] - 26:24, 52:2, 53:4
**Securities** [1] - 46:12
**security** [1] - 17:16
**see** [7] - 7:1, 14:20, 19:20, 44:1, 44:14, 46:2, 52:25
**seeing** [1] - 32:6
**seek** [1] - 5:20
**seeking** [1] - 26:10
**seem** [2] - 8:13, 39:1
**SELLERS** [1] - 1:13
**sense** [5] - 9:4, 11:21, 14:16, 23:9, 51:10
**sensically** [1] - 52:24
**sensitive** [1] - 33:4
**sentence** [1] - 25:22
**sentences** [1] - 55:20
**separately** [1] - 53:7
**Serco** [2] - 48:15, 49:2
**Service** [1] - 12:22
**services** [6] - 26:4, 27:15, 27:20, 27:23, 27:25, 28:5
**Services** [2] - 12:21, 12:24
**set** [5] - 27:1, 27:2, 27:3, 40:19, 51:16
**sets** [1] - 32:4
**setting** [1] - 7:21
**Several** [2] - 47:25, 48:25
**shallow** [1] - 53:2
**sham** [28] - 8:14, 10:8, 24:1, 25:9, 25:12, 25:23, 25:24, 26:2, 27:21, 28:3, 28:4, 28:7, 30:10, 30:12, 30:13, 30:14, 30:15, 30:16, 35:13, 35:16, 36:11, 38:7, 38:13, 38:15, 39:2, 39:17, 54:24
**shams** [5] - 8:12, 8:16, 8:21, 30:19, 38:9
**shared** [2] - 49:6, 50:6
**SHEARMAN** [1] - 2:2
**shipbuilders** [1] - 51:19
**shortage** [1] - 36:3
**show** [5] - 10:3, 28:8, 46:16, 47:17, 55:1
**showing** [1] - 54:12
**shown** [1] - 41:21
**shows** [1] - 47:3
**shred** [1] - 14:23
**shredding** [1] - 19:21
**side** [4] - 30:13, 46:8, 46:9, 54:5

**sIGNATURE** [1] - 56:25
**significant** [2] - 9:5, 36:2
**significantly** [2] - 7:15, 39:12
**similar** [1] - 17:8
**similarly** [1] - 4:4
**simple** [1] - 24:3
**simply** [7] - 6:18, 6:19, 6:23, 7:11, 37:1, 37:6, 40:7
**single** [2] - 6:12, 51:16
**situated** [1] - 1:4
**situations** [3] - 22:11, 40:2, 45:17
**size** [1] - 39:8
**slept** [1] - 22:10
**small** [1] - 19:3
**solicit** [2] - 8:6, 38:22
**solicitation** [9] - 8:9, 8:23, 9:7, 17:16, 26:9, 26:14, 31:17, 38:24, 39:7
**solicited** [3] - 24:13, 26:18, 29:10
**someone** [1] - 54:10
**somewhat** [1] - 39:20
**somewhere** [1] - 29:5
**soon** [1] - 56:13
**sorely** [1] - 37:13
**sorry** [6] - 9:10, 15:23, 16:3, 26:12, 34:1, 50:8
**sought** [1] - 24:18
**sound** [1] - 8:25
**sounds** [2] - 35:11, 38:14
**Southern** [1] - 46:13
**specialized** [1] - 51:7
**specific** [15] - 9:24, 10:13, 11:11, 35:9, 38:9, 41:23, 42:3, 47:9, 48:20, 49:14, 53:3, 53:5, 53:8, 55:13, 55:17
**specifically** [12] - 5:3, 8:17, 9:19, 14:19, 33:21, 33:22, 34:9, 36:7, 42:7, 43:1, 46:9, 50:16
**specificity** [5] - 9:12, 9:14, 23:14, 23:21, 47:5
**spent** [2] - 54:21, 55:15
**Square** [1] - 2:9
**stage** [2] - 30:1, 45:25
**stand** [2] - 44:21, 55:16

standard [16] - 10:23,
11:1, 11:7, 11:8,
15:21, 21:13, 21:22,
22:19, 22:20, 22:21,
23:8, 40:19, 40:22,
42:15, 47:14, 54:9
standing [1] - 48:1
stands [3] - 6:12,
36:14, 56:14
Star [1] - 28:15
start [9] - 5:7, 11:6,
11:7, 11:23, 14:10,
31:21, 33:19, 47:14,
52:21
started [3] - 35:20,
35:21, 38:2
starters [1] - 25:16
starts [1] - 22:20
state [3] - 4:16, 34:10,
44:18
statement [1] - 32:15
statements [24] - 7:6,
7:17, 7:23, 17:25,
30:21, 30:22, 31:1,
31:6, 31:9, 39:21,
39:23, 39:25, 41:19,
41:22, 42:1, 42:2,
42:4, 47:20, 48:12,
49:14, 49:16, 54:25,
55:24
states [1] - 34:8
STATES [2] - 1:1, 1:10
statute [25] - 4:15, 5:8,
5:16, 5:17, 5:19, 6:2,
6:13, 6:23, 6:24, 7:2,
7:20, 7:24, 9:20,
12:14, 20:13, 20:18,
20:20, 21:7, 21:14,
21:18, 22:7, 22:12,
40:12, 43:16
steal [1] - 41:13
steered [1] - 26:7
STENERSON [2] - 2:1,
3:20
Stenerson [1] - 3:21
STENOGRAPHIC [1] -
2:13
STERLING [1] - 2:2
STEVEN [1] - 1:12
Steven [1] - 4:6
still [4] - 22:1, 37:18,
45:25, 52:24
Stonestreet [2] -
56:20, 56:24
STONESTREET [1] -
2:8
straightforward [1] -
41:15
Street [2] - 2:2, 2:5
stuff [1] - 50:7

subject [6] - 9:13,
11:8, 15:8, 15:18,
16:8, 39:6
submit [8] - 30:15,
39:23, 43:19, 43:25,
46:4, 47:4, 47:21,
55:1
subordinates [2] -
16:19, 21:2
subsequently [1] -
14:23
substantial [1] - 42:18
successfully [1] -
32:17
successors [2] -
16:19, 21:2
sufficient [13] - 7:13,
7:22, 10:11, 10:14,
13:6, 13:21, 19:7,
19:12, 33:7, 45:11,
45:13, 45:14, 46:20
suggest [6] - 9:16,
24:7, 39:1, 42:9,
49:23, 52:13
suggesting [1] - 54:9
suggestion [3] -
21:21, 28:24, 37:11
suggests [1] - 42:6
Suite [3] - 1:14, 1:21,
1:24
summarize [2] -
44:20, 44:21
summary [1] - 47:8
supplemental [1] -
55:14
support [2] - 25:11,
28:11
Support [1] - 48:17
suppose [1] - 9:25
supposed [3] - 27:2,
27:3, 54:24
supposedly [1] - 6:2
surprising [1] - 31:8
survey [2] - 43:11
survive [1] - 23:24
Susan [1] - 3:2
SUSAN [1] - 1:3
suspicion [4] - 13:7,
14:13, 23:1, 23:3
suspicious [1] - 41:6
sustain [2] - 30:23,
31:6

**T**

tactical [1] - 43:20
talks [3] - 31:25, 32:2,
53:8
team [2] - 26:20, 38:25
teaming [37] - 8:3, 8:5,

8:6, 8:10, 8:13, 8:22,
8:23, 9:7, 9:17,
11:11, 24:7, 24:9,
24:12, 24:20, 25:17,
26:9, 26:13, 26:14,
26:19, 28:8, 28:19,
28:20, 29:6, 29:7,
29:9, 29:23, 30:6,
38:7, 38:15, 38:17,
38:21, 38:23, 39:6,
39:10, 39:16, 54:24
technology [1] - 41:14
TECHNOLOGY [1] -
1:22
teed [1] - 43:14
telephone [4] - 15:8,
15:18, 16:9, 19:6
temptation [2] - 10:22,
10:24
term [2] - 25:21, 48:6
termed [1] - 17:16
test [2] - 22:4, 37:20
testified [2] - 15:4,
15:9
testimony [1] - 48:24
thankfully [1] - 5:7
THE [75] - 1:1, 1:9,
1:12, 1:19, 2:1, 2:4,
3:7, 3:13, 3:19, 3:25,
4:5, 4:11, 4:20, 5:4,
10:16, 10:20, 12:8,
12:16, 13:24, 14:9,
14:14, 15:23, 16:1,
16:4, 16:12, 16:22,
17:21, 17:23, 18:8,
19:22, 23:25, 24:2,
26:8, 26:13, 26:18,
27:8, 27:12, 28:18,
29:2, 29:16, 29:18,
29:21, 30:8, 30:20,
30:24, 31:13, 32:9,
32:24, 33:10, 33:12,
33:14, 33:16, 33:24,
34:6, 36:23, 40:13,
40:15, 41:18, 42:5,
42:25, 44:3, 44:5,
44:14, 44:17, 44:25,
47:11, 47:13, 50:12,
52:18, 55:6, 55:9,
55:11, 55:18, 55:23,
56:11
them.. [1] - 3:12
themselves [2] - 19:7,
49:6
thereby [1] - 34:15
therefrom [2] - 30:11,
30:19
they've [9] - 10:8,
12:5, 22:7, 31:16,
34:18, 36:14, 46:3,

47:7, 54:13
thinking [1] - 14:3
third [8] - 6:9, 8:1,
9:21, 10:6, 10:7,
10:11, 22:3, 40:10
this.. [1] - 52:17
thousands [2] - 5:10,
45:4
three [4] - 5:25, 6:5,
9:18, 35:20
tight [1] - 51:7
tiny [1] - 51:20
tipped [1] - 31:22
Title [4] - 26:7, 27:16,
28:14, 28:15
title [2] - 28:13, 52:6
TODD [1] - 2:1
Todd [1] - 3:21
together [2] - 8:7, 9:2
toll [2] - 6:2, 9:19
Toll [1] - 4:6
TOLL [3] - 1:12, 1:13,
4:6
tolled [1] - 7:24
tolling [2] - 21:20,
21:23
tolls [2] - 6:13, 6:23
took [2] - 11:11, 37:19
topic [1] - 26:8
topics [1] - 18:5
total [2] - 5:14, 53:7
totally [1] - 27:21
touch [1] - 33:4
touches [1] - 39:4
toward [1] - 14:7
tracks [1] - 12:13
trade [2] - 41:13, 47:3
trail [3] - 11:19, 17:18,
18:20
transaction [1] - 8:19
TRANSCRIPT [1] - 1:9
transcript [1] - 56:21
TRANSCRIPTION [1] -
2:13
transmitting [1] -
20:25
transparency [1] -
41:20
TRAURIG [1] - 1:20
Treasury [1] - 46:12
TRENGA [1] - 1:9
trick [4] - 13:6, 14:12,
22:25, 28:6
TRIDENTIS [1] - 2:5
Tridentis [2] - 4:4,
49:2
true [6] - 18:12, 24:20,
28:7, 32:8, 51:12,
51:14

trust [2] - 55:8, 55:10
try [1] - 36:12
trying [2] - 19:17, 34:1
turned [1] - 15:2
two [13] - 5:14, 5:19,
14:7, 21:12, 24:23,
28:13, 32:12, 35:22,
38:20, 38:25, 43:2,
43:21, 55:20
Twombly [4] - 45:12,
46:9, 47:15, 50:1
typically [3] - 21:15,
21:17, 25:13
Tysons [1] - 1:20

**U**

U.S [1] - 2:8
under [5] - 13:21,
25:12, 34:10, 42:11,
56:12
undercuts [1] - 34:18
understood [1] -
36:24
undetectable [1] -
5:22
undetected [2] - 5:12,
45:7
undiscovered [1] - 6:8
undoubtedly [1] - 30:5
undue [1] - 20:19
UNITED [2] - 1:1, 1:10
units [2] - 48:13,
48:20
unknown [1] - 53:13
unlawful [1] - 24:10
unless [6] - 10:13,
31:11, 47:8, 52:16,
55:4, 55:17
unlikely [1] - 51:1
unofficial [1] - 17:3
unquote [3] - 6:18,
22:21, 50:23
unsupported [1] -
25:22
untenable [1] - 26:1
unusual [1] - 8:4
unwritten [11] - 5:10,
6:11, 6:13, 6:18,
6:23, 10:1, 20:1,
24:8, 40:11, 45:5,
52:5
up [18] - 3:14, 4:16,
5:14, 19:16, 22:7,
24:10, 25:14, 25:19,
30:16, 43:14, 44:6,
45:6, 49:21, 50:25,
51:1, 51:2, 54:21,
54:23
useful [1] - 7:23

## V

**VA** [1] - 1:21
**valid** [3] - 14:20, 38:24, 54:24
**Valley** [1] - 15:11
**variety** [1] - 11:21
**various** [1] - 18:1
**verbal** [1] - 16:25
**versus** [3] - 3:3, 14:16, 14:17
**veteran** [1] - 53:9
**victim** [1] - 5:16
**victims** [1] - 5:14
**view** [2] - 41:5, 43:14
**vigorous** [1] - 18:2
**violated** [2] - 7:11, 15:7
**violation** [1] - 21:16
**violations** [5] - 14:22, 14:25, 19:5, 21:15, 21:24
**Virginia** [1] - 2:9
**VIRGINIA** [1] - 1:1
**vis** [2] - 38:25
**vis-a-vis** [1] - 38:25
**Vitamins** [3] - 18:24, 19:9, 19:13
**vs** [1] - 40:3

## W

**wage** [1] - 18:21
**wages** [1] - 18:16
**wants** [2] - 4:23, 55:14
**warrant** [1] - 54:8
**Washington** [4] - 1:15, 1:25, 2:3, 2:6
**website** [1] - 7:16
**websites** [5] - 7:7, 10:7, 39:21, 40:1, 54:25
**welcome** [1] - 3:25
**West** [1] - 19:12
**whatsoever** [3] - 25:11, 31:12, 39:19
**WHITE** [1] - 1:12
**whole** [2] - 27:2, 30:4
**wide** [5] - 5:12, 24:8, 48:6, 49:15, 52:6
**WILLIAM** [1] - 2:4
**William** [1] - 4:3
**wish** [1] - 49:8
**witness** [4] - 15:3, 16:8, 29:19, 54:6
**witness'** [1] - 49:16
**witnesses** [9] - 11:12, 11:25, 28:23, 29:5, 47:21, 52:6, 55:25, 56:1

**witnesses'** [1] - 52:3
**WL1475705** [1] - 19:13
**word** [5] - 17:7, 18:6, 30:15, 33:14, 42:25
**words** [2] - 46:18, 48:3
**Workers** [6] - 17:10, 17:22, 31:3, 42:3, 43:5, 43:6
**workers** [2] - 24:12, 29:10
**WORKS** [1] - 1:20
**works** [1] - 9:2
**Works** [2] - 3:9, 48:18
**world** [1] - 23:11
**write** [1] - 14:24
**writing** [12] - 13:1, 13:4, 16:14, 16:20, 17:4, 36:13, 36:17, 36:19, 36:21, 37:1, 37:4, 37:7
**written** [5] - 16:17, 17:17, 24:9, 43:10, 54:23
**wrongdoer** [1] - 20:19
**wrongdoers** [1] - 20:6
**wrongdoing** [4] - 40:5, 41:12, 41:14, 41:16

## Y

**year** [6] - 5:18, 6:8, 21:18, 37:25, 38:4, 43:16
**years** [7] - 5:12, 5:13, 5:15, 35:20, 35:21, 35:22
**York** [4] - 1:14, 1:18, 1:24, 46:13
**yourself** [2] - 51:18, 51:21

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SUSAN SCHARPF, | ) | |
| *on behalf of herself and all others similarly* | ) | |
| *situated, et al.,* | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-01372 (AJT/WEF) |
| | ) | |
| GENERAL DYNAMICS CORP., *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

In this antitrust putative class action, Defendants[1] have filed a Joint Motion to Dismiss for Failure to State a Claim, [Doc. No. 178] (the "Joint Motion"), and, separately, various individual Motions to Dismiss for Failure to State a Claim, [Doc. Nos. 180, 181, 184, 187, 189, 191, 193] (the "Individual Motions"). For the reasons stated below, the Joint Motion is GRANTED on the grounds that the claims by the named plaintiffs are barred by the applicable statute of limitations.[2]

## I. BACKGROUND

In this antitrust action, Plaintiffs Susan Scharpf and Anthony D'Armiento (together, "Plaintiffs") brought suit on October 6, 2023 on behalf of themselves individually and, under

---

[1] The Defendants are General Dynamics Corp., Bath Iron Works Corp., Electric Boat Corp., General Dynamics Information Technology, Inc., Huntington Ingalls Industries, Inc., Newport News Shipbuilding and Dry Dock Co., Ingalls Shipbuilding, Inc., HII Mission Technologies Corp., HII Fleet Support Group LLC, Marinette Marine Corporation, Bollinger Shipyards, LLC, Gibbs & Cox, Inc., Serco, Inc., CACI International Inc., The Columbia Group, Inc., Thor Solutions, LLC, Tridentis, LLC, BMT International, Inc., Technology Financing, Inc., and Faststream Recruitment Ltd. BMT and Technology Financing have been dismissed from this action, [Doc. No. 200], and Plaintiffs have filed a notice of settlement with Faststream and a motion for the Court to preliminarily approve of that settlement, certify a settlement class, and appoint settlement class counsel. [Doc. Nos. 201, 219].

[2] Because the Court will grant the Joint Motion, it does not need to reach the Individual Motions, which will be denied as moot.

1

Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of a class "consisting of all persons employed as naval architects and/or marine engineers in the United States by Defendants" (the "Class"). [Doc. No. 1] at 1 (the "Complaint").[3] Scharpf worked in the alleged relevant market from 2007 to 2013, first, as a naval architect at Alion Science & Technology Corporation from 2007 to 2009, then, as a naval marine engineer with Computer Sciences Corporation from 2009 to 2011, and finally, as a marine engineer with Gibbs & Cox, Inc. from 2011 to 2013. *Id.* ¶ 19. D'Armiento worked in the alleged relevant market from 2002 to 2004 when he was employed as a naval architect with Northrop Grumman Ship Systems[4] from 2002 to 2004. *Id.* ¶ 20.

The Complaint alleges as its sole cause of action a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

*Id.*

Briefly summarized, the Complaint alleges in support of that Section 1 claim that Defendants—who comprise approximately "75 percent of the relevant market"—entered into a conspiracy in restraint of trade that consists of an "'unwritten gentlemen's agreement' not to affirmatively recruit one another's naval engineers" or naval architects, *id.* ¶¶ 244, 242, and that

---

[3] More specifically, the Complaint purports to include in the proposed Class "[a]ll naval architects and marine engineers employed by Defendants (except Defendant Faststream Recruitment Ltd.), their predecessors, subsidiaries, and/or related entities in the United States at any time from January 1, 2000, until Defendants' unlawful conduct ceases." *Id.* ¶ 227. The proposed Class excludes "Defendants' executives, human resources managers, and human resources staff; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state, or local governmental entities." *Id.* ¶ 228.

[4] Northrop Grumman Ship Systems was a former division of Northrop Grumman Corporation that has since been spun off into a new entity named "Huntington Ingalls Industries, Inc." *Id.* ¶ 20.

2

this agreement "suppressed wages for naval engineers below competitive levels, depriving Plaintiffs and the Class of hundreds of millions of dollars in compensation," *id.* ¶ 1.

### A. The Naval Industry

Plaintiffs' Section 1 conspiracy claim pertains only to that part of the naval industry involved with the design and manufacture of the United States "public fleet," that is, vessels owned or operated by federal and state governments or agencies, which are built domestically, while most commercial vessels are built overseas. *Id.* ¶ 116. The domestic shipbuilding industry generates approximately $30 billion a year, nearly 80% of which is derived from military shipbuilding, maintenance, and repairs, and employs approximately 108,000 workers. *Id.* ¶ 117. Thus, the country's major and minor shipbuilding yards rely predominantly on contracts with the U.S. military. *Id.* ¶ 116. As of 2020, about 10,000 of those workers were employed as naval architects or marine engineers. *Id.* ¶ 121.

"Naval architects" design vessel hulls and are responsible for a vessel's overall stability and performance, while "marine engineers" design onboard systems such as propulsion mechanics, electrical systems, water purification, heating systems, and air conditioning. *Id.* ¶ 122. While personnel within these two categories are employed under various titles, the Complaint refers to all of them as "naval engineers." *Id.* Naval engineers earn a median salary of $100,000, and generally must have a bachelor's degree in engineering and U.S. citizenship; but some roles additionally require either master's degrees, doctoral degrees, other specialized training, or security clearances. *Id.* ¶¶ 123-25. Most of the naval engineers in the United States work for (1) shipbuilders, (2) dedicated engineering consultancies, or (3) the federal government directly. *Id.* ¶¶ 127-31. Naval engineering skills are highly transferable, and consequently, Defendants are "horizontal competitors" in this labor market for the same pool of talent. *Id.* ¶¶ 132-33. According

3

to the Complaint, given that limited pool of talent, together with job characteristics that ordinarily promote job mobility such as at-will employment agreements and the industry's geographic concentration, one would expect a competitive environment in which Defendants would "headhunt" experienced candidates, but they did not do so because of their no-poach conspiracy. *Id.* ¶ 126.

The Complaint further alleges that the nature of the domestic ship-building industry encourages the type of anticompetitive conduct at issue here. In that regard, construction projects in the industry typically require collaborative participation from a plethora of contractors, subcontractors, and firms, *see id.* ¶¶ 119, 129; thus, consultancies and shipbuilders often work together across multiple projects, *id.* ¶ 137. As described in the Complaint:

> This repeat-player dynamic encourages close and cooperative inter-firm relationships that extend to the individual level—so much so that one industry veteran described the various firms as "allied places." It also ensures that competing firms' fates are bound to each other by networks of obligation and favoritism that provide each firm with many opportunities to help friends and punish rivals who are perceived as competing "out of bounds."

*Id.* This environment also produces industry groups, conferences, and other regular events at which competitors are free to "interact privately without any digital record." *Id.* ¶ 138. Moreover, industry executives are geographically concentrated in the Washington, D.C., Northern Virginia, and East Coast areas, which further "facilitated Defendants' no-poach conspiracy." *Id.* ¶¶ 139-40.

**B. The No-Poach Conspiracy**

The Complaint alleges that, though the "origins [of the conspiracy] are obscure," all major industry players had joined in the conspiracy by 2000, *id.* ¶ 160, and the conspiracy has continued despite "sales, spin-offs, reorganizations, and other corporate events during the Class Period" because business units maintained continuity through legacy names, personnel, operating practices, and culture. *Id.* ¶¶ 160-61.

4

In support of Plaintiffs' claim that a conspiracy was formed and continues to this day, the Complaint alleges the statements of a wide range of industry participants:

> Managers with hiring authority repeatedly and independently confirmed the existence of an industry-wide "gentlemen's agreement," using that term, not to actively poach from competitors. Another senior employee conveyed that a company that had broken the rules was "not supposed to do that." Each Engineering Defendant in this action is tied to the conspiracy through the testimony of at least one witness who verified the party's adherence to the industry's no-poach regime.

*Id.* ¶ 142. The Complaint also cites similar statements by several other unnamed witnesses. *See, e.g., id.* ¶¶ 143, 146-48, 150-58. Moreover, Plaintiffs allege that each of the Defendant entities or business units were connected to the conspiracy by at least one witness who either (1) named the individual Defendant as a part of the conspiracy, (2) discussed how the conspiracy related to an individual seeking to change employment in the industry, or (3) acknowledged that the Defendant had a policy or practice of not recruiting competitors' employees. *Id.* ¶ 159.

A main feature of the alleged conspiracy is that the Defendants actively avoided recruiting from other Defendants' naval engineers, except when naval engineers made the initial approach to a Defendant, in which case Defendants could and did hire them. *Id.* ¶ 161. "No Engineering Defendant, much less *all Engineering Defendants*, would arrive at such a combination of practices independently without a mutual understanding that the other Engineering Defendants would restrict themselves to the same policies."[5] *Id.* ¶ 162. Moreover, according to one witness, "[t]here was so much more demand [for employees] than there was talent," *id.* (second alteration in original), and thus, the Complaint alleges, Defendants should have been engaged in a "war for talent in which Defendants offered regular promotions and pay increases, attempted to lure talent

---

[5] The Complaint defines "Engineering Defendants" as "the group of business units operated by Defendants other than Faststream Recruitment Ltd.—i.e., the units that employ or employed naval engineers during the Class Period." *Id.* ¶ 22. The Complaint uses "each Engineering Defendant" to refer to "such functional business unit that exists or existed with an independent identity at the relevant time(s)." *Id.* And the Complaint uses "All Engineering Defendants" to "refe[r] to all such business units that exist or existed with an independent identity at the relevant time(s)." *Id.*

5

away from rivals, and matched offers from competitors trying to do the same," *id.* ¶ 163. "[T]he only explanation for firms' parallel failure to actively recruit from competitors is an unlawful agreement," *id.* ¶ 164, and the following "plus factors" indicate an unlawful conspiracy rather than merely parallel action based on independent decision making:

(1) high barriers to entry;

(2) shared financial incentives to maintain low salaries industry-wide;

(3) shared pressure from government customers to keep costs low;

(4) extensive repeat-player working relationships among competitors, with opportunities for a range of informal punishments that can be used to enforce the unlawful no-poach agreement;

(5) social ties between key personnel, encouraging trust and cooperation among competitors;

(6) opportunities to collude at industry events, social events, and frequent informal meetings among key personnel; and

(7) a culture of secrecy that insulates the industry from rigorous oversight and enables collusion.

*Id.* ¶ 166-75.

Defendants are also alleged to have participated in the conspiracy by sharing sensitive compensation information, both at in-person events, *id.* ¶¶ 178-81, and through third parties such as Faststream, *id.* ¶¶ 182-83. This information sharing scheme "enabled Defendants to confirm that their no-poach agreement was continuing to have its desired effect of suppressing compensation and that their competitors' compensation was not indicative of true competition for labor." *Id.* ¶ 183. Notably, this information was not provided to Defendants' employees. *Id.* ¶ 182.

Plaintiffs also allege several ways in which the Defendants concealed their conspiracy, specifically, that Defendants (1) avoided putting the alleged agreement in writing, *id.* ¶ 205; (2) entered pretextual teaming agreements that contained limited no-hire clauses, *id.* ¶ 206; (3)

6

JA355

represented that they offer "competitive" compensation, *id.* ¶¶ 207-08; (4) made "public and private" representations to "direct attention away" from the alleged conspiracy, such as one Defendant's reference to a "grow our own" workplace development approach, *id.* ¶ 209; (5) represented that they adhere to ethical standards, federal laws, and antitrust laws in particular, *id.* ¶¶ 210-15; (6) represented that they preserve confidential business and employee information, *id.* ¶ 216; and (7) represented that they actively recruit potential employees, *id.* ¶ 217.

## II. LEGAL STANDARD

Under Rule 12(b)(6), "a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted." *Adams v. NaphCare, Inc.*, 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). In addressing a Rule 12(b)(6) motion, a court must assume the truth of all facts alleged in the complaint and construe the factual allegations in favor of the plaintiff. *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009). However, to survive a motion to dismiss, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotation marks and citations omitted). Dismissal of a complaint is appropriate when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). While the well-pleaded facts within a complaint are considered by the Court to be true, legal conclusions are not afforded the same presumption. *Id.* at 678. Further, the Court may consider the assertion of the statute of limitations as an affirmative defense pursuant to Federal Rule of Civil Procedure 12(b)(6) "if the time bar is apparent on the face of the complaint." *Dean*

7

*v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005); *see also Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (noting that it is appropriate to rule on an affirmative statute of limitations defense "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint").

## III. ANALYSIS

In the Joint Motion, Defendants seek dismissal based on the statute of limitations.[6] [Doc. No 178-1] at 10; *see* 15 U.S.C. § 15b. As alleged in the Complaint, the Plaintiffs' employment and participation in the relevant market ended no later than 2004 (as to D'Armiento) and 2013 (as to Scharpf). [Doc. No. 1] ¶¶ 19-20. The expiration of the Sherman Act's applicable four-year statute of limitations as to both Plaintiffs, without any tolling, is therefore clear from the face of the Complaint. Plaintiffs contend, however, and the Defendants dispute, that the Complaint sufficiently alleges fraudulent concealment to toll the statute of limitations.[7]

### A. Fraudulent Concealment in the Fourth Circuit

To plead fraudulent concealment, Plaintiffs must sufficiently allege that "(1) the [Defendants] fraudulently concealed facts which are the basis of a claim, and that (2) the [Plaintiffs] failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987). Although the circumstances constituting fraudulent concealment, as with all allegations of

---

[6] Defendants also seek dismissal for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Given the Court's dismissal based on the applicable limitations period, the Court will not rule on this asserted alternative ground for dismissal.

[7] While the Complaint also raises the continuing violation doctrine to toll the statute of limitations, *see Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997), it does so in reference to the interests of potential class members, *see* [Doc. No. 1] at ¶ 202; and Plaintiffs concede that the doctrine does not relate to acts prior to the last four years. [Doc. No. 202] at 42. Therefore, it appears to be undisputed that the named Plaintiffs do not allege that the continuing violation doctrine applies to their individual claims. As such, "[Plaintiffs'] only hope is to invoke fraudulent concealment doctrine to start the limitations period later than [four years prior to the instatement of the action]; if this argument fails, there is no need to reach the others." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 177 (4th Cir. 2007).

8

fraud, must be pleaded with particularity, *see* Fed. R. Civ. P. 9(b), the Fourth Circuit has recognized that, "[i]n cases involving alleged fraud by omission or concealment, it is well-nigh impossible for plaintiffs to plead all the necessary facts with particularity, given that those facts will often be in the sole possession of the defendant." *Corder v. Antero Res. Corp.*, 57 F.4th 384, 402 (4th Cir. 2023). Accordingly, "plaintiffs may partly rely on information and belief without running afoul of Rule 9(b)" as long as they "state the factual allegations that make their belief plausible." *Id.* However, "this relaxed standard 'does not *eliminate* the particularity requirement.'" *Id.* (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987)).

In a series of cases, the Fourth Circuit has discussed the sufficiency of factual allegations for the purpose of tolling based on fraudulent concealment. In *Pocahontas*, the plaintiff sued various coal-mining companies after the statute of limitations had expired for, as is relevant here, price-fixing under the Sherman Act.[8] *Id.* In an effort to avoid dismissal of the action as untimely, the plaintiff argued that the defendants had "employed techniques of secrecy" to conceal the conspiracy. In support of that claim, plaintiffs pointed to the defendants' response when asked why the price for delivered coal was so low and why the defendants refused to accept certain deliveries of coal; that is, rather than admit the conspiracy, the defendants lied. *Id.* at 218; *see Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 123 (4th Cir. 1995) (discussing *Pocahontas*). Explaining that "[i]t can hardly be imagined that illegal activities would ever be so gratuitously revealed," *Pocahontas*, 828 F.2d at 219, the Fourth Circuit dismissed as "sophistry" the plaintiff's argument that such a "failure to own up to illegal conduct" in response to a "timid inquiry" was enough to toll the statute of limitations. *Id.* at 218–19.

---

[8] The plaintiff theorized that the defendants had conspired to monopolize the metallurgical coal trade in certain West Virginia counties, thereby eliminating the plaintiff (a competing contract coal miner) from the market. 828 F.2d at 215.

9

In *Marlinton*, the Fourth Circuit formalized its approach to fraudulent concealment. There, food store plaintiffs alleged that several large dairy defendants had concealed their conspiracy to fix milk prices. 71 F.3d 121. The Fourth Circuit rejected the "separate and apart" standard, which "consider[s] only those acts of concealment completed *subsequent in time* to the wrong," *id.* at 125 (quoting *Texas v. Allan Construction Co.*, 851 F.2d 1526, 1532 (5th Cir. 1988)), and held that the proper standard for such claims is the "intermediate, affirmative acts" standard, which requires plaintiffs to provide evidence of affirmative acts of the defendants' concealment but allows for the consideration of conduct both before and after the completion of the conduct constituting the offense.[9] 71 F.3d at 125.

In *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278 (4th Cir. 2012), *aff'g sub nom. Boland v. Consolidated Multiple Listing Service, Inc.*, 868 F. Supp. 2d 506 (D. S.C. 2011), the plaintiffs alleged a conspiracy between several defendants to restrain competition and raise prices for real estate services. *Boland*, 868 F. Supp. 2d at 509. The plaintiffs argued that they had adequately pleaded fraudulent concealment by alleging "acts of concealment such as meeting secretly, giving pretextual reasons for the costs of real estate services, and agreeing at meetings" to not discuss the conspiracy publicly. *Id.* at 517–18. The district court rejected these allegations as insufficient under Rule 9(b), finding, as the Fourth Circuit did in *Pocahontas*, that such allegations "amount to no more than a failure to admit wrongdoing, which does not suffice." *Id.* at

---

[9] *Marlinton* also suggested that *Pocahontas* did not exclude the possibility of a third, "self-concealing" standard, which would permit a plaintiff to satisfy the "affirmative acts" element of fraudulent concealment simply by demonstrating that the underlying antitrust violation was inherently deceptive. *Id.* at 123 n.1. Ultimately, the Fourth Circuit held that the "intermediate, affirmative acts" standard was applicable because "[a]lthough [price-fixing] is generally secretive, it need not be so." *Id.* A later decision clarified that "[t]he self-concealing standard is only proper when deception or concealment is a necessary element of the antitrust violation." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 541 n.24 (4th Cir. 1997). As far as the Court could determine, no court in this circuit has applied the "self-concealing" standard; in any event, Plaintiffs and Defendants appear to agree that the intermediate, affirmative acts standard applies here. *See* [Doc. No. 1] ¶ 204-26; [Doc. No. 178-1] at 13–19.

10

518. On appeal, the Fourth Circuit specifically affirmed the district court's conclusion on this issue. *Robertson*, 679 F.3d at 291 n.2 (citing *Pocahontas*, 828 F.2d at 218–19).

Finally, in *Edmonson v. Eagle National Bank*, 922 F.3d 535, 553 (4th Cir. 2019), the Fourth Circuit applied *Marlinton*'s "intermediate, affirmative acts" standard to allegations that the defendants had employed "trick[s] or contrivance[s]" to conceal a kickback scheme prohibited by the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* The Fourth Circuit found that the plaintiffs had sufficiently pleaded affirmative acts constituting a fraudulent concealment of their scheme when they alleged with sufficient particularity under Rule 9(b) that the defendants (1) "created and used 'sham' entities to channel the allegedly unlawful cash kickbacks"; (2) entered sham, "back-dated" agreements to conceal the scheme from investigators; and (3) omitted reporting the kickback payments on plaintiffs' settlement statements, "notwithstanding that governing regulations *required* reporting such payments." *Id.* at 553–54.

### B. Plaintiffs' Allegations Do Not Sufficiently Plead Affirmative Acts of Concealment

Relying on the Fourth Circuit's pronouncements regarding the fraudulent concealment doctrine in *Edmonson* and *Marlinton*, and the relaxed pleading standard for fraud under Rule 9(b) as set out by *Corder*, Plaintiffs point to the following categories of allegations in their Complaint that reflect how the Defendants affirmatively concealed their "no-poach" conspiracy:

(1) Defendants agreed to keep the alleged agreement secret, *see, e.g.*, [Doc. No. 1] ¶ 205 (alleging Defendants avoided putting the alleged agreement in writing);

(2) Defendants made general public and non-public representations that they offer "competitive" compensation and actively recruit employees, *see, e.g.*, *id.* ¶¶ 207-09 (alleging Defendants represented that they offer "competitive" compensation); *id.* ¶ 217 (alleging Defendants represented that they actively recruit potential employees);

(3) Defendants made general statements that they comply with antitrust laws and are essentially law-abiding and ethical, *see, e.g.*, *id.* ¶¶ 207-17 (alleging Defendants failed to admit illegal conduct in web pages, published reports, and codes of

conduct); *id.* ¶¶ 210-15 (alleging Defendants represented that they adhere to ethical standards, federal laws, and antitrust laws in particular); *id.* ¶ 216 (alleging Defendants represented that they preserve confidential business and employee information); and

(4) Defendants included non-solicitation clauses in teaming agreements as "cover" for the unlawful no-poach scheme, *see, e.g., id.* ¶ 206.

The holdings and pronouncements in *Pocahontas*, *Marlinton*, *Boland* and *Robertson*, and *Edmonson* require a rejection of all four of these categories of allegations as insufficient to plead fraudulent concealment at the motion to dismiss stage.

In *Boland* and *Robertson*, the district court and the Fourth Circuit rejected as insufficient to toll the statute of limitations plaintiffs' allegations that defendants (1) met secretly, (2) gave pretextual reasons for real estate costs, and (3) agreed to keep secret the nature of their communications to conceal their illegal agreement. *See Boland*, 868 F. Supp. 2d at 518; *Robertson*, 679 F.3d at 291 n.2. The allegations here that Defendants agreed to keep the conspiracy secret ( category one) fare no better than those in *Boland* and *Robertson*; and while Plaintiffs here allege certain "pretextual reasons" and public misrepresentations ( categories two and three) with more specificity than the plaintiffs in *Boland* and *Robertson*, these allegations are, in substance, claims that Defendants lied and "fail[ed] to own up to illegal conduct." *See Pocahontas*, 828 F.2d at 218. In fact, these statements have even less connection to the alleged conspiracy than the allegations in *Pocahontas* regarding the defendants' purportedly false responses to the plaintiff's inquiry. *See id.* As the Fourth Circuit explained in *Marlinton*, it is not enough to allege that "the defendants ... lied" upon "general inquiry." *Marlinton*, 71 F.3d at 123. Here, the allegations are that Defendants simply failed to admit or disclose their conspiracy without *any* inquiry of them at all. As such, the allegations are insufficient to plead affirmative acts of concealment.

12

Plaintiffs attempt to distinguish *Boland* by pointing to an allegation in the underlying complaint that the defendants had agreed "to develop, implement, enact, and facilitate the enforcement of unlawful CMLS Rules, regulations, by-laws, policies, and procedures." *See Boland*, 868 F.Supp.2d at 513. Plaintiffs argue that the Fourth Circuit's affirmance of the district court's statute of limitations ruling was therefore based on the district court's recognition that the challenged agreements were not *affirmatively* concealed, but rather were "memorialized," "adopted in non-public meetings," and simply "not publicized." [Doc. No. 202] at 32–33. In other words, the challenged agreements were presumably discoverable, while the "gentlemen's agreement" here was unwritten, concealed and therefore undiscoverable. *See id.* at 33.

This argument falls short. First, rather than relying on the memorialized nature of the challenged agreements for its rejection of any tolling, as Plaintiffs suggest, the district court in *Boland* focused on whether the plaintiffs' allegations that the defendants "used means and methods designed to avoid detection" sufficiently alleged affirmative acts of concealment and concluded that they did not.[10] *Boland*, 868 F. Supp. 2d at 518. Second, to the extent that Plaintiffs argue that the decision to participate in a secret conspiracy is *itself* an affirmative act, *see* [Doc. No. 1] ¶ 204 (asserting as an affirmative act that "Defendants had established an 'unwritten rule' that no one Defendant would affirmatively recruit the other's naval engineers"), the Fourth Circuit in *Marlinton* explained that antitrust violations that are not "inherently deceptive" are subject to the "intermediate, affirmative acts" standard, not the "self-concealing" standard. *Marlinton*, 71 F.3d at 123 n.1. As this Court has explained, the "self-concealing" standard does not apply here, nor do

---

[10] Similarly problematic is Plaintiffs' apparent reliance, *see* [Doc. No. 202] at 33, on *Robertson*'s recognition that the "concerted conduct" in that case was "both plainly documented and readily available so that plaintiffs can describe the factual content of the agreement without the benefit of extended discovery." *Robertson*, 679 F.3d at 290. But that aspect of the decision related to whether the plaintiffs had pleaded facts sufficient to establish the *conspiracy itself*. *See id.* at 288 (holding that "the complaints satisfied the pleading requirements set forth in *Twombly*"). Here, by contrast, the question is whether Plaintiffs point to *affirmative acts* that concealed facts that are the basis of their claim.

Plaintiffs contend that it does, *see supra* note 9, and they therefore may not succeed on their claim that, by the creation of and participation in a secret conspiracy, the Defendants committed an act of concealment that tolls the statute of limitations. At bottom, the first three categories of allegations are simply alleged failures to admit wrongdoing, and as such, are insufficient to plead affirmative acts under Rule 9(b).

Plaintiffs are therefore left with their argument that the no-hire clauses in the teaming agreements are "sham provisions" that constitute affirmative acts of concealment. *See* [Doc. No. 1] ¶ 206. In that regard, Plaintiffs contend that the no-hire clauses are "shams" because they are "duplicative"; that is, they "occlude the conspiracy by presenting an explanation for the industry's lack of recruitment in which the teaming agreement tail wags the no-poach dog."[11] [Doc. No. 202] at 35.

Plaintiffs' no-poach dog won't hunt. In *Edmonson*, the underlying complaints alleged that the "sham" business entities were used "for the *sole* purpose of receiving the [kickback] payments," and that those payments were further disguised by "sham" agreements that set a fee schedule that was not followed when payments were made, and under which the referring brokers performed no services. *Edmonson*, 922 F.3d at 542 (emphasis added). But the no-hire clauses alleged here have none of the features of the "sham" entities and instruments in *Edmonson*. *See Sham*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A false pretense or fraudulent show; an imposture. 2. Something that is not what it seems; a counterfeit."). Indeed, these no-hire clauses—whose lawfulness Plaintiffs do not challenge—plainly serve the presumably valid purpose of

---

[11] Plaintiffs also allege that the no-hire clauses "misled Plaintiffs" by "creat[ing] the false impression that workers could be solicited and recruited by rivals who were *not* working on their projects." [Doc. No. 1] ¶¶ 206, 13. But the Complaint does not allege *which* Defendants entered the teaming agreements containing these no-hire clauses, or that the Plaintiffs were even aware of such agreements when working for certain Defendants between 2002 and 2013. *See* [Doc. No. 1] ¶¶ 19-20. In short, there are no allegations as to how the Plaintiffs were misled, and their conclusory claim thus fails to "state the factual allegations that make their belief plausible." *Corder*, 57 F.4th at 402.

prohibiting solicitation for the duration of a teaming agreement. *See* [Doc. No. 1] ¶ 13 ("These written teaming agreements were used to cover up the Defendants' unlawful 'gentlemen's agreement' with more credibly defensible project-based limitations."). Perhaps more importantly, there is no allegation that these Plaintiffs were "diverted away" from litigation by, or were even aware of, these provisions.[12]

For these reasons, Plaintiffs have not pleaded facts sufficient to satisfy the affirmative acts element of the Fourth Circuit's fraudulent concealment doctrine, and the Complaint therefore fails to allege facts sufficient to toll the expiration of the applicable statute of limitations apparent on the face of the Complaint.[13]

## IV. CONCLUSION

Accordingly, for the above reasons, it is hereby

**ORDERED** that the Joint Motion to Dismiss, [Doc. No. 178], be, and the same hereby is, **GRANTED**; and this action is dismissed as time-barred under the applicable statute of limitations; and it is further

**ORDERED** that the Individual Motions, [Doc. Nos. 180, 181, 184, 187, 189, 191, 193], be, and the same hereby are, **DENIED** as moot; and it is further

**ORDERED** that the Motion for Preliminary Approval of Settlement, [Doc. No. 219], be, and the same hereby is, **DENIED** as moot.

---

[12] Plaintiffs take the position, itself unsupported, that "reliance [on affirmative acts] is not required for this element of fraudulent concealment." *See* [Doc. No. 202] at 36. But a plaintiff's exposure to an affirmative act and its misleading effect is a core aspect of this element of the test that certainly has some aspect of exposure and reliance built into it. *See, e.g.*, *Edmonson*, 922 F.3d at 549 (noting that the fraudulent concealment doctrine applies "where the defendant has wrongfully deceived or misled *the plaintiff*") (emphasis added) (quoting *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987)).

[13] Because the Court holds that the Plaintiffs have failed to plead facts sufficient to support the affirmative acts element, the Court does not reach the due diligence element.

15

JA364

The Clerk is directed to send a copy of this Order to counsel of record and enter judgment in accordance with this Order pursuant to Fed. R. Civ. P. 58.

April 19, 2024
Alexandria, Virginia

/s/
Anthony J. Trenga
Senior United States District Judge

16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| Susan Scharpf, et al.,<br>*on behalf of herself and all other similarly<br>situated*,<br><br>        Plaintiffs,<br><br>v.<br><br><br>General Dynamics Corp, et al.<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br>Civil Action No. 1:23-cv-1372-AJT-WEF |

**<u>JUDGMENT</u>**

Pursuant to the order of this Court entered on April 19th, 2024, and in accordance with

Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the defendants

Bath Iron Works Corp., Bollinger Shipyards, LLC, CACI International Inc., Electric Boat Corp.,

General Dynamics Corp., General Dynamics Information Technology, Inc., Gibbs & Cox, Inc.,

HII Fleet Support Group LLC, HII Mission Technologies Corp., Huntington Ingalls Industries,

Inc., Ingalls Shipbuilding, Inc., Marinette Marine Corporation, Newport News Shipbuilding and

Dry Dock Co., Serco, Inc., The Columbia Group, Inc., Thor Solutions, LLC, Tridentis, LLC,

BMT International , Inc. and Technology Financing, Inc., and against the plaintiffs Susan

Scharpf, *on behalf of herself and all others similarly situated*, and Anthony D'Armiento, *on*

*behalf of himself and all others similarly situated.*

FERNANDO GALINDO, CLERK OF COURT

By:_____/s/_____
        D. Estevez, Deputy Clerk

Dated: 4/19/2024
Alexandria, Virginia

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SUSAN SCHARPF and ANTHONY D'ARMIENTO, on behalf of themselves and all others similarly situated,<br><br>                      Plaintiffs,<br><br>v.<br><br>GENERAL DYNAMICS CORP., et al.,<br><br>                      Defendants. | Case No. 1:23-cv-01372-AJT-WEF |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiffs Susan Scharpf and Anthony D'Armiento (individually and on behalf of the Proposed Class) hereby appeal to the United States Court of Appeals for the Fourth Circuit from the April 19, 2024, memorandum opinion and order (ECF # 224) and final judgment (ECF # 225), which dismissed the action as time-barred under the applicable statute of limitations.

DATED: May 20, 2024               Respectfully submitted,

                                       <u>/s/ *Steven J. Toll*</u>
                                       STEVEN J. TOLL
                                       (Va. Bar No. 15300)

                                       Brent W. Johnson (admitted *pro hac vice*)
                                       Robert W. Cobbs (admitted *pro hac vice*)
                                       Alison S. Deich (Va. Bar No. 87452)
                                       Zachary R. Glubiak (Va. Bar No. 93984)

**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
stoll@cohenmilstein.com
bjohnson@cohenmilstein.com
rcobbs@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com

Shana E. Scarlett (admitted *pro hac vice*)
Rio S. Pierce (admitted *pro hac vice*)
**HAGENS BERMAN
SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (admitted *pro hac vice*)
**HAGENS BERMAN
SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (admitted *pro hac vice*)
**HAGENS BERMAN
SOBOL SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

George F. Farah (admitted *pro hac vice*)
Nicholas Jackson (admitted *pro hac vice*)
**HANDLEY FARAH & ANDERSON
PLLC**
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
njackson@hfajustice.com

2

Simon Wiener (admitted *pro hac vice*)
**HANDLEY FARAH & ANDERSON PLLC**
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567
swiener@hfajustice.com

*Counsel for Plaintiffs and the Proposed Class*

Candice J. Enders (admitted *pro hac vice*)
Julia R. McGrath (admitted *pro hac vice*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark (admitted *pro hac vice*)
Stephen J. Teti (admitted *pro hac vice*)
Arielle S. Wagner (admitted *pro hac vice*)
Eura Chang (admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
sjteti@locklaw.com
aswagner@locklaw.com
echang@locklaw.com

*Additional Counsel for Plaintiffs and the Proposed Class*

3

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Steven J. Toll*
Steven J. Toll